IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA CEIVED
NORTHERN DIVISION

2001 SEP -7 P 4: 39

Curves International, Inc.,

        Plaintiff,

vs.

Linda S. Mosbarger,

        Defendant.

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

Case Action No. 2:07-CV-807- MHt

## APPENDIX OF CASES

    Plaintiff submits the following appendix of cases in support of its motion for preliminary injunction:

Tab 1      *Domino's Pizza, Inc. v. El-Tan, Inc.*, Bus. Franchise Guide (CCH) ¶ 10,676, (N.D. Okla. Apr. 28, 1995)

Tab 2      *Giampapa v. Carvel Corp.*, Bus. Franchise Guide (CCH) ¶ 11,442, (D.N.J. June 18, 1998)

Tab 3      *Dunkin' Donuts v. Shivem, Inc.*, Bus. Franchise Guide (CCH) ¶ 10,681, (D. N.J. May 4, 1995)

Tab 4      *ServicemasterResidential/Commercial Services, L.P. v. Westchester Cleaning Services Inc.*, Bus. Franchise Guide (CCH) ¶ 12,073 (S.D.N.Y. 2001)

Tab 5      *Rita's Water Ice Franchise Corp. v. DBI Investment Corp.*, Bus. Franchise Guide (CCH) ¶ 10,918 (E.D. Pa. 1996)

Tab 6      *Sparks Tune Up Centers, Inc. v. Gary White*, Bus. Franchise Guide (CCH) ¶ 10,941 (E.D. Pa. 1989)

Tab 7      *Specialty Bakeries, Inc. v. City Bagels, Inc.*, Bus. Franchise Guide (CCH) ¶ 10,648 (E.D. Pa. 1995)

Tab 8      *Diet Center, Inc. v. Virginia Mary Day*, Bus. Franchise Guide (CCH) ¶ 9651 (D. Mass. 1990)

Tab 9        *ATL Int'l, Inc. v. Baradar,* Bus. Franchise Guide (CCH) ¶ 11,345 (D. Ma. 1997)

Tab 10       *ServiceMaster Residential/Commercial Services, L.P. v. Proctor,* Bus. Franchise
             Guide (CCH) ¶ 12,251 (D. Neb. 2001)

Dated:  September 7, 2007                    Respectfully Submitted,

                                             GRAY, PLANT, MOOTY, MOOTY &
                                              BENNETT, P.A.
                                             Michael R. Gray (175602)
                                             Jason J. Stover (30573X)
                                             500 IDS Center, 80 South Eighth Street
                                             Minneapolis, Minnesota  55402
                                             Telephone:  (612) 632-3000
                                             Facsimile: (612) 632-4444
                                             mike.gray@gpmlaw.com
                                             jason.stover@gpmlaw.com

                                             Of Counsel

                                             William D. Jones III  (asb-3120-e57w)
                                             Joseph W. Carlisle  (asb-1197-e68c)
                                             JOHNSTON BARTON PROCTOR & ROSE LLP
                                             Colonial Brookwood Center
                                             569 Brookwood Village, Suite 901
                                             Birmingham, Alabama  35209
                                             Phone: (205) 458-9400
                                             Fax:    (205) 458-9500
                                             wdj@johnstonbarton.com
                                             jwc@johnstonbarton.com

                                             **Attorneys for Plaintiff**

**CERTIFICATE OF SERVICE**

I hereby certify that I have filed the above and foregoing *Appendix of Cases* with the Clerk of the Court, and served Certified U.S. Mail/Return Receipt Requested, with proper postage affixed, a true and correct copy of the foregoing on the Defendant at the following address:

> Linda S. Mosberger
> 750 Shields Road
> Deatsville, AL 36022

this 7th day of September, 2007.


Of Counsel

GP:2258560 v1/W0615855.DOC



PLAINTIFF'S EXHIBIT
1

**US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶10,676, Domino's Pizza, Inc. v. El-Tan, Inc., Michael A. Ellis, Danny Tan Sheau Yang, Owasso Pizza, Inc., and Wayne Salisbury; Domino's Pizza, Inc. v. B.A. Enterprises, Inc., Lewis Wayne Humbyrd, Ronald Predl, and Jerry Evans; Domino's Pizza, Inc. v. Elvieanna Lynne Potts. (Filed April 28, 1995)**

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**Domino's Pizza, Inc. v. El-Tan, Inc., Michael A. Ellis, Danny Tan Sheau Yang, Owasso Pizza, Inc., and Wayne Salisbury; Domino's Pizza, Inc. v. B.A. Enterprises, Inc., Lewis Wayne Humbyrd, Ronald Predl, and Jerry Evans; Domino's Pizza, Inc. v. Elvieanna Lynne Potts.**

U.S. District Court, Northern District of Oklahoma. Case Nos. 95-C-180-B, 95-C-181-B, and 95-C-182-BU. Filed April 28, 1995.

**Agreements Not to Compete --Enforceability --Sale of Goodwill --Reasonableness. --**

A covenant not to compete contained in a pizza franchise agreement was valid and enforceable against the terminated franchisee under Oklahoma law, since the covenant was ancillary to a sale of good will (i.e. the franchise agreement). Even if the franchise agreement could not be considered the sale of goodwill, however, the covenant would be enforceable as a reasonable restriction on the exercise of a lawful profession. The covenant only restricted the franchisee from offering carry-out and delivery services for one year in a ten-mile radius from the franchise site.

**Back reference: ¶845.**

**Preliminary Relief --Enforcement of Noncompetition Agreement --Likelihood of Success --Irreparable Harm --Balance of Harm --Public Interest. --**

A terminated pizza franchisee was preliminarily enjoined from operating in violation of the franchise agreement's covenant not to compete. The franchisor was likely to succeed on the merits of its claim that the noncompetition covenant was enforceable and would suffer irreparable harm if the covenant were not enforced due to its inability to attract new franchisees in the area and the likelihood of customer confusion. Furthermore, the balance of harm favored the franchisor because the covenant was restricted to carry-out and delivery services and any injury to the franchisee was mitigated by the franchisor's posting of a bond. The issuance of preliminary injunction would not be adverse to the public interest.

**Back reference: ¶845.**

**[Opinion in full text]**

***FINDINGS OF FACT AND CONCLUSIONS OF LAW***

BRETT, D.J.: The Court has for consideration the motion for a preliminary injunction (Docket #3), pursuant to Fed.R.Civ.P. 65, filed by Plaintiff Domino's Pizza ("Domino's"). Domino's seeks to prevent Defendants, who are former Domino's franchisees, from operating a pizza carry-out and delivery business at the sites of their former Domino's stores, pursuant to a covenant not to compete included in the franchise agreements. Domino's also seeks assumption of leases on the former Domino's sites, and to prevent Defendants from keeping and using all confidential customer information, also in accordance with provisions in the four written franchise agreements. Defendants currently are operating "All-Star Pizza" stores, which include pizza carry-out and delivery services, at the sites of their former Domino's franchises. A hearing was held on this motion March 28, 29 and April 3, 1995. After considering the pleadings and issues presented, the relevant evidence and the arguments of counsel, the Court enters the following Findings of Fact and Conclusions of Law:

***FINDINGS OF FACT***

1. Plaintiff Domino's Pizza is a Michigan corporation with its principal place of business in Michigan. Domino's is authorized to transact business in Oklahoma and did so at the relevant times herein.

2. Defendants El-Tan, Inc., B.A. Enterprises, Inc., and Owasso Pizza, Inc., are Oklahoma corporations with their principal places of business in Oklahoma. Defendants Elvieanna Lynne Potts, Michael A. Ellis, Danny Tan Sheau Yang, Wayne Salisbury, Lewis W. Humbyrd, Ronald Predl and Jerry Evans are citizens of Oklahoma.

3. Domino's owns, uses, promotes and licenses certain trademarks, service marks and commercial symbols ("Domino's Marks").

4. Domino's operates and licenses persons to operate retail pizza carry-out and delivery services using Domino's Marks. These Domino's stores utilize a uniform business format, using special equipment and specifications for the preparation and sale of pizza and other authorized food and beverage products.

5. Defendant-Franchisees El-Tan (Sand Springs, Oklahoma), B.A. Enterprises (Broken Arrow, Oklahoma), Owasso Pizza (Owasso, Oklahoma), and Potts (Claremore, Oklahoma), operated four Domino's pizza stores in cities near Tulsa under written franchise agreements with Domino's (Plaintiff's Exhibits 1A, 2A, 3 and 4). Defendant-Guarantors Ellis (Owasso and Sand Springs), Yang (Sand Springs), Salisbury (Owasso), Humbyrd (Broken Arrow), Predl (Broken Arrow) and Evans (Broken Arrow) guaranteed payment and performance of the respective franchise contracts.

6. The franchise agreements allowed the Defendants the exclusive use of Domino's Marks within their respective territories.

7. The franchise agreements constitute a sale of Domino's goodwill for the duration of the franchise agreements. Domino's has accrued goodwill over its history of operating approximately 5,000 pizza carry-out and delivery stores worldwide (franchise or company-owned) and carrying on multimillion-dollar advertising campaigns annually.

8. Domino's provides a profit-sharing plan whereby franchisees who sign up for the program received a rebate on food and other products purchased from Domino's (Plaintiff's Exhibits 18, 21).

9. Defendants did not sign up for the profit-sharing plan.

10. On February 27, 1995, the Defendants, of their own volition, changed the names of their respective stores from "Domino's" to "All-Star Pizza" and continued operation at the sites of their Domino's franchises. [1]

11. The franchise agreements were terminated by Domino's via hand-delivery of written notice to the respective Defendants on February 27, 1995, for good cause under the franchise agreements.

12. The franchise agreements provide covenants not to compete and a lease assignment clause that go into effect upon termination of the franchise.

13. Three of the covenants not to compete –in the franchise agreements of the Owasso Defendants, [2] the Sand Springs Defendants [3] and Defendant Potts –state:

You agree that, for a period of one (1) year after termination or expiration of this Agreement ... you will not, directly or indirectly for the benefit of you or your owners, or through or on behalf of or in conjunction with any other person, partnership or corporation, own, engage in, be employed by, advise, assist, invest in, franchise, make loans to, or have any other interest, whether financial or otherwise, *in any carry-out or delivery pizza store business* located at the premises of the Store or within ten (10) miles of the premises of the Store (except for other Domino's Pizza Stores operated under franchise agreements with us or other Domino's Pizza Stores in which you or your owners shall have an ownership interest) ... [emphasis supplied].

14. The covenant in the Broken Arrow franchise agreement [4] is essentially the same, except that the covenant does not go into effect if the franchisee terminates for cause. [5]

15. The franchise agreements also require Defendants to return all copies of the Domino's Operating Manual, all written customer lists and other proprietary information.

16. The Court issued a Temporary Restraining Order on February 28, 1995, with concurrence of the parties, requiring Defendants to remove all Domino's Marks from the store premises, and to transfer to Domino's all telephone numbers listed under Domino's names, trademarks and commercial symbols.

17. Domino's posted a bond in the amount of $100,000 on March 3, 1995, in accordance with the Court's Order of February 28, 1995.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and the parties herein. 28 U.S.C. §1332.

2. Venue is proper under 28 U.S.C. §1391.

3. Any Finding of Fact above which might be properly characterized a Conclusion of Law is included herein.

4. The party seeking a preliminary injunction must show: (1) a substantial likelihood of prevailing on the merits; (2) irreparable harm in the absence of the injunction; (3) proof that the threatened harm outweighs any damage the injunction may cause to the party opposing it; and (4) that the injunction, if issued, will not be adverse to the public interest. *Kansas Health Care v. Kansas Department of Social & Rehabilitation Services,* 31 F.3d 1536, 1542 (10th Cir. 1994).

5. When the movant prevails on the other factors, the Tenth Circuit Court of Appeals applies a modified version of the "success on the merits" prong. "It will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Koerpel v. Heckler,* 797 F.2d 858, 866 (10th Cir. 1986), *citing Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir. 1981).

6. Contracts in restraint of trade are void and unenforceable in Oklahoma unless they fall within one of two statutorily created exceptions: the sale of goodwill, or dissolution of a partnership. *See* 15 O.S. §217-19; *Bayly, Martin & Fay v. Pickard,* 780 P.2d 1168 (Okla. 1989).

7. "Goodwill" has been defined in Oklahoma as "the custom or patronage of any established trade or business; the benefit or advantage of having established a business and secured its patronage by the public." *Freeling v. Wood,* 361 P.2d 1061, 1063 (Okla. 1961), *citing* Black's Law Dictionary, Third Edition. The *Freeling* court further stated that the goodwill of a business "is the value that results from the probability that old customers will continue to trade with an established concern." *Id.*

8. Oklahoma courts have not considered whether 15 O.S. §218 applies to franchise agreements. [6] There is a split of authority in other jurisdictions as to whether franchise agreements are indeed a sale of goodwill.

9. There is a substantial likelihood that Oklahoma courts would follow the majority of courts in holding that covenants not to compete in franchise agreements are valid under §218. [7] See Novus Franchising, Inc. v. Taylor, 795 F.Supp. 122, 129 (M.D.Pa. 1992).

10. Under the record here, the Court holds that the covenant not to compete is likely to be held valid under §218.

11. If, however, the covenant would not be considered as ancillary to a sale of goodwill, the Court believes the covenant would be valid under 15 O.S. §217, which holds that reasonable restrictions on the exercise of a lawful

profession are enforceable in Oklahoma. *Bayly, Martin & Fay,* 780 P.2d at 1170.

12. The covenant, which is restricted to a 10-mile radius from the franchise site, a one-year duration, and to prohibiting pizza carry-out and delivery services only, is a reasonable restriction.

13. The Court concludes that Domino's has met the Tenth Circuit's modified version of the "success on the merits" prong: it has raised substantial questions as to the validity of the covenant not to compete, which indicate that this issue is a "fair ground for litigation."

14. Without injunctive relief, Domino's would suffer irreparable harm due to its inability to attract new franchisees to the area now serviced by All-Star Pizza. Further, there is a substantial likelihood of confusion among customers because the Defendants are operating pizza carry-out and delivery stores at the same location as the former Domino's franchises. *See Economou v. Physicians Weight Loss Centers,* 756 F.Supp. 1024, 1039 (N.D.Ohio 1991) ("[T]he purpose of the covenants is to protect against loss of control of reputation, loss of good will and consumer confusion. In general, the courts have held theses are sufficient grounds for a finding of irreparable injury.").

15. Defendants' claim of irreparable harm has been mitigated by the bond posted by Domino's; further, the covenant does not prevent Defendants from serving other types of food, or even dine-in pizza. Therefore, the balance of harm favors Domino's.

16. Issuing a preliminary injunction in this case will not be adverse to the public interest.

17. Under Fed.R.Civ.P. 65(a)(2), "evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record of the trial and need not be repeated upon the trial."

19. [ *sic* ] Domino's Motion for a Preliminary Injunction is hereby granted as provided in the Preliminary Injunction filed contemporaneously herewith.

20. The parties will adhere to the following trial schedule:

June 2, 1995 –EXCHANGE THE NAMES AND ADDRESSES OF ALL WITNESSES, INCLUDING EXPERTS, IN WRITING, ALONG WITH A BRIEF STATEMENT REGARDING EACH WITNESS' EXPECTED TESTIMONY (UNNECESSARY IF WITNESS' DEPOSITION TAKEN);

June 16, 1995 –COMPLETE ALL DISCOVERY;

July 7, 1995 –FILE AN AGREED PRETRIAL ORDER AND EXCHANGE ALL PRENUMBERED EXHIBITS;

July 7, 1995 –PRETRIAL CONFERENCE AT 2 P.M.;

August 14, 1995 –FILE SUGGESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ANY TRIAL BRIEFS.

[1] Their expressed reason for doing so was that, in operating under the subject Domino's franchise agreements, their expenses were exceeding income.

[2] Owasso Pizza, Inc., Michael A. Ellis and Wayne Salisbury.

[3] El-Tan, Inc., Michael A. Ellis and Danny Tan Sheau Yang.

[4] This franchise agreement involves Defendants B.A. Enterprises, Inc., Lewis Wayne Humbyrd, Ronald Predl and Jerry Evans.

[5] To terminate for cause, the franchisee must provide to Domino's a written 30-day notice of any breaches of the franchise agreement, and an opportunity to cure. The franchisee further must provide a 10-day notice to

terminate.

[6] The parties agreed at the preliminary injunction hearing that, should §218 apply in this case, the territorial restriction therein is not violated by the covenant not to compete.

[7] California courts hold that covenants not to compete in franchise agreements are not ancillary to a sale of goodwill. *Scott v. Snelling and Snelling,* 732 F.Supp. 1034, 1041. (N.D.Cal. 1990). However, the *Scott* case applied California law; both California and Oklahoma courts have noted the split between California and Oklahoma law on applying the "rule of reason" to covenants restraining competition. *See Bayly, Martin & Fay,* 780 P.2d at 1171, n.9; *Scott,* 732 F.Supp. at n.11. Because of this split, the Court does not consider *Scott* –cited by Defendants –to be persuasive when considering covenants not to compete under Oklahoma law.

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

PLAINTIFF'S
EXHIBIT
2

**US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶11,442, Joseph A. Giampapa v. Carvel Corp. (Filed June 18, 1998)**

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

The court has designated this opinion as NOT FOR PUBLICATION. Please consult the Rules of the Court before citing this case.

**Joseph A. Giampapa v. Carvel Corp.**

U.S. District Court, District of New Jersey. Civ. No. 96-4758 (WGB). Filed June 18, 1998.

**New Jersey Franchise Practices Act**

**Choice of Law —Contractual Stipulation —Public Policy —New Jersey. —**

New Jersey law applied to an ice cream franchisee's breach of contract and New Jersey Franchise Practices Act claims against its franchisor, even though the franchise agreement contained a New York choice of law provision. New Jersey's strong public policy in favor of protecting New Jersey franchisees weighed heavily in favor of applying New Jersey law, regardless of the choice of law provision. Moreover, New Jersey had much more substantial contacts with the transactions at issue than New York, whose only link to the suit was that the franchisor had been headquartered in the state until 1991.

**Back reference: ¶1830.48.**

**Relationship/Termination —Cause for Termination —Termination by Franchisee —Material Breach by Franchisor —Shipment of Substandard Products. —**

An ice cream franchisor's alleged shipment of one batch of nonconforming ice cream to a franchisee did not constitute a material breach of the franchise agreement that justified termination by the franchisee. The one alleged breach out of hundreds of shipments was clearly minor in the context of the entire contract. Moreover, the franchisee could have remedied the breach by notifying the franchisor of the problem and demanding a credit or replacement. The one bad shipment did not make the franchisor's remaining performance meaningless or necessarily predict that future shipments also would be bad. Significantly, the franchisee had not reported any other problems regarding product quality during the course of the parties' relationship. In fact, the franchisee had tested the alleged substandard shipment not because he was experiencing problems, but because he wanted to support the claims of other franchisees that the franchisor's system had a quality control problem.

**Back references: ¶825, ¶1220.**

**Common Law —Breach of Franchise Agreement —Shipment of Substandard Products to Other Franchisees. —**

An ice cream franchisor's alleged shipment of substandard ice cream to numerous franchisees did not constitute a material breach of its contract with another franchisee. The franchisor's obligations to each franchisee were separate. The franchisor's alleged breach of the other franchise agreements did not affect its agreement with the complaining franchisee at all. Although a pattern of substandard shipments to other franchisees might indicate a problem with the franchisor's quality control systems, it did not render the franchisor unable to perform under its contract with the complaining franchisee.

**Back reference: ¶1220.**

**Common Law —Implied Covenant of Good Faith/Fair Dealing —Refusal to Allow Expansion, Co-Branding —Contractual Right. —**

An ice cream franchisor did not breach the implied covenant of good faith and fair dealing by refusing to allow a franchisee to open a satellite store or to test the concept of co-branding. The franchisee claimed that the franchisor's stated reason for its refusal —that the franchisee was not in "good standing" —was a pretext used to punish the franchisee for refusing to release his claims in a class action lawsuit against the franchisor. However, the franchisee did not contend that a new location or co-branding was critical to the financial viability of the franchise, and the franchise agreement did not grant the franchisee the right to open satellite locations or to participate in a co-branding program. Thus, the franchisor's insistence upon a condition in exchange for approval did not transcend community standards of decency, fairness, or reasonableness such that it constituted bad faith. The franchisor was not obliged to ignore the contentious nature of its relationship with the franchisee.

**Back reference: ¶1250.**

**Relationship/Termination —Release Requirement —Existing Claims in Class Action —Condition for Expansion, Co-Branding. —**

An ice cream shop franchisor's requirement that a franchisee release all claims in class action suit against the franchisor before the franchisor would allow the franchisee to open a satellite store or to test the concept of co-branding did not violate the New Jersey Franchise Practices Act. The parties' franchise agreement did not give the franchisee the right to open a satellite store or to test a co-branding concept. The statute prohibited any requirement that a franchisee execute a release at the time of entering into a franchise agreement, not at the time that an existing agreement was modified. In addition, this prohibition applied only to the release of future claims, not the release of past claims.

**Back reference: ¶850.74.**

**Relationship/Termination —Release Requirement —Class Action Claims —Condition for Expansion, Co-Branding —Restriction on Right of Free Association. —**

An ice cream franchisor's requirement that a franchisee release all claims in a class action lawsuit against the franchisor before the franchisor would approve the opening of a new satellite store or the franchisee's testing of a co-branding concept did not impinge on franchisees' right of free association in violation of the New Jersey Franchise Practices Act.

**Back reference: ¶850.74.**

**Relationship/Termination —Release Requirement —"Good Standing" Requirement —Condition for Expansion, Co-Branding —Unreasonable Standard of Performance. —**

An ice cream franchisor's purported requirement that a franchisee be in "good standing" and release all claims in a class action lawsuit against the franchisor before receiving permission to expand or co-brand did not constitute an unreasonable standard of performance that violated the New Jersey Franchise Practices Act. The alleged requirement did not negatively affect the franchisee's rights under the original franchise agreement and did not render him incapable of performing his obligations under the agreement. In addition, the franchisor's actions did not alter the standards that the franchisee was required to meet in order to keep his franchise.

**Back references: ¶850, ¶850.74.**

**Relationship/Termination —Release Requirement —Existing Class Action Claims —Condition for Expansion, Co-Branding —Illegal Ancillary Agreement. —**

An alleged requirement that an ice cream franchisee release all claims in a class action lawsuit against its franchisor before it would be permitted to open satellite stores did not constitute an ancillary agreement that violated the New Jersey Franchise Practices Act. The statute prohibited waivers or releases of liability at the time of entering into the franchise agreement, not releases executed during the term of the agreement for the purpose of settling disputes between the parties. Thus, the alleged release requirement did not illegally restrict

the franchisee's right to litigate.

**Back reference: ¶850.74.**

**Relationship/Termination −Illegal Release Requirement −Remedies Under Statute −Damages, Injunctive Relief −Unilateral Termination of Agreement by Franchisee −Defense to Liability. −**

Even if an ice cream franchisor's purported requirement that a franchisee release all claims in a class action suit against the franchisor before receiving permission to expand violated the New Jersey Franchise Practices Act, the franchisor was not liable under the statute because the franchisee had unilaterally terminated the franchise without proper notice prior to bringing an action under the statute. The franchisee's remedy for the franchisor's alleged violations was to bring a suit for damages or injunctive relief, not to terminate the franchise agreement. Not only had the franchisee failed to comply with the franchise requirements by closing his store, but he also had violated the statute by failing to give 15 days' prior written notice. The franchisee's noncompliance was a statutory defense to liability.

**Back references: ¶850.74, ¶860.**

**Relationship/Termination −Covenants Not to Compete −Reasonableness −Two Miles, Three Years − Legitimate Enforcement Interest −Undue Hardship −Public Interest. −**

A restrictive covenant that prohibited a former ice cream franchisee from operating within two miles of his former store for a period of three years after termination was reasonable and enforceable under New Jersey law. The franchisor had a legitimate interest in enforcing the covenant to protect its customer goodwill and to prevent the franchisee from using product and business information that had been conveyed to the franchisee. The fact that the franchisor had implemented a "supermarket program" under which it sought to increase sales by selling to grocery stores located in certain franchisees' market areas did not mean that the franchisor had no continuing interest in sales through its franchisees. Moreover, the franchisor's failure to enforce similar covenants against other New Jersey franchisees did not indicate that the franchisor had no legitimate interest in the covenant. Unlike the complaining franchisee, the other franchisees were nearing the end of their agreements and the franchisor had made a business decision not to enforce the covenants in those cases. Enforcement of the covenant would not cause the franchisee undue hardship, since it would not severely restrict him from opening another ice cream store. The geographic and temporal restrictions were reasonable under the circumstances. Finally, enforcement of the covenant would not significantly harm the public interest. The public interest in free and unfettered choice of ice cream shops in the area of the franchisee's former store was not of sufficient weight to preclude enforcement of the covenant.

**Back reference: ¶845.72.**

**Common Law −Breach of Franchise Agreement −Wrongful Termination by Franchisee −Franchisor's Damages −Lost Royalty, Advertising Fees −Liquidated Damages Provision. −**

An ice cream franchisor was entitled to $54,474 in lost royalty and advertising fees from a franchisee that had wrongfully terminated the franchise agreement. However, the franchisor was not entitled to an additional $15,000 under the agreement's liquidated damages provision. The provision applied only if the franchisor terminated or canceled the franchise. Moreover, enforcing the liquidated damages provision in addition to awarding regular damages would result in a double recovery by the franchisor.

**Back reference: ¶1240.**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### [In full text]

BASSLER, D.J.: This matter was tried without a jury before this Court on April 14, 15, 16 and 20, 1998. The Court's jurisdiction in this case is pursuant to 28 U.S.C. §1332 (diversity of citizenship). For the reasons set forth

below, the Court determines that Plaintiff Joseph Giampapa ("Giampapa") is *not entitled to a declaratory judgment* declaring that he did not wrongfully terminate his License Agreement with Defendant Carvel Corporation ("Carvel") and that the restrictive covenant is unenforceable. Furthermore, the Court finds that Carvel is *not liable* for breach of the franchise agreement between the parties and is *not liable* for violation of the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 *et seq.* The Court also concludes that Giampapa *is liable* for breaching the franchise agreement, and Carvel is awarded damages in the amount of $54,474.99.

## I. *PROCEDURAL HISTORY*

Plaintiff Joseph Giampapa ("Giampapa") is a former franchisee of a Carvel Ice Cream store. Giampapa alleges that Carvel's breaches of the agreement between the parties ("License Agreement") and violations of New Jersey's Franchise Practices Act forced him to terminate the parties' agreement and close his Carvel store.

Giampapa filed a declaratory judgment complaint in the Superior Court of New Jersey, Law Division, Passaic County, on or about September 11, 1996. The Complaint alleged that Carvel breached the License Agreement by supplying nonconforming ice cream mix, that Carvel violated the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 *et seq.*, and that Carvel breached the covenant of good faith and fair dealing. Giampapa sought a declaration that he did not wrongfully terminate the License Agreement, an order declaring the restrictive covenant unenforceable, and an order declaring that Giampapa was under no further obligation to Carvel.

Carvel properly removed the action to this Court on October 9, 1996, based on diversity of citizenship. Carvel filed an answer on November 15, 1996, asserting by way of counterclaim that Giampapa (1) infringed Carvel's trademarks; [1] (2) violated the restrictive covenant by continuing to operate an ice cream store within two miles of his former Carvel store; and (3) breached the License Agreement by failing to pay royalties and other payments in the amount of $46,518.00. Carvel sought damages of several million dollars, punitive damages, and an injunction enforcing the restrictive covenant.

## II. *FINDINGS OF FACT*

The Court makes these findings of fact pursuant to Fed. R. Civ. P. 52. The Court bases its findings of fact on its careful consideration of the testimony adduced at trial and a review of the documentary evidence submitted, as well as the logical inferences to be drawn from them. In evaluating the evidence of record, the Court undertook an individualized assessment of the credibility of each witness, and assigned the appropriate weight to the testimony based on the Court's conclusions with respect to credibility.

In assessing the credibility of each witness in this case, the Court has taken into consideration how well each witness was able to recall and describe the things testified to, the manner of the witness while testifying, whether the witness had an interest in the outcome of the case or any bias or prejudice concerning any party or matter involved in the case, how reasonable the witness's testimony was considered in light of all the evidence in the case, 9A Wright & Miller, *Federal Practice and Procedure:* Civil 2d §2585 (1995); *see also Miller v. Mercy Hospital, Inc.,* 720 F.2d 356, 365 (4th Cir.), *cert. denied,* 470 U.S. 1083 (1983) ("[c]redibility involves more than a witness's demeanor and comprehends an overall evaluation of testimony in light of its rationality or internal consistency and the manner in which it hangs together with other evidence"), and whether the witness's testimony was contradicted by what that witness had said or done at another time, by the testimony of other witnesses, or by other evidence. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

The Court makes the following findings by a preponderance of the credible evidence:

On June 20, 1998, Giampapa and his former partner, Douglas A. McCaffrey, entered into a Carvel Retail Manufacture License Agreement ("License Agreement") with Carvel, having purchased a retail ice cream store from Giampapa's uncle for $275,000. Giampapa leases the land on which the store is situated from his aunt. On June 30, 1992, when McCaffrey's employer transferred him out of state, Giampapa and Carvel entered into a second License Agreement. The parties agree that this License Agreement is a franchise agreement under which Giampapa operated a retail ice cream store using the Carvel name and products. Giampapa was employed part time as a patent attorney but worked at the store himself on evenings and weekends. In addition to being a member of the U.S. Patent and Trademark Bar, Giampapa, who holds an MBA, is also member of the New Jersey Bar.

The License Agreement requires that Carvel franchisees purchase an ultra-high temperature, pasteurized liquid ice cream mixture manufactured for Carvel according to its standards from designated independent dairies. As would be expected under a franchise agreement, Carvel licensees may not purchase or sell ice cream mixture not manufactured to Carvel's standards. The License Agreement obligates Giampapa to make royalty and advertising payments to Carvel until July 31, 1998 –the date the License Agreement expires.

From the commencement of the License Agreement, June 30, 1992 until Giampapa's termination on August 31, 1996, Giampapa operated the Carvel retail store at 741 Market Street, Paterson, New Jersey. The License Agreement contained a covenant prohibiting Giampapa from engaging in competition with Carvel for a period of three years and within a two mile radius of his store after termination of the License Agreement.

In the fall of 1992, Carvel began a new business venture by selling its products out of "branded freezers" in Pathmark supermarkets in New Jersey. Although initially Carvel only made its products available to supermarkets in areas where there were no pre-existing Carvel franchise stores, in April 1993, Carvel announced that it would begin selling its products to supermarkets in the same market areas as existing franchisees. The objections by franchisees that this competition subverted their franchisee agreements eventually led to litigation in 1994 between Carvel and its franchisees in the United States District Court for the District of Connecticut. *See Carvel Corporation v. James Baker et als.*, 1997 U.S. Dist. LEXIS 17609 (D.Conn. July 22, 1997). Giampapa was and is a party to that litigation, hereinafter referred to as the "Supermarket Lawsuit."

In the spring of 1994, Carvel conducted a regional seminar for franchisees in Northern New Jersey at a hotel in the Meadowlands. Carvel's entire executive management team was there. Management advised the franchisees that the company was experiencing declining store count and competition from TCBYs and other ice cream vendors. Carvel management represented that in order for Carvel to continue to have a retail presence, Carvel wanted each franchisee to add one location by opening additional, non-traditional distribution outlets in the form of "carts," "kiosks" and "branch unit" stores. Carvel claimed that if each franchisee added one or two branch units, kiosks or vending carts, Carvel could substantially increase the availability of its ice cream. Part of the incentive to the franchisees was that they would not have to pay extra for any gallonage of ice cream mix sold through these alternative distribution forms since it was counted within the required 10,000 gallon minimum. Accordingly, Giampapa, with Carvel's blessing, looked at locations in downtown Paterson and in Hawthorne, New Jersey. These sites did not pan out for one reason or another. However, by late 1994, Giampapa did find two potential business opportunities: a former Dairy Queen in Garfield, and a multiple-site program with McCrory's Five & Dime.

These sites passed the initial screening by Wayne King, the director of Carvel's real estate department, and Giampapa was instructed to submit formal proposals, which he did. In February 1995, Greg DeMadis, Carvel's Vice President for Retail and Business Development, met with Giampapa at the Garfield site and advised him that the sites would be approved only if he signed a release of his claims against Carvel in the Supermarket Lawsuit in Connecticut. DeMadis told Giampapa that Carvel was not inclined to approve any location where the franchisee could potentially gain financially and turn around and use those resources against the company to fund the supermarket litigation.

Tom Kornacky, an associate of Mr. DeMadis, and Vice President of Retail Operations, subsequently told Giampapa that the Garfield site would be approved if he would sign the release. Because Giampapa refused to sign the release, Carvel refused to approve the Garfield site and Giampapa consequently gave up any attempt to explore six or seven other potential sites in McCrory's stores. At the trial Carvel tried to soften its position by testifying that it routinely insisted on a mutual release whenever a new location was being added by a franchisee. At another time DeMadis testified that there were other impediments to signing off on Giampapa's new site, such as getting a release from Dairy Queen and getting rid of the Dairy Queen trade dress to produce a lease satisfactory to Carvel.

The Court does not credit this testimony. It may be true that other things needed to be done but that was plainly not the reason for Carvel's refusal to approve the new location. The Court credits Giampapa's testimony that unless he released Carvel in the Supermarket Lawsuit there was no way Carvel would approve the new site. The other reasons now offered by Carvel for not approving the Garfield location are pretextual.

In addition to using satellite locations to stem declining ice cream sales, another strategy that Carvel and its franchisees discussed was co-branding: the sale of other products at a Carvel store. At the regional seminar held

at the Meadowlands in the spring of 1995, Giampapa was told by Mr. Kornacky that to participate a franchisee had to be "in good standing," which Kornacky explained meant that a franchisee could not be in litigation with the company. Giampapa at that time was a litigant in the Supermarket Lawsuit in Connecticut.

Meanwhile, in the Supermarket Lawsuit, other franchisees were being accused by Carvel of using adulterated mix for the ice cream. At the request of another franchisee and a fellow litigant, Giampapa had samples of the ice cream mix analyzed for butterfat content and total solids by Sani-Pure Laboratories. Sani-Pure Food Laboratories issued a test report dated April 25, 1996 based on three separate samples. The butterfat content was determined to be 6.64%, whereas the federal standard for ice cream is 10%. The percentage of total solids also did not meet federal standards. The laboratory kept the samples for thirty days pursuant to their standard operating procedures. Although Giampapa sent the results of the test to a fellow franchisee who was coordinating various tests being taken by franchisees throughout thirteen states in support of the franchisees accused by Carvel of using adulterated mix, he did not advise Carvel of the results of these tests.

By letter of August 30, 1996, Giampapa notified Carvel that he was terminating the License Agreement. On August 31, 1996 Giampapa ceased operating his store as a Carvel franchise and removed all Carvel signage. Since September 1, 1996, he has operated on the same site as the Paterson Ice Cream Bakery.

## III. CONCLUSIONS OF LAW

### A. Choice of Law

The License Agreement provides that disputes will be settled by application of New York law. Giampapa, however, argues that despite this provision, New Jersey law should apply. The Court agrees.

A federal court sitting in diversity must apply the conflict of laws principles of the forum state, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487 (1947). In contract actions (and in the absence of a specific contractual choice of law provision), New Jersey follows the Restatement (Second) of Conflict of Laws §188 (1971), which looks to the jurisdiction having the most significant relation and closest contacts with the transaction and the parties. *State Farm Mutual Auto. Ins. Co. v. Estate of Simmons,* 84 N.J. 28, 34 (1980); *Kaufman v. Provident Life and Cas. Ins. Co.,* 828 F. Supp. 275, 282 n.10 (D.N.J. 1992), *aff'd,* 993 F.2d 877 (3d Cir. 1993); *Pancza v. Remco Baby, Inc.,* 761 F. Supp. 1164, 1168 (D.N.J. 1991).

Ordinarily, where the parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts uphold the contractual choice. *Instructional Systems, Inc. v. Computer Curriculum Corp.,* 130 N.J. 324, 341 (1992). However, under New Jersey law, a choice of law provision will *not* be honored if:

1)

the state chosen has no substantial relationship to the transaction or the parties, or

2)

application of the law chosen would conflict with the fundamental public policy of a state having a greater interest in a determination of a particular issue and such state would be applicable in the absence of the choice of law provision under the governmental-interest analysis.

*Stanton v. Rich Baker Berman & Co., P.A.,* 876 F. Supp. 1373, 1381 (D.N.J. 1995).

The New Jersey Supreme Court has recognized that the state's strong public policy in favor of protecting its franchisees under the Franchise Practices Act, N.J.S.A. 56:10-1 *et seq.,* can override a choice of law provision mandating the application of another state's law. *Instructional Systems,* 130 N.J. at 346 (upholding application of New Jersey law despite contractual provision stipulating that California law would apply). The Court noted that the purpose behind franchise legislation is to protect franchisees and to make their bargaining position more equal to manufacturers'. *Id.* at 344-45. The Court further held that the franchise laws would be meaningless if manufacturers' choice of law provisions were routinely upheld:

[W]ere parties free to dispense with the protection afforded by franchise acts, any 'large franchisor by insertion of a choice of law provision requiring application of the franchisor's home state's law, could with a stroke of a pen remove the beneficial effect of the franchisee's state's remedial legislation.'

*Id.* at 345 (quoting *Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.,* 208 N.J. Super. 666, 671-72 (App. Div. 1986)). In this case, New Jersey's strong public policy in favor of protecting its franchisees weighs heavily in favor of applying New Jersey law, regardless of the choice of law stipulation in the License Agreement.

Even if there were no choice of law provision in the License Agreement, and this case were viewed as a traditional breach of contract action, New Jersey law would apply. New Jersey has the closest contacts with the transactions at issue. Giampapa's ice cream store (and the potential sites for future stores) are located in New Jersey. Carvel's representative met with Giampapa in New Jersey. The restrictive covenant is being enforced against Giampapa in New Jersey.

Carvel argues that the contractual stipulation applying New York law should be enforced, arguing that it has a longstanding history in New York and has many licensees in New York. However, Carvel does not address the public policy considerations in favor of applying New Jersey law, above. Nor does Carvel explain how New York has a substantial interest in this litigation. There is no indication in the record that New York has any contact with this suit, other than the fact that Carvel had its headquarters there until 1991. (Since 1991, its headquarters have been in Connecticut.) This is clearly insufficient to justify applying New York law, especially when New Jersey has a much greater policy interest in, and substantial contacts with, the litigation. The Court concludes that New Jersey law should apply to this case.

### B. *Giampapa's Right to Terminate the Agreement*

Giampapa defends his decision to close his Carvel store because he claims that Carvel once shipped him a batch of ice cream mix that was not up to standards. Giampapa also stated that he knew of other franchisees who had similar problems with quality control. He argues that these were material breaches of the contract by Carvel and justified his own refusal to carry out his contractual obligations.

### 1. *Effect of One Bad Batch of Ice Cream*

Giampapa treated Carvel's ice cream quality control problems as a material breach of the contract. "If ... during the course of performance one party fails to perform essential obligations under the contract, he may be considered to have committed a material breach and the other party may elect to terminate." *Medivox Productions, Inc. v. Hoffman-LaRoche, Inc.,* 107 N.J. Super. 47, 58-59 (Law Div. 1969).

Repeated failure by Carvel to meet quality control standards might amount to a failure of the contract's "essential obligations." Giampapa, however, presented evidence of only one confirmed batch of nonconforming ice cream over the course of the contract. [2] A single breach in the context of a long series of obligations may be material, but only where it ruins the essential purpose of a contract:

Where a contract calls for a series of acts over a long term, a material breach may arise upon a single occurrence or consistent recurrences which "tend to defeat the purpose of the contract."

*Id.* at 59 (citations omitted). A breach of a promise which is "subordinate and incidental" to the contract's main purpose "does not constitute a breach of the entire contract or warrant its rescission by the injured party." *Oscar Barnett Foundry Co. v. Crowe,* 219 F. 450, 455 (3d Cir. 1915). Although every breach of a contractual obligation theoretically gives rise to a cause of action, to actually discharge the other party from its obligations, the breach "must be of an absolute part of the obligation." *Id.*

To determine whether a single breach is material in a contract that calls for continuing obligations, the Court must consider its effect on the contract as a whole. In applying the test of materiality to such contracts, a court should evaluate 1) the ratio quantitatively which the breach bears to the contract as a whole, and 2) the degree of probability or improbability that such a breach will be repeated. *Medivox,* 107 N.J. Super. at 59 (citing *Maple Flock Co. v. Universal Future Products,* 1 K.B. 148, 157 (1934)).

Carvel's alleged breach in shipping one substandard batch of ice cream mix is clearly minor in the context of the entire contract, in which the parties performed their obligations for several years. The purpose of the contract was to supply Giampapa with quality ice cream so that he could sell it and pay Carvel royalties. This one incident, out of hundreds of shipments, does not defeat this purpose.

Furthermore, Giampapa could have remedied the breach by notifying Carvel of the problem and demanding a credit or replacement. Although this case is not governed by the Uniform Commercial Code, the policy underlying the UCC's requirement that there be "substantial impairment" caused by a nonconforming shipment applies equally here: "The requirement that there must be substantial impairment of value before the buyer may revoke acceptance precludes revocation for trivial defects or defects which may be easily corrected." *Herbstman v. Eastman Kodak Co.,* 68 N.J. 1, 9 (1975). In fact, there was testimony that other nonconforming shipments were remedied by Carvel. Thus one bad shipment, which could have been remedied, did not defeat the whole purpose of the contract, or make Carvel's remaining performance meaningless.

This one shipment did not necessarily predict that future shipments would also be bad. Again, the entire history of the contract is relevant. Although Giampapa recalled a few previous instances in which problems had occurred, he apparently did not find them particularly serious, since he had no recollection of the details. Nor did Carvel give any indication that it would not or could not perform its future obligations under the contract, which is the usual indication of material breach. *See Universal Computer (Systems) Ltd. v. Datamedia Corp.,* 653 F. Supp. 518 (D.N.J. 1987), *aff'd,* 838 F.2d 1208 (3d Cir. 1988).

The Court notes that when Giampapa did have a sample tested, it was not because he was experiencing problems but because he wanted to be able to support the claims of other franchisees that there was a quality control problem in Carvel's system. Significantly, Giampapa never complained to Carvel that he was experiencing any problem with the mix. That is because he had no problems. Even when Carvel reached out to the franchisees in June of 1996 and invited them to corporate headquarters in Connecticut to discuss the entire quality control program, a meeting which included Giampapa and James Stubblefield, Vice President of Manufacturing and Quality, Giampapa never indicated he was having any problem, either with the operation of his franchise or his ice cream mix. Therefore, Giampapa has failed to establish that this one substandard shipment by Carvel, in the context of the entire contract, was a material breach.

## 2. *Knowledge of Other Franchisee's Problems*

Giampapa states that he knew of other franchisees' similar quality control problems. In fact, he testified that their problems were the reason he tested his own ice cream mix for compliance with standards. Even if Giampapa believed that other franchisees experienced similar problems, however, these problems in other parties' contracts are not a material breach of *Giampapa's* contract with Carvel.

The Court does not consider the other franchisees' experience to be relevant to this contract. Carvel's obligations to each franchisee are separate, and a breach of one franchise agreement does not equal a breach of the other agreement. Although Giampapa argues that the other franchisees' problems created concern that Carvel would breach its obligations to him as well, Giampapa cites no cases, and the Court could find none, in which a plaintiff relied on breaches of other contracts by the defendant to justify termination.

The Court must therefore analyze Giampapa's actions under the same standard as for any material breach case: How serious was this breach, and to what extent did Carvel's actions create a probability that the breach would be repeated? The Court concludes that the effect of a breach of another contract on Giampapa was not "serious"; it did not affect his License Agreement at all. Although a pattern of substandard shipments in other contracts may indicate a problem with Carvel's quality control systems, it is a huge leap to assume from this that Carvel would be unable to perform under the License Agreement with Giampapa. The Court concludes that breaches of other franchisees' agreements are not "material" breaches by Carvel.

## C. *Breach of Implied Covenant of Good Faith*

Giampapa does not argue that the refusal to allow him to open a satellite store or to test the concept of co-branding constitutes a breach of the License Agreement. Indeed he could not, since the License Agreement

nowhere confers such a right. Rather, Giampapa contends that Carvel's decisions in this regard constitutes a breach of an implied covenant of good faith and fair dealing. Giampapa's good faith claims arise principally out of Carvel's refusal to approve a satellite location for a new store. Carvel informed Giampapa that his proposed site would be approved on one condition: that he execute a release of all claims made against Carvel in the pending lawsuit in Connecticut. When Giampapa refused, Carvel did not allow him to open a new store. Carvel's stated reason for refusing to approve the site was that Giampapa was not in "good standing."

Giampapa asserts that Carvel breached the implied covenant of good faith and fair dealing by unilaterally imposing this "good standing" requirement. Giampapa alleges that this "good standing" requirement was not actually defined, but was instead a pretext used to punish Giampapa's refusal to release his claims in the Connecticut lawsuit. Giampapa also makes a similar argument with respect to the fact that Carvel did not approve Giampapa's location for a test site for co-branding.

Under New Jersey law, every contract contains an implied covenant of good faith and fair dealing prohibiting either party to the contract from "do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Bak-A-Lum Corp. of America v. Alcoa Building Products, Inc.*, 69 N.J. 123 (1976); *Onderdonk v. Presbyterian Homes of N.J.*, 85 N.J. 171 (1981). The good faith performance or enforcement of a contract requires adherence to the agreed common purpose "of the contract and consistency with the justified expectations of the other party." *Riveredge Associates v. Metropolitan Life Insur. Co.*, 774 F. Supp. 897, 899 (D.N.J. 1991).

The covenant of good faith and fair dealing prohibits conduct which, though not addressed explicitly in the contract, should be prohibited to ensure that the contract retains its intended business efficacy. Liability for breach of the covenant of good faith and fair dealing, therefore, does not require proof that the defendant violated the literal terms of the contract. *Association Group Life, Inc. v. Catholic War Veterans of the United States of America*, 61 N.J. 150, 153 (1972); *Riveredge Assocs.*, 774 F. Supp. at 900; *Feldman v. U.S. Sprint Communications Co.*, 714 F. Supp. 727, 731 (D.N.J. 1989).

The duty of good faith and fair dealing does not alter the terms of a written agreement, however. *Rudbart v. North Jersey Dist. Water Supply Comm'n*, 127 N.J. 344, 366 (1992), *cert. denied*, 113 S. Ct. 203 (1992); *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*, 934 F.2d 976, 983 (8th Cir. 1991) ("Acting according to the express terms of a contract is not a breach of the good faith and fair dealing.").

Since the License Agreement does not explicitly give Giampapa the right to open new stores, and since Carvel does not contend that a new location was critical to the financial viability of the existing location, it is difficult to see how Carvel's decision about Giampapa's new location can constitute bad faith. That the written terms of the agreement are not altered does not mean, of course that a party to a contract can act in bad faith to thwart his contracting partner's expectation interest and then hide behind the contract's literal terms. A party who transgresses community standards of decency, fairness or reasonableness while adhering to a contract's literal terms has still breached the covenant of good faith and fair dealing when such conduct thwarts a plaintiff's contractual expectation. *See, e.g., National Westminster Bank NJ v. Lomker*, 277 N.J. Super. 491 (App. Div. 1994), *certif. denied*, 142 N.J. 454 (1995) (while the good faith requirement does not impose upon a commercial lender obligations that alter the terms of the deal or preclude it from exercising bargained-for rights, a debtor may defend against enforcement of a lender's rights where the lender has engaged in bad faith, misconduct or the like).

In this case, the License Agreement contained no written provision granting Giampapa a right to satellite locations or to participate in experimental programs such as co-branding. Carvel's insistence upon a condition in exchange for approval of the new location was not bad faith. Although Carvel's refusal to grant the approval can be seen as "playing hardball" with Giampapa, this is not sufficient to establish a breach of good faith and fair dealing. Judge Easterbrook stated the principle well in the commercial lender context:

We do not doubt the force of the proverb that the letter killeth, while the spirit giveth life. Literal implementation of unadorned language may destroy the essence of the venture. Few people pass out of childhood without learning fables about genies, whose wickedly literal interpretation of their "masters' " wishes always leads to calamity. Yet knowledge that literal enforcement means some mismatch between the parties' expectation and the outcome does not imply a general duty of "kindness" in performance, or of judicial oversight into whether a party had "good cause" to act as it did. Parties to a contract are not each others' fiduciaries; they are not bound to treat customers with the same consideration reserved for their families.

*Kham & Nate's Shoes No. 2 v. First Bank,* 908 F.2d 1351, 1357 (7th Cir. 1990).

Furthermore, a defendant cannot be required to grant concessions to someone who is suing him. Carvel here was not obliged to ignore the larger context of its relationship with Giampapa. [3] Giampapa has not shown by a preponderance of the evidence that Carvel's actions were a "transgress[ion of] community standards of decency, fairness or reasonableness" amounting a breach of good faith. Nor has Giampapa sustained his burden of proving that Carvel's actions frustrated reasonable expectations arising out of the License Agreement.

### D. *Claims Under the Franchise Practices Act*

Giampapa argues that Carvel's refusal to approve his new store without a release of his claims in the Supermarket Lawsuit also violated the New Jersey Franchise Practices Act. Specifically, he argues that the Franchise Practices Act makes it illegal:

a.

   To require a franchisee at the time of entering into a franchise arrangement to assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed by this act.

b.

   To prohibit directly or indirectly the right of free association among franchisees for any lawful purpose.

* * *

e.

   To impose unreasonable standards of performance upon a franchisee.

f.

   To provide any term or condition in any lease or other agreement ancillary or collateral to a franchise, which term or condition directly or indirectly violates this act.

(Plaintiff's Supp. Brief at 2-5.); N.J.S.A. 56:10-7.

### 1. *Requirement of Release*

Giampapa claims that Carvel's demand for a release of the Connecticut lawsuit violates N.J.S.A. 56:10-7(a). The plain language of this provision defeats Giampapa's argument, however. The section specifically prohibits requiring the franchisee to execute a release *at the time of entering into a franchise arrangement.* By its plain language, this section does not apply to modifications of existing franchise agreements.

The one case that cites this provision of the Franchise Practices Act, *Stradling v. Southland Corp.,* BUSINESS FRANCHISE GUIDE (CCH) (New Developments) , ¶10,887 (M.D.Pa., Mar. 19, 1996), found that the section only prohibits a franchisor from requiring a release of *future* claims as a condition precedent to the execution of a franchise agreement. A release of liability for *past* claims was held not to violate the Franchise Practices Act.

Although *Stradling* is distinguishable from this case in that a release was contemplated in the franchise agreement, the court's interpretation of N.J.S.A. 56:10-7(a) is equally applicable here. Giampapa here was not asked to release Carvel from future liability, but only from past liability, specifically from the lawsuit already

pending in Connecticut. This was not an attempt by Carvel to immunize itself from the requirements of the Franchise Practices Act with regard to a new franchise agreement.

Giampapa could argue that Carvel's supermarket program violates the implied covenant of good faith and fair dealing because the supermarket program subverts the reasonable expectations of the franchisees that they would not be facing competition from neighboring supermarkets selling Carvel ice cream. He could further argue that by insisting on a release, Carvel is precluding Giampapa from a right to seek a remedy under the Franchise Practices Act. If there is merit to that argument, it strikes this Court that it would service Giampapa only if he were asking for judicial intervention to require Carvel to give him an additional location rather than as a basis for terminating the License Agreement. N.J.S.A. 56:10-10 provides that a violation of the Franchise Practices Act can entitle the franchisee to damages and "where appropriate" to injunctive relief. For the purposes of deciding this lawsuit, it is enough to conclude that since the License Agreement did not give Giampapa the right to open a satellite store or participate in a test of the co-branding concept, Carvel's insistence on a release as the quid pro quo is not a practice prohibited by N.J.S.A. 56:10-7(a).

## 2. *Right to Free Association of Franchisees*

Neither party elaborated on this theory, but Giampapa cites N.J.S.A. 56:10-7(b) in his brief. (Plaintiff's Supp. Brief at 4.) The Court assumes that by citing this section, Giampapa implies that Carvel's attempt to obtain a release from the Supermarket Lawsuit was intended to discourage its franchisees from uniting to challenge Carvel's policies.

The Court is unclear why requiring a release from Giampapa (or any other franchisee) would affect the franchisees' right of association. Here, it is coincidental that Giampapa is involved in a lawsuit with other franchisees and is thus "associating" with others. Carvel would have likely sought the same release even if Giampapa had brought the Connecticut lawsuit on his own. Furthermore, even if Carvel obtained the release from Giampapa, the rest of the Connecticut litigants would be unaffected.

Giampapa's theory is based on speculation that franchisees in a collective suit would feel coerced to release their claims of liability by Carvel. The release requirement does not impinge on any franchisee's right to associate with his other franchisees, however; it merely affects the individual franchisee's ability to gain concessions from Carvel. In any case, Giampapa's theory is not spelled out in any detail. Nor does Giampapa cite any case that holds that such a violation enables the franchisee to terminate the License Agreement rather than to an award of damages or injunctive relief as provided for in the Franchise Practices Act. Giampapa therefore has failed to meet his burden on this issue.

## 3. *Unreasonable Standards of Performance*

Giampapa argues that Carvel's purported requirement that he be in "good standing" and execute a release of his claims before receiving permission to expand imposed an "unreasonable standard[] of performance" on him. It is well established that a franchisor is prohibited from acting in a manner that is "arbitrary and capricious or in bad faith." *Westfield Centre Service v. Cities Service Co.*, 158 N.J.Super. 455 (Ch. Div. 1978), *aff'd*, 172 N.J.Super. 196 (App. Div. 1980), *aff'd*, 86 N.J. 453 (1981). However, there are very few cases explaining what constitutes an "unreasonable" standard of performance.

One case indicates that the franchisor imposes an unreasonable standard of performance when it sets conditions making it difficult or impossible for the franchisee to comply with his obligations. In *Gelardi Corp. v. Miller Brewing Co.*, 502 F.Supp. 637 (D.N.J. 1980), a beer company apparently "targeted" the plaintiff distributor for replacement by another distributor. The company subsequently entered into a distributorship agreement with the plaintiff's direct competitor in the same area (a violation of the exclusive area given to plaintiff). The company then gave the plaintiff's competitor more favorable credit terms and better delivery services. These obvious actions by the franchisor led to a bitter price war between the plaintiff and his competitor.

Finally, the plaintiff was forced to sign a noncompete agreement with his competitor agreeing not to serve in that area. The company then terminated the plaintiff's distributorship agreement, based on the plaintiff's breach of contract in not serving the stipulated area. The court denied the company's motion for summary judgment, finding that

it appears that Miller's conduct towards Gelardi made Gelardi's business life sufficiently miserable that Gelardi was forced to quit its distribution of Miller products in its primary area of responsibility. While any given action of Miller may not have violated this statutory prohibition the cumulative effect amounted to imposing an unreasonable standard of performance insofar as Miller expected Gelardi to perform at all under the adverse conditions that Miller had created.

*Id.* at 653.

It is simply not the case that Giampapa had no choice other than terminating the License Agreement in response to Carvel's actions. This case is quite different from *Gelardi*, where the franchisee was expected to perform his franchise agreement under not only adverse but destructive conditions imposed by the franchisor. The only adverse condition that Giampapa suffered was his inability to expand to another store. This did not cause a detriment to his original store, or to his rights under the original License Agreement. He was still capable of performing his obligations under the License Agreement. Carvel's actions certainly did not alter the standards that Giampapa was required to meet in order to keep his franchise and do not rise to the level of "unreasonable standards of performance."

### 4. Ancillary or Collateral Agreements

N.J.S.A. 56:10-7(f) prohibits a franchisor from including a term or condition in an ancillary or collateral agreement that would indirectly or directly violate the Franchise Practices Act. Given the underlying policy of the Franchise Practices Act to protect franchisees from unfair dealings, this section of the Franchise Practices Act was likely intended to prevent a franchisor from doing indirectly what it could not do directly. In other words, what is illegal in a franchise agreement is also illegal in an ancillary agreement.

Giampapa states, accurately, that the Franchise Practices Act encourages franchisees to seek redress through the courts, by providing a cause of action in Superior Court and allowing the recovery of attorney's fees. N.J.S.A. 56:10-10. Giampapa claims that Carvel's demand for a release is an ancillary agreement contravening this public policy by undermining his access to the courts. Carvel counters that the state has an equally strong public policy in favor of private settlement of disputes without involving the courts. [4]

It is true that franchisees in general have far less bargaining power than franchisors, and are thus potentially subject to economic coercion in their contracts. *See Kubis & Perszyk, Assocs., Inc. v. Sun Microsystems, Inc.,* 146 N.J. 176 (1996). In this case, Giampapa essentially argues that the "ancillary agreement" sought by Carvel forced him to choose between expanding his business and maintaining his lawsuit in Connecticut. This appears to be a permissible choice under the Franchise Practices Act, however, at least according to legislative history cited by the Carvel, which indicates that the statute was not intended to prohibit releases as part of the settlement of disputes. During the debates on the bill, the Governor noted:

Section 8(a) [now codified in N.J.S.A. 56:10-7(a)] which prohibits a franchisor from requiring a franchisee to assent to a release, assignment, novation, waiver or estoppel and thus relieve any person from liability imposed by the Act, has an unintended result. *It would effectively prohibit the parties from settling disputes by way of new agreements or releases for consideration. It is my understanding that the intent is to prohibit the compelling of such releases on waivers of liability at the time the franchise is entered into.*

(Defendant's Supp. Brief at 5 ( *quoting* Governor's comments, dated December 2, 1971, to Assembly Bill No. 2063 (emphasis added)).) In response to this comment by the Governor, N.J.S.A. 56:10-7(a) of the Franchise Practices Act was changed to make clear that it only prohibited waivers or releases of liability *at the time of entering into* the franchise agreement. More significantly, these comments in the legislative history assume that the Franchise Practices Act allows releases *during the term* of the franchise agreement for the purpose of settlement of disputes between the franchisor and franchisee. Although the Franchise Practices Act protects the rights of franchisees to bring an action in state court, it does not follow that any conduct that affects a lawsuit is a violation of the statute. Under Giampapa's theory, *any* release of liability executed by a franchisee would be illegal. The evidence indicates that a release such as the one in this case is not an illegal restriction on a franchisee's right to litigate.

Finally, even if Giampapa was truly subjected to unreasonable standards of performance or any other prohibited practice, his remedy was a suit for damages or an injunction under the Franchise Practices Act. It was *not* to terminate the License Agreement. It is quite apparent to this court that Giampapa decided to terminate the License Agreement because it was not financially advantageous to him and because of Carvel's supermarket program. He testified that he was paying approximately $15.00 to $16.00 a gallon for mix that was available from other dairies for $5.00 a gallon and that the significant reason that he terminated the License Agreement was that he was not generating enough revenue. The alternative explanations he gave to justify the termination of the License Agreement simply do not hold up. For example, he testified that there were quality control issues that went to the heart of the License Agreement. These quality control issues, however, were with fellow franchisees and not with Giampapa. There were never any complaints to Giampapa from customers nor were there any complaints from Giampapa to Carvel about the quality of the product. Carvel periodically tested Giampapa's ice cream at the store and found no defects. In fact, Giampapa testified that his own tests on the ice cream were always fine and that he was not concerned about bad product.

It is also apparent to the Court that another factor, other than quality control, motivating Giampapa to terminate the License Agreement was Carvel's supermarket program. Giampapa acknowledged that he first wanted to terminate his relationship with Carvel at the point when they started the supermarket program in the franchisors' backyards in 1994. In Giampapa's case, Carvel was servicing a supermarket in Paterson within two blocks of his store and another within a two mile radius of the store.

Giampapa also testified to other grievances that he felt justified his termination of the License Agreement, such as Carvel insisting that he keep open a lobby and submit to other inspections to insure compliance. The Court, however, after observing the demeanor of the witnesses for Carvel, finds that Carvel did not engage in some kind of retaliatory action because of Giampapa's involvement in the Supermarket Lawsuit but dealt with him in an even handed way. Giampapa may not have liked Carvel's response to his request, but Carvel acted well within its rights under the License Agreement. The Court credits the testimony of James Stubblefield that Giampapa was never targeted with respect to quality control or singled out and tested because of Giampapa's involvement in the Supermarket Lawsuit.

Giampapa also complained that Carvel denied him the opportunity to engage in co-branding, that is, selling products other than Carvel's at the store. But Gregory DeMadis, Vice President of Retail Operations and Business Development, credibly testified that Carvel never offered co-branding to all its franchisees. The most that Giampapa was denied was the opportunity to participate as a test site.

Nor did Giampapa ever advise DeMadis prior to August 31, 1996, that he was contemplating terminating the franchise due to a bad mix problem, an onerous royalty structure, or unfair treatment due to his participation in the Supermarket Lawsuit.

Because Giampapa unilaterally terminated the agreement, Carvel is permitted to raise his noncompliance with the franchise as a statutory defense to liability:

It shall be a defense for a franchisor, to any action brought under this act by a franchisee, if it be shown that said franchisee has failed to substantially comply with requirements imposed by the franchise and other agreements ancillary or collateral thereto.

N.J.S.A. 56:10-9. Not only did Giampapa fail to comply with the franchise requirements by closing his store, he also violated the Franchise Practices Act by failing to provide fifteen days' written notice before termination. N.J.S.A. 56:10-5. Carvel is therefore not liable for any violations of the Franchise Practices Act.

### E. *Validity of Restrictive Covenant*

Carvel, in its counterclaim, seeks enforcement of the restrictive covenant in the License Agreement barring Giampapa from operating an ice cream store within two miles of his former Carvel store for three years after termination. (Giampapa is currently operating an independent ice cream store in the exact location of his former Carvel store.) Giampapa argues that the restrictive covenant in the License Agreement is unreasonable and therefore unenforceable under New Jersey law.

Restrictive covenants in New Jersey are generally enforceable to the extent that they are "reasonable under the circumstances." *Solari Indus. v. Malady*, 55 N.J. 571 (1970). The party seeking to enforce the covenant has the burden of proving its reasonableness. *Ingersoll-Rand v. Ciavatta*, 110 N.J. 609 (1988). A restrictive covenant's terms will be modified ("blue-penciled") to make its terms reasonable under the circumstances if necessary. *See, e.g., Raven v. A. Klein & Co.*, 195 N.J. Super. 209 (App. Div. 1984).

To determine whether a restrictive covenant is "reasonable," the court must consider whether the covenant 1) protects a legitimate interest; 2) imposes an undue hardship on the party subject to it; and 3) injures the public interest. *Solari*, 55 N.J. at 576. One court has noted that covenants ancillary to the sale of a business are given more latitude than a restrictive employment covenant, because parties entering into a sale of business contract presumably have more bargaining power than an employee. *Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834 F. Supp. 683, 691 (D.N.J. 1993) (Irenas, J.). How far this "latitude" extends is not clearly set forth, but there is nothing in the case law that mandates the application of a different substantive test of "reasonableness" depending on which type of covenant is involved.

In *Jiffy Lube,* Judge Irenas held that a restrictive covenant in a franchise agreement is analogous to a sale of business, and is therefore "to be examined under the more liberal standards applicable to a sale of business." *Id.* Nevertheless, he applied the three *Solari* factors to find that the covenant was reasonable. This Court will therefore evaluate the reasonableness of this covenant applying the *Solari* factors as well.

### 1. *Legitimate Business Interest*

Giampapa argues that Carvel does not have a legitimate interest in enforcing the covenant. Giampapa states that

the only legitimate interests which have been recognized by the Courts of the State of New Jersey to support the enforcement of restrictive covenants are the protection of trade secrets and confidential business information and the protection of customer relationships.

(Plaintiff's Supp. Brief at 11.) Trade secrets and customer relationships have been recognized as legitimate protectable interests, particularly in employment contracts. In this case, Carvel provided Giampapa with access to its equipment, its product mix, and its vendors, in other words, to all the items he needed to operate an ice cream store. This knowledge certainly has value to Carvel and to potential competitors. Without a restrictive covenant, any franchisee could (as Giampapa did) develop a relationship with Carvel's suppliers, and then use those relationships after the termination of the contract. The Court therefore finds that this information constitutes a protectable interest.

Additionally, in franchise agreements, courts have found that customer goodwill developed by the seller or franchisor is also a protectable interest. Courts have recognized that the customer goodwill associated with the franchisor is an important benefit of the franchise relationship. *See Liberty Sales Assoc., Inc. v. Dow Corning Corp.*, 816 F.Supp. 1004, 1010 (D.N.J. 1993). As Judge Irenas stated in *Jiffy Lube*, "a franchise agreement, in part, [is] a conveyance of the franchisor's good will to the franchisee for the length of the franchise." *Jiffy Lube*, 834 F. Supp. at 691. Carvel's customer goodwill, therefore, is a legitimate interest that benefitted Giampapa during the franchise and that can be protected after the agreement is terminated.

Giampapa further argues that Carvel's new business initiative through its supermarket program somehow evidences that Carvel no longer had a business interest in its conventional franchisee program. This argument is simply a non sequitur. That a company is endeavoring to increase sales through supermarket sales does not mean it has no continuing interest in sales through its franchisees. The evidence that Carvel was attempting to increase sales through its franchisees (for example, by co-branding or kiosks) hardly supports a conclusion that Carvel had no business interest to protect.

Giampapa further argues that Carvel's failure to enforce the covenant against other franchisees in New Jersey illustrates that there is no legitimate interest in the covenant, and estops Carvel from enforcing it in his case. However, Carvel's actions (or lack thereof) in other cases do not amount to a waiver or estoppel of its contract rights in *this* action. One district court considering this issue found that an employer's failure to enforce a restrictive covenant against similarly situated employees did not estop the employer from enforcing the covenant. In *Minnesota Mining & Manufacturing Co. v. Kirkevold*, 87 F.R.D. 324 (D. Minn. 1980), the court found that the

plaintiff's situation was distinguishable from that of the other employees, and that other considerations were relevant in the employer's decision not to enforce the covenant against those employees. Similarly, in this case, the other franchisees were in a different position from Giampapa. Greg DeMadis of Carvel testified that the other franchisees were nearing the end of their agreements, and that it was simply not cost-effective to enforce those covenants. The Court found this testimony credible. Carvel made a business decision not to enforce the restrictions in other cases. Giampapa, on the other hand, had nearly two years of royalty and advertising payments remaining when he terminated the License Agreement.

The court in *Kirkevold* concluded:

All things considered, the failure of [defendant] to attempt to enforce similar covenants against other former employees is not overly probative of any intent to relinquish its contractual rights or to knowingly mislead [plaintiffs] so as to estop [defendant] from enforcing the covenant in question. For the Court to hold otherwise would effectively place employers in the precarious position of being compelled to enforce all such restrictive covenants with respect to all its former employees, which might encourage attempts to restrain trade, and which might undermine labor relations.

*Id.* at 336. A similar rationale would apply to the franchise context. Giampapa's argument would require a franchisor to enforce every restrictive covenant, without regard to cost-effectiveness or individual circumstances. This is impractical and unfair, not only to Carvel, but to other franchisees. Whether a restrictive covenant may be enforced depends on its reasonableness *under the circumstances. See Solari,* 55 N.J. at 576. Carvel may enforce or may not enforce other covenants, but the primary inquiry is whether enforcement of the covenant in *this* case is reasonable.

## 2. *Undue Hardship*

Giampapa claims that the covenant is unduly restrictive, because Carvel can open another store anywhere within his trading area. Like so many of Giampapa's arguments, this argument is not clearly articulated in his brief. Giampapa's arguments that Carvel believes "there is no geographical trading area for any particular Carvel store" or that Carvel is not subject to a similar restrictive covenant are ultimately irrelevant to the central question: whether the covenant imposes an undue hardship on Giampapa. "Undue hardship" has been interpreted to mean that the restrictions imposed are disproportionate, compared to what is necessary to protect the legitimate interest of the party enforcing the covenant. *See Coskey's T.V. and Radio Sales v. Foti,* 253 N.J. Super. 626 (App. Div. 1992). In this case, Giampapa is not severely restricted from opening another ice cream store. The covenant restricts Giampapa from opening a competing business within two miles of the store for three years after termination. To comply with the covenant, Giampapa needs only to find a location more than two miles away from his current store.

Instead, Giampapa simply converted the Carvel store (literally overnight) into his own independent ice cream store. Carvel has a legitimate interest in protecting the goodwill developed at this store location. Carvel also has a legitimate interest in protecting its "know-how" and ice cream manufacturing processes from appropriation. There was no evidence that it would be particularly difficult to find a location more than two miles away, or that there is no market for ice cream stores outside of Paterson. In fact, as Giampapa testified, his current location has problems with crime and vandalism; a location several miles away might actually avoid these problems.

Courts have found restrictions of longer than three years reasonable, *see, e.g., Rubel & Jensen v. Rubel,* 85 N.J. Super. 27 (App. Div. 1964) (five years), and have found restrictions of greater than three miles reasonable, *see, e.g., Jiffy Lube,* 834 F. Supp. at 692 (five miles). The Court finds the time and geographic restrictions in the covenant are reasonable under the circumstances.

## 3. *Public Interest*

Giampapa claims that the enforcement of the covenant harms the public interest by undermining franchisees' efforts to litigate disputes. Giampapa obliquely refers to a similar argument under the Franchise Practices Act, *see* Section D, above. It is really a claim that the franchisees' right to litigate is being harmed. Nevertheless, even if the Court reads this argument to state that franchisees will potentially be harmed, this type of harm to the "public" is not the focus of restrictive covenant law.

New Jersey courts have generally invoked harm to the public interest to preclude enforcement of a restrictive covenant only where the covenant could interfere with or place limitations on a special professional relationship, for example, the doctor-patient relationship or the attorney-client relationship. *Karlin v. Weinberg,* 77 N.J. 408 (1978) (noncompetition clause in doctor's employment agreement could limit patient choice); *Jacob v. Norris, McLaughlin & Marcus,* 128 N.J. 10, 20 (1992) ("[L]awyer restrictions are injurious to the public interest. A client is always entitled to be represented by counsel of his own choosing."). In these cases, the courts were concerned that prohibiting a doctor or lawyer from practicing in a certain area would prevent patients or clients in that area from having freedom of choice in the highly personal area of health care or legal representation.

The restrictive covenant in this case is not quite of this import. Conceivably, it could limit the public's choices among ice cream shops around in the area of the Giampapa's former Carvel store. This is a limitation, but a very minor one. The Court does not see a special "personal" ice cream consumer-ice cream store relationship that would be undermined. Although the Court does not wish to minimize the importance of ice cream, the "public interest" in free and unfettered choice of ice cream is not of sufficient weight to preclude enforcement of this covenant. The Court finds the restrictive covenant reasonable and enforceable as written. [5] The Court will therefore enjoin Giampapa from violating the covenant for two years from the date of entry of judgment.

### F. *Carvel's Right to Damages*

Carvel also asserted a counterclaim for royalties and advertising fees. As explained above, Giampapa has not established that he was entitled to terminate the contract due to Carvel's material breach. Giampapa's closing of his Carvel store therefore amounted to a breach of his obligations under the License Agreement.

Giampapa was obligated to make annual royalty and advertising payments to Carvel through July 31, 1998. (License Agreement, ¶7.) Giampapa wrongfully terminated the License Agreement on September 1, 1996. The Carvel established that these fees were as follows:

```
Sept. 1, 1996-March 1, 1997

     Royalty Fee:  ...................................   $ 7,400.00

     Advertising Fee:  ..............................   $13,300.00


March 1, 1997-March 1, 1998

     Royalty Fee:  ...................................   $15,200.00

     Advertising Fee:  ..............................   $13,300.00


March 1, 1998-July 31, 1998

     Royalty Fee:  ...................................   $ 6,458.33

     Advertising Fee:  ..............................   $ 5,666.66
```

TOTAL:    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    $54,474.99

Therefore, Giampapa is liable for $54,474.99 in royalty fees and advertising payments.

Carvel also argues that it is entitled to liquidated damages of $15,000 pursuant to the License Agreement. The enforceability of a liquidated damages provision depends on whether the set amount is a reasonable forecast of just compensation for the harm caused by the breach and whether the harm is difficult to estimate accurately. *Wasserman's, Inc. v. Middletown*, 137 N.J. 238, 250 (1994). New Jersey courts have recognized that liquidated damage clauses are presumptively reasonable and that the party challenging the clause bears the burden of proving its unreasonableness. *Id.* at 252.

The terms of the liquidated damages provision do not apply to the facts of this case. The provision states that liquidated damages arise if *Carvel* terminates or cancels Giampapa's right to operate his store through his breach. Here, Giampapa terminated the contract himself. *Cf. Ramada Franchise Systems, Inc. v. Bhagat*, 1993 WL 408001, at **3–4 (4th Cir., Oct. 14, 1993) (provision entitled franchisor to liquidated damages only when it terminated the franchise agreement, and not when the agreement was terminated under other circumstances). This is not a situation where Giampapa kept his store open but did not meet his obligations in other ways, and Carvel was forced to terminate his franchise.

Even if the liquidated damages provision was triggered, it was to serve as an alternative remedy to receiving consequential damages. Enforcing both the liquidated damages provision and awarding regular damages is a double recovery. *See Farnsworth on Contracts*, §12.18 at 897 (1982 ed.) ("[I]f the [liquidated damages] provision is sustained ... both parties are bound by it, and it displaces the conventional damage remedy for breach."). [6] The Court finds that Carvel is not entitled to liquidated damages.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Carvel is *not liable* for breach of the License Agreement or for breach of the covenant of good faith and fair dealing. The Court also concludes that Carvel *did not violate* the Franchise Practices Act.

The Court concludes that Giampapa *is liable* for breach of the License Agreement and consequently for damages in the amount of $54,474.99. Giampapa is further *enjoined* from violating the restrictive covenant in the License Agreement for a period of two years from the date of entry of the judgment.

The parties shall agree as to form on a proposed Final Judgment consistent with this opinion. This proposed Final Judgment shall be submitted to the Court no later than fifteen (15) days from the date of this opinion.

If the parties are unable to agree to a proposed Final Judgment, Carvel shall, within twenty (20) days from the date of this opinion, submit to this Court and serve on opposing counsel a proposed Final Judgment, in writing, that is consistent with this opinion.

Giampapa shall have five (5) days from receipt of Carvel's proposed Final Judgment in which to file his written objections to its form and his own written proposed Final Judgment that is consistent with this opinion. These shall be served on opposing counsel and filed with the Court. If Giampapa wishes to file objections, he *must* file an alternative proposed Final Judgment in writing with the Court.

Carvel shall have three (3) days from receipt of Giampapa's alternative proposed Final Judgment in which to file written objections to its form.

*All objections must be submitted in writing to the Court, and must contain legal and factual support for the objections and for the party's own proposed Final Judgment.*

---

[1] Carvel withdrew its trademark claims before trial.

[2] Carvel objected to the introduction of Giampapa's expert report on the basis that the mix itself had not been preserved, making it impossible for Carvel's expert to test the mix. The Court, however, found Giampapa's explanation as to why the mix was not preserved to be credible. Giampapa was not planning this suit when the mix was tested and did not deliberately destroy the evidence so as to preclude the introduction of the report. *Barbera v. DiMartino*, 305 N.J. Super. 617, 642 (App. Div. 1997) ( "Spoilation of evidence occurs when, in a prospective civil action, evidence necessary to the deposition of the matter willfully is destroyed with the intent of depriving a party of its use in litigation.")

[3] A showing that the defendant's actions towards the plaintiff were motivated by good faith business reasons, such as plaintiff's problems in paying its bills, is a complete defense to a claim for breach of the covenant of good faith and fair dealing. *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 F. Supp. 637 (D.N.J. 1980); *Nolan v. Control Data Corp.*, 243 N.J. Super. 420, 433-37 (App. Div. 1990).

[4] It is not clear that this section even applies to Giampapa's situation. The proposal to open a new store was never formalized, and therefore, it was technically not a "lease or other agreement ancillary or collateral" to the franchise. The few cases that refer to this section involve explicit collateral contracts or at least writings purporting to alter the terms of the franchise agreement. *See, e.g., Westfield Centre, supra.*

[5] Furthermore, as Carvel points out, three New York courts have found this same covenant reasonable.

[6] The Court is skeptical whether this liquidated damages provision is even enforceable. Liquidated damages provisions are more likely to be reasonable where the parties had comparable bargaining power. *Id.* at 253. Although Carvel claims in its brief that the liquidated damages term was "bargained for," the Court finds this scenario implausible. Furthermore, Giampapa is already subject to an enforceable restrictive covenant, which serves to protect Carvel's customer goodwill. The liquidated damages provision thus seems superfluous and even punitive. "The subject cancellation clause is unreasonable if it does more than compensate [the non-breaching party] for their approximate actual damages caused by the breach." *Id.* at 254.

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company



US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶10,681, Dunkin' Donuts Inc. v. Shivem, Inc., et al. (Filed May 4, 1995)

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

The court has designated this opinion as NOT FOR PUBLICATION. Please consult the Rules of the Court before citing this case.

**Dunkin' Donuts Inc. v. Shivem, Inc., et al.**

U.S. District Court, District of New Jersey. Civil No. 94-5627 (CSF). Filed May 4, 1995.

**Preliminary Relief –Trademark Infringement –Post-Termination Use –Likelihood of Success – Irreparable Harm –Balance of Harms –Public Interest. –**

A donut shop franchisee who had been terminated for failure to make timely payments was preliminarily enjoined from operating under the franchisor's name and trademarks. The franchisor was likely to prevail on its trademark infringement claim because its marks were valid and legally protectable, the terminated franchisee's continued use of the marks inevitably would cause consumer confusion, and the continued use was clearly unauthorized. Furthermore, the extreme likelihood of consumer confusion would irreparably harm the franchisor. Such harm outweighed any injury to the franchisee if it were enjoined from continuing to use the franchisor's marks, since any such injury would result from the franchisee's own refusal to comply with its contractual obligations and, therefore, could only be considered self-inflicted. An injunction alleviating any possible consumer confusion caused by the franchisee's continued use also was in the public interest.

Back references: ¶1100.30, ¶1100.38.

**Preliminary Relief –Enforcement of Noncompetition Agreement –Incident to Sale of Business – Reasonableness of Terms –Two Years, Five Miles. –**

A terminated donut shop franchisee was preliminarily enjoined from owning, operating, or having any interest in any donut shop within a 5-mile radius of any of its former franchises or any of the franchisor's other outlets for a period of two years pursuant to the franchise agreement's noncompetition provision. Covenants not to compete in franchise agreements were considered incident to the sale of a business, rather than ancillary to an employment agreement, and therefore were enforced as long as the terms were reasonable. In this case, both the geographic scope and duration of the provision were reasonable and did not require judicial limitation. Moreover, without a preliminary injunction restraining the franchisee from continuing operations, the franchisor would clearly suffer harm to its goodwill.

Back reference: ¶845.

<div align="center">

**OPINION**

**[In full text]**

</div>

FISHER, D.J.: On March 17, 1993, Shivem, Inc. and Hitendra Patel ("defendants") entered into a franchise agreement with Dunkin' Donuts, Inc., which authorized defendants to operate a donut shop at Route 9 and Alexander Avenue in Howell Township, New Jersey. On May 8, 1994, defendants entered into another franchise agreement with Dunkin' Donuts, Inc., by the terms of which defendants were licensed to operate a satellite location at 13 Lanes Mill Road in Lakewood, New Jersey, to be used strictly as a Dunkin' Donuts sales outlet. Under the terms of the agreements, defendants were granted the right to use the name "DUNKIN' DONUTS", a registered trademark, along with other proprietary marks owned by plaintiff. In exchange, defendants agreed to pay as a franchise fee to Dunkin' Donuts a sum equal to 4.9% of their gross sales, and to pay 5% of their gross sales as a contribution to the Dunkin' Donuts Franchise Owners Advertising and Sales Promotion Fund. Both agreements required that the franchise and advertising fees be paid by Thursday of each week, in conjunction

with the submission of weekly statements of gross sales covering the 7-day period ending at the close of business on the preceding Saturday.

On June 15, 1994, Dunkin' Donuts notified defendants that they were in default of their agreement for failure to submit the required sales statements and failure to make timely payments due under the agreement. Defendants were given an opportunity to cure the default, but did not do so. Accordingly, on July 28, 1994, Dunkin' Donuts sent defendants a written notice of termination of the franchise agreement. The written notice provided that termination would be effective 60 days after defendants received the notice of default, which, according to postal records, occurred on June 20, 1994 [1].

Upon termination, the agreement provided that defendants shall promptly pay to Dunkin' Donuts all sums accrued prior to the termination, plus interest, as well as any damages, costs and expenses, including reasonable attorney's fees, incurred by Dunkin' Donuts by reason of defendants' default. Franchise and advertising fees in excess of $15,000 remain outstanding. Moreover, despite termination of its franchise agreement, defendants continue to operate the Dunkin' Donuts shop and the satellite sales outlet, using the "DUNKIN' DONUTS" name and other proprietary marks. Claiming that such unauthorized use of the marks is causing irreparable harm, Dunkin' Donuts seeks to enjoin defendants' infringement. Dunkin' Donuts also seeks to enjoin defendants' continued operation of its business pursuant to the post-termination restrictive covenant, which prohibits operation of a similar business for a period of two years after termination within a five-mile radius of defendants' former Dunkin' Donuts location or any other Dunkin' Donuts shop.

Although the entry of an injunction generally requires a hearing, a preliminary injunction may issue on the basis of affidavits and other written evidence, without the need for a hearing, if the evidence submitted does not leave unresolved any relevant factual issues. *Williams v. Curtiss-Wright Corp.,* 681 F.2d 161 (3d Cir. 1982); *Professional Plan Examiners v. Lefante,* 750 F.2d 282 (3d Cir. 1984). In the present case, defendants have not submitted any evidence whatsoever in opposition to plaintiff's application for preliminary injunction [2]. Based upon the undisputed evidence submitted by plaintiff, the court finds that Dunkin' Donuts is entitled to a preliminary injunction to prevent the continued unauthorized use of its trademarks and to prevent defendants from operating their business in violation of the provisions of a covenant not to compete.

In ruling on a motion for a preliminary injunction, the court must consider four factors: (1) the likelihood that the applicant will prevail on the merits at the final hearing; (2) the extent to which the applicant is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *Opticians Ass'n v Independent Opticians,* 920 F.2d 187, 191-92 (3d Cir. 1990). Although it is almost always the case that the public interest will favor a plaintiff who has demonstrated both a likelihood of success on the merits and irreparable injury, courts should award preliminary injunctive relief only upon weighing all four factors. *AT&T v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1427, n.8 (3d Cir. 1994).

### [Trademark Infringement]

To prevail on a claim for damages arising out of an alleged trademark infringement, a plaintiff must establish that the mark is valid and legally protectable, that plaintiff owns the mark and that the defendant's use of the mark is likely to create confusion concerning the origin of the goods or services. *Opticians,* 920 F.2d at 192; *S&R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 375 (3d Cir. 1992). In addition, where the defendant's previous use of the mark occurred with the plaintiff's permission, the plaintiff must also establish that the defendant's continued use of the mark was unauthorized. *S&R Corp.,* 968 F.2d at 375; *Birthright v. Birthright, Inc.,* 827 F. Supp. 1114, 1134 (D.N.J. 1993).

The validity of a registered mark and the registrant's ownership of the mark are proven when that mark is federally registered and has become incontestible under the Lanham Act. *Fisons Horticulture, Inc. v. Vigoro Indust. Inc.,* 30 F.3d 466 (3d Cir. 1994); *Pedi-Care Inc. v. Pedi-A-Care Nursing, Inc.,* 656 F. Supp. 449 (D.N.J. 1987). The mark in this case is registered and incontestible. In fact, when they entered into the franchise agreement, defendants expressly acknowledged that the name "DUNKIN' DONUTS" is registered as a trademark on the Principal Register of the United States Patent Office. (Bowman Certification, Ex. A at Introduction and ¶7.A.) Thus, there can be no dispute that Dunkin' Donuts owns the mark and the mark is legally protectable.

Regarding the third requirement, certainly "there is a great likelihood of confusion when an infringer uses the

exact trademark" as the plaintiff. *Opticians*, 920 F.2d at 195 (citing *U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981)). In the present case, defendants and Dunkin' Donuts are both using the same trademark, which is owned by Dunkin' Donuts. Thus, it is inevitable that there will be consumer confusion about defendants' relationship with the franchise. *See S&R Corp.*, 968 F.2d at 375.

Finally, it is readily apparent that defendants' continued use of the trademark is unauthorized. Initially, defendants' use of the trademark was authorized pursuant to the terms of its franchise agreement with Dunkin' Donuts. That agreement gave Dunkin' Donuts the right to terminate the agreement in the event that the franchisee failed to cure any default arising out of the failure to timely remit required franchise fees or advertising contributions. Once plaintiff terminated the franchise agreement, based on defendants' failure to make the required payments, defendants were no longer authorized to use the mark [3]. This court concludes, therefore, that Dunkin' Donuts has adequately demonstrated a likelihood of success on the merits of its trademark infringement claim [4].

In addition to establishing probability of success on the merits, Dunkin' Donuts must also demonstrate irreparable injury. Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will. *Opticians*, 920 F.2d at 195. Because of the potential damage to reputation and good will that can result from confusion surrounding an owner's marks, it has been held that where the plaintiff makes a strong showing of likelihood of consumer confusion, irreparable injury follows as a matter of course. at 195-96. Thus, since this court has already held that defendants' use of the Dunkin' Donuts marks creates the likelihood of confusion, it naturally follows that plaintiff has satisfied the irreparable injury requirement as well.

Next, the court must balance the hardships to the respective parties. For a preliminary injunction to issue, plaintiff must demonstrate that the grant of an injunction will create no greater harm for the defendants than denial of the injunction would create for the plaintiff. *S&R Corp.*, 968 F.2d at 379. There is no doubt that defendants will suffer harm because of their inability to continue in business as a Dunkin' Donuts shop. However, inasmuch as it was defendants' own refusal to comply with the obligations under their agreement which brought about the need for an injunction, any harm imposed by the issuance of an injunction must be considered self-inflicted and should not be the basis for denying injunctive relief. In a factually analogous trademark infringement case wherein the defendant continued to operate its business despite the termination of its franchise agreement due to underpayment of royalty fees, the court stated the principle as follows:

To the extent that the defendants suffer significant, and in a sense irreparable, damage from the granting of the preliminary injunction, this harm is a predictable consequence of their willful breach of contract and their misconduct. As such, it is not the type of harm from which we seek to protect a defendant. While a court fashioning an equitable remedy should not impose hardship on a defendant which exceeds that required to protect a plaintiff's legitimate contractual interests, the often painful harm which follows a defendant who willfully breaches a contractual undertaking is not a basis for denying a plaintiff the relief to which it is legally entitled.

*Jiffy Lube Int'l, Inc. v, Weiss Bros., Inc.*, 834 F. Supp. 683 (D.N.J. 1993).

The final factor the court must consider is whether the grant of injunctive relief furthers the public interest. In a trademark case, there is a strong public interest in the protection of the trademark and in the prevention of deception of the public. *Opticians*, 920 F.2d at 197. Given the likelihood of confusion arising out of defendants' continued use of the Dunkin' Donuts trademark, it would be in the public interest to alleviate that confusion by enjoining defendants' continued infringement. Having satisfied all four factors necessary for the issuance of a preliminary injunction, plaintiff is entitled to the injunctive relief requested. Accordingly, pending further order of this court, defendants are restrained and enjoined from operating a Dunkin' Donuts shop at Route 9 and Alexander Avenue in Howell Township, New Jersey, or at 13 Lanes Mill Road in Lakewood, New Jersey. Defendants are also restrained and enjoined from using the DUNKIN' DONUTS tradename or any other proprietary marks owned by Dunkin' Donuts.

### [Enforcement of Noncompetition Agreement]

Notwithstanding that defendants are hereby enjoined from operating Dunkin' Donuts shops, plaintiff maintains that it would also be harmed by defendants' continued operation of a similar business, even if a different name is used. Plaintiff therefore seeks to enforce the restrictive covenant contained in the franchise agreement, which prohibits operation of a similar business for a period of two years after termination within a five-mile radius of

defendants' former Dunkin' Donuts location or any other Dunkin' Donuts shop.

Because a covenant not to compete in a franchise agreement is to be treated like a covenant incident to the sale of a business, rather than as a convenat ancillary to an employment agreement, this court will give deference to the parties' agreement and thus will enforce the restrictive covenant that is under consideration here. See *Jiffy Lube Int'l v. Weiss Bros., Inc.,* 834 F. Supp. at 691. Although the court has the power to limit the application of the covenant if the terms of such covenant are not reasonable with respect to duration, geographical scope or the extent of the activity restrained, see *Solari Indust. v. Malady,* 55 N.J. 571 (1970) and *Coskey's T.V. & Radio Sales v. Foti,* 253 N.J. Super. 626 (App. Div. 1992), the court finds that neither the 5-mile nor the 2-year provisions in this restrictive covenant require such limitation. Plaintiff is entitled to the protection afforded by the enforcement of its bargained-for noncompetition clause. Without a preliminary injunction to restrain defendants from operating a competing donut shop either in the exact location which was formerly a Dunkin' Donuts shop or in that general vicinity, plaintiff will clearly suffer harm to its goodwill. Consequently, defendants are restrained and enjoined from owning, maintaining, engaging in, being employed by or having any interest in any other business which sells or offers to sell any product of a type offered by a Dunkin' Donuts shop if such other business is located within a 5-mile radius of Route 9 and Alexander Avenue in Howell Township, New Jersey, or within a 5-mile radius of 13 Lanes Mill Road in Lakewood, New Jersey, or within a 5-mile radius of any other Dunkin' Donuts Shop for a period of 2 years from the date of the accompanying order.

[1] Pursuant to the terms of the franchise agreement for the satellite facility, the termination of the franchise agreement for the main location rendered defendants in default of the agreement for the satellite location.

[2] Defendants, in fact, have failed to file an answer or other responsive pleading to the plaintiff's amended complaint. Default was thus entered by the Clerk of the Court on March 31, 1995, and Dunkin' Donuts has moved for the entry of final judgment by default.

[3] Although defendants have not challenged the validity of the termination, such a dispute would not prevent this court from granting the preliminary injunction --a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor, and the franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated. *S&R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 375 (3d Cir. 1992).

[4] In actuality, because default has been entered against defendants, plaintiff has prevailed on its trademark infringement claim. Nevertheless, there is always the possibility that the entry of default may be set aside for good cause shown. Therefore, the court has analyzed the case in terms of the likelihood of success on the merits.

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

PLAINTIFF'S
EXHIBIT
4

**US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶12,073, Servicemaster Residential/Commercial Services, L.P. nd Sassne Enterprises, Inc. dba Servicemaster Associated Services v. Westchester Cleaning Services, Inc. dba Servicemaster of Westchester; Michael A. Ceglio and Robert P. Ritucci. (Filed April 19, 2001)**

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**Servicemaster Residential/Commercial Services, L.P. nd Sassne Enterprises, Inc. dba Servicemaster Associated Services v. Westchester Cleaning Services, Inc. dba Servicemaster of Westchester; Michael A. Ceglio and Robert P. Ritucci.**

U.S. District Court, Southern District of New York. Case No. 01 Civ. 2229 (JSM). Filed April 19, 2001.

### New York Franchises Law

#### Choice of Law —Contractual Stipulation —Tennessee —Law of Franchisee Home State. —

A disaster restoration and cleaning services franchise agreement's choice of law provision that called for application of Tennessee law unless the franchisee's home state had enacted franchise legislation that required that the home state's law apply to any disputes with the franchisor was properly enforced as requiring the application of Tennessee law. The franchisee's home state was New York and the New York Franchises Law contained no provision which required New York law to apply to the dispute with the franchisor.

Back reference: **¶1830.**

#### Common Law —Termination Date of Franchise Agreement —Expiration of Written Agreement —Continued Operation After Expiration. —

A disaster restoration and cleaning services franchisee and franchisor which continued to operate as if their franchise agreement was still in place even though the agreement had expired in 1998 of its own terms, remained subject to the terms of their agreement, and the agreement could not be regarded as properly terminated for purposes of the non-compete clause until the franchisor's final notice of termination on January 4, 2001.

Back reference: **¶1220.**

#### Noncompetition Agreements —Reasonableness —Geographic Scope —Duration. —

The non-compete clause of a disaster restoration and cleaning services franchise agreement which prohibited the franchisee from owning or operating any similar business within the agreement's single-County territory for a one year period after the agreement's termination was reasonable in geographic scope and duration.

Back reference: **¶845.60.**

#### Noncompetition Agreements —Preliminary Relief —Likelihood of Success on Merits —Irreparable Harm. —

The franchisor of a disaster restoration and cleaning service business demonstrated a likelihood of success on its claim to enforce the non-compete covenant contained within its franchise agreement with a terminated franchisee, and demonstrated that it would be irreparably harmed by the franchisee's ability to trade on the knowledge and customer relationships gained as a franchisee, therefore the franchisee was preliminarily enjoined from violating the non-compete agreement.

Back references: ¶845, ¶855.

<div align="center">**[Opinion in full text]**</div>

MARTIN, D.J.: Plaintiff Franchisor brings this application for a preliminary injunction against Defendant Franchisee for the purpose of preventing Defendant from operating under the ServiceMaster name and to enforce a non-compete clause contained in their franchise agreement during the pendency of this suit for trademark infringement and breach of contract. Since the application was brought, Defendant has consented to cease operation as ServiceMaster. The Court now addresses the issue of the enforceability of the non-compete clause.

In order to obtain a preliminary injunction, Plaintiff must demonstrate (1) either a likelihood of success on the merits or that serious questions exist and the balance of hardships tips in Plaintiff's favor, and that (2) Plaintiff will suffer irreparable harm in the absence of injunctive relief. See *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir. 1994).

Plaintiff licenses franchises to perform disaster restoration and cleaning services under the ServiceMaster name. In December 1993, Plaintiff entered into the franchise agreement at issue here (the "Franchise Agreement") with Defendant. (Wills Aff. Ex. A.) Defendant received a non-exclusive license for operation as a ServiceMaster franchise in Westchester County, New York, and promised to devote itself to the cities of Yonkers, Scarsdale, and Eastchester.

Defendant was periodically delinquent in its obligations under the Franchise Agreement. For example, Plaintiff alleges that Defendant failed to pay its franchise fees for six months in 1994 and for eight months in 1996, and that a 1997 audit revealed that Defendant had underreported its gross sales, which allowed it to lower its franchise fees. (Comp. PP 19-22.) Defendant charges in turn that Plaintiff did not live up to some of its obligations, such as promoting the home restoration business through national advertising.

On February 17, 1999, Plaintiff served Defendant with a franchise termination notice. (Wills Supp. Aff. Ex. A.) Although Defendant obtained an extension of time to meet its franchise obligations, it ultimately failed to make the payments that it owed. On July 19, 1999, Plaintiff served Defendant with a confirmation of franchise termination. (Wills Supp. Aff. Ex. C.) Plaintiff claims that in November 1999, in the course of ordering cleaning supplies, Defendant informed Plaintiff that it had never received the July termination notice. (Wills Supp. Aff. P 7.) Plaintiff agreed at that time to grant Defendant additional time to cure its defaults. (Wills Supp. Aff. Ex. D.)

After a series of communications between the parties and additional attempts to bring Defendant into compliance with its back fees, on October 4, 2000, Plaintiff served Defendant with a second notice of termination that included a sixty-day period to cure the outstanding defaults. (Wills Supp. Aff. Ex. J.) When Defendant failed to meet its obligations, the Franchise Agreement terminated on January 4, 2001. At all times, Defendant continued to operate under the ServiceMaster name.

Paragraph 15.3 of the Franchise Agreement contains a non-compete clause which provides that for a period of one year after the franchise's termination, Defendant is prohibited from owning or engaging in any business within Defendant's former territory that performs any of the services licensed by ServiceMaster. Defendant argues that the non-compete clause should not be enforced because the Franchise Agreement expired by its own terms in 1998, or alternatively because Plaintiff terminated the franchise on July 19, 1999, and thus one year from termination has already passed, and because enforcing the clause is unreasonable in these circumstances.

First, a question exists over the appropriate law to be applied to this claim. The parties profess uncertainty about whether New York or Tennessee law governs, and they decline to brief the issue. The Franchise Agreement contains a choice-of-law provision that calls for application of Tennessee law unless the franchisee's home state has enacted franchise legislation that requires that the home state's law apply to any disputes with the franchisor. (Wills Aff. Ex. A P 24.1.) New York's Franchise Act contains no such provision. See N.Y. Gen. Bus. Law §680 *et seq.* Under New York's choice-of-law rules, courts will honor a contractual choice-of-law provision if it bears a reasonable relationship to the dispute. See *LaGuardia Assocs. v. Holiday Hospitality Franchising, Inc.*, 92 F. Supp. 2d 119, 127 (E.D.N.Y. 2000). Here, ServiceMaster's principal place of business is in Tennessee. Therefore, it appears from the documents currently before the Court that Tennessee law applies to this claim. In any event, the standards governing non-compete clauses applied by the two states are substantially similar.

The Franchise Agreement provided for a term of five years, subject to renewal for an additional five-year term if the franchisee met certain conditions. (Wills Aff. Ex. A. P 2.) Most of these conditions were designed to protect the franchisor, for example, the requirement that the franchisee not be in default on its obligations. The parties submit no evidence of renewal when the Agreement expired in December 1998. However, because they continued to operate as if the Franchise Agreement was in place, as evidenced by Plaintiff's notice of termination sent in February 1999 and Defendant's continued operation as a ServiceMaster franchise, the parties at a minimum impliedly agreed that the Franchise Agreement would continue to govern their relationship. [1] See Hawes Office Sys., Inc. v. Wang Labs., Inc., 537 F. Supp. 939, 943 (E.D.N.Y. 1982); 62B Am. Jur. 2d Private Franchise Contracts §517. Considered from another angle, Plaintiff waived Defendant's non-compliance with the conditions for renewal when it continued to behave as though the Franchise Agreement was in effect. Cf. Freytag v. Crass, 913 S.W.2d 171, 173 (Tenn. Ct. App. 1995).

Defendant also argues that its franchise was terminated in July 1999, and that Plaintiff thereafter agreed to allow Defendant to continue using the ServiceMaster name while the parties resolved the issue of the missing back payments and negotiated a new franchise agreement. (Ceglio Aff. at 3.) The existence of such an oral agreement is contradicted by Plaintiff's letter of November 9, 1999, in which it states that Defendant will be given more time to cure its defaults or face termination. (Wills Aff. Ex. D.) ("We are willing to give you one final chance to bring your business into compliance or your rights will be terminated on December 1, 1999.") Similarly, Plaintiff's letter of March 14,2000, warns that Defendant's franchise license is in imminent danger of being terminated. (Wills Supp. Aff. Ex. H.) Thus, Plaintiff's communications to Defendant indicate that Plaintiff elected to continue the Franchise Agreement despite the July 1999 termination notice. It is also worth noting that Plaintiff submits testimony that Defendant informed Plaintiff that the July termination notice was not received. (Wills Supp. Aff. P 7.)

While the existence of a possible agreement by Plaintiff to allow Defendant to operate as ServiceMaster while not actually maintaining franchise status raises a question of fact, it is undisputed that Defendant continued to operate as a ServiceMaster franchise until very recently. As such, Defendant accepted the benefits of franchise status and traded on the good will of Plaintiff. Although Plaintiff's letter to Defendant of November 30, 1999, anticipates that Defendant will sign a new set of contracts if it meets its financial obligations, the fact remains that the parties' relationship continued to be governed by the 1993 Franchise Agreement until that event occurred. [2] (Wills Supp. Aff. Ex. F.) Defendant should not be permitted to rely here on a July termination date that it ignored at the time and of which it later claimed never to have received notice. At this stage in the proceedings, it appears likely that the Franchise Agreement remained in effect until it was properly terminated by Plaintiff on January 4, 2001.

In order for a covenant not to compete to be enforced, it must pass a reasonableness test. New York and Tennessee courts will enforce a non-compete clause between business entities only where it protects a legitimate business interest and where its terms are reasonable both in time and geographic scope. See DAR & Assocs. v. Uniforce Servs., Inc., 37 F. Supp. 2d 192, 196-98 (E.D.N.Y. 1999); Carvel Corp. v. Eisenberg, 692 F. Supp. 182, 185-86 (S.D.N.Y. 1988); Servpro Indus., Inc. v. Pizzillo, 2001 Tenn. App. LEXIS 87, No. M2000-00832-COA-R3-CV, 2001 WL 120731, at *6-7 (Tenn. Ct. App. Feb. 14, 2001). The party seeking to avoid the covenant must also demonstrate a lack of meaningful choice during the bargaining process. See Carvel Corp. v. Rait, 117 A.D.2d 485, 503 N.Y.S.2d 406, 410-11 (App. Div. 1986).

In the franchise post-termination context, such covenants have been enforced where their scope is reasonably related to the protection of the franchisor's know-how and its ability to place new franchisees in the same territory. See Eisenberg, 692 F. Supp. at 186 (upholding three-year, two-mile restriction on ice-cream store); Servpro, 2001 WL 120731, at *7-8 (upholding two-year, twenty-five-mile restriction on restoration cleaning franchise). There is a recognized danger that former franchisees will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the good will of the franchisor. See generally Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc., 834 F. Supp. 683, 691-92 (D.N.J. 1993) (upholding ten-month, five-mile restriction on rapid lube operation); Economou v. Physicians Weight Loss Ctrs., 756 F. Supp. 1024, 1032 (N.D. Ohio 1991) (upholding one-year, fifty-mile restriction on diet center). This can be particularly true where the business operates out of the same location.

Defendant argues that ServiceMaster's technology is not as unique as it claims, and that three other ServiceMaster franchises already operate in the same territory. Thus, Defendant argues, ServiceMaster's interest in protecting its know-how and its ability to place another franchise in Westchester County is outweighed by the harm to Defendant if it is unable to establish another cleaning business for a period of one year. In addition,

because a residential and commercial cleaning company differs from an ice-cream store in that the company goes to the customer, rather than vice versa, the chance of consumer confusion and damage to ServiceMaster's good will is less likely.

Although these arguments have some merit, Defendant cannot reasonably dispute that when Plaintiff provided it with training and confidential manuals, Plaintiff extended to Defendant the knowledge and ability to launch a restoration cleaning business and that Defendant has used those tools to operate its business for fifteen years. In addition, the mere fact that Plaintiff has three other franchises operating in Westchester County does not mean that it does not have a legitimate interest in placing another; apparently there is enough business in the county to support four franchises. *See, e.g., Rait*, 503 N.Y.S.2d at 411 (finding irrelevant the fact that Carvel had the option to license another store one mile from the franchisee, where the non-compete clause covered two miles).

Although the nature of the business here requires that the company visit the customer's home or business, rather than vice versa, Plaintiff claims that many of their franchisees' clients are obtained through referrals from the insurance industry. As such, there is a danger that Defendant will seek to capitalize on relationships that it built as a ServiceMaster franchise, which may have the effect of harming the good will of Plaintiff and jeopardizing its ability to place a new franchise. The Tennessee Court of Appeals recognized this fact when it enforced a restrictive covenant against a restoration cleaning franchise and noted:

It is apparent that Servpro would have a more difficult time finding a new franchisee for the Fort Lauderdale territory if a former franchisee were performing the same services within that territory, while soliciting the same customers he previously serviced as a Servpro franchisee. The evidence suggests that the term "customers" should in this case refer not only to individual property owners for whom Servpro franchisees do restoration work, but also property managers, insurance agents and adjustors who are a major source of referrals for the restoration business.

*Servpro*, 2001 Tenn. App. LEXIS 87, *18-19, 2001 WL 120731, at *7.

Finally, Plaintiff does not argue that the restrictive covenant was not the product of a fair bargaining process. Therefore, because the time and geographic limitations appear to be reasonable, Plaintiff has demonstrated a likelihood of success on its claim to enforce the non-compete covenant.

Plaintiff must also demonstrate irreparable harm should injunctive relief be denied. Once again, the potential harm to Plaintiff arises from Defendant's ability to trade on the knowledge and customer relationships gained as a ServiceMaster franchise, which impacts on Plaintiff's good will and its interest in re-franchising the market. *See Jiffy Lube*, 834 F. Supp. at 692-93; *Economou*, 756 F. Supp. at 1039. In addition, the franchise system itself is endangered if a franchise is permitted to avoid its reasonable non-compete obligations. *See Jiffy Lube*, 834 F. Supp. at 693.

For the foregoing reasons, Plaintiff's application for a preliminary injunction to enforce the non-compete clause contained in the Franchise Agreement is granted. Defendant is hereby enjoined from engaging in the type of cleaning services offered by ServiceMaster until January 4, 2002, in the territory of Westchester County, except to the extent necessary to complete performance of existing contracts.

### SO ORDERED.

---

[1] Whether the parties impliedly agreed to renew for a term of five years, or whether the relationship was terminable at will, is a question the Court need not reach.

[2] Plaintiff stated at oral argument that a period of three years passed between the contractual expiration of the parties' previous franchise agreement and their renewal, which is the contract at issue here.

---

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

PLAINTIFFS
EXHIBIT
5
PHIGAD-Bayonne, N.Y.

**US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶10,918, Rita's Water Ice Franchise Corp. v. DBI Investment Corp., et al. (Dated April 8, 1996)**

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**Rita's Water Ice Franchise Corp. v. DBI Investment Corp., et al.**

U.S. District Court, Eastern District of Pennsylvania. Civil Action No. 96-306. Dated April 8, 1996.

**Preliminary Relief –Enforcement of Noncompetition Agreement –Likelihood of Success – Enforceability of Agreement. –**

A flavored ice franchisor was likely to succeed on claims that a covenant not to compete between the franchisor and two franchisees was enforceable. The covenant related to the franchisor's protectable interests in the use of its trademarks and the development of the particular geographic market, and was supported by adequate consideration. Furthermore, the covenant, which prohibited the franchisees from operating a "frozen confection" business within one and a half miles of the former franchise sites for a period of 18 months, was appropriately limited in time, territory, and scope. The 18-month restriction was reasonable because that was the approximate length of time it would take the franchisor to establish a new franchise in the area. The one and a half mile restriction was reasonable given research indicating that the franchisees drew their customers from approximately a three mile radius around their shops.

Back reference: ¶845.

**Preliminary Relief –Enforcement of Noncompetition Agreement –Irreparable Harm –Goodwill – Development of Market. –**

A flavored ice franchisor would be irreparably harmed by two terminated franchisees' continued operation of their businesses at their former locations, in violation of the franchise agreements' covenant not to compete. The franchisor had an interest in the goodwill at the terminated franchises, as well as an interest in placing a new franchise in the area as quickly as possible. Competition from the terminated franchisees would impede such expansion. Furthermore, if the franchisor were unable to enforce the restrictive covenant, the value of all its franchises would be lowered. Other franchisees might violate their agreements in similar ways and then use the franchisor's goodwill to establish a competing business.

Back references: ¶845, ¶855.

**Preliminary Relief –Enforcement of Noncompetition Agreement –Balance of Harm –Hardship on Franchisees. –**

The balance of harm favored a preliminary injunction enforcing a covenant not to compete between an flavored ice franchisor and terminated franchisees pending arbitration. Although the franchisees undoubtedly would suffer some harm if an injunction were issued, such harm was a result of their own making because they had breached the franchise agreements by selling unauthorized products and altering the franchisor's recipes. Preliminary enforcement of the covenant would not impose any hardship on the franchisees beyond that necessary to protect the franchisor's contractual interests. In addition, enforcement of the covenant would not force the franchisees to go out of business at their present locations, since they still would be able to sell other types of foods and snacks.

Back references: ¶845, ¶855.

**Preliminary Relief –Enforcement of Noncompetition Agreement –Public Interest. –**

The public interest supported an injunction prohibiting two terminated franchisees from competing in violation of a covenant not to compete contained in their franchise agreements.

**Back references: ¶845, ¶855.80.**

**Preliminary Relief –Enforcement of Noncompetition Agreement –Required Bond by Franchisor. –**

Terminated flavored ice franchisees were preliminarily enjoined, pending arbitration, from continuing operations in violation of a covenant not to compete contained in their franchise agreements. However, the franchisor was required to post a $100,000 bond to cover potential damages in case it was found that the franchisees were wrongfully enjoined.

**Back references: ¶845, ¶855.**

## MEMORANDUM

### [In full text]

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

SHAPIRO, D.J.: Plaintiff, Rita's Water Ice Franchise Corporation ("Rita's"), alleges breach of a franchise agreement by defendants DBI Investment Corporation, Scott Irrgang, and Denise Irrgang. Rita's avers that defendants breached the franchise agreement by using its proprietary marks and trade dress without authorization and by selling unauthorized products. Rita's motion for a temporary restraining order was denied as moot after a conference call with the parties. Rita's now seeks a preliminary injunction; a hearing was held on February 27, 1996. At the hearing, defendants agreed to discontinue the use of Rita's trademark and trade dress and agreed to an order so providing; the only remaining issue is the enforceability of the covenant not to compete contained in the franchise agreement. The parties submitted post-hearing memoranda on that issue.

The court will order defendants to discontinue use of Rita's trademark and trade dress and grant Rita's motion for a preliminary injunction to enforce the covenant not to compete pending a decision or award pursuant to arbitration in accordance with the franchise agreement. The following are the court's findings of fact and conclusions of law.

### *FINDINGS OF FACT*

1. Rita's Water Ice Franchise Corporation ("Rita's") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business in the Eastern District of Pennsylvania. Rita's franchisees operate Rita's Water Ice shops along the northeast corridor through 71 franchised locations, five of which are located in Florida.

2. Rita's is the owner of trade and service marks and has registered the marks in the United States Patent and Trademark Office. A Rita's franchisee is licensed to use the marks in the operation of its franchised business.

3. DBI Investment Corporation is a corporation organized and existing under the laws of the State of Florida with a principal place of business in Jupiter, Florida.

4. Scott and Denise Irrgang, citizens of Florida and the owners of DBI Investment Corporation, guaranteed the obligations of DBI Investment Corporation.

5. On January 28, 1994, Rita's and DBI Investment Corp. entered into a franchise agreement granting defendants the right to operate a Rita's shop at 150 Indian Town Road, Jupiter, Florida, 33477.

6. On October 21, 1994, Rita's and DBI Investment Corp. entered into a franchise agreement granting defendants the right to operate a Rita's shop at 1454 Tenth Street, Lake Park, Florida 33477.

7. Each franchise agreement was signed in Philadelphia.

8. Each franchise agreement is governed by Pennsylvania law and provides for venue in the Eastern District of Pennsylvania for preliminary injunctive relief and for enforcement of rights under the Lanham Act. Each franchise agreement provides that all other disputes, including permanent injunctive relief and damages, are to be arbitrated before the American Arbitration Association in Philadelphia. *See* Franchise Agreement, Articles XXI-XXIII.

9. Defendants began to operate each Rita's shop soon after signing the respective franchise agreements.

10. Before opening the Rita's shops, defendants received training in the Rita's shop operation.

11. Each franchise agreement contains a post-termination, noncompetition covenant stating that:

For a period of eighteen (18) months following termination or expiration of this Agreement, or a partner or shareholder's interest in the franchise, regardless of the cause of termination, neither Franchisee nor such partner or shareholder shall directly or indirectly, for itself or through, on behalf of, or in conjunction with any other person, partnership, corporation, or other unincorporated business, own, maintain, engage in, be employed by, or have any interest in any business specializing in whole or in part or in any way related to or connected with the frozen confection business within a radius of one and one half (1.5) miles of any System shop, including Franchisee's former Shop.

Franchise Agreement, Article XX.

12. Each franchise agreement requires that the franchisee sell only approved products and that "[a]ll containers, cartons, bags, napkins, and other paper goods and packaging used in the dispensing or sale of the water ice and other food or beverage products" bear the proprietary marks of Rita's; unapproved sources of supply are not permitted. Article XI.E, G, and H.

13. Article XVIII.C of each franchise agreement authorizes Rita's to terminate the agreement without opportunity to cure if the franchisee fails to offer all required products and services, or if franchisee offers unauthorized products or services, or it franchisee fails to use the proprietary marks in the manner and for the purposes specified by the company.

14. Each franchise agreement requires the italian ice mix to be purchased only through Rita's designated supplier. The franchise royalty is collected at the time the proprietary mix is purchased by franchisees from Rita's.

15. Rita's gave written notice of default on May 18, 1995 to DBI Investment Corporation for use of altered recipes and flavors. The default was not cured.

16. On or about January 10, 1996, Dennis Gillen, a representative of Rita's, observed hot dogs cooking and advertised for sale and other unauthorized products on the premises. Defendants were also using unauthorized product, ingredients, and flavors for sale of italian ice at defendants' Rita's shops.

17. The franchise agreements were terminated on February 9, 1996.

18. At the hearing, defendants agreed to change the name of their shops and remove all remaining Rita's trade dress, including a distinctive awning.

19. Defendants continue to operate the two former Rita's shops in a substantially similar manner as they did as Rita's franchisees, without Rita's service marks and logo.

20. Each franchise agreement provides that the good will arising from the use of Rita's proprietary mark belongs to Rita's and not the defendants. Franchise Agreement, Article VI.D.

21. Rita's had approved defendants' sites after conducting demographic and marketing studies; defendants' shops were located in target market areas for Rita's expansion.

22. Rita's has five franchises operating in Florida and has commitments from franchisees to open eighteen more units.

23. It would take eighteen months to establish another franchise operation in the Jupiter area, absent competition from defendants.

24. Marketing studies show that customers are drawn to a Rita's shop from a three mile radius.

25. Rita's financed extensive advertising in the market area of defendants' shops.

26. Rita's conducted marketing studies and shared the information it obtained regarding business developments, marketing strategies, and competition with its franchisees.

27. Defendants have not submitted financial statements to plaintiff as required under the franchise agreements.

28. Rita's estimates defendants' annual profits at $50,000 per shop.

29. Defendants introduced no testimony or other evidence that they would suffer harm if not permitted to operate a Rita's shop or business specializing in frozen confections within a 1.5 mile radius of defendants' former shops.

## DISCUSSION

On a motion for a preliminary injunction, the court must consider four factors: (1) the likelihood that the applicant will prevail on the merits at the final hearing; (2) the extent to which the movants are irreparably harmed by the conduct complained of; (3) the extent to which defendants will suffer irreparable harm if preliminarily enjoined; and (4) the public interest. *S&R v. Jiffy Lube International, Inc.*, 968 F.2d 371, 374 (3d Cir. 1992). The franchise agreements are governed by Pennsylvania law. Franchise Agreement, Article XXIII.

### [Enforceability of Noncompetition Agreement]

The plaintiff is likely to prevail on the merits at the final arbitration hearing. An enforceable restrictive covenant in the franchise context must satisfy three requirements: (1) the covenant must relate to either a contract for sale of goodwill or other subject property; (2) the covenant must be supported by adequate consideration; and (3) the covenant must be reasonably limited in both time and territory. *Piercing Pagoda, Inc. v. Hoffner*, 351 A.2d 207, 210 (1976) (citing cases). A franchisor has a protectible interest in the sale of a franchise because of expenditures made by a franchisor for market development and training, the grant of an exclusive sales area, and permission to use the franchisor's name. *Id.* at 211; *Sparks Tune-Up, Inc. v. White*, 1989 WL 41321 (E.D. Pa. April 18, 1989) (franchisor's interest in expertise, training, logo, name, advertising assistance, and exclusivity rights may be protected by covenant not to compete); *see Novus Franchising, Inc. v. Taylor*, 795 F. Supp. 122 (M.D. Pa. 1992) (name and method of operation carries a quantum of value and goodwill). Here, plaintiffs introduced evidence of these factors sufficient to establish a protectible interest in the franchise. Adequate consideration exists for the restrictive covenant; the covenant was a condition to the original grant of the franchise, and defendant received the benefits of the franchise agreement as consideration.

The restrictions of the covenant are appropriately limited in time and territory. Plaintiff's president, Robert Tumolo, testified credibly that eighteen months is the approximate length of time it would take to establish a new franchise in the area without competition from defendants. *See Novus* at 128 (time necessary to "seek, train, and bring up to speed replacement franchisees" found reasonable); *see also Jiffy Lube International, Inc. v. Weiss Brothers, Inc. et al.*, 834 F. Supp. 683, 692 (D.N.J. 1993) (adjusting length of time in restrictive covenant from three years to ten months to correlate with the time necessary for franchisor to set up a new franchise in the area). A time period of eighteen months is reasonable.

Rita's research revealed that customers were drawn from an approximate three mile radius. *See Piercing Pagoda*, 351 A.2d at 212 (covenant with thirty mile radius reasonably necessary for protection of the franchisor). A restriction to a radius of one and one half miles of any Rita's including defendants' former shops is reasonable.

The covenant is also reasonably limited in scope. The franchise agreement was for the operation of a business selling water ice and related products. The defendants received the benefit of Rita's expertise and the use of Rita's name in connection with the frozen confection business. Tumolo testified that "frozen confections" were the natural and anticipated product line sold by Rita's. Protection of the products for which the name and good will of Rita's has value is reasonable in the context of a covenant not to compete.

### [Irreparable Harm]

Rita's is irreparably harmed by defendants' violation of the franchise agreement. Rita's has an interest in the good will its franchise has created as well as an interest in being able to place a new franchise in the area as quickly as possible. As stated in *Piercing Pagoda*, "[t]he covenant faces the economic reality that continued operation of [the former franchisee's] store subsequent to termination of the agreement would adversely affect the ability of the franchisor to secure another franchisee in the same territory." 351 A.2d at 212.

Defendants cite *In re: Arthur Treacher's Franchise Litigation*, 537 F. Supp. 311 (E.D Pa. 1982), in support of their position that a preliminary injunction should be denied because Rita's is not in a position to refranchise in the area. However, the facts in *Arthur Treacher's* are distinguishable. There, the franchisor, involved in significant litigation with its franchisees, had recently terminated the licenses of over 200 stores; it was on the verge of bankruptcy. Here, another potential franchisee had expressed interest in the area of defendant's former franchise. Until the termination of the franchise agreement, defendants had territorial protection and development rights. Rita's has an interest in expansion and desires a presence in the market; competition from the former franchisee would lead to significant harm.

Furthermore, the franchise agreements at issue are similar to the agreements signed with other franchisees. If plaintiff is unable to enforce this restrictive covenant against these defendants, the values of all its franchises are lowered. Other franchisees might violate their franchise agreements in similar ways and use Rita's good will to establish competing businesses.

### [Balance of Harm]

Defendants did not appear at the hearing or present evidence but there is no doubt that the defendants will suffer some harm if a preliminary injunction is issued. However, the harm to defendants is of their own making. Defendants breached the terms of the franchise agreement by selling unauthorized products, using Rita's service marks and trade dress, and altering Rita's recipes. A preliminary injunction will not impose a hardship on defendants beyond that necessary to protect plaintiff's contractual interests. Moreover, enforcing the restrictive covenant does not force the defendants to go out of business at their present locations; defendants may still sell snack foods such as hot dogs, chips, and soda.

### [Public Interest]

Although not heavily implicated in the instant case, the public interest supports contractual enforcement by preventing competition in violation of a valid restrictive covenant.

### [Preliminary Enforcement of Agreement]

The court will grant Rita's relief in accordance with the terms of the attached order. The court orders the termination of the franchise agreements, and permanently enjoins defendants from violating the Lanham Act. Under the terms of the franchise agreements, the court has jurisdiction over the restrictive covenants only for purposes of considering preliminary relief. Franchise Agreement, Article XXI. Plaintiff has filed with the American Arbitration Association in Philadelphia; the arbitrator[s] will render a final decision on the merits.

The court will require plaintiffs to post a bond in the amount of $100,000, in accordance with the terms of Fed. R. Civ. P. 65(c), to cover potential damages suffered by defendants if they have been wrongfully enjoined. This amount is based on the plaintiff's estimate of defendants' annual profits at $50,000 per shop; defendants did not introduce any evidence regarding their profits.

Any facts in the Discussion section not set forth in the Findings of Fact are incorporated therein.

### CONCLUSIONS OF LAW

1. Defendants violated the franchise agreement by selling unauthorized products, using Rita's service marks and trade dress, and altering Rita's formulas.

2. Rita's is likely to succeed on the merits because the restrictive covenant relates to a protectible interest, is supported by consideration, and is reasonable in both time and territory.

3. Rita's will suffer irreparable harm if the covenant is not enforced; the established harm to Rita's outweighs the foreseeable harm to the defendants.

4. The public interest supports enforcement of the covenant.

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

PLAINTIFF'S
EXHIBIT
6
PENGAD-Bayonne, N.J.

## [¶ 9410] Noncompetition Agreement Was Reasonable, Enforceable

### Sparks Tune-Up Centers, Inc. v. Gary White.

U.S. District Court, Eastern District of Pennsylvania. Civil Action No. 89-664. Filed April 19, 1989.

**Common Law—Noncompetition Agreements—Reasonableness—One Year—Ten-Mile Radius—Franchisee's Continuing Obligations—Injunctive Relief.**—A noncompetition agreement prohibiting a franchisee from operating an automobile tune-up center or a similar business within 10 miles of its franchise for one year after termination was reasonable and enforceable, even though the franchisee had a continuing duty to meet payroll and rental obligations. Permitting the franchisee to operate at the franchise location after termination would interfere with customer relationships established by the franchisor. Since such interference would cause incalculable and irreparable harm to the franchisor, the court granted an injunction against the franchisee's violation of the clause. Back references: ¶ 810.05, 850.

### Memorandum

[In full text]

NEWCOMER, J.:

#### I. *Procedural Background.*

Plaintiff, Sparks Tune-Up Centers, Inc. ("Sparks"), brought this action alleging causes of action stemming from an alleged violation of a franchising agreement by defendant Gary S. White. Sparks seeks monetary damages for the breach of contract claims. The plaintiff also seeks a declaratory judgment stating that Sparks may now discontinue its obligations pursuant to the default provisions of the contract. Plaintiff also seeks to permanently enjoin White from operating any business which would compete with Sparks Tune-Up Centers. There being no need for extensive discovery in this case the Court Ordered a short discovery period and that plaintiff's prayer for a preliminary injunction be addressed at trial as a claim for permanent injunctive relief.

Defendant brings a counterclaim alleging that Sparks itself violated the franchising agreement. In this regard White alleged that plaintiff breached an implied covenant of good faith and fair dealing. Defendant argues that a set-off is appropriate in the event both parties are found to have violated the contract. A jury trial was held on April 17 and 18, 1989, on the issues of breach of contract. The defendant's claim for injunctive relief was tried to the bench. At the close of evidence, the Court directed a verdict for plaintiff on its breach of contract claim, and also directed a verdict for plaintiff on defendant's counterclaim regarding breach of an implied covenant of good faith dealing. The directed verdict for plaintiff on its breach of contract claim per-

tained to liability only, so the matter of damages went to the jury. The jury returned a verdict awarding plaintiff $105,951.49 in damages. What follows is my Findings of Fact and Conclusions of Law pertaining to the claim for injunctive relief.

#### II. *Overview of Applicable Law.*

A reasonable contract covenant not to compete is legal and binding in Pennsylvania. *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244 (3d Cir. 1985); *Piercing Pagoda, Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207 (1976). Under a franchise agreement where for example, the franchisor provides business expertise, business training, use of corporate names and logo, advertising assistance and exclusivity rights in a certain geographical area, the franchisor's interest may be properly protected by a reasonable covenant not to compete for a period following termination of the contract. *Id.* 351 A.2d at 210.

A covenant not to compete is unreasonable, and therefore unenforceable, if it is overly broad in time and territory, or if it creates an unreasonable hardship on the obligated party. *Krauss v. M.L. Claster & Sons, Inc.,* 434 Pa. 403, 254 A.2d 1 (1969). It is a general rule of Pennsylvania contract law that the terms of a covenant not to compete are unenforceable if they are broader than necessary to protect the business at issue and its goodwill. *Westec Security Services, Inc. v. Westinghouse Electric Corporation,* 538 F.Supp. 108, 122 (E.D. Pa. 1982).

An injunction is an extraordinary remedy which should not be issued if the parties may be adequately protected at law. *Bronstein v. Sheppard,* 50 Pa. Cmwlth. 199, 200, 412 A.2d 672, 673 (1980). However, it is a long established rule in Pennsylvania that a

¶ 9410

©1990, Commerce Clearing House, Inc.

party who is or will be injured by a violation of such a covenant not to compete is ordinarily entitled to injunctive relief. *Schwartz v. Laundry & Linen Supply Drivers*, 339 Pa. 353, 14 A.2d 438 (1940); *Records Center, Inc. v. Comprehensive Management*, 363 Pa. Super. 79, 525 A.2d 433, 436 (1987). Because the violation of a covenant not to compete results in interference with customer relationships causing nonquantifiable damages, such covenants are prima facie enforceable in equity. See *Bryant Co. v. Sling Test & Repair*, 471 Pa. 1, 369 A.2d 1164 (1976); *Bettinger v. Carl Berke Associates, Inc.*, 455 Pa. 100, 103, 314 A.2d 296, 298 (1974); *Records Center*, 525 A.2d at 436.

With these general principles in mind I now make my Findings of Fact and Conclusions of Law.

III. *Findings of Fact.*

1. Sparks Tune-Up Centers, Inc. is a Delaware corporation with its principal place of business in Illinois. Sparks is a citizen of Delaware and Illinois for the purposes of any determination of diversity of citizenship subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

2. Gary S. White is an individual and a citizen of the Commonwealth of Pennsylvania. White operates a Sparks Tune-Up franchise with its principal place of business located at 1574 Bristol Pike, Bucks County, Pennsylvania.

3. During or about May, 1985, Sparks Tune-Up was a division of MAACO Enterprises, Inc. ("Sparks/MAACO" and "MAACO" respectively). MAACO, at all times material to this case, is a corporation organized pursuant to the laws of Pennsylvania in February 1972. MAACO's principal place of business is in King of Prussia, Pennsylvania. On April 20, 1987, Sparks Tune-Up Centers, Inc. purchased, in essence, the Sparks Tune-Up division of MAACO and also purchased all rights under all Franchise Agreements entered into by Sparks/MAACO.

4. Sparks/MAACO granted franchises to persons to establish and operate automotive service centers under a uniform system developed by Sparks/MAACO. The agreements include use of federally registered proprietary marks. Sparks has continued this business pursuit since its purchase of the business.

5. On or about August 30, 1985, Sparks/MAACO and White entered into a franchise agreement under terms in which White was franchised to operate a Sparks Tune-Up Center (the "Franchise Agreement"). The Franchise Agreement was purchased by Sparks from Sparks/MAACO in conjunction with the April 20, 1987, sale. The Franchise Agreement included White's use of the "Sparks Tune-Up" tradename along with use of a logo and other marks.

6. The Franchise Agreement obligated White, *inter alia*:

a) to pay Sparks weekly royalties equal to seven percent (7%) of the gross sales from the business;

b) to submit weekly written reports to Sparks of gross sales generated by the service center; and,

c) to pay Sparks an advertising contribution in the amount of $400.00 per week, which may be increased ten percent (10%) each year.

7. White has failed and refused to submit to Sparks weekly written business reports for the report period ending January 1, 1988, and for report periods of December 2, 1988, to the present in contravention of his obligation under the Franchise Agreement.

8. With some minor exceptions White has failed and refused to pay Sparks any royalty fees since June, 1987.

9. With minor exceptions, White has also failed to pay to Sparks the advertising contribution since October, 1988.

10. White has failed to pay for products received from Sparks.

11. The Franchise Agreement provides that White would be in default of the contract in the event that the required payments owing from the franchisee are more than thirty (30) days overdue.

12. Notwithstanding White's refusal to pay the fees owed and to submit reports as required pursuant to the Franchise Agreement White continues to operate a Sparks Tune-Up Center.

13. The Franchise Agreement also provides that upon termination of the franchise, the franchisee shall not compete directly or indirectly with Sparks by operating an auto service facility within a radius of ten miles of the existing franchise center for a period of one year following termination.

IV. *Conclusions of Law.*

1. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties and the amount of controversy is in excess of $10,000, exclusive of costs and interests.

**20,162**    New Developments    128   9-90

2. Because of the default by White the Franchise Agreement is hereby declared terminated.

3. The covenant not to compete as set forth in the Franchise Agreement, and which covers a period of one year following contract termination and an area of a ten mile radius is a reasonable covenant. This covenant is reasonable even in light of the continuing obligations of White to meet rental and payroll obligations. Therefore the covenant is a binding contract term pursuant to Pennsylvania law.

4. Permitting White to continue a car service business at his current location would result in interference with customer relationships established by Sparks. Such interference would constitute incalculable and irreparable harm to plaintiff. Therefore, Sparks cannot be adequately protected at law with regard to the covenant not to compete.

5. White is enjoined for a period of one year from the date of these findings from engaging in any business the same as, similar to, or competitive with any Sparks Tune-Up Center at any location within a radius of ten miles of the center operated by White at the time of termination of the Franchise Agreement.

---

## [¶ 9411]  Contract Breaches Justified Termination, Not Caused by Unlawful Encroachment

### Sparks Tune-Up Centers, Inc. v. Gary White.

U. S. District Court, Eastern District of Pennsylvania. Civil Action No. 89-664. Filed May 1, 1989.

**Common Law—Franchise Termination—Contract Breaches—Encroachment—Breach of Covenant of Good Faith/Fair Dealing—Express Authority to Open Franchises.**—Failure to pay royalties, to submit weekly written reports, and to make advertising contributions were contract breaches that justified termination of an automobile tune-up franchise. While admitting that it failed to perform these contractual obligations, the franchisee claimed that the failures were caused by the franchisor's establishment of two franchises within five miles of its location. The franchisee alleged that such encroachment breached an implied covenant of good faith and fair dealing. Although Pennsylvania law recognizes the covenant of good faith and fair dealing, it does not imply the covenant in an area of a contractual relationship in which the contract has an express term. In this case, the franchisor was expressly authorized to open the new franchises. Back references: ¶ 810, 1620, 1620.10.

### Memorandum

#### [In full text]

NEWCOMER, J.: This is an action for breach of contract. Plaintiff, Sparks Tune-Up Centers, Inc. alleged that defendant Gary S. White violated a franchise agreement (the "Franchise Agreement"). Before me at the close of evidence at trial was plaintiff's motion for a directed verdict pursuant to Fed.R.Civ.P. 50(a).

In open court, after written and oral argument by the parties, I granted plaintiff's motion in part and denied it in part. What follows is the rationale in support of that Order.

I. *Background.*

On August 30, 1985, Gary White entered into the Franchise Agreement with Sparks Tune-Up which, at that time, was a division of MAACO Enterprises, Inc. ("Sparks/

MAACO" and "MAACO" respectively). Pursuant to the Franchise Agreement White agreed to operate an automotive service center under a uniform system developed by Sparks/MAACO. White, as a result of the Franchise Agreement, operated a Sparks Tune-Up franchise located at 1574 Bristol Pike, Bucks County, Pennsylvania, until the time of trial.

On April 20, 1987, the plaintiff, Sparks Tune-Up Centers, Inc. ("Sparks"), purchased all the assets of Sparks/MAACO. Pursuant to this sale all the existing franchise agreements entered into by Sparks/MAACO, including the Franchise Agreement of Gary White, were transferred to Sparks.

The Franchise Agreement obligates White, *inter alia*:

1) to pay to Sparks weekly royalties equal to seven percent (7%) of the gross sales from the business;

¶ 9411    ©1990, Commerce Clearing House, Inc.

US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶10,648, Specialty Bakeries, Inc., dba Bagel Builders v. City Bagels, Inc., Jay Greenfield and Diane Greenfield, his wife, and Jordan Scheinfeldt. (Dated March 31, 1995)

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

Specialty Bakeries, Inc., dba Bagel Builders v. City Bagels, Inc., Jay Greenfield and Diane Greenfield, his wife, and Jordan Scheinfeldt.

U.S. District Court, Eastern District of Pennsylvania. No. 95-1615. Dated March 31, 1995.

**Terminated Bagel Franchisee Enjoined from Violating Noncompetition Agreement**

**Preliminary Relief --Enforcement of Noncompetition Agreement --Protection of Legitimate Interest --Undue Hardship --Public Interest. --**

A terminated bagel franchisee, pursuant to noncompetition provisions contained in its franchise agreements, was preliminarily enjoined from continuing to operate independent shops at its formerly franchised locations. The franchisor had a legitimate interest in enforcing the noncompetition provisions, protecting its reputation, and safeguarding its trade secrets. While the franchisee would undoubtedly suffer serious harm as a result of the injunction, any such harm was a foreseeable consequence of its admitted breach of the franchise agreements. Furthermore, protection of the franchisor's trademark would serve the public interest by reducing consumer confusion.

Back references: ¶810, ¶850.

## MEMORANDUM

## [In full text]

KELLY, J: Plaintiff Specialty Bakeries, Inc., d/b/a Bagel Builders ("Bagel Builders") filed this case on March 20, 1995, along with a motion for a preliminary injunction and temporary restraining order, alleging various trademark and breach of contract claims. After a conference in chambers on March 23, 1995, I found that immediate and irreparable harm would occur to Bagel Builders if a temporary restraining order was not entered, and accordingly I entered such an order and scheduled a preliminary injunction hearing for March 28, 1995.

The parties stipulated that the restraints included in my order of March 23 would remain in effect, and testimony at the preliminary injunction hearing was limited to the issue of whether Bagel Builders was entitled to enforce the restrictive covenants contained in the franchise agreements by injunctive relief. Having considered the testimony at the preliminary injunction hearing, and after giving both sides an opportunity to be heard, I entered a preliminary injunction order on March 30, 1995. I am now making the following findings of fact and conclusions of law in support of that order.

## I. FINDINGS OF FACT

1. Bagel Builders is a New Jersey corporation, organized under the laws of the State of New Jersey and having a principal place of business in Moorestown, New Jersey.

2. Defendant City Bagels, Inc. ("City Bagels") is a Pennsylvania corporation, organized under the laws of the Commonwealth of Pennsylvania and with a principal place of business in Philadelphia, Pennsylvania.

3. Defendants Jay Greenfield and Diane Greenfield, husband and wife, are adult individuals who live and reside in Pennsylvania.

4. Defendant Jordan Scheinfeldt is an adult individual who lives and resides in Pennsylvania.

5. Bagel Builders is in the business of operating bagel restaurants and manufacturing bagels. There are five company-owned Bagel Builders stores and twelve franchises, most of which are located in the Philadelphia area. N.T. March 28, 1995 at 5. "Bagel Builders" was issued a registered trademark by the United States Department of Commerce on January 10, 1989. N.T. March 28, 1995 at 6; Plaintiff's Complaint, Exhibit F.

6. In 1992 defendant Jay Greenfield ("Greenfield") answered a Bagel Builders franchising advertisement in the Philadelphia Inquirer by contacting Rocco Fiorentino, president of Bagel Builders. Fiorentino knew Greenfield as an experienced franchisee who had several McDonald's franchises, and 18 to 20 Jiffy Lube franchises in Indiana. N.T. March 28, 1995 at 7.

7. After a period of negotiation, Bagel Builders entered into a franchise agreement with City Bagels on August 8, 1992 to operate a Bagel Builders restaurant at 7 Penn Center in Philadelphia. The franchise agreement expires on October 31, 2002. Plaintiff's Complaint, Exhibit A.

8. On August 9, 1992, defendants Greenfield, Diane Greenfield, and Scheinfeldt signed a guarantee agreement in which they personally guaranteed the obligations of City Bagels under the franchise agreement on the 7 Penn Center location. Plaintiff's Complaint, Exhibit B.

9. On March 2, 1994, Bagel Builders entered into a second franchise agreement with City Bagels, to operate a bagel restaurant at 30th Street Station in Philadelphia Pennsylvania. The franchise agreement expires on March 1, 2004. Plaintiff's Complaint, Exhibit C.

10. On March 2, 1994, Jay Greenfield entered into a guarantee agreement in which he personally guaranteed the obligations of City Bagels under the franchised agreement on the 30th Street Station location. Plaintiff's Complaint Exhibit D.

11. Both franchise agreements contained identical provisions in which City Bagels, among other things, agreed: to forward weekly royalty payments to Bagel Builders; to make payments into an advertising and promotion fund; to maintain the Bagel Builders image; to only offer food and drink specifically authorized in writing by Bagel Builders; to purchase all bagels from Bagel Builders or its approved supplier; that all accounts owing and not paid would bear interest at 2% per month on the 30th Street Station location and at the prime rate plus 2% annually for the 7 Penn Center location; that City Bagels could only use the Bagel Builders trademark so long as the franchise agreements were in place; that Bagel Builders had the right to physically inspect City Bagel's restaurants, books and records; that City Bagels was obligated to follow Bagel Builders policies, procedures, standards, and specifications; that Bagel Builders would remain the sole owner of all proprietary information; and finally, that City Bagels would not perform services for, be employed by, engage in or acquire, participate nor have any final or other interest in any other business offering bagels," within 15 miles of any Bagel Builders location and specifically within 15 miles of the 30th Street location and 7 miles of the 7 Penn Center location. Plaintiff's Complaint, Exhibits 1 and 3.

12. City Bagels has breached the franchise agreement. Fiorentino testified that from "day one we had trouble with royalties, advertising and products." N.T. March 38, 1995 at 24. City Bagels has not made payments for the above since September of 1994. N.T. March 28, 1995 at 24.

13. City Bagels received several notices of breach, the last one on February 8, 1995. N.T. March 28, 1995 at 26. The breach was never cured.

14. On February 8, 1995, Bagel Builders made its last delivery of product to City Bagels. Since that date, City Bagels has been using products which are not made or authorized by Bagel Builders. N.T. March 28, 1995 at 26.

15. At the March 28, hearing, Fiorentino presented a bag of bagels which contained a blueberry, cinnamon raisin, and plain bagel sold by a Bagel Builders store on the morning of the hearing, and a blueberry, cinnamon raisin and plain bagel purchased at City Bagel's 7 Penn Center location the evening before. The Bagel Builders bagels and the corresponding bagels purchased at 7 Penn Center were markedly different in appearance.

16. Bagel Builders has been receiving complaints about the quality of bagels purchased at the 2 City Bagel locations. N.T March 28, 1995 at 28-30; 72.

17. City Bagels is presently operating the 30th Street Station and 7 Penn Center locations under the name The Philadelphia Bagel Authority. For a period of time, a banner reading The PHILADELPHIA BAGEL AUTHORITY appeared over top of the Bagel Builders sign at the 7 Penn Center location. The Bagel Builders sign has since been removed. Handbills distributed at those locations contained this message:

We've changed our name...

introducing

The Philadelphia Bagel Authority

Bagel Bakery and Restaurant

NEW NAME, SAME GREAT

FRESH BAGELS, SANDWICHES, SOUPS

18. As of March 17, 1995, the name Bagel Builders was still being printed on register receipts at the two City Bagel locations. Plaintiff's Exhibit 11.

19. Part of the "management team" at City Bagel's 30th Street Station location is man who operates a Skolnick's bagel restaurant in Philadelphia. Skolnick's is a direct competitor of Bagel Builders. N.T. March 28, 1995 at 36.

20. Greenfield has told Bagel Builders that he intends to open two new bagel shops called the Fairmount Bagel Institute in the art museum and Rittenhouse Square areas of Philadelphia. N.T. March 28, 1995 at 37.

21. Bagel Builders terminated the franchise agreements with City Bagels in a letter dated March 15, 1995. Plaintiff's Exhibit 12.

22. Fiorentino testified that if a preliminary injunction were not entered, Bagel Builders would be harmed because customers at the two City Bagel locations who are expecting to purchase Bagel Builders bagels will continue to receive a different product. N.T. March 28, 1995 at 38.

## II. CONCLUSIONS OF LAW

23. This Court has jurisdiction because there is diversity of citizenship under 28 U.S.C §1332 and because it involves a trademark claim.

24. In order to obtain a preliminary injunction, a moving party must demonstrate both a likelihood of success on the merits and the probability of irreparable harm if the relief is not granted. *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990).

25. A court must consider the following factors in deciding whether to grant a preliminary injunction: the likelihood that the moving party will prevail on the merits at final hearing; the extent to which the moving party is being irreparably harmed by the conduct complained of; the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and the public interest. *S&R Corporation v. Jiffy Lube International, Inc.*, 968 F.2d 371 (3d Cir. 1992).

26. Under the franchise agreement, the law of New Jersey applies.

27. In *Jiffy Lube International, Inc. v. Weiss Brothers, Inc.*, 834 F.Supp. 683 (D.N.J. 1993) a New Jersey district

court upheld a restrictive covenant in similar circumstances to the dispute at hand. In doing so, the court cited New Jersey law that a restrictive covenant must protect a legitimate interest of the employer; must impose no undue hardship on the employee and must not impair the public interest. *Solari Industries v. Malady*, 55 N.J. 571, 264 A.2d 53 (1970).

28. Bagel Builders has a substantial likelihood of prevailing in the merits. City Bagels has not disputed that the franchise agreements had been breached.

29. The granting of a preliminary injunction would protect Bagel Builders' legitimate interests. Bagel Builders documented complaints it has received about the quality of the bagels sold at the two City Bagels locations, which by itself is a serious enough interest.

30. Bagel Builders also has a legitimate interest in enforcing its bargained-for covenant with City Bagels not to compete against it in the center city Philadelphia area. Greenfield, despite his protestations to the contrary at the preliminary injunction hearing, can only be considered an experienced franchisee who knew what he was getting into when he signed the franchise agreements containing the restrictive covenants.

31. Bagel Builders also has a legitimate interest in protecting its secrets. Greenfield acknowledged at the hearing that a man who operated a Skolnick's franchise, was helping to manage the 30th Street locations. N.T. March 28, 1995 at 87.

32. There is undoubtedly a severe and regrettable hardship to defendants. However, as in the *Jiffy Lube v. Weiss Brothers* case, whatever hardship defendants face is a foreseeable consequence of their admitted breach of the franchise agreements.

33. The public interest served in protecting a registered trademark. Consumer confusion, such as has been documented by Bagel Builders, is never a desired end.

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company



PLAINTIFF'S
EXHIBIT

**US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶9651, Diet Center, Inc. v. Virginia Mary Day. (Dated March 19, 1990)**

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**Diet Center, Inc. v. Virginia Mary Day.**

U.S. District Court, District of Massachusetts. Civil Action No. 89-40128XX. Dated March 19, 1990.

**Noncompetition Agreement Enforced Against Former Franchisee**

**Preliminary Injunction —Enforcement of Noncompetition Agreement —Irreparable Harm —Likelihood of Success —Public Interest. —**

A weight loss center franchisor was granted a preliminary injunction enforcing a noncompetition agreement against a former franchisee since continued use of the franchisor's trademark at its non-franchise weight loss clinic constituted infringement, unfair competition, and breach of contract; continued operation would cause irreparable harm to the franchisor; the franchisor had no adequate remedy at law; the franchisor was likely to succeed on the merits of its action; the balance of harm weighed in the franchisor's favor; and the public interest supported the issuance of the injunction.

**Preliminary Injunction —Enforcement of Noncompetition Agreement —Trademark Infringement —Use of Confidential Methods and Procedures —Competition Within Thirty-Mile Radius. —**

A preliminary injunction enforcing a noncompetition agreement contained in a weight loss center franchise agreement prohibited a former franchisee from continuing to use the franchisor's trademarks, trade dress, or commercial symbol; employing the franchisor's confidential methods and procedures; and competing with the franchisor within a 30-mile radius of the former franchisee's territory.

**Preliminary Injunction**

**[In full text]**

SKINNER, D.J.: Upon consideration of plaintiff Diet Center, Inc.'s ("DCI") application for a preliminary injunction, the memorandum submitted in support thereof, the argument of counsel, the evidence of record and the entire record herein and it appearing that:

1. Jurisdiction is conferred upon this Court by 15 U.S.C. §1121, 28 U.S.C. §§1331, 1332, 1338 and by the doctrine of pendent jurisdiction.

2. Venue lies in this court pursuant to 28 U.S.C. §1391.

3. Plaintiff Diet Center, Inc. ("DCI") is franchisor of weight loss and weight control centers.

4. Through its franchise system, DCI offers a comprehensive and effective weight loss and control program that includes recommended diets, daily weigh-ins, counselling, Diet Center supplements, including vitamins and the Diet Center supplement, to promote safe and effective weight loss and weight control for individuals.

5. DCI franchisees are licensed to use certain Diet Center proprietary marks, including but not limited to, Diet Center, and "How to Win at the Losing Game" and such other trade names, trademarks and service marks as are designated in writing as part of the licensed system. DCI franchisees agree to be trained by DCI and to operate their franchised businesses using the system, method and procedures developed by DCI (the "Diet Center

System").

6. Certain of DCI's License Agreements provide for sublicensing, in whole or in part, of the rights and interests acquired by franchisees under their License Agreement with DCI. Through its License Agreements, DCI controls the nature and quality of the services offered by its franchisees. Sub-franchisees agree to operate in accordance with the Diet Center System and to adhere to Diet Center standards. Franchisees which subfranchise are responsible for controlling the nature and quality of the services offered by their subfranchisees and to assure that they meet the standards set by DCI for all users of the Diet Center trademarks and service marks.

7. In order to identify weight loss and control businesses that operate within the Diet Center System, DCI has employed and caused to be advertised throughout the United States its trademarks, trade names and service marks, including the trademark and service mark Diet Center. DCI's federal service mark Registration Nos. 1153518 and 1105803 are incontestable. DCI has continually used each of its registered marks in connection with the Diet Center System, including advertising, promotion and sale of goods and services in interstate commerce, including commerce within the Commonwealth of Massachusetts.

8. On September 22, 1982, DCI entered into a License Agreement with James R. Meyers ("Meyers") for five licensed territories in the city limits of Worcester, Auburn and Shrewsbury and within the county limits of Worcester County, Massachusetts. On July 10, 1984 DCI and Meyers agreed to an amendment to the Agreement substituting for certain territories the areas of Holden, Paxton, Rutland, Princeton and West Boylston in the County of Worcester in Massachusetts.

9. On August 22, 1988, Meyers entered into a Sublicense Agreement with Day for the territory of Holden, Massachusetts.

10. Pursuant to the Sublicense Agreement, Day was required, among other things, to pay an initial fee and monthly Continuing License Fees to Meyers.

11. On September 26, 1988, Day entered into a Confidential and Non-Competition Agreement with DCI pursuant to which Day agreed to maintain the confidentiality of all company information and procedures and agreed not to compete with Diet Center following termination of her Sublicense Agreement for a period of two years within a thirty mile radius of her territory by:

a.

selling or delivering products or services of the kind sold and distributed by DCI or in any other manner engaging in the sale, delivery or purchase of such products and services; and

b.

engaging, directly or indirectly, in the business of weight control and diet counselling or conducting a diet and weight-loss business of any kind similar to that of DCI, or in any business competitive with DCI.

12. Day has operated the Holden Diet Center since approximately September 1988.

13. Day failed to pay outstanding amounts on the initial franchise fee owed by her to Meyers and checks paid to Meyers by Day were also returned to Meyers without payment.

14. By letter dated February 9, 1989, Meyers gave Day written notice of her defaults under the Sublicense Agreement and warned that if violations were not corrected within thirty (30) days the subfranchise would be terminated.

15. Day failed to cure her defaults.

16. By letter dated August 10, 1989, Meyers notified Day that her subfranchise was terminated, and demanded that she close her business immediately and cease using the Diet Center trademarks and service marks.

17. After the effective date of termination of her subfranchise and with the full knowledge of DCI's exclusive right to use and to authorize others to use the Diet Center trademarks and service marks, Day has

a.

employed and continues to employ the DCI trademarks and service marks in connection with the operation of the weight loss and weight control business in Holden, Massachusetts; and

b.

refused and continues to refuse to cease operating pursuant to DCI's confidential business method; and

c.

disparaged DCI and the DCI franchise system causing substantial consumer confusion.

It Further Appearing that these acts constitute trademark and service mark infringement, unfair competition and breach of contract, and that such acts are causing and will continue to cause irreparable harm to DCI; that DCI has no adequate remedy at law; that there is a likelihood that DCI will ultimately succeed on the merits of this action; that the balance of relative harm weighs in favor of DCI; and that the public interest favors the issuance of the requested injunction, it is this 19th day of March, 1990.

Ordered:

A. That until further Order of this court, defendant Day and all persons acting pursuant to her authority or in concert with her or pursuant to her direction or control, including her agents, servants, partners, employees, attorneys, successors, and assigns, are hereby enjoined from operating or doing business using the Diet Center trade name, service marks, trademarks or any other proprietary mark, trade dress, slogan, sign, symbol or device associated with Diet Center and the Diet Center System; and from operating or doing business under any name or in any manner that might tend to give the general public the impression that Day is licensed by or otherwise associated with Diet Center or from committing any other act which infringes upon DCI's service marks or trademarks or which otherwise unfairly competes with DCI.

B. That until further Order of this court, defendant Day and all persons acting in concert with her or pursuant to her authority, direction or control, including her agents, servants, partners, employees, attorneys, successors, and assigns, are hereby enjoined from using any confidential methods, procedures and techniques associated with the Diet Center System and acquired by virtue of Day's affiliation with the Diet Center System.

C. That defendant Day shall forthwith take all steps and invoke all procedures necessary to fully comply with the post-termination obligations contained in the parties' Confidential and Non-Competition Agreement and that in connection therewith, until further Order of this court, Day is hereby enjoined from competing with Diet Center within a thirty mile radius of her territory by:

a.

selling or delivering products or services of the kind sold and distributed by DCI or in any other manner engaging in the sale, delivery or purchase of such products and services; and

b.

engaging, directly or indirectly, in the business of weight control and diet counselling or conducting a diet and weight-loss business of any kind similar to that of DCI, or in any business competitive with DCI; and

D. That defendant Day shall forthwith take all steps to turn over to DCI all procedures manuals, packaging, signs, advertising, promotional materials or other materials bearing DCI's name or mark; and

E. That plaintiff DCI is hereby required to post a bond in the amount of $100.00.

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

PLAINTIFF'S EXHIBIT 9
PENGAD-Bayonne, N. J.

**US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶11,345, ATL International, Inc. v. Mohammad Baradar. (Dated November 12, 1997)**

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**ATL International, Inc. v. Mohammad Baradar.**

U.S. District Court, District of Maryland. Civil No. JFM-97-3642. Dated November 12, 1997.

**Relationship/Termination --Noncompetition Agreements --Preliminary Relief --Enforcement of Agreement --Reasonableness of Terms --Irreparable Harm to Franchisor. --**

An automotive repair franchisor was entitled to a preliminary injunction enforcing a franchise agreement's post-termination covenant not to compete against the franchisee. The covenant's geographic and time limitations --ten miles and two years --were reasonable. In addition, the franchisor would suffer irreparable harm if the franchisee were permitted to continue operating in violation of the covenant. Allowing a "breakaway" franchisee to continue operating in violation of a covenant not to compete very well could send a signal to other disgruntled franchisees that they could also break away, thereby unraveling the entire franchise system. No monetary remedy could adequately compensate the franchisor for such harm. While the franchisee undoubtedly would suffer harm if an injunction were issued, any such harm was the direct result of its executing an agreement containing a noncompetition covenant.

**Back references: ¶845.60, ¶845.70.**

**PROCEEDINGS**

**[In full text]**

THE COURT: Who do I have on the line?

MR. HILLMAN: Your Honor, this is Allan Hillman and Grover Outland, General Counsel for ATL International.

Your Honor, I have the honor of presenting to Your Honor Thomas B. Howell, the President of ATL.

Your Honor, also on the line is chief counsel for Mr. Baradar, J. Michael Dady, in Minnesota, his colleague, Mr. Jeffrey Haff, and Mr. Baradar himself is also on the line from Oregon.

THE COURT: All right. If I could please ask you all to identify yourselves each time you speak since I do have a court reporter here.

We are here in the case of ATL International versus Baradar, Civil Action Number JFM-97-3642, on ATL's motion for a preliminary injunction.

The last legal memorandum was submitted by ATL. I did get these transcripts that Mr. Baradar submitted, but I would think the most efficient way to proceed would be to hear from Mr. Baradar to respond to the reply memorandum that ATL has filed.

Who would like to speak for Mr. Baradar?

MR. DADY: I would, Your Honor. This is Michael Dady with the firm of Dady & Garner in Minneapolis today.

THE COURT: All right. Go ahead.

MR. DADY: With respect to the issue of injunctive relief, Your Honor, the concept is basically this, it seems to me. The wrecking ball is about to knock over the historic building. In other words, is there some type of irreparable harm that is going to incur here if the Court does not grant the relief requested?

The courts in your jurisdiction look at that as the preeminent criteria, as does the United States Supreme Court in the case of Sampson versus Murray. They say that you've got to look at that first, and the irreparable harm must both, be both substantial and irreparable.

In this case there is an adequate remedy at law. Sometimes in Maryland they talk about that as being a separate factor. It does seem to me that one is the mirror image of the other; that is, in determining whether there is an irreparable injury or not, you look at would money damages be adequate?

In this case the franchisor is claiming they are entitled to keep my client out of the business of providing oil changes and lube jobs and related services for two years. If in fact they are right —we have several reasons why we contend they are wrong —the damages are very simple.

Determine the two years worth of revenue, multiply that times seven percent, and subtract from that any mitigation efforts that the franchisor reasonably undertook or should have undertaken, and that is the damage. So there is a very clear money damages remedy here. There is no irreparable harm.

With respect to the law on this point, the segue into the law, of course, is the fact that in that regard, I noticed that the principal case, Judge, that they rely on is the case of Jiffy Lube versus Weiss Brothers, interesting because it is in the same industry. That case happens to be out of New Jersey.

In that case, however, injunctive relief was granted because, and properly so, I might add, in that case the franchisee continued to use the trademark and had been caught, in the words of the Court, with his hand in the till.

The Court said we are going to enforce in this case, where you have such unclean hands, a franchisee who admittedly has been caught with his hands in the till, we are going to enforce the covenant, but we are going to reduce it. We are not going to make this at ten miles. We are going to make this three miles. We are not going to make it two or three years. We are going to make it ten months.

But even in that case, where the franchisee is using the mark, and is caught with his hands in the till, we are going to impose a one million dollar bond because if we, the Court, are wrong here, the damages to this operator will be very substantial.

In this case, Judge, by contrast, we did not end the relationship and continue to use the mark; rather the franchisor ended the relationship. That is an important distinction. They terminated our client.

Our client has good claims against the franchisor for violations of the applicable state Franchise Acts in both Oregon and Maryland for fraud in the inducement.

In that regard, by the way, we noticed with respect to the fraud in the inducement claim that the franchisor is assuming that Maryland law applies. We don't know why because in the franchise agreement it says Maryland law applies with respect to the contract.

With respect to the fraud claim, of course, involving an Oregon plaintiff, it does seem to us that Oregon law would apply. In the case of Campbell —this is not in our brief, Judge, because it just came up in their reply — Campbell versus Southland Corporation, 127 Oregon Appellate Court 93, at 871 P.2d 487, a 1994 decision of the Court of Appeals, the Court said what most judges of the country recognize, and that is this, that the law long ago abandoned the position that a written contract must be held sacred, regardless of the fraud of one of the parties in procuring it. It is for the jury to decide whether a party is entitled to rely on a verbal representation to conflict with the written agreement.

The precise holding in this case was the question of fraud in the inducement is one for the jury, not to be disclaimed ineffectively with the writing.

There are many, many cases from other jurisdictions that hold to the same effect. I don't see there is any point in stream citing them, but they are out.

So we have different fact situations than the Jiffy Lube case. We have no irreparable harm, and we then rely principally on four cases on the fact scenario.

The case out of your jurisdiction, Your Honor, it is a Maryland case, it is Budget Rent-A-Car versus Raab. I think the franchisor does a very fair job of framing the issue with respect to looking at whether a covenant post-term should be enforced, and that is to determine whether the law of a particular jurisdiction is going to look at it like the sale of a business or they are going to look at it like an employment contract.

Where they miss the mark, however, is they suggest that we agree with them that Maryland jurisdiction would look at a franchise post-term non-compete like the sale of a business. We dispute that, and I think our brief was intended to be very clear on that.

Raab says you look at a franchise relationship. In Budget Rent-A-Car it was a rent-a-car license, a clearly sophisticated business as a franchise that changes oil and lubes a car.

They say in Maryland the test in a franchise post-term covenant is like that of an employment relationship. In applying that test, not surprisingly in the Raab case they said we are not going to shut this guy down under the circumstance. The injunction is denied.

The second case we rely on besides the Raab case is out of Ohio, and that is the Physicians Weight Loss versus Creighton case. What that case says that is important for Your Honor's determination of this issue we believe is that you need existing competition within the state in order to determine whether a covenant should be enforced. If there is no existing competition within the state, we are not going to speculate about what might happen in the future. Since there is no competition at that time, we are going to deny the covenant in the writing as a matter of law.

The facts are the same here. We can dispute how far away the next state's location is, but there is no dispute that there are no other franchise locations in the entire state.

THE COURT: Now, the state is not --

MR. DADY: By the way, Judge, you will notice in Mo's affidavit he offered his opinion. We apologize for this. He thought he was right. He offered his opinion that the closest location was in another state, was 35 miles away. That was his best estimate.

He had one of his employees drive the distance today over the commonly traveled route between Vancouver, Washington and Lake Oswego, Oregon. He is prepared to testify that the precise distance is 26.7 miles, not the 15 that is referenced in the papers of the franchisor in this case.

So we are sorry. We were off by about eight miles on that, but he drove it today when that became in dispute, or he had an employee do it, and it is 26.7 miles.

With respect to the third case, Judge, that we rely on, it is the Rem Metals case out of Oregon. That case says this. When you are looking at whether it is appropriate to grant injunctive relief in a post-term situation, you want to look at are there some real secrets? If you are looking at an employer/employee situation, are there some real trade secrets that need to be protected here against disclosure in the market place or some form of unfair competition?

The burden is upon the moving party to demonstrate some secret. We are not talking about designing or manufacturing a heart valve here. We are talking about lubricating the belts in automobiles.

The franchisor has not pointed to a single significant trade secret that it needs protection against in this situation, and that is because there are none. That is the only logical assumption or certainly their capable

counsel would have pointed them out.

So that is the Rem Metals case out of Oregon. It is cited in our brief.

The fourth case that we rely on, Judge, we mentioned. That is Campbell versus Southland, and that is the case out of Oregon which says in Oregon, when you are looking at a fraud in the inducement in a contract with an integration clause, we are going to look at all the facts, not just the document drafted by the franchisor in determining whether there has been a fraud here.

So with respect to irreparable harm, we submit there is none to the franchisor because they have an adequate remedy at law.

On the other hand, with respect to the irreparable harm to the franchisee, it is the case that if he is told, in this premises where he has got two and a half years left to go on the lease, he is out of business, he is going to be pushed in all likelihood, as his affidavit points out, certainly out of business and into bankruptcy.

There is a whole laundry list of cases that say putting a franchisee out of business constitutes irreparable harm. Indeed, the case that the franchisors rely on, Judge, the Jiffy Lube case points out, I think they called it a death penalty.

They said in that case, because he was using the trademarks of the franchisor, wanting that fact, even though he ended the relationship and he was caught with his hand in the till, the death penalty is in order there.

It isn't in order, we submit, Judge, on the facts present in this case, which is the segue into the second point that we have here, the Court properly considers under Maryland law in deciding whether it is going to grant injunctive relief, and that is balancing the hardship. We submit that the hardship to the franchisee in this case is so much greater than the hardship to the franchisor that you can't weight them on the same scale.

The franchisee is talking about a single isolated franchise out there left to develop his own market all by himself in Oregon, and there is going to be no type of irreparable harm to the franchisor if the injunction is not granted; whereas the common definition of irreparable harm, that is you are out of business, would occur in all likelihood to this franchisee if the injunction is granted. So that second factor is well tipped decidedly in favor of denying the injunction here.

With respect to success on the merits, this case is in its earliest stages, Judge. It is just a few days or several days old. We don't even have an answer in yet, but we have laid out in our responsive papers a blueprint of a claim for a violation of the Oregon Franchise Disclosure Statute.

It is elementary. When franchises are sold, they have to be done consistent with the disclosure statute in place. In this case we are selling in Oregon. You have to comply with the Oregon statute. That means no earnings are claimed, unless you make them in a specified way.

We submitted an affidavit saying that they were puffing both the earnings potential of this business and the success ratio. That is a violation of the Oregon statute. It is also a violation of the Maryland statute.

When you are looking, as you are here, at equitable relief, one of the things you look at is is the contract, pursuant to which the covenant might be enforced, is that contract void or voidable because of a statutory violation or because of a prior material breach? If so, you don't need to look any further. There is nothing to be enforced.

In this case, that leads to the next point on the merits, Judge, and that is prior material breach of commitment by the franchisor. Mo's affidavit talks about the commitment that he received to be provided with substantial site selection assistance. He was furnished with none.

He talks about the commitment that he received for ongoing assistance in advertising, for example. He got none. In fact, what he got is reversed help. They ran up some ad bills and didn't pay them. He is left defending a claim in small claims court.

So there is a prior material breach here that would excuse an otherwise existing obligation to perform on a post-term covenant not to compete.

With respect to the fourth factor, Your Honor, public policy, it is not a huge factor generally, but where you have an out-of-business situation, the case law says it is in order to take a look at public policy because we favor employment, we favor giving people an opportunity to pursue the trade that they have learned, and Mo has learned this trade, oil change, lube job. It is what he knows, and selling ancillary products.

For the franchisor to attack him in the scurrilous way they have and suggest he admits underreporting revenue is a falsehood of the greatest order.

There is a $286,000 dispute here that is comprised of two things, 110,000 to 120,000 of customer discounts. In other words, he didn't get the money. They want seven percent on that.

Secondly, he was told in training, and it is even admitted in the affidavit of the franchisor in their submission, that they say that on ancillary products you do not owe a fee. The balance of that relates to ancillary sales of other products in which no fee is owed.

So there is nothing at all admitted with respect to any underreporting or any amount new, except for the fact that when he didn't get any services, starting in about February of '97, he, in exercising self-help, he ceased continuing to send in royalty checks for getting nothing in return, let alone a promise of service.

When you look at all four of those factors, Your Honor, we submit that all four of them support denying the injunction in this case. Let's develop the facts and go forward and have the trial on the merits.

If it should turn out that the franchisor's dreams as reflected in their papers are realized, they have an adequate remedy at law because my guy will be in business and will be making money. He can pay a money judgment equal to seven percent he would have earned in the next two years, less any appropriate mitigation offset if by any chance the Court were to ignore the facts and the law as we presented them and grant the injunction.

The last thing I would say is we think you should look at the Jiffy Lube case where in that case, unlike this one, the franchisee is caught with his hand in the till. Unlike this case, he continues to operate with the trademarks and the Court says I am going to give you a three mile radius. I am going to give it to you for ten months because that is more than enough time to put another franchisee in there, and I am going to require the franchisor to post a one million dollar bond.

We think that is the worst thing that should happen in this case. For the reasons that we discussed, Your Honor, we don't think any injunctive relief should be granted. Thank you.

THE COURT: In terms of the relative harms to the party, you did not address one of their points that they suffer incalculable harm simply because the message sent to other franchisees that, you know, if you want to, just leave us, set up a business on your own, that is destructive to the very concept of the franchise.

MR. DADY: Thanks, Judge, because I want to talk about anything you want to talk about. I appreciate the opportunity to address that point.

In law school they used to call that the parade of horribles. They said when you don't have anything to argue on the facts and the law with respect to the particular situation at issue, talk about the parade of horribles, all the bad things that can happen.

What we say is the way the franchisor keeps people in the system is delivering on the commitments that it made, showing franchisees, like it said it would to my client, that there is actual value attached to this mark for staying in this system.

This is one isolated situation. Keep in mind, Judge, my client did not leave this system. This is something that they keep overlooking in their moving papers. He was terminated.

We wanted to sit down with them and negotiate a commitment from them to either honor their commitment or if not, let's cut the cord in an equitable way.

This cases arises out of the franchisor's termination of an all-by-yourself franchisee out there in Oregon and the fact that in this case the Court says to the franchisor, go ahead, if you think you have a ten million dollar or a hundred million dollar damages claim against Mo, go make it.

That should be a deterrent if they are looking for one. But in any event, it seems to me the job of the plaintiff's lawyers, the defense lawyers in this case, and the job of this Court is to decide this case. In this case we are talking about one isolated franchisee in Oregon and the harm that they talk about is speculative in the extreme.

The fact that an injunction is denied and the Court says go ahead and prove up your multimillion dollar damages if you can should give anybody out there that cares about what happens to Mo in Oregon pause about doing anything that some judge or jury might consider to be a violation of the franchisor's legal rights.

So our thought in a nutshell is the best way for any franchisor to keep his franchisee in the system is to deliver on its commitments and show them that there is value attached for staying in the system.

Secondly, we are not asking for any decision on the merits today, Judge. All we are saying is that where, as here, there is an adequate remedy at law, injunctive relief is not appropriate. It is not appropriate for the additional reasons as well.

THE COURT: All right. Mr. Outland, Mr. Hillman, who is going to be speak?

MR. HILLMAN: Your Honor, this is Allan Hillman. I would like to speak first and then provide Mr. Outland with an opportunity, if it please the Court?

THE COURT: All right.

MR. HILLMAN: Let me address Mr. Dady's point concerning the parade of horribles.

The Court in Jiffy Lube noted that —apparently the Court believed it wasn't such a parade of horribles —that specifically one of the reasons to grant the injunctive relief was that other franchisees would get the message that they could violate the agreement with impunity. These are the Court's words again. Such a result could be devastating to the franchisor. That is page 17 of our reply.

Your Honor, taking Mr. Dady's points one at a time, in the Budget case, and I appreciate Mr. Dady's characterization that we addressed it reasonably fully, and I give Mr. Outland credit for that, I think one point to be made about Budget is that it was decided in 1972, 25 years ago. It was decided at a time when there was virtually no franchising at all.

The interesting point is that apart from every other distinction between Budget and this case and all the subsequent franchise cases we cited, is that the Court didn't even ask whether there could be an analogy to sale of business cases. It treated it as if it was purely an employment case. The subject never came up.

Twenty years later Mr. Garner, who is my friend and Mr. Dady's partner, wrote a treatise in which he stated, as we quoted to Your Honor, that the appropriate analogy was the sale of business case. The reason for that is that the courts in 20 years have come around to that way of thinking.

Your Honor, I submit that the Maryland Court of Appeals presented with a franchise case in this day and age would conclude the same, but we do not have to rely on that because in this particular case there is no question that under any theory this covenant is enforceable.

Your Honor, let me note one other thing now on this subject. ATL does not merely do light maintenance. It doesn't just do oil changes, tune-ups. It is not a Jiffy Lube. It is not a Sparks Tune-Up; although in the Sparks

case, which we cited, the covenant was fully enforced for a ten mile radius.

ATL is a multifaceted organization which does heavy maintenance, including engine repairs. We haven't gotten into the subject of the radius, Your Honor, but under these circumstances, ten miles is entirely appropriate.

Five miles may have been appropriate in the Jiffy Lube situation. But in a situation where somebody gets major maintenance for $3500, like an engine repair, people will go a long distance to do that.

Your Honor, ATL used to have a longer, a longer radius in its original contracts. ATL did studies. ATL determined that ten miles was sufficient in its more recent contracts, and Mr. Baradar is a beneficiary of that.

The reason is that ATL is not interested in frustrating competition. It believes, and its legal department believes, that it ought to have a covenant not to compete to the extent necessary to protect itself, and no more.

Your Honor, with respect to the two years, Mr. Howell's affidavit goes into that at great lengths and I won't recapitulate it unless Your Honor wants to hear it, but it takes a very long time in the normal situation, particularly in view of the kind of heavy maintenance that ATL centers do, to get a center, to get through the zoning problems that don't exist necessarily with other light maintenance kinds of organizations, to find franchisees, to obtain the necessary permits, the processes set forth there.

Does it take two years all the time? No, Your Honor. Sometimes it takes longer; sometimes it takes less time, but the point is that we can't have a contract which says for every different franchisee or every different locality it will be one year for this person, five years for this, and so forth. You have to have something consistent which seems reasonable to your needs and the franchisee's protection also.

That is why the ten miles is in there because sometimes it might be that seven or eight miles would be appropriate and sometimes --

In a situation where Mr. Baradar is, where it is not a major metropolitan area, ten miles is, quite frankly, probably too little. A person who has a major job to do is going to go ten miles, is going to go 15 miles. Your Honor, ten miles is a reasonable compromise from Mr. Baradar's standpoint certainly.

Mr. Dady said that Mr. Baradar, we are trying to stop him from doing business. Well, we are not trying to stop him from doing business. We don't have one of those non-competes saying you can't compete for two years, you can't compete with our centers.

A lot of franchisors have that sort of thing. They have provisions that say you can't compete with any of the franchisor's centers for two years.

Well, we don't do that at all. This is a modest covenant. It says you can't compete within ten miles of your own center, period. That is the only restriction.

As to Mr. Baradar being trained by us to do the job, I note that in their papers they say that Mr. Baradar didn't get any training at all. Now, Your Honor, it is convenient to argue that he got trained and, therefore, he has got to keep doing this.

Well, Mr. Baradar has got a wonderful background. I wish I had it. He was a financial consultant. He was the branch manager and sales manager of two companies, none at all in the automotive industry. He has a wealth of experience. He is not in any --he doesn't have the slightest problem in going out and getting another job.

Compare him to the poor guy who was the branch manager for the tree company in the Ruhl case in Maryland, where he was enjoined in a similar fashion, and he didn't know a thing but trees; but the Court of Appeals said well, it is a reasonable covenant, we've got to protect the employer. Here we've got a franchisor.

With respect to --let me tick off their cases. I've discussed the Budget case. Mr. Outland will be thrilled to discuss it at great lengths, but it is discussed at pages 18 to 22 of our original memo.

The key here is that protectable interest is the franchise itself. Case after case still hold it. More than that, if you just put that aside, we have substantial undisputed business good will, customer good will.

As Mr. Howell's affidavit makes clear, the repeat business in this kind of business is substantial. Half the customers or more come back. They don't come back next week, but they come back. That is undisputed.

Your Honor, with respect to the 26 miles versus 35 versus 15, covenants not to compete are not analyzed, as Your Honor knows, under the nearest road. They are analyzed by taking a map and doing a radius. That is the only way you could possibly do it. That was 15 miles.

My suggestion, Your Honor, is that Mr. Baradar simply pulled the wool over his counsel's eyes when he said 35. He certainly knew it wasn't anything like 35.

With respect to trade secrets, we demonstrated —first of all, trade secrets are one of the several protectable interests that support the covenant. You do not need to prove the existence of trade secrets.

We have protectable interests proven in the area of the franchise itself, as the McDonald's case says, as the Jiffy Lube case says, and every case we've cited says, and we've shown substantial customer good will.

I believe, frankly, we have shown that there is plenty of confidential information provided to the franchisee. The manual itself, if one actually looks at it instead of quoting six lines from it, demonstrates that; but Your Honor doesn't have to find or even reach the issue of trade secrets in order to grant this covenant.

With respect to irreparable harm, as I said, the courts have said over and over again that irreparable harm is not just the message sent to the other franchisees that they can break the system. That has happened, Your Honor, many times when these covenants have not been enforced.

But irreparable harm is the franchise system itself, is the loss of good will. There is no way to calculate that. There is no way to run a franchise system without some sort of protection like this.

I would defy, frankly, Mr. Dady to find a franchisor in the United States of any significance and any success who does not have a franchise agreement with a non-compete. I would tell you, Your Honor, from doing this work for over 20 years, that most of them are more far-reaching than ATLs.

Mr. Dady makes the point that in Jiffy Lube the fellow was continuing to use the trademark after termination, and that is why the Court struck him down.

Well, there were two issues in that case, Your Honor. One is unlawful termination and the franchisee challenged it. The other was whether the covenant not to compete would be enforced. I think Mr. Dady is mixing them up innocently.

The Court said yes, it could be irreparable harm if the franchisee is terminated, but went ahead and terminated it. The Court said yes, he was caught with his hands in the till, and that was the ground, not for the issue of the non-compete, Your Honor, but for the termination.

Now Mr. Baradar, Mr. Outland can speak to this, has proffered an explanation for the 286,000 shortfall, and we've submitted an affidavit that specifically states we will accept all of that merely for the sake of argument. There is still about $190,000 left that is unaccounted for, and there is no explanation given for it.

Although Your Honor doesn't have to reach that issue and resolve it here, it is pretty clear that there is plenty of reason to terminate this man. If you want to talk about unclean hands, he is the gentleman with unclean hands.

I think in terms of the law that applies here, the law that applies here is clearly going to be Maryland law. Not only because of the choice of law clause, but as Your Honor knows, under tort law it is the place where the injury is suffered.

So even if you ignore that, under Maryland law and the law of most jurisdictions, the law of the place that suffers, being Maryland, since this is where ATL is, would be the law applied to, you know, to the tort.

Frankly, beyond that, if Mr. Baradar claims fraud on him, it is Maryland law not only because of the fact that the agreement states it, but also because he was in Maryland when he was supposedly defrauded.

The next point, Your Honor, is with respect to the covenant, and I don't dwell too much on this, Your Honor, but Judge Harvey did recognize, albeit in dictum, that ATL's post-term covenant would be in enforceable.

Your Honor, with respect to the Physicians Weight Loss Center and the issue of competition, we discussed that case at page 21 of our brief, our reply brief.

The Court said there that the problem we have is that the franchisor has abandoned his interest in preserving his good will. That is a quote we cited on page 21 of our brief. The Court found that the number of centers had gone from 35 to 2. The franchisor didn't have anybody competing, but also had no plans to have anybody competing. It simply did not have a system anymore.

In another case that was cited by them, which they don't refer to, the O.V. case, the Court said that one of the problems here is that the deterrent value of the restrictive covenant is lost without other franchisees.

Here, there are hundreds of other franchisees. There is another franchisee in the same phone book as Mr. Baradar. There is another franchisee who has employees, frankly, that Mr. Baradar was unhappy about when the fellow came and tried to take Mr. Baradar's employees. That is how close they are.

There are people going back and forth between these two places, and we've got nine people interested in franchises in that area. I guess we have eight now because Mr. Baradar told them, as we sworn in our statements, that we are a bunch of liars, but we've still got eight others.

In the International Bartending Institute case, Your Honor, which we quote, Judge Gallagher in Florida said the other franchisees have indicated that they are watching this case closely to see if they should join Ms. Baird —that is the franchisee —in failing to make her payments and then continuing operations independent of defendant.

That is exactly the case here, Your Honor. That is what is happening here. They paraded a lot of franchisees in that case in front of the judge yelling fraud. The judge said that's not the issue.

Your Honor, Mr. Dady has paraded a lot of franchisees here, although they scoured the company and just dredged up eight guys, and they all yell fraud, but, Your Honor, that's another issue.

As Judge Niemeyer recognized and Judge Harvey recognized in Payne, that's not presented here, but they are waiting to see what is going to happen. There will be another 50 people if this non-compete isn't enforced who are going to come in and yell fraud.

We stand on the Maryland law concerning fraud in the inducement, which is the general proposition. I think Judge Niemeyer's decision in the Quality case says it as well as it can possibly be said.

There is also an incredible staleness to these claims, and the ATL statute of limitations of one year is clearly violated. There is no question that these people cannot bring these claims here or in arbitration, where they have asserted them. We will deal with that in the arbitration, Your Honor, but clearly they are barred.

Your Honor, the next point is with respect to public policy, again, he has manifold opportunities to go elsewhere.

I would like to take a look at my notes, Your Honor, to see if there is anything else I would like to add before Mr. Outland speaks. If the Court will bear with me for one second, please?

THE COURT: Certainly.

MR. HILLMAN: Your Honor, I would like to close with two points. First of all, as to the bond, I am prepared to address the amount of bond. I don't want to get ahead of myself, Your Honor.

I certainly don't want to assume that we are going to reach that issue, but if the Court would like to hear that now, we have substantial argument on the bond issue.

THE COURT: I was going to ask you, so go ahead.

MR. HILLMAN: All right. I will respond to that.

Your Honor, I would cite to Your Honor several cases. First of all, with regard to Jiffy Lube, Mr. Dady is absolutely correct that the bond was set at one million dollars. The judge in that case noted that the franchisee paid $500,000 for the franchise. Mr. Baradar paid $25,000. I am going to ask Mr. Outland to do the math on that, but I believe that that is 1/20th.

On that basis, if it is 1/20th cash down, and that is what they are talking about in Jiffy Lube, we are talking about a $50,000 bond. This is consistent, Your Honor, with several cases decided on non-compete bonds recently.

I cite Your Honor Curtis versus Youngblade, 878 F.Supp. 1224, where a United States District Court in Iowa, a salesman had a $250,000 a year job and the Court said well, we are going to place a bond pretty close to that, so the bond was 200,000.

Here Mr. Baradar says that he is making between 13 and $20,000. Now under the analysis of the Curtis case, he should have 4/5ths of that as the bond. We will call it 20. Four-fifths of that would be 16,000.

Your Honor, in the Equipment & Systems versus the Zevetchin case, 864 F.Supp. 253, Massachusetts, a federal court there, several former employees had left the company and they stole all the trade secrets and competed. The company was facing ruin and the Court said the non-compete is enforced, $50,000 bond. It was only one person doing this.

Another decision in the O'Rourke case at 920 F.Supp. 1405, also a federal court case in Iowa —I guess they have a lot of crazy people in Iowa. Mr. Dady lives out there. He can tell me about that.

But the employee violated the covenant, took the trade secrets, set up a whole new business, was driving the other company into the ground, $100,000 bond, and he was making a lot more money when he had been an employee.

So, Your Honor, we suggested in our brief, Mr. Howell actually has stated in his affidavit and we put in our brief, that he had sold the center for $300,000 when he was making a hundred thousand dollars off it when he had been a franchisee, and he is very experienced in this area. Using that as a guideline, the amount of the bond would be no more than 60,000.

We are certainly prepared to put up whatever bond Your Honor believes is appropriate, but we think the neighborhood of between 20 and 60 is certainly appropriate under all the authorities and under Mr. Baradar's statement that he is just not doing real well, so how much can this business be worth?

The last statement is, Your Honor, in the Jiffy Lube case the Court said one can view a franchise agreement in part as a conveyance of the franchisor's good will to the franchisee for the length of the franchise. When the franchise terminates, the good will is metaphysically reconveyed to the franchisor. A restrictive covenant reasonably crafted is necessary to protect the good will after that reconveyance.

Jiffy Lube not only has a valid interest in protecting its good will that has been developed by having its franchisees do business, but it also has an interest in being able to place a new franchisee at or near the same location where this good will has been created.

A reasonably crafted restrictive covenant is a legally acceptable means of protecting those interests.

Finally, to the extent that the defendant suffers significant and perhaps irreparable damage in the granting of the preliminary injunction, this is a predictable consequence of their willful breach of contract and misconduct. As such, it is not the type of harm from which we seek to protect a defendant.

While the Court fashioning an equitable remedy should not impose hardship on a defendant which exceeds that required to protect a plaintiff's legitimate contractual interest, the often painful harm which follows a defendant who willfully breaches a contractual undertaking is not a basis for denying a plaintiff the relief to which it is legally entitled.

Your Honor, the post-term covenants are the only protection that ATL or any other franchisor has to effect that protection. I would like Mr. Outland to make a few remarks, if it pleases the Court.

THE COURT: All right.

MR. HILLMAN: Thank you, Your Honor.

MR. OUTLAND: If it please the Court, Your Honor, this is Grover Outland speaking. I note that Mr. Baradar's declaration is not accompanied by any contemporaneous writings at the time supporting his averments. With the ten affidavits we have just supplied, there are numerous exhibit, as many as eight exhibits of contemporaneous attachments or contemporaneous writings attached as one.

Specifically responding to something Mr. Dady said, that there was no site assistance, the Waters affidavit avers that he traveled to Oregon twice to assist Mr. Baradar. Several sites were identified. The Tualatin site was agreeable to everyone. That site actually went to lease.

I worked on the lease on that site, providing assistance from ATL headquarters in assisting Mr. Baradar and his other counsel in Oregon. My own affidavit attests to the substantial assistance that I gave Mr. Baradar and his attorney on the Lake Oswego site that is the subject of this litigation.

In fact, due to recent developments which are covered I believe in Exhibit 4 to my affidavit, the sublessor, Mr. Baradar's sublessor has abandoned the premises at that property, and he would have no legal rights whatsoever in the property if I had not insisted on the master landlord's consent letter. This sets up by way of attornment and non-disturbance certain rights that he has in terms of now being able to move forward and possibly continuing to occupy the premises.

Mr. Howell's affidavit very clearly lays out protectable interests. He speaks to nine different innovations, new programs and services that have been added over the years, a principal one of which, ATL MotorMax, the engine replacement line, Mr. Baradar enthusiastically embraced in September of 1996.

This is the type of heavy use, heavier service where customers will travel more than that ten miles where they have had a positive experience. Mr. Baradar in his declaration states that he gave quality service and he knows that these customers are coming back.

Susan Waters' affidavit and Mr. Howell's affidavit also speak to the fact that with respect to advertising assistance that Mr. Dady just complained about, that as a matter of fact, Mr. Baradar stopped making advertising contributions in September, 1995, after only two months of operation.

Furthermore, on his initial advertising fee, which is $6,000, he only paid $1,000. So I think we have to look at which party breached with respect to its obligations, and that party is clearly Mr. Baradar.

Finally, Your Honor, in conclusion, in wrapping up the arguments, the insightful arguments that Mr. Hillman has made on the law, I would like to return to Mr. Dady's analogy.

He is right. There is an historic building here. There is a wrecking ball. ATL International and its system is the historic building and Mr. Baradar, if he continues to operate in violation of the post-term covenant not to compete,

that will be the wrecking ball.

Thank you, Your Honor.

THE COURT: All right. Anybody on the plaintiff's side want to say anything? On the defendant's side, Mr. Baradar's side? Hello, hello.

MR. DADY: Michael Dady here, Judge.

THE COURT: Mr. Dady, anything you want to say in response?

MR. DADY: Yeah, very briefly. Thank you.

First of all, I would like to take challenges from Mr. Hillman and others, and the most obvious example, let me start by saying that franchisor attorneys race in contest with each other who can put the most in there with respect to shortening statutes of limitations, disclaiming applicable statutes and everything else in terms of their drafting competition.

Nevertheless, since the question was are there franchise systems out there that do not have in the formal agreement they draft non-competes, the answer is yes, there are lots of them. The most obvious is the automotive franchise. It is extremely —I am not aware of any. I have just been in that industry this week. That is why it immediately comes to mind.

But post-term non-competes are commonly not enforced and there are industries where they do not exist at all, even in the writing drafted by the franchisor. Automotive franchises would be the most obvious example.

With respect to Mr. Outland's point, you bet they helped us to draft the lease when they were signing us up with the franchise and what my client is talking about, Judge, in his affidavit, is a violation under the Franchise Statute.

So the commitment that they made to provide us with their expertise claimed at the time at selecting a site that would generate dramatic revenue and once we signed up, they left us high and dry to find a site. So Mr. Baradar did that, and the record is very clear on that.

THE COURT: How much is your client making out of this business?

MR. DADY: What's that?

THE COURT: How much is your client making out of this business?

MR. DADY: The amount that he was making as a franchisee, Mr. Hillman, when he said he has been able to eke out like 20 grand, whereas when he signed up, he was told he would make 90 or a hundred grand, that is his best information.

The situation now is, after he has had an opportunity for several days to operate private, is if it is the case that the business that he generated, and our affidavits say that it is, Judge, he generated the business out there, he generated the good will, nothing that ATL did, he reasonably believes that his business will remain the same, if not improve without ATL.

If you take his, and he is generating 400,000 plus a year in revenues, if you take seven percent of 400,000, that is about 30 grand. Add that to the 20, that is 50 grand. It is common —

You know, the New York Stock Exchange right now, the earning multiple is 20. That isn't the case with small businesses, but taking cash flow at a multiple of six to eight is common in selling small businesses.

So if you take six times the cash flow of 50 grand, that is the $300,000 that Mr. Baradar estimates is the value of his business. It appears to me, based on my review of the information, that that is low. If indeed he could

continue to operate as an independent and build on his own good will, the value of that business will be significantly higher than $300,000.

By the way, with respect to the value of the business, I think Mr. Hillman misspoke when he said my client was able to purchase this business for $25,000. There was an up-front fee I believe, Judge, of $25,000, but my client had to buy equipment, hire employees and so forth, so he had 150 to $200,000 invested in that business extremely fast. So the business is something different than what you pay for your initial franchise fee. It was dramatically higher.

With respect to the Jiffy Lube case, the New Jersey case that the franchisor relies on, Your Honor, the quote that you were given at is at page 693. What that says is this.

Defendants, that is the franchisee, have been caught with their hands in the till —indeed, they've admitted to putting their hands there. Were plaintiffs not allowed to terminate an errant franchisee, franchisees would get the message that they could defraud with impunity.

In other words, in that situation the franchisee was stealing from the franchisor, admitted to it. The franchisor continued to use the mark.

In granting the injunctive relief, the Court said at page 692, most importantly for this case, on the topic of irreparable harm, the trademark infringement amounts to irreparable injury as a matter of law.

It is undisputed in this case. There is no such trademark infringement. All of the signs have been taken down, the marks have not been used, the telephone number is not being used.

Finally, in that case the Court said while admitting the dramatic damage that would occur to the franchisee in that Jiffy Lube case, "Equitable relief against forfeiture should not be granted to a party whose own knowing fraudulent conduct is itself the cause of the forfeiture."

That is not the case here. There has been no fraud here on the part of the franchisee. The fraud was in the misrepresentations, the violations of the Franchise Act that this franchisor made in signing up this franchise.

When you look at all the factors, it is clear to say that there are dramatic difference of opinion on what the facts will ultimately show. Under this situation, Judge, the most equitable thing to do in balancing those four factors, it seems to us, is to deny the injunction. If indeed the franchisor can prove its claims, it has an adequate remedy at law.

Thank you very much.

MR. HILLMAN: Your Honor, may I have two minutes?

THE COURT: Yes.

MR. HILLMAN: This is Allan Hillman, Your Honor.

MR. DADY has made much of the fact that Mr. Baradar has been an honorable guy and took down all the signs and so forth. Your Honor, there is a problem here.

Mr. Baradar not only was totally dishonorable, but the only reason those signs came down, that the trademark was ceased being used is because we filed the lawsuit and got a TRO. We went —

THE COURT: You did not get a TRO.

MR. HILLMAN: Excuse me. I beg your pardon. We got an agreement to every part of the TRO from Mr. Garner, all right? No TRO was entered, but he agreed to every provision in the TRO, except the restrictive covenant. I will be glad to get Mr. Garner on the phone if you would like from New Jersey and he will, I am sure, state that.

That is why, Your Honor, we are only debating the non-compete because the evidence showed that after the termination, for ten days approximately, until we had to file suit, Mr. Baradar continued to use the ATL mark, answer the phone, so forth and so on, all the things that were violated.

We went in for a TRO. Mr. Garner very honorably said, Your Honor, we agree to everything in this TRO except we do not agree to the non-compete, the post-term non-compete. That is why we are here, Your Honor.

I am not saying that a TRO was actually entered. I do not mean to say that. I am saying, however, that the only reason that Mr. Baradar took down everything was because we filed suit. Then his counsel, acting very responsibly, I might say, agreed to those terms.

The next thing is that Mr. Baradar, the Court doesn't have to resolve the issue of whether Mr. Baradar had his hand in the till or not; although, we believe it is pretty clear that he did.

He didn't pay tons of royalty fees and advertising fees from almost the inception of his contract, as Mr. Outland pointed out, which was an independent basis for the termination and a substantial violation. He certainly had his hands in the till in that respect because he had our money and still does.

Obviously we don't agree that he was told he would make $90,000 or ten million or whatever. That is a dispute the Court needs to resolve.

The last two points I would make, Your Honor, are small businesses, and Mr. Howell will speak to that if Your Honor wishes because he is very experienced in this, don't go for six to eight times earnings. They go for about two times earning.

Mr. Baradar claims he is making 50,000 now. We don't have any evidence of that, Your Honor, but we still believe that even that would only be a hundred thousand dollar bond. We certainly don't believe that that would be −that would be acceptable, but certainly anything more would be rather unusual.

Finally, Your Honor, although you don't have to resolve all the disputes the parties have now, Judge Harvey made clear to this Court in two cases, the Phillips case, which I had the pleasure of being plaintiff's counsel 21 years ago, and the Cable TV case, that merely because the Court has heard the motion on affidavits, it is not foreclosed from evaluating the sworn statements in light of the overall record, and it is well-established that the Court may make findings of disputed facts on a record such as this one, that one being a record on affidavits, exhibits and memoranda.

So we believe Your Honor has the full discretion to enter this injunction, and we believe that it is a very reasonable injunction. It is the norm, if not less than the norm in this industry, the automotive aftercare industry, and we ask Your Honor to enter it.

Mr. Outland has one comment.

MR. OUTLAND: Your Honor, Grover Outland.

We don't want to concede that the trademark infringement issue at this point has been totally resolved. There is this telephone number −4551 are the last four numbers −that has been advertised under the ATL mark. It is in the current phone book for the Portland, Vancouver areas that runs all the way through the fall of 1998, advertised as All Tune and Lube. Furthermore, this phone number is also in our offering circular.

So his attempt to try to retain that phone number and trade on the good will is also a violation of the Lanham Act.

MR. HILLMAN: Your Honor, the preliminary injunction that we submitted, the proposed order would cover that issue, as well as the other.

Thank you very much for your time, Your Honor.

THE COURT: One thing I am still not clear on, in terms of the net revenues from the business, does that include from the ancillary activities for which, I don't know whether you call them royalties or whatever, the seven percent is not paid, does it include the U-haul business and everything else?

MR. DADY: Mo, maybe you can answer that for the Judge. It does include the tires and batteries and so forth. I am not sure if that 400,000 plus number would include any revenues generated from your U-haul business. Does it, Mo?

MR. BARADAR: Yes, it does. It includes that.

THE COURT: That is Mr. Baradar?

Hello? Are people still there?

MR. DADY: Yes.

MR. HILLMAN: Yes, Your Honor.

THE COURT: The $20,000 is the total net revenue?

MR. DADY: We are confusing our terms here, Judge. The revenue of the business is between 400 and 450,000 annualized.

THE COURT: Right.

MR. DADY: You asked earlier about what he was making.

THE COURT: Yeah, that is what I mean.

MR. DADY: Mr. Hillman said that that number was in the $20,000 range –

THE COURT: Right.

MR. DADY: –when he was operating as an ATL franchisee. We've acknowledged that as being in the ball park.

THE COURT: Okay.

MR. DADY: That $20,000 net –

THE COURT: Net profit.

MR. DADY: –annual number to this individual.

THE COURT: And that includes all the ancillary activities.

MR. DADY: That is my understanding. I'm not sure if you could hear Mo very well, Judge, but that is what he said.

THE COURT: That is what I thought he said.

All right. Well, I am prepared to rule.

Under Fourth Circuit law it is clear the factors that I am to apply; first, the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, two, the likelihood of harm to the defendant if the requested relief is granted, three, the likelihood that the plaintiff will succeed on the merits, and four, the public interest.

I note that this is not the conventional language of adequate remedy at law; although clearly, if one clearly had a clear monetary remedy, that would factor into the first factor that I do consider.

I am going to grant the injunction. I have no doubt that the plaintiff would suffer irreparable harm if I were to deny the preliminary injunction. As cases say, it is the franchise system itself that is at issue.

I do not take it as a parade of horribles argument at all. I think it is very realistic to expect that if a franchisee simply were to stop paying fees or stop other things that were due and then, after having operated under the franchise name for several years, were simply to then say okay, I'm breaking away, I'll stop using the various things that I've received as a franchisee and will go out on my own, that that would be a clear signal that other franchisees could do the same.

Clearly, there is before me a record that there are at least some unhappy franchisees, indeed represented by plaintiff's counsel in this case. So it is not simply a question of what is going on out there in the undefined world. There is a world that is somewhat defined by the record, and I have little doubt that my failure to grant the injunction here might unravel the franchise system.

I might say Mr. Howell's affidavit I found very well done. This is not simply a big nameless franchisor against somebody who is, granted, a small businessman. This is a small businessman who built up his business who stands to lose it if the franchise unravels. So I have little doubt that the plaintiff would suffer irreparable harm if the preliminary injunction is denied.

The idea that the monetary remedy against Mr. Baradar would be sufficient, frankly, is laughable. That is not what the harm is, and I do not accept that argument at all.

Of course, Mr. Baradar is going to suffer harm because I am granting the injunction. He is not going to be able to do this kind of business within ten miles of where he is now doing it for two years, but that is exactly what he contracted for. I am very sorry, but you enter into a contract, if the contract is reasonable, you are going to have to live with its terms.

Here, there is little doubt in my mind that the ten miles is reasonable and that the two years is reasonable. Whether or not it should be a couple more miles here, a couple more miles there, one could argue in a specific context; but on this record at least, there is no basis for me to infer that either the duration or the distance is unreasonable and indeed, I affirmatively find that they are reasonable on this record.

All of this obviously is on a record that has been developed early. It will be further developed as the litigation proceeds, but I've got to make the decision on the front end.

The likelihood that the plaintiff will succeed on the merits, that is something that clearly there are going to be factual disputes down the line. There are going to be legal issues. There are going to be choice of law issues.

There are going to be issues concerning the effect of –whether you call them integration clauses or disclaimer clauses or whatever, there are going to be issues there and there are going to be allegations made by the defendant that he was misled, whether it be in violation of common law fraud rules or franchise statutes. I am perfectly aware that those are going to be real issues in this case.

However, on the issue on which the plaintiff will bear the burden, which is essentially the reasonableness of the covenant, I have little doubt on this record that the plaintiff will prevail.

On the other issues, of course, it is the defendant who is going to bear the burden of proof. I cannot say from this record that it is likely that he is going to prevail on those.

I think that there are going to be severe serious legal obstacles, and there are some things in the record here

which, I am not going to get into credibility, but there are issues —let me just say I can't, there is no reason for me to take everything the defendant says at face value.

They are issues which are not directly related to the fraud in the inducement but, for example, the nature of how good the business was when he took it over where he is now which, you know, which obviously, on this record, I am not, I have reasons to question credibility.

I am not saying that he is not telling the truth, but I am saying that since he has got the burden, there are reasons for me to realize that credibility ultimately will be an issue.

In that regard I also take into account the question of the length of time, the alleged staleness of the claims now being asserted.

I am not saying that Mr. Baradar is not telling the truth. I have no idea. All I am saying is that it is important to recognize that his credibility will be important, that he bears the burden of proof, and on this record there obviously are going to be disputes about credibility.

The public interest I don't really think is an independent factor in this case. Of course, it is unfortunate that Mr. Baradar will not be able to stay in this line of business at that location or within ten miles of it, but there are other things that he can do. He can go in this business outside that geographic area. He can go into another business.

But in any event, the fact of the matter is that the covenant is a reasonable one, and I think that is the controlling public interest factor.

So that's my ruling. The question is how much bond to set? I will set a bond of $60,000.

Whichever way one looks at it, either by a multiple of —it wouldn't be a multiple. It would be the reverse of a multiple —of the Jiffy Lube case, assuming that it was a $500,000 franchise fee there, working backwards one could get to something, whatever it was, the 30,000 figure that Mr. Hillman mentioned, some figure, 50,000 I think.

Here, what I am really using is a, trying to value Mr. Baradar's business. If he has been operating historically at $20,000 profit basically, taking three times that is, based upon what Mr. Howell said in his affidavit about what he could sell the business for, maybe that's high to apply that multiple here, maybe it is low, but it is reasonable. So it is going to be a $60,000 bond.

Are there any specific —I don't have, of all the things I reviewed, and I have reviewed all of your papers, which I commend both sides for, they were very well done, as well as I commend both sides for the quality of the oral arguments, I do not have the preliminary injunction itself in front of me.

MR. HILLMAN: Your Honor, Allan Hillman. I will have it hand-delivered to Your Honor immediately. We had given it to Judge Young subsequent to the TRO hearing. I think he said he was going to send it along with the file.

THE COURT: It may be in the court file or it may be here somewhere. My law clerk is going to go look for it.

The reason I am raising the issue, is there anything in there specifically —obviously the concept or the idea of the preliminary injunction is objectionable to Mr. Baradar and his counsel in any event. Is there any specific language that is problematic?

MR. HILLMAN: Your Honor, Allan Hillman.

Before Mr. Dady has an opportunity to respond, I just say one thing, which is that the preliminary injunction order is precisely the same, except that it accommodates the fact that it is a preliminary, exactly the same as a TRO, the terms of which were agreed to by Mr. Dady's partner before Judge Young, excepting —as Your Honor knows, he did not agree to the non-compete.

MR. DADY: Judge, speaking to the order issue, we believe --

THE COURT: Is this Mr. Dady?

MR. DADY: This is Mr. Dady.

THE COURT: Yes.

MR. DADY: The proposed temporary restraining order is moot, except as to the discussion here today with respect to staying in business at that location. So we believe that the order should be limited to saying he is enjoined from operating at that location.

With respect to the telephone number, he bought that telephone number when he bought this business. It was an independent Lake Oswego Auto Repair that he bought, and that number was the number of that business. So we think he should be able to use that number for whatever other purpose he wants to use it.

I think we do have a dispute, as Mr. Outland has identified, with respect to that telephone number. It is not something that was given to him by ATL or that was acquired after he became an ATL franchisee. He acquired that number before he became an ATL franchisee.

So we think he should be able to keep that number and the Court's order should be limited to saying that he may not operate an ATL franchise or anything similar to it at that location.

THE COURT: Mr. Hillman, we can get into the telephone number, but as a matter of --I was going to say as a matter of the Lanham Act, but that is essentially where I don't want to go, I guess.

But as a matter of practical sense, if the telephone number is being used in some line of work other than this, is there any real harm?

MR. HILLMAN: Your Honor, Mr. Outland will address this.

MR. OUTLAND: Your Honor, but for the fact that it has been advertised in the telephone book running through 1998 under our service mark, and but for the fact also, Your Honor, that it is in our registered offering circular, I certainly could understand what Mr. Dady is trying to assert there.

I mean there is a very real danger that if Mr. Baradar operates anything under this number, the prospective franchisees calling in will receive the same kind of information that I understand caused one of them to bolt from any further consideration of the franchise.

The business there was defunct, based on the best information that we have. There did exist a phone number there. I can attest to that because of my affidavit.

I have said that I used to call that phone number, but it certainly was not a business that, you know, that had any kind of viability to it. There were just empty shop bays. I believe that to the extent Mr. Baradar purchased anything, it was simply a few items of equipment.

People will call. People will keep calling that number. In terms of Mr. Howell's affidavit, in excess of 50 percent of customers return. Existing customers familiar with the ATL mark and that center will keep calling that number.

THE COURT: Okay.

MR. HILLMAN: If he opens up more than ten miles away, Your Honor, and he keeps this phone number, then the same problem kind of problems exists with respect to trademark infringement.

THE COURT: Well, I think, as a practical matter, I don't think that prospective customers or prospective new franchisees, but particularly old customers, prospective customers, it makes any sense to having them call a

telephone number of a franchisee who has just had a covenant not to compete entered against him, so I am going to also enjoin Mr. Baradar from using that telephone number.

On the other issues, they have become moot, have they not, so there is no reason to enter the injunction?

MR. HILLMAN: Well, Your Honor, I am a little bit concerned here. Mr. Garner made clear that they agreed to the terms of the TRO and made clear that that was no longer at issue.

You know, we filed all our papers originally discussing the whole issue of the identification. There are a number of things that are required for an ex-franchisee to do in terms of identifying, in terms of protecting the information of the franchisor and so forth. They were all agreed to.

There is nothing in this order, and if Your Honor has the TRO in front of Your Honor, as I say, it is the same order.

MR. OUTLAND: Your Honor, this is Grover Outland for just a second.

Specifically under that franchise agreement, he is supposed to assign all telephone numbers used in the business. This number has been extensively advertised under the ATL mark, regardless of its origin.

So we should go ahead and receive an assignment. He should be ordered to assign that over to us.

MR. HILLMAN: They are not objecting to this, so we need this order entered. The last thing we need is there to be a dispute later about there not being an order entered on the trademark and all of sudden franchisees around the country hearing that there was some sort of preliminary injunction issued, but the Court only issued the order on the non-compete and didn't issue anything else.

Your Honor, this case is the case that is going to be known around the country as the ATL case. We need the preliminary injunction order, that they have not even objected to the form, except for the non-compete, we need that entered.

If they object to any of those terms, they should say so now. We should have been arguing that before.

THE COURT: Okay.

MR. HILLMAN: I shouldn't have been led —

THE COURT: Okay. Wait, wait, wait.

MR. HILLMAN: I didn't think it was an issue before this Court.

THE COURT: Wait a minute.

MR. DADY: My name is Michael Dady, not Michael Garner. I think my position has been very clear, and it is also Michael Garner's position as spelled out in the introduction in defendant's memorandum of law in opposition to the motion.

In the very first paragraph he said we wish to make clear that we've complied with the requirements of the franchise agreement to remove signs and so forth, such that the motion is now moot. The defendant opposes only the portion of the motion that seeks to enforce the covenant not to compete.

That is Michael Garner's position and that's Michael Dady's position. The injunction should relate only to the open issue, which is the issue related to his ability to operate the auto care facility at that specific location.

THE COURT: Okay.

MR. HILLMAN: Your Honor —

THE COURT: Mr. Hillman.

MR. HILLMAN: —I respectfully disagree with that.

THE COURT: Mr. Hillman, what I want you to do is to draft an order which essentially may be doing my work a little bit, but I don't have the order.

Just redo it to say that in light of Mr. Baradar's agreement, voluntary agreement that his counsel have now represented has been accomplished, that whatever it is that he has done is done. Those issues are now moot. So it is, therefore, not necessary for the Court to enjoin him to do this, this, and this.

Then have the injunction run only to what is remaining, which I gather from what you are telling me, I don't have it in front of me, is enforcement of the covenant not to compete and the telephone number.

What I am suggesting is if you are concerned about the form of the order, draft the order in such a way that it states in the order why it is that I am not granting the preliminary injunction as to the other things as to which there has been an agreement, and that should protect your interest; should it not?

MR. HILLMAN: Thank you, Your Honor.

MR. DADY: Judge, in that regard, I suggest to Mr. Hillman and the Court, he could just lift the language right out of the first paragraph of our brief.

THE COURT: That is what I am suggesting. Just take the language out of their brief. Everything that was agreed to, just put that in, what the injunction is not addressing, and then put in what it is. Send that over to Mr. Dady. Fax it out for approval by form.

Can you get it to me tomorrow sometime?

MR. HILLMAN: Absolutely, Your Honor. I will get it to you in the morning.

THE COURT: If you can —

MR. HILLMAN: Can the bond be posted by 5 p.m. tomorrow, Your Honor?

THE COURT: Five o'clock tomorrow. Okay?

MR. DADY: Judge, can I just intrude for one more minute here with respect to the issue of the bond?

THE COURT: Yes, Mr. Dady.

MR. DADY: I understand the Court to say that the reason you were setting the bond that low is because you had assumed that in the Jiffy Lube case, that the franchisee in that case paid a million dollars for the franchise and here we paid $25,000 and indeed, that was Mr. Hillman's argument.

Not to circle around the barn a second time, but just to quote from that case at page 693, Judge, the reason the Court in that case set a million dollar bond is because, it says, "This amount is determined on the basis of the $500,000 paid by the defendants to purchase this franchise and on the basis of the considerable losses which will be incurred by the shutting down of this business."

I am sure Mr. Hillman and Mr. Outland will concede, Jiffy Lube does not charge its franchisee the $500,000 fee to get in the business. Rather the Court looks at what is the total investment in the business, plus what's the

losses in setting that million dollar bond.

In this case the total investment was approximately $150,000, and I don't think there is any dispute about that.

But I just want to clear up that factual basis. I don't know that it makes any difference to the Court in the amount of the bond, but I just thought to be clear on our position. It appears I wasn't as clear as I intended to be, so forgive me.

THE COURT: I appreciate that, Mr. Dady. In fact, I shouldn't have referred to it at all because I really, my real basis for coming up with $60,000 was the $20,000 profit figure, historic profit figure with a multiple of three, which seems to me to be reasonable for the value of the business.

So I did refer to it. I referred to the million. I should have referred to 500,000, but I don't know what Jiffy Lube —I don't want to get into a debate about that. I should never have referred to it.

My method of analysis really was taking a look at what has been represented to me by Mr. Baradar himself as to what his annual profit has been and put a multiple of three on it. Okay?

Thank you very much.

MR. HILLMAN: Thank you, Your Honor.

THE COURT: Thank you again for the quality of your arguments.

(The proceedings concluded.)

---

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

PLAINTIFF'S
EXHIBIT
10

**US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶12,251, Servicemaster Residential/Commercial Services, L.P. v. Kenneth B. Proctor. (Filed October 31, 2001)**

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

**Servicemaster Residential/Commercial Services, L.P. v. Kenneth B. Proctor.**

U.S. District Court, District of Nebraska. Case No. 4:01CV3089. Filed October 31, 2001.

**Non-Competition Agreement –Injunctive Relief –Irreparable Harm. –**

A franchisor of cleaning services that sought injunctive relief to stop a terminated franchisee from violating the non-competition provisions of their agreement would be irreparably harmed if that relief were not granted because it faced the likelihood that other franchisees would flaunt their agreement just as the terminated franchisee did. The net result of a failure to enforce the non-competition provision would be a heavy blow to the franchise system developed by the franchisor. That type of injury could not be easily or precisely measured by an award of damages. The non-competition covenant prohibited the terminated franchisee from engaging in any cleaning services business in Lancaster County, Nebraska for a term of one year after termination.

**Back reference: ¶845.**

**Non-Competition Agreement –Injunctive Relief –Balance of Harms. –**

The balance of harms weighed in favor of a franchisor of cleaning services that sought injunctive relief to prevent a terminated franchisee from violating the non-competition provisions of their agreement. The injunction would prohibit the terminated franchisee from engaging in the cleaning business in Lancaster County, Nebraska for one year. During the one year period, the franchisee could perform cleaning work in other counties and could perform unrelated work in Lancaster County. If the injunction was not granted, the franchisor's business would be seriously harmed throughout the country for longer than a year. Other franchise holders would realize that they could reap the benefits of their franchise agreements, including the use of the franchisor's registered trademarks, goodwill, and reputation, and, later at their election and with little or no cost, begin to compete with the franchisor as if they had never signed an agreement.

**Back reference: ¶845.**

**Non-Competition Agreement –Injunctive Relief –Probability of Success on the Merits. –**

A franchisor of cleaning systems that sought injunctive relief to prevent a terminated franchisee from violating the non-competition provisions of their agreement had a probability of success on the merits because the dispute was governed by Tennessee law and Tennessee courts had enforced a very similar covenant in a very similar franchise situation for a longer period of time. Counsel for the franchisee candidly agreed that if Tennessee law applied, his client would probably lose. The non-competition covenant prohibited the terminated franchisee from engaging in any cleaning services business in Lancaster County, Nebraska for a term of one year after termination.

**Back reference: ¶845.**

**Choice of Law –Contractual Stipulation –Enforceability –Number of Contacts with State –Bargaining Power –Public Policy. –**

The choice of Tennessee law provision contained in a cleaning systems franchise agreement was valid and enforceable because: (1) the parties agreed to the choice of law provision in a written commercial contract; (2) the contacts between Nebraska and Tennessee were about evenly divided; (3) there was no convincing evidence that the franchisor's bargaining strength was substantially greater than the franchisee's; and (4) given the commercial nature of the franchise agreement, the public policy of Nebraska would not find the choice of

law selection repugnant even if it meant that a non-competition provision would be enforced between business people.

**Back reference: ¶1830.**

**Non-Competition Agreement --Injunctive Relief --Public Interest. --**

The public interest would be served by the granting of injunctive relief to a franchisor of cleaning services to prevent a terminated franchisee from violating the non-competition provisions of their agreement. The non-competition covenant prohibited the terminated franchisee from engaging in any cleaning services business in Lancaster County, Nebraska for a term of one year after termination. Enforcement of the agreement served to confirm the expectations of the business people who entered into the agreement. It was important to the rational conduct of commerce that expectations expressed in written agreements be enforced unless there was a very good reason not to do so. No such reason existed in the present dispute. There was no reason to believe that competition in Lancaster County, Nebraska for cleaning services would be adversely impacted by the enforcement of the covenant.

**Back reference: ¶845.**

## MEMORANDUM AND ORDER

### [In full text]

KOPF, D.J.: The plaintiff seeks a preliminary injunction forcing the defendant to honor the post-termination non-competition provision of a franchise agreement. I will grant the motion. [1]

As for the request for a preliminary injunction regarding trademark infringement and return of property, that portion of the motion will be denied as moot. At the evidentiary hearing I was told that those issues had been "largely cured" and the parties could probably resolve any remaining issue which had not yet then been resolved. (Tr. 11-12; 20-21; 111-13.) Nevertheless, if these disputes have not been mooted, I trust the plaintiff will notify me.

### FINDINGS OF FACT

For purposes of the preliminary injunction only, I make the following findings of fact.

### Background

1. ServiceMaster franchises a business system for residential and commercial cleaning and other related services using unique techniques, special equipment and processes, standards and specifications, products, and other methods, all associated with "ServiceMaster" trademarks, service marks, trade names and commercial symbols. (Ex. 21 ¶4.) ServiceMaster is a Delaware limited partnership with its principal place of business in Memphis, Tennessee. DLK&P was a Nebraska corporation.

2. Kenneth Proctor began working for a ServiceMaster franchise in Lincoln owned by the Johannsen [2] family in 1998. He served as the production manager, which required that he schedule jobs and maintain the vehicles. (Proctor Dep. 10:11-13:23.) Kenneth Proctor's parents, David and Linda Proctor, began to consider purchasing the ServiceMaster franchise from the Johannsens in July 1998. (Proctor Dep. 11:16-25.) Kenneth Proctor and his parents formed a Nebraska corporation, DLK&P, which was incorporated in September 1998. Its sole shareholders were David Proctor and Linda Proctor, the parents of Kenneth Proctor. David, Linda, and Kenneth Proctor were the directors and officers. (Ex. 1.) [3] DLK&P purchased ServiceMaster of Lincoln from the Johannsens on November 2, 1998. (Proctor Dep. 23:7-12.) Kenneth Proctor knew that the ServiceMaster franchise had been operating in Lincoln, Nebraska through various owners since 1972. (Proctor Dep. 27:17-28:17.) After DLK&P bought ServiceMaster of Lincoln, Kenneth Proctor continued the duties he had performed as production manager for the prior owners and assumed sales duties he had not previous held. (Proctor Dep.

12:18-13:24.) Kenneth Proctor told Katherine Giaramita, the ServiceMaster regional market manager responsible for training and support of franchisees, that he was the general manager or operations manager of the franchise and asked her to treat him as the owner. (T. 30:17-19.) Linda Proctor had no day-to-day responsibility in the business. (Proctor Dep. 31:20-22; 41:8-14.)

3. Kenneth Proctor served as Secretary of DLK&P from its inception through September 28, 2000. He resigned as secretary because he didn't like the fact that bookkeeping and record keeping were not current and that financial obligations (such as taxes and franchise fee payments to ServiceMaster) were not being met. (Proctor Dep. 39:12-40:22; 35:17-23.) After Kenneth Proctor resigned as corporate secretary, he continued to act as an employee (and did so even after the business assets were transferred to his wife). (T. 59-60, 63.)

### The Franchise Agreement and Guaranty

4. On February 10, 1999, ServiceMaster entered into a franchise agreement (the "Franchise Agreement") with DLK&P. The Franchise Agreement was executed on behalf of DLK&P by David Proctor (as President), Linda Proctor, and Kenneth Proctor (as Secretary). (Ex. 2.) The Proctors received a disclosure statement on July 16, 1998, which was the date of their first personal meeting with a ServiceMaster representative to discuss purchase of the franchise. A final copy of the franchise agreement that was later signed was received on December 2, 1998. (Ex. 2 at p.18.)

5. The Franchise Agreement contains several defined terms which affect the covenant not to compete at issue in this case. The "Franchisor" is ServiceMaster. The "Franchisee" is DLK&P. (Ex. 2, p.1.) In addition, for purposes of the non-compete provisions of paragraph 15, the definition of franchisee includes all officers and directors of DLK&P. (Ex. 2 ¶15.1.) The "Franchised Business" is a home and office cleaning business described in great detail in Exhibit A to the Franchise Agreement. (Ex. 2, ¶.1 and p.1, and Ex. A to Ex. 2.) The "System" is the program, method, and system developed by the Franchisor, and includes, without limitation,

techniques, special equipment and processes; standards and specifications for products, equipment and processes; and methods and techniques for inventory and cost controls, record keeping and reporting, personnel management, sales, promotion, and advertising....

(Ex. 2, p.1.) The Franchise Agreement licenses the use of the "Proprietary Marks" to the Franchisee. The "Proprietary Marks" consist of "certain trade names, service marks, trademarks and trade dress as are now designated and may be designated by the Franchisor in the CyberManual [not defined] or otherwise in writing as a part of the System." (Ex. 2, p.1.)

### The Non-compete Provisions

6. Paragraph 15 of the Franchise Agreement contains the non-compete provisions at issue. Paragraph 15.3, the post-termination covenant not to compete, provides as follows:

15.3 *Post-Term Covenant Not to Compete.* The Franchisee covenants that for a period of one (1) year after the expiration or termination of this Agreement, regardless of the cause of termination, except as otherwise approved in writing by the Franchisor, the Franchisee shall not, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any other person, persons, partnership or corporation, do or engage in any act proscribed by Paragraph 15.2 of this Agreement, except that the restrictions contained in Paragraph 15.2.3 of this Agreement, shall be limited during the post term period to within the Territory described in Paragraph 1.1 of this Agreement.

(Ex. 2, ¶15.3.) [4]

7. Paragraph 15.2.3 of the Franchise Agreement, incorporated by reference into paragraph 15.3, provides that the Franchisee shall not

[o]wn, maintain, engage in, or have any interest in any other business which performs any of the various programs and services licensed by the Franchisor included within the System, or other systems or programs

licensed by the Franchisor under the Proprietary Marks, both within and outside the Territory described in Paragraph 1.1 of this Agreement; provided, however, that this provision shall not apply to any ownership of the Franchisee of less than one percent (1%) of the outstanding equity securities of any publicly held corporation.

(Ex. 2, ¶15.2.) The "Territory" defined in paragraph 1.1 of the Franchise Agreement is Lancaster County, Nebraska. (Ex. 2, ¶1 & Ex. A.)

### Severability, Enforceability, and Tennessee Choice of Law Provisions

8. Paragraph 15.4 of the Franchise Agreement provides that the non-compete provisions shall be construed as independent of other covenants in the Franchise Agreement, and provides that if the covenants are found to be overbroad, the Franchisee agrees to be bound by the most restrictive covenant that would be enforceable. Specifically, it provides as follows:

15.4 *Independent Covenants.* The parties agree that each of the covenants contained in Paragraphs 15.2 and 15.3 shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Paragraph 15 is held to be unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which the Franchisor is a party, the Franchisee expressly agrees to be bound by any lesser covenant subsumed with the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant was separately stated in and made a part of this Paragraph 15.

(Ex. 2, ¶15.4.)

9. Paragraph 25.1 of the Franchise Agreement specifies that Tennessee law shall apply to the interpretation of the agreement.[5] It states as follows:

25.1 *Governing Law.* This Agreement takes effect upon its acceptance and execution by the Franchisor in the State of Tennessee, and except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §1051 *et seq.*), shall be interpreted and construed under the laws of the State of Tennessee, which laws shall prevail in the event of any conflict of law. Notwithstanding the foregoing, if the state in which the Franchised Business is located has enacted legislation regulating franchising which requires that the law of that state shall apply to the relationship created by this Agreement, it is agreed that this Agreement shall be interpreted and construed under the laws of the state in which the Franchised Business is located.

(Ex. 2, ¶15.4.) This provision establishes a general rule that Tennessee law will apply. The limited exception to that rule applies only if the franchise statutes of the state where the Franchisee is located require application of that state's law. Nebraska's franchise statutes contain no such general provision, but rather a provision that the limited restrictions of the Nebraska franchise statutes apply only to certain franchises located in Nebraska. Neb. Rev. Stat. Ann. §§87-403 (Lexis 2000). Accordingly the general rule of ¶25.1 requiring application of Tennessee law applies.

### Franchisor Entitled to Recover Costs of Enforcement

10. Paragraph 22 of the Franchise Agreement provides that the Franchisor is entitled to recover its costs of enforcing its rights under the agreement. It states as follows:

22. *COSTS OF ENFORCEMENT.* In any action brought by the Franchisor to secure or protect its rights under this Agreement, the Franchisor will be entitled to recover as part of any judgment entered in its favor attorneys' fees incurred, as well as court costs, travel and living expenses, witness and deposition fees, costs of investigation and any other costs incurred by the Franchisor as a result of the proceedings. Neither this remedy nor any other remedy exercised by the Franchisor will be deemed exclusive. The Franchisor will be entitled cumulatively to exercise any and all remedies available in law or equity, and its exercise of any one right or remedy will not preclude it from exercising any other right or remedy.

(Ex. 2, ¶22.)

## The Guaranty

11. A Personal Guaranty and Agreement to be Bound Personally by the Terms and Conditions of the Franchise Agreement (the "Guaranty") was attached to and is a part of the Franchise Agreement. David, Linda and Kenneth Proctor each signed the Guaranty in their individual capacities. Each signatory to the Guaranty (each "Guarantor") agrees to become surety and guaranty for the Franchisee's obligation under the Franchise Agreement. The Guaranty provides in pertinent part as follows:

[Each Guarantor] agree[s] to be personally bound for the payment of all amounts and the performance of the covenants, terms and conditions of the Franchise Agreement, to be paid, kept and performed by the Franchisee as though the undersigned [Guarantors] and each of them executed an agreement containing the identical terms and conditions of the Franchise Agreement.

In addition, if the Franchisee fails to comply with or defaults on any other terms andconditions of the Franchise Agreement, then the undersigned [Guarantors], and any successors or assigns to this agreement, do hereby, individually, jointly, and severally, promise and agree to comply with the terms and conditions of the Franchise Agreement for and on behalf of the Franchisee.

(Ex. 2, p.20.)

## Benefits Received by DLK&P as Franchisee

12. Kenneth Proctor had no experience doing disaster restoration work or cleaning prior to working for the Johannsens, the prior operators of the ServiceMaster franchise purchased by DLK&P. He had no formal training in such work until he attended ServiceMaster training at an academy for managers, two weeks after DLK&P bought the franchise. No one else from DLK&P attended ServiceMaster's academy of management (T. 78-80.)

13. When DLK&P bought the franchise, it received approximately 50 manuals from the Johannsens. It also received the CyberManual and computer software used to do estimating for fire and restoration jobs. (T. 81.) Kenneth Proctor acknowledged calling Ms. Giaramita, a regional franchisee manager for ServiceMaster and asking her for assistance or getting information from her on "quite a few" instances. (Proctor Dep. 30-31.) DLK&P received periodic mailings from ServiceMaster, including product updates, product catalogs and possibly technical bulletins. DLK&P purchased ServiceMaster cleaning products and received marketing material from ServiceMaster. (Proctor Dep. 29-30.) During the time that Kenneth Proctor was associated with DLK&P, d/b/a ServiceMaster of Lincoln, he had an opportunity to interact with insurance adjusters. He acknowledged that developing good referral relationships with insurance adjusters is important for success in disaster restoration work. (T. 83.)

## Registration of Trademarks

14. ServiceMaster was granted registration of its trademarks by the United States Commissioner of Patent and Trademarks, Certificate of Registration Nos. 782,584 ("ServiceMaster"), 1,931,212 ("WE SERVE cube"), and 2,085,318 ("The color yellow as applied to a vehicle"). ServiceMaster has filed an Affidavit in compliance with §§8 and 15 of the Trademark Act of 1946, as amended, for the "ServiceMaster" mark which has become incontestable under 28 U.S.C. §1065. (Ex. 21 ¶¶6-10 and Exhibits B-E.) ServiceMaster has the exclusive right to control the use of its registered servicemarks and trademarks.

## Termination of Franchise Agreement

15. By letter dated October 17, 2000, ServiceMaster provided DLK&P with a written Notice of Intent to Terminate the Franchise Agreement ("October 17 Notice") in accordance with paragraph 13.3 of the Franchise Agreement. The October 17 Notice identified payment defaults by DLK&P, and stated that if DLK&P did not cure the payment defaults within 60 days, the Franchise Agreement would be terminated effective 30 days after the expiration of the cure period. This October 17 Notice also reminded the Proctors of the post-termination noncompete agreement, as follows:

The [Franchise] Agreement also prohibits you from entering into competition with ServiceMaster in the territory covered by the Agreement for a period of one (1) year following the later date of termination or the date you cease all use of the ServiceMaster trademarks and system. ServiceMaster hereby demands strict compliance with this prohibition.

(Ex. 3.) DLK&P did not cure the defaults identified in the October 17 Notice, nor did it respond to that notice by contacting ServiceMaster. (Ex. 21 ¶14.)

16. The Franchise Agreement automatically terminated effective January 15, 2001 at the expiration of the 30-day period following the 60-day period in which DLK&P failed to cure its defaults under the Franchise Agreement. (T. 4:14-24; Ex. 21 ¶14.)

### Post-Termination Obligations of Franchisee

17. Paragraph 14 of the Franchise Agreement obligates the franchisee to comply with certain post-termination obligations, including the following:

14.1 *Association with System*. The Franchisee shall immediately cease to have the right to perform any services or use, by advertising or in any manner whatsoever, any format, methods, procedures and techniques associated with the System and the Program.

14.2 *Removal of Name*. The Franchisee's name shall be withdrawn from all published lists of persons and entities licensed to perform services associated with the System and the Franchisee shall not hold itself out to the public as a present or former franchisee of the Franchisor.

14.3 *Use of Proprietary Marks*. The Franchisee will cease and terminate all use of the Proprietary Marks and the word "ServiceMaster", in any manner whatsoever, or any colorable imitation thereof, including identification on vehicles and equipment, and it will take all steps necessary to disassociate itself from the Proprietary Marks, the Program and the System, such as the withdrawal of all advertising materials, the destruction of all letterheads, and the removal of all signsand any other articles which display the Proprietary Marks and the trade dress associated with the Proprietary Marks, including the removal of all distinctive colors, designs and decals.

14.4 *Telephone Numbers*. The Franchisee will change its telephone numbers and listings with instructions to the telephone company to transfer the telephone number(s) and listing(s) under which the Franchisee received calls for the Franchised Business to the Franchisor or another franchisee designated by the Franchisor. The Franchisee will execute a telephone supersedure form which can be submitted to the telephone company upon the termination of this Agreement to effectuate the assignment of the telephone number(s) and listing(s).

14.5 *Unfair Competition*. The Franchisee agrees, in the event it continues to operate or subsequently begins to operate another business, not to use any reproduction, counterfeit, copy or colorable imitation of the Proprietary Marks or the System either in connection with the operation or the promotion of such other business which is likely to cause confusion, mistake or deception, or which is likely to dilute the Franchisor's exclusive rights in and to the Proprietary Marks and the System, and further agrees not to utilize any trade dress or designation of origin or description or representation which falsely suggests or represents an association or connection with the Franchisor so as to constitute unfair competition.

14.6 *Return of CyberManual*. The Franchisee shall immediately turn over to the Franchisor the CyberManual and all manuals, records, files, instructions, computer software and any and all other materials relating to the operation of the Franchised Business in the Franchisee's possession, and all copies thereof (all of which are acknowledged to be the Franchisor's property), and shall retain no copy or record of any of these materials, except for the Franchisee's copy of this Agreement, any correspondence between the parties, and any other documents which the Franchisee reasonably needs for compliance with any provision of law.

14.7 *Cancellation of Assumed Name Registration*. Upon the termination or the expiration of this Agreement, the Franchisee shall take such action as shall be necessary to cancel any assumed name or equivalent registration which contains the word "ServiceMaster" or any other Proprietary Marks and the Franchisee shall

furnish the Franchisor with evidence satisfactory to the Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

...

14.9 *Compliance with Covenants.* The Franchisee shall comply with the covenants contained in Paragraph 15 and any other provisions of this Agreement with obligations that continue beyond the expiration or termination of this Agreement.

(Ex. 2, ¶14.)

### Actions Related to Post-Termination Obligations and Non-compete Provisions

18. In October 2000, a fire destroyed or damaged many (but not all) DLK&P assets: ServiceMaster-provided manuals and videotapes, vehicles, business records and equipment. (T. 60-61.) Yet the business continued to operate. In December 2000, Kenneth Proctor was running the cleaning business. DLK&P still had two vehicles painted ServiceMaster yellow and approximately 50 ServiceMaster manuals that had been boxed up but not returned to ServiceMaster. (T. 89-90.) As late as March 1, 2001, the fax number previously used by DLK&P, d/b/a ServiceMaster of Lincoln, was being used by PROClean. (T. 92.) The boxed manuals were not returned to ServiceMaster until May 22, 2001. (T. 90.)

19. On December 21, 2000, David Proctor filed a petition for relief under Chapter 7 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Nebraska. (Ex. G.) After the dissolution of DLK&P was finalized on February 11, 2001, David Proctor took possession of the assets of DLK&P, and they became part of his bankruptcy estate. (Tr. 16-19.) Kenneth Proctor sought to purchase all business assets and property formerly owned by DLK&P, Inc., d/b/a ServiceMaster of Lincoln from his father's bankruptcy estate. Kenneth Proctor knew that ServiceMaster took the position that the non-compete provision in the Franchise Agreement prevented him from buying the DLK&P business assets and using them in competition with ServiceMaster. (T. 92.) He received a March 1, 2001, letter from ServiceMaster's attorneys advising him that he was bound by the Franchise Agreement, including the post-termination non-compete provision, and that he could not use the assets of DLK&P to operate a competitive business in Lancaster County for one year after termination. (Ex. 6.) The letter included this statement:

[The Franchisor] fully expects that you will abide by the post-termination noncompete provisions of the Franchise Agreement. Consequently, if you purchase the assets of DLK&P, Inc. with the intention of operating a competitive business, you do so at your own peril and with full notice that ServiceMaster will take all actions necessary, including litigation, to enforce the post-termination noncompete provisions of the Franchise Agreement. The fact that you expended money to purchase the assets will not be a defense to ... enforcement action.

(Ex. 6.) The sale of DLK&P's assets was privately negotiated with the bankruptcy trustee and Cornhusker Bank, first lien holder on the business assets and property. (Ex. 5.) On March 12, 2001, Proctor filed an affidavit with the United States Bankruptcy Court in which he stated that any and all ServiceMaster trademarks and trade names had been "purged and removed from" the business assets and property he intended to purchase from the bankruptcy estate. (Ex. 7.) However, two of Proctor's service vehicles were not repainted to remove ServiceMaster's registered servicemark yellow color until after March 13, 2001. (T. 89; Ex. 17.) On March 20, 2001, the United States Bankruptcy Court approved the sale of all business assets and property formerly owned by DLK&P, Inc., d/b/a ServiceMaster of Lincoln to Proctor for $20,838.38. (Ex. K.)

20. On March 23, 2001, Kenneth Proctor's wife, Dawn Wiedenfeld, filed Articles of Incorporation for PROClean, Inc., a Nebraska corporation with a registered office at the same location as the office of the former DLK&P, Inc., d/b/a ServiceMaster of Lincoln. (Ex. 8.) Dawn Wiedenfeld is the sole director and sole officer of PROClean, Inc. (Ex. 8.) On April 18, 2001, Kenneth Proctor assigned to Dawn Wiedenfeld all business assets and property formerly owned by DLK&P, Inc., d/b/a ServiceMaster of Lincoln, purchased by him from the bankruptcy estate. (Ex. 14.) No money changed hands and no purchase price was established. Dawn Wiedenfeld then assigned the former DLK&P assets to PROClean, Inc. in exchange for 1,000 shares of PROClean, Inc. common stock. (Ex. 16.)

21. DLK&P, Inc., d/b/a ServiceMaster of Lincoln, maintained telephone directory listings in the Lincoln Business White and Yellow page telephone directories, advertising its business operations as "ServiceMaster of Lincoln" and using the number 402-476-4343. Proctor and PROClean, Inc. continued to accept telephone calls using the 402-476-4343 telephone number up to approximately May 10, 2001. (T. 36, 38, 98.) PROClean continues to use the facsimile 402-476-4988 that was formerly associated with DLK&P, d/b/a ServiceMaster of Lincoln. (Ex. 10; T. 92, 94.) Customers who called the 402-476-4343 number after January 10, 2001 were confused as to whether the business was ServiceMaster or PROClean. Proctor informed his employees to tell customers who expressed confusion that PROClean was a new business that had the same phone number as ServiceMaster of Lincoln. He also informed customers that they had purchased the equipment from ServiceMaster. (T. 96-97.) Proctor did not assign the phone number for "ServiceMaster of Lincoln" used by DLK&P to ServiceMaster. Instead, in April 2001 he changed the phone number for PROClean in response to ServiceMaster's lawsuit. (T. 100-01.)

22. When Proctor worked as the General Manager for DLK&P, d/b/a ServiceMaster of Lincoln, Proctor and DLK&P did not restrict their activities to the geographic boundaries of Lancaster County. (T. 101:11-22.) Between late December 2000 and April 15, 2001, Kenneth Proctor, doing business as PROClean, also did cleaning work outside of Lancaster County. (T. 77.) PROClean does not offer any services that were not also offered by DLK&P, Inc., d/b/a ServiceMaster of Lincoln. (Proctor Dep. 89.)

23. DLK&P had purchased cleaning supplies from ServiceMaster until the time of the October 2000 fire. Most were destroyed in the fire, and the remaining supplies were used up by January 15, 2001. (T. 67-68.) Some cleaning equipment used by DLK&P carried ServiceMaster marks. Those marks were removed prior to January 1, 2001 (T. 68-69.) Some trucks bore ServiceMaster marks. These marks were removed after the fire. Two of those trucks were painted the ServiceMaster yellow color, and not repainted until approximately March 1, 2001. (T. 70-71.) However, these trucks were not used between January 15, 2001 and the time they were repainted. (T. 71-72.) The CyberManual was produced in compact disk format, and the disks were not returned to ServiceMaster until May 22, 2001. Kenneth Proctor did not use the CyberManual, or computer software provided by ServiceMaster to franchisees, after May 2000. (T. 73-75.)

24. There is evidence that PROClean sent solicitations to former DLK&P customers. Kenneth Proctor's deposition testimony and his hearing testimony on this point are at odds. His deposition testimony was that PROClean sent a direct mail solicitation in the form of Exhibit 4 to 1000 former customers of DLK&P [6] and that PROClean prepared but did not mail a solicitation to commercial accounts (such as restaurants) in the form of Exhibit 9. [7] However, at the hearing held two weeks after his deposition, Proctor testified that in the interim between his deposition and the hearing he had investigated whether the solicitations in Exhibits 4 and 9 had in fact been mailed, and was advised by Lana Leighton, the PROClean office manager, that the solicitation in Exhibit 4 had not been mailed but that the solicitation in Exhibit 9 had been mailed. (T. 84:6-17; 93:5-11.) [8] Either the deposition testimony is accurate (because Proctor's hearing testimony that Ms. Leighton was questioned about mailings is not credible) or the hearing testimony is accurate (because that testimony is credible). No matter which testimony I choose to believe, there is credible evidence that a solicitation was mailed by PROClean to former customers of DLK&P, doing business as ServiceMaster of Lincoln.

25. The business assets and property of DLK&P, Inc., d/b/a ServiceMaster of Lincoln were never physically removed from the business premises, but merely passed from DLK&P to Kenneth Proctor to Dawn Wiedenfeld to PROClean, Inc. After assignment of the business assets to Dawn Wiedenfeld, Kenneth Proctor became an employee of PROClean, Inc. and operated the business on a daily basis. At no time did the business cease operating throughout the time period during which David Proctor filed bankruptcy, the Franchise Agreement terminated, PROClean was incorporated and the assets transferred from the bankruptcy estate to Kenneth Proctor to Dawn Wiedenfeld to PROClean, Inc. During this entire time, Kenneth Proctor continued to operate the business out of the same location with the same employees and the same equipment performing the same services using the same phone number on a daily basis.

26. There are two other ServiceMaster franchises in Lincoln, one of which is a residential and disaster restoration business identical to that operated by DLK&P. A franchisee manager for ServiceMaster testified that these other Lincoln franchisees are "very interested" in the outcome of this pending case. (T. 40:4.) She stated as follows:

They are obviously interested that the franchise fees that they continue to pay to our company under their franchise agreements are protecting the name that they are using. They are interested that we as a company

enforce and take seriously the provisions of our franchise agreement, not just the noncompete provisions but the franchise agreement as a whole. One of the franchise owners, in particular, that's here in Lincoln has expressed to me several times over the years that he's contemplated disassociating himself with ServiceMaster and doing basically the same thing that Ken Proctor is doing here, and I have repeatedly said to him that that would be in violation of his franchise agreement, and so he's watching this case with great interest, I'm sure.

(T. 40:6-20.)

## II. ANALYSIS

The plaintiff's request for a preliminary injunction to enforce the non-competition provisions of the franchise agreement is, of course, governed by well-known framework found in *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc). There the Court of Appeals stated I must look at four factors when considering whether to grant a motion for preliminary injunction. Those factors are: (1) the threat of irreparable harm to the movant; (2) the balance between the harm to the movant and the injury that granting the injunction will inflict on the other party; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Id.* at 113. I approach that task next.

First, I conclude that the plaintiff will suffer substantial irreparable injury unless I grant the preliminary injunction. Unless the defendant is stopped from violating the non-competition provisions of the agreement, the plaintiff faces the likelihood that other persons will flaunt their agreement just as Proctor has done here.

Indeed, the evidence shows that other franchisees of the plaintiff in the Lincoln, Nebraska, market are closely monitoring this case. The net result of a failure to enforce the non-competition provision would be a heavy blow to the franchise system developed by the plaintiff. That type of injury cannot easily or precisely be measured by an award of damages. *See, e.g., ATL International, Inc., v. Mohammad Baradar*, Civil No. JFM-97-3642, *available in* Bus. Franchise Guide (CCH) ¶11,345 (D. Md.1997) (the franchisor would suffer irreparable injury if the franchisee were permitted to continue operating in violation of a post-termination covenant not to compete; allowing breakaway franchisee to continue operating in violation of a covenant not to compete could very well unravel plaintiff's entire franchise system); *Jiffy Lube International Inc. v. Weiss Bros., Inc.*, 834 F. Supp. 683, 692-93 (D. N.J. 1993) (irreparable injury shown when post-termination covenant not to compete wasviolated by franchisee; the failure to grant injunctive relief could impede the plaintiff from enforcing the provisions of a similar agreements against other franchisees); *Economou v. Physicians Weight Loss Centers of America*, 756 F. Supp. 1024, 1039 (N.D. Ohio 1991) (irreparable injury shown when post-termination covenant not to compete was violated by franchisee; purpose of the covenants was to protect against loss of control of reputation, loss of good will, and consumer confusion and those things are not easily susceptible to proof of damages).

Second, while the burden on the defendant will not be insignificant if I grant the motion, a much greater injury will be suffered by the plaintiff if I deny it. If I grant the motion, the defendant will, in essence, be prohibited from engaging in the cleaning business in Lancaster County, Nebraska for one year. During this one-year period, the defendant can do cleaning work in other counties, and he can perform unrelated work in Lancaster County.

If I do not grant the motion, the plaintiff's franchise business will be seriously harmed throughout the country and not merely for a year. Without an injunction, other franchise holders will see that they may reap the benefit of the franchise agreement, including use of the plaintiff's registered marks, goodwill and reputation, and, later at their election and with little or no cost, begin to compete with the plaintiff as if they had never signed a franchise agreement.

Since the defendant agreed to the non-competition provision in an arms length business transaction, the plaintiff's claim of irreparable injury appears to be well-founded while the defendant's converse claim rings hollow. *See, e.g., Jiffy Lube International*, 834 F. Supp. at 693 ("To the extent that the defendants suffer significant, and in a sense irreparable, damage from the granting of the preliminary injunction, this harm is a predictable consequence of their willful breach of contract and their misconduct.")

Third, the plaintiff is likely to prevail on the merits. In coming to this conclusion, I decide that this case will be governed by Tennessee law. Defendant's counsel candidly agreed that if Tennessee law applied, his client would "probably ... lose." (Tr. 22:7). He was right.

Tennessee has enforced a very similar covenant in a very similar franchise situation for a longer period of time. *See, e.g.,* ServPro Industries, Inc. v. Pizzillo, No. M2000-00832-COA-R3CV, *available in* 2001 WL 120731 (Tenn. Ct. App. 2001) (enforcing post-termination non-competition provision in restoration and cleaning franchise agreement where husband who was bound by the agreement went to work for his wife who operated the competing business; the non-competition bar extended for 2 years within a 25 mile radius of the franchised business). I will follow that well-reasoned decision.

Tennessee law applies because of the choice of law provision in the franchise agreement. Despite the defendant's effort to evade it, this choice of law provision should be enforced. In particular, this is the correct result because (1) the parties agreed to the choice of law provision in a written commercial contract; (2) the contacts between Nebraska and Tennessee are about evenly divided; (3) there is no convincing evidence that the plaintiff's bargaining strength was substantially greater than the defendant's; and (4) given the commercial nature of the franchise agreement, the public policy of Nebraska would not find the choice of law selection repugnant even if it meant that a non-competition provision would be enforced between business people. *See, e.g., Modern Computer Systems, Inc. v. Modern Banking Systems, Inc.*, 871 F.2d 734, 738-40 (8th Cir. 1989) (enforcing forum selection and choice of law provisions in franchise agreement). *See also Restatement (Second) of Conflict of Laws* §187 (1971).

In particular, I do not agree with the defendant that Nebraska would treat this case like a contract of employment, and, as such, refuse to apply Tennessee law because Nebraska has taken a strict view of non-competition provisions involving former employees. As the Nebraska Supreme Court has stated, "We do not define the permissible scope of a covenant not to compete ancillary to the sale of a business this narrowly." *Presto-X-Company v. Beller*, 235 Neb. 55, 65, 568 N.W.2d 235, 241 (1997). Reasonable non-competition agreements are upheld in Nebraska when they involve the sale of businesses. *See, e.g., Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 755-56, 472 N.W.2d 391, 397-98 (1991) (upholding covenant not to compete in sale of business). A franchise agreement like this one is more like a sale of a business than it is a contract of employment. Thus, a Nebraska court would have no trouble applying the law of Tennessee which compels a similar result in franchise cases.

Finally, I believe the public interest will be served by granting the injunction. There is no reason to think that competition in Lancaster County, Nebraska for cleaning services will be adversely impacted if I enforce this covenant. On the other hand, enforcement of the reasonable non-competition promise serves to confirm the expectations of the business people who entered into the franchise agreement. It is important to the rational conduct of commerce that expectations expressed in written agreements be enforced unless there is a very good reason not to do so. No such reason exists in this case.

IT IS ORDERED that:

1.

      Except as noted in the following paragraph, the plaintiff's request (filing 2) for a preliminary injunction is denied as moot.

2.

      The plaintiff's request for a preliminary injunction (filing 2) regarding the non-complete clause is granted. In particular, but not by way of limitation, Kenneth B. Proctor is hereby restrained as follows: until January 15, 2002, he shall not own, maintain, engage in, or have any interest in any type of cleaning services offered by the plaintiff, ServiceMaster.

3.

      Within 15 days of this date, the plaintiff shall give security, within the meaning of Federal Rule of Civil Procedure 65(c), in the sum of $500.

[1] I apologize for the delay between the evidentiary hearing and the issuance of this opinion. Shortly after the evidentiary hearing, one of our judges was stricken with cancer and since then has been absent from the bench. Given the earlier retirement of another judge, our court was

then left with only two active district judges. That situation has caused unfortunate delays.

[2] The spelling of the prior owners' name is inconsistent in the record. *Compare* "Johansen" (Proctor Dep. 12:2) *with* "Johannsen" (T. 80:25.) I have adopted the "Johannsen" spelling used in the transcript.

Extracts of the deposition of Kenneth Proctor are attached as exhibits to the affidavit of Michael Gray, counsel for the plaintiff, which is Exhibit 20. References to "Proctor Dep." are references to these extracts.

[3] Numbered exhibits were introduced into evidence at the hearing. Lettered exhibits are attachments to the affidavit of Amelia Blanton, which is Exhibit 21. Exhibits to the Blanton affidavit are cited simply as exhibits. For instance, exhibit A to the Blanton affidavit included in the record as Exhibit 21 is cited as "Ex. A."

[4] There was evidence that the one-year period was chosen because ServiceMaster needed that long to locate and secure a new franchisee, to give customers served by the terminated franchisee time to procure services from another ServiceMaster franchisee within the same territory, and to allow the franchisor to maintain the relationships with the insurance company personnel who referred disaster work to the terminated franchisee. (T. 41:6-42:8.)

[5] I note that the Franchise Agreement also contains a consent to personal jurisdiction in Tennessee and an agreement that any enforcement proceeding will be venued in Tennessee. (Ex. 2, ¶25.4.) However, the parties have not argued that jurisdiction or venue is improper in Nebraska.

[6] In his deposition, Kenneth Proctor indicated that on or about January 10, 2001, he sent a direct mail solicitation to approximately 1,000 of DLK&P's former ServiceMaster customers informing them that he had purchased the inventory and equipment from his father and started an independent company known as "PROClean." (This solicitation is Exhibit 4.) He also indicated in his deposition that at this same time, PROClean also sent out 30 to 40 "spotlight schedules" to former ServiceMaster customers who had monthly, bi-monthly or quarterly commercial cleaning agreements with DLK&P. (Proctor Dep. 41-48.)

[7] T. 93:5-7 (describing deposition testimony).

[8] When asked why Ms. Leighton did not testify at the hearing, Kenneth Proctor stated that she could not come to the hearing because she was leaving town. (T. 88:20-24.) He acknowledged that she could have submitted an affidavit verifying that Exhibit 4 was never mailed, but that she did not. (T. 88:22-89:2.)

---

© 2007, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company