RECEIVED

2008 JAN 21  P 5: 04

CLK
U.S. DISTRICT
MI F DISTRICT AL A

U. S. DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CURVES INTERNATIONAL, INC.,    )
                               )
        Plaintiff,             )
                               )
v.                             )        CASE NO.  2007-CV-807-MHT
                               )
                               )        **JURY TRIAL REQUESTED**
                               )
LINDA S. MOSBARGER,            )
                               )
        Defendant.             )

## BRIEF IN SUPPORT OF PENDING DEFENDANT MOTIONS

**COMES NOW** the DEFENDANT, LINDA S.MOSBARGER, nee LINDA S.

LEWIS, by and through undersigned counsel, and requests this Honorable Court to

consider this brief in support of the following pending motions of the Defendant:

Motion to Re-Consider the factual dicta of the Order of December 5, 2007 [Exhibits A-

K]; Request for a Name Correction [Exhibit A]; Motion to Add Indispensable  Parties

[*Fed.R.Civ.P.19 or 20*]; Motion to Dismiss the Plaintiff's Complaint as being un-

supported factually to  raise a claim under the cited federal statutes [*Fed.R.Civ.P.

12(b)(1) & 12(b)(6)*] and the  Defendant's Summary Judgment Motion [*Fed.R.Civ.P.

56*], as grounds for such the Defendant submits the following:

I.        Factual Matters for Re-Consideration

1. Mike's Gym [aka, Fit Express, Jordan's Gym, The Jordan Community Center] was in business in 1997 prior to the Curves franchise at issue being executed in 1999. [Exhibit B]

2. At all times prior to the Divorce of Mike and Linda Lewis Mosbarger [Exhibit A], Mike's Gym [aka, Fit Express, Jordan's Gym, The Jordan Community Center] was owned and operated by both Mike and Linda Mosbarger. [Exhibit B & D]

3. Following the couple's Divorce in the spring of 2006 [Exhibit A], all Holtville, Alabama, businesses were owned and operated by Linda Lewis. [Exhibit A]

4. Holtville, Alabama, was the actual location of the Curves franchise at issue, and such is not, and never was an incorporated town or city, despite such requirement in the Franchise Contract. [Exhibit C, see Exhibit A to Franchise Contract]

5. The Curves franchise contractual agreement was not breached by Linda Lewis continuing to operate, or subsequently leasing to a third party, the pre-existing gym [Jordan's Gym, The Jordan Community Center]. [Exhibits C, F & G]

6. The Curves franchise at Section #9.B. contains an express exception for pre-existing exercise businesses:

"In consideration thereof, Franchisee therefore covenants and agrees that, *except* for any interest which Franchisee has in a competitive business on the effective date of this Agreement, by its signature herein below," to, in short, not compete. [Exhibit C]

7. The Plaintiff not rebutted the existence and applicability of the exception of pre-existing exercise businesses to this franchise contract dispute.

8. The franchise agreement should be strictly interpreted against the Plaintiff as the drafter of such.

9. Plaintiff's complaint seeks to unilaterally change the terms of the contract, and further seeks to unconstitutionally infringe upon the Defendant's right of interstate commerce, ability to contract and freedom of association.

10. Additionally, equitable estoppel and laches should bar the Plaintiff from raising this complaint at this point in time, since the Plaintiff benefited from the Defendant's built up "good will" from the pre-existing Mike's Gym business [1997] when the Curves business opened in 1999. [Exhibit B, C & K]

11. The franchise contract additionally contains a "consent" provision to pre-existing businesses in Section #9.B.1.

12. Based on prior filed affidavits of the landlords of the Mike's Gym [1997] and the Curves business at issue [Affidavits of Robert Golden & Elaine Golden], the two businesses were operated side by side with separate entrances, but with shared telephones and mailing addresses, from the inception of the Curves business in 1999 until the Curves business was dissolved by Linda Lewis in July of 2006. [Exhibit C]

13. Clearly, with regular inspections by Curves District Mangers, Curves corporate headquarters was aware and consented to the continuation of this business practice dating from 1999 until 2006. [Exhibit C]

14. At no time, during the duration of the franchise contract with Curves from 1999-2006 did the Defendant receive any notice of any objection by the Plaintiff related to her ownership and operation of the two side by side exercise operations, Mike's Gym [1997] & Curves[1999]. [Exhibit C]

15. Upon closing the Curves business in July, 2006, the Defendant gave notice to the Plaintiff.

16. At no point in time, subsequently to July, 2006, has the Defendant utilized any equipment, manuals, business practices thereof or trade marks of the Plaintiff.

17. Advertising in the Holtville, Alabama, area has always been very limited because there are no media outlets in Holtville or Deatsville, Alabama; specifically there are no newspapers, radio stations, magazine production facilities, cable or television stations located in this rural area of Elmore County, Alabama, where the Defendant at all times territory-wise was restricted. [Exhibit C]

18. Mike's Gym [aka, Fit Express, Jordan's Gym, The Jordan Community Center] was never a party to, restricted by, controlled by or subject to the franchise contract at issue. [Exhibit C]

19. Also, the Curves franchise agreement did not prohibit the Defendant from owning any other exercise equipment separate and apart from the Curves operation, specifically the equipment of the authorized pre-existing exercise business often referred to as Mike's Gym [aka, Fit Express, Jordan's Gym, The Jordan Community Center]. [Exhibit C]

20. The Plaintiff did not sustain their burden of proof in bringing this faulty breach of contract action. Nothing in any of the pleadings or injunctive relief hearing testimony indicated the Plaintiff had suffered any economic loss of income or business interference by the Defendant in late 2006 [November & December of 2006] building new facility for the pre-existing gym [aka, Mike's Gym, Fit Express, Jordan's Gym, The Jordan Community Center] next door to her house in a non-business district of rural Elmore County, Alabama, or leasing such to a

third party Ken Johnson in January of 2007, for operational purposes. [Exhibit A, B, C, D, E, F, G, H, I & K]

21. The Regional Director's testimony at the November 21,2007, injunction hearing on many issues was mistaken.  [Exhibits H& I and B & D]

22. At no time, did the Plaintiff comply with the notice or mediation provisions of the franchise agreement [Section #13 and 14.B.], prior to bringing this law suit.  It is the position of the Defendant, the Plaintiff breached numerous provisions of the franchise contract prior to and by bringing this Federal Court litigation which has been unnecessarily stressful and financially burdensome to the Defendant, in direct conflict with the terms and conditions of the contract at issue. [Exhibit C]

23. At no time did the Plaintiff seek to "amicably" and in "good faith" seek to resolve this dispute prior to instituting this litigation, contract to Section #13.A. of the contract at issue. [Exhibit C]

24. Never did the Plaintiff afford the Defendant a sixty (60) day abatement of this legal action in an effort to comply with the conciliatory spirit  and language of the contract at issue or allow for the mediation process detail in the contract within Section #13. [Exhibit C]

25. Additionally, the Defendant never received the letter set out in Exhibit 2 of the Complaint.

26. Also, the Defendant was not given proper service of process by the Plaintiff in compliance with *Fed.R.Civ.P. 4* in this matter; the only service the Defendant received to this action was from the Clerk of this Court related to the Plaintiff's petition for expedited discovery, as opposed to being delivered a copy of the Complaint, and the Defendant demand strict proof thereof. See, Defendant's Counterclaim.

27. The Defendant also requests strict proof thereof of any alleged compliance with the contested sections of the franchise contract, and maintains the Plaintiff's numerous provisional breaches to the franchise contract at issue should bar the Plaintiff from proceeding in this matter on grounds of estoppel and the Federal Rules of Civil Procedure 1,12(b)(1), 12(b)(6), 19 and 56. [Exhibit C]

28. The Defendant also requests proof of the out of state attorneys full compliance with Alabama Bar Association Rule VII, as amended. [Exhibit J]

II.    Defendant Seeks Enforcement of Franchise Contract

The Defendant also seeks to enforce the franchise agreement at issue, due to the

Plaintiff bringing this legal action contrary to the notice and mediation provisions [Sections #13 & 14.B.], the Plaintiff should be required to reimburse to the Defendant the all expenses wrongfully incurred to be made whole. Additionally, the Plaintiff for choosing to seek the return of the Curves exercise equipment which was optional under the franchise contract, should be required to forward to the Defendant $18,500 for the used Curves equipment the Defendant no long desires and has had stored since the summer of 2006, in accordance with the franchise contract at Section #12.A.8. In the alternative, the Defendant requests for this Honorable Court to require the Plaintiff to pay the Defendant for the used Curves equipment as detailed in the franchise contract [ Exhibit C at Section #12.A.8.] and pick up said equipment at the Plaintiff's expense.

### III.    Federal Law To Support the Defendant's Position

The Plaintiff's complaint is unsupported by the law of this judicial circuit. The Plaintiff should be barred from pursuing this matter by the terms and conditions of the frachise contract, equitable estoppel and the applicable federal law, as follows. Whether a party has the proper standing to bring a claim under the Lanham Act depends not on the nature of the parties as being direct competitors as the Plaintiff wrongfully alleges under the facts at hand, but rather, according to federal law, by following the "*Conte* test , on the relevant facts:

1. The nature of the plaintiff's alleged injury, i.e. whether it is of the type that Congress sought to redress in providing a private remedy for violations;

2. The directness or indirectness of the asserted injury;

3. The proximity or remoteness of party to alleged injurious conduct;

4. The speculativeness of a damage claim; and,

5. The risk of duplicative damages or complexity in apportioning damages."

*Lanham Act, Section 43(a), 15 U.S.C.A. 1125(a); Conte Brothers Automotive, Inc. v. Quaker State-Slick, 165 F.3rd 221, 225 (3rd Cir. 1998); See, Proctor & Gamble Co. v. Amway Corp., 242 F.3rd 539, 561-62 (5th Cir. 2001); Phoenix of Broward, Inc. v. McDonald's Corp., 489 F.3rd 1156, 1159-60 (11th Cir. 2007).*

The mere fact the Defendant's pre-existing exercise business Mike's Gym[aka, Fit Express, Jordan's Gym, The Jordan Community Center] was an exception to the covenant not to compete, legally blocks the Plaintiff from pursuing a Lanham Act action, such as this. Factually, there is no breach of contract or alleged economic damages, so under the *Conte* test, the Plaintiff lacks standing to bring this unfair business practices lawsuit against the Defendant. *Conte Brothers, id. at 225; Proctor & Gamble, id. at 561-62; Phoenix of Broward, id. at 1159-60; Restatement (Third) of Unfair Competition, Section 3 (1995); 4 McCarthy on Trademarks and Unfair Competition, Section 27:32 n.1 (4th ed. 1996).*

In every Federal case, the party bringing the suit must establish standing to prosecute the action. *Elk Grove Unified School District v. Newdow, 542 U.S. 1, 1,124 S.Ct. 2301, 2308, 159 L.Ed.2d 981 (2004).*    This matter fails both the "case or controversy" test of *Article III* and the limits of federal jurisdiction. To demonstrate *Article III* standing, a plaintiff must allege that 1) he has suffered an actual or threatened injury, 2) the injury is fairly traceable to the challenged conduct of the defendant and 3) the injury is likely to be redressed by a favorable ruling. *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County, 450 F.3rd 1295, 1304 (11th Cir. 2006).*    The Plaintiff's action appears to violate the U.S. Constitution and is factually not supported by Federal law. *Bender v. William Sport Area School District, 475 U.S. 534, 546 n.8,108 S.Ct. 1326, 1334 n. 8, 89 L.Ed 2d 501 (1986).*  In this matter, the primary conduct the Plaintiff asserts as wrongful is authorized by the Plaintiff's own franchise contract, specifically the Defendant under the franchise contract was authorized to own, and operate if she wished but those are not our facts, a pre-existing competing exercise facility. Therefore, the basic premise of this action is faulty. The Plaintiff should have never brought this action. The Plaintiff's Complaint fails the case and controversy test and the Federal issue test in relation to this particular franchisee and franchise contract. *Conte Brothers, id. 1165 F.3rd at 225.*

Additionally, Alabama law does not recognize a common-law tort of unfair competition. *Fed.R.Civ.P. 56; 128 U.S.C.A.; Lanham Act Section 43(a); Pundenz v. Light Fuse, Inc., 177 F.3d 1204, 1207 (11th Cir. 1999)* In light of the exception to the franchise contract authorizing the Defendant to own and operate a competitive pre-existing exercise business, the Plaintiff's complaint is without legal support. [Exhibit C]

The Plaintiff knew this but willfully sought to attack the Defendant any way. [Exhibit C] The Plaintiff has not acted in good faith in bringing this action contrary to the contract between the parties at Sections #9, 12, 13 and 14. [Exhibit C]  As this Court and the Plaintiff's legal counsel is aware no trade mark rights may be claimed in a product's functional shape or features, i.e. set up design of particular exercise equipment.  Pundez v. Light Fuse, Inc., 177 F.3rd 1204, 1207 (11th Cir. 1999).  Plus, there is no factual or legal support for this action or any damages of the Plaintiff.  *Fed.R.Civ.P. 56.*  The Defendant was authorized under the franchise contract to continue with Mike's Gym [aka, Fit Express, Jordan's Gym, The Jordan Community Center]. [Exhibit C]  Nothing the Defendant has been alleged to have done supports this legal action.  The Defendant at no point in time "knowingly and deliberately" took any unauthorized actions or any actions to harm the Plaintiff.  The Plaintiff has not proven any damages in relation to any actions of the Defendant, or proven any vindictiveness in the Defendant's lawful action of continuing to own Mike's Gym [aka, Fit Express, Jordan's Gym, The Jordan Community Center] after she closed her Curves franchise.  Therefore, the Defendant is entitled to a summary judgment in this action as a matter of law.  *Fed.R.Civ.P. 56; Optimum Tech, Inc. v. Home Depot USA, Inc., 2007 WL 465535 (11th Cir. 2007);See, Exhibit C.*

In summary, "Jordan's Gym" or "The Jordan Community Center" was clearly an authorized pre-existing business exception to the parties franchise contract at issue herein. [Exhibit C, Sec. #9.B.]  This federal action was improperly brought in breach of the franchise contract. [Exhibit C, Sec. #13 & 14.B]  The Plaintiff's Complaint does not

under the undisputed relevant facts of this matter state a federal claim for which relief can be granted. *Fed.R.Civ.P. 12(b)(1), 12(b)(6), 56.* The Defendant, Linda Lewis, respectfully requests a summary judgment as a matter of law. *Fed.R.Civ.P.56* The Defendant does not contest the Counterclaim as long as the relevant facts which led to the filing of the Counterclaim are considered by this court in the determination of whether to award attorney fees in this matter. The Plaintiff brought this action in breach of the franchise contract between the parties, breaches to at least Sections # 9.B; 12.A.8.; 13; 14.B and Exhibit A to the Curves Franchise agreement [Exhibit C]; contrary to the law of the 11th Circuit; and unsupported by any legal or equitable fact scenario, in light of the franchise contract and the documents on file in this record. [Exhibit A-K] Therefore, the Defendant seeks an ward of reasonable attorney fees, expenses related to defending this matter and specific performance of the Plaintiff's purchase of the used Curves exercise equipment in storage in the amounts of $48,000; 14,000; and 18,500, respectively- totaling $80,500 (as of this date with interest). [Exhibit C at Sec. #12.A.8.] Or, in the alternative, allow the Defendant's Counterclaim to proceed with the added indispensable parties who are essential to present the full factual circumstances surrounding the "exceptional" and out of the ordinary policies and practices the Plaintiff participated in or led to bring this unlawful action against the Defendant. *See, Fed.R.Civ.P. 19; Hodge v. State of Alabama, 643 So.2d 982, 984 (Ala. Civ. App. 1993); Holland v. City of Alabaster, 566 So2d 224 (Ala. 1990);[Exhibits A-K].* "Exceptional" cases merit an award of attorney fees, especially cases brought without legal or factual support in a willful, malicious, and harassing manner. *Lipscher V. LRP Publications, Inc., 266 F.3d 135, 1320 (11th Cir. 2001); Fed.R.Civ.P. 1; 11; 12 & 56..*

Finally, the Defendant seeks the following:

1.    Grant of the Motion to Re-Consider and supplementation of the facts submitted to this Court by Exhibits, Affidavits, Prior Record, etc. [Exhibits A-K];

2.    Grant the Defendant's Motion for Summary Judgment [Fed.R.Civ.P. 56];

3.    Order addition of indispensable parties sought in Counterclaim and subsequent Rule 19 Motion [Fed.R.Civ.P. 19];

4.    Order Defendant's name to be corrected to Linda Lewis [Exhibit A];

5.    Order Plaintiff's out of state legal to show full compliance with the provisions of the Alabama Bar Association, specifically Rule VII [Exhibit J] ;

6.    Utilize the factual support filed with this Court in relation to the Defendant's Counterclaim and this legal brief to support an award of reasonable attorney fees, court costs and related expenses in favor of the Defendant;

7.    Order specific performance of the Plaintiff's demand for the used Curves equipment according to the schedule detailed in the fracnchise contract at Section # 12.A.8. [Exhibit C]; and,

8.    Order all exhibits of the parties to be included in the record.

Respectfully submitted,

_Connie J. Morrow_
Connie J. Morrow
(#ASB-6870-O78C)
Attorney for LINDA S. LEWIS

OF COUNSEL:
Grainger Legal Services, LLC
4220 Carmichael Court, N.

Montgomery, Alabama 36106
Tel. (334) 260-0500
Fax (334) 260-5580
E-mail cgrainger@graingerlegal.com

## CERTIFICATE OF SERVICE

The undersigned verifies a true and accurate copy of this document has been delivered to the following (Defendants and purported legal counsel) by placing on this date a copy of such in the U. S. mail, proper postage prepaid, on this the 21st day of January, 2008, and addressed as follows:

Joseph W. Carlisle
William D. Jones, III
JOHNSTON, BARTON, PROCTOR & ROSE, LLP
Colonial Brookwood Center
569 Brookwood Village, Suite 901
Birmingham, AL   35209

Jason J. Stover
Micheal R. Gray
GRAY, PLANT, MOOTY, MOOTY & BENNETT, PA
500 IDS Center, 80 South Eighth Street
Minneapolis, MN   55402

_Connie J. Morrow_
Connie J. Morrow
(#ASB-6870-O78C)
Attorney for LINDA S. LEWIS

## DEFENDANT'S EXHIBITS OF SUPPORT

1. EXHIBIT A- Certified Copy of Linda Mosbarger's Divorce which Granted her right to resume use of her maiden name and ownerchi of all businesses in the Holtville, Alabama area-Curves and Mike's Gym [aka, Fit Express, Jordan's Gym, The Jordan Community Center].

2. EXHIBIT B- Wetumpka Herald Article-1997-Mike's Gym [aka, Fit Express, Jordan's Gym, The Jordan Community Center].

3. EXHIBIT C- Defendant's Copy of the Franchise Contract with Plaintiff-Curves dated April 5, 1999.

4. EXHIBIT D- Notarized Statement of Knowledge of Linda Lewis' Ownership Interest in Mike's Gym (1997)[aka, Fit Express, Jordan's Gym, The Jordan Community Center] Prior to Ownership of Curves Franchise (1999).

5. EXHIBIT E- Picture of Ken Johnson Working on New Facility-November or December, 2006.

6. EXHIBIT F- Documents of Sale of Mike's Gym [aka, Fit Express, Jordan's Gym, The Jordan Community Center] Equipmen.

7. EXHIBIT G- Lease of Building to Ken Johnson.

8. EXHIBIT H- Photo of Marilyn Fisher, who Resembles Linda Lewis and who was the trainer/instructor on duty on August 27, 2007, when Curves Regional Director Visited the Facility.

9. EXHIBIT I-True Owners of Wetumpka Curves Franchise, Who have never had or reported a conflict or Problem concerning Linda Lewis or "Mike's Gym" [aka, Fit Express, Jordan's Gym, The Jordan Community Center].  This contradicts the

Curves Regional Directors Testimony at the Injunction Hearing on November 21, 2007.

10. EXHIBIT J-Alabama State Bar Association Rule related to Out of State Lawyers Practicing Law in Alabama.

11. EXHIBIT K-Additional Photographs Made Inside Defendant's Other Gym-Mike's Gym[aka, Fit Express, Jordan's Gym].

## IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

FILED

| | | |
|---|---|---|
| IN RE: THE MARRIAGE OF | ) | |
| | ) | **MAR 13 2006** ∟ ᴗᴸ |
| **LINDA S. MOSBARGER** | ) | |
| **Plaintiff – Wife,** | ) | LARRY DOZIER |
| | ) | CIRCUIT CLERK ELMORE COUNTY |
| **and** | ) | **Case No: DR-2005-336** |
| | ) | |
| **MICHAEL G. MOSBARGER** | ) | |
| **Defendant – Husband.** | ) | |

### FINAL DECREE OF DIVORCE

The parties appeared before this honorable court on February 21, 2006, and

March 1, 2006. Upon consideration of the testimony taken and evidence presented on said dates,

the court does hereby ORDER, ADJUDGE, AND DECREE as follows:

1.      The parties are divorced on the grounds of incompatibility.

2.      Either party may again contract marriage as provided by the law of this

State, but not until after sixty (60) days of the date hereof, except to each other;

provided, however, that should an appeal be taken from this decree within

forty-two (42) days, neither party shall marry again, except to each other during

the pendency of said appeal.

3.      Each party shall have exclusive ownership and possession of any and all

of their financial deposit accounts and retirement accounts.

4.      Each party shall have exclusive ownership and possession of the personal

property within their respective possessions. However, the television set,

bedroom suite, clothes, collectibles, and other personal effects that the Wife

removed from the Husband's apartment and is currently in the physical

possession of the Wife, shall be the property of the Husband. The Wife shall

allow the Hon. Robert B. Reneau, or anyone else at his direction, to retrieve said

items from the Wife within a reasonable time following the date of this order.

5.    Any and all items that compose the coin collection that was an issue during the

final hearing of this cause, shall be awarded to the Husband.

6.    The Wife is hereby awarded the exclusive ownership and possession of the

marital residence located at 750 Shields Road, Deatsville, Alabama 36022,

subject to the Husband's equitable interest in the same in the amount of

$22,000.00. Further, the Wife shall be responsible for all remaining

indebtedness on the marital residence and shall indemnify and hold the

Husband harmless from same. At such time as the Wife shall pay the

Husband for his equitable interest in said marital residence, the Husband shall

execute a Quit Claim Deed relinquishing his interest in said property to the Wife.

7.    The Wife shall have exclusive ownership and possession of the business known as

"Curves" and any other businesses associated therewith that are located in the

Holtville/Slapout area subject to the Husband's equitable interest in same in the

amount of $4,800.00. The Wife shall indemnify and hold the Husband harmless

from any and all liabilities associated with said business.

8.    The Wife shall pay the sum of $26,800.00 (representing the Husband's equitable

interest in the marital residence and "Curves") to the Hon. Robert B. Reneau on

behalf of the Husband by no later than May 1, 2006.

9.    Each of the parties shall pay for one-half (1/2) of the appraisal fees in this cause.

Specifically, each party shall pay the sum of $165.00 to Michael Respess for his

appraisal of the coin collection, and the sum of $4,128.78 to Brad Turner of

Aldridge Borden & Company. Said appraisals have been deemed by this

court to be accurate.

10.    The Hon. Robert B. Reneau is awarded a *Guardian ad Litem* fee of $18,044.80.

Said sum shall be paid to Mr. Reneau from the Husband's property settlement

and shall be the first debt paid from the subject proceeds. Subsequently, the

Hon. Robert B. Reneau is authorized to pay any and all debts and / or fees as he

deems necessary and / or proper from the Husband's property settlement.

Further, Mr. Reneau is authorized to liquidate any and all of the Husband's assets

necessary to pay any and all debts the Husband has and / or will incur.

11.    The court determines that no income from the business known as "Curves" shall

be attributed to the Husband for the tax year 2005.

12.    Each of the parties shall file as "married / separate," for the 2005 tax year.

13.    Based on the evidence presented, the court makes a factual finding that the

business known as "Curves" has been operated as a sole proprietorship, and to

that extent, the court finds as such.

14.    The coin collection that was marked as Exhibits 22 through 27 shall be placed in

the possession of the Hon. Robert B. Reneau for the care and / or liquidation of

the same.

15.    Each of the parties shall be responsible for and hold the other harmless from any

and all debts incurred in their respective names.

16.    Neither party shall pay alimony to the other.

17.    The Wife shall be allowed to change her last name to "Lewis."

DONE AND ORDERED this ___|5___ day of March, 2006.


**HON. JOHN B. BUSH** /⅔/₁₆
Elmore County Circuit Judge
Wetumpka, Alabama

    I, the undersigned Clerk of the Circuit Court of Elmore County, Alabama, do hereby certify that the above is a true and correct copy of the Decree rendered in the above-styled cause. Said Decree is on file and recorded in my office.

    Witness my hand and seal of the court this __14th__ day of March, 2006.


Elmore County Circuit Clerk



# The Wetumpka Herald

THURSDAY, JUNE 26, 1997     |     PRICE 50¢     |     ELMORE COUNTY'S NEWS SOURCE SINCE 1898

# Slapout men shaping up

SLAPOUT — Slapout men are getting lean and mean –

Retired lawman Bob Andrews said

Andrews, who lives in Slapout, said the center is convenient as he does not have to drive to Montgomery or go to a fitness center there.

"It's ideal for people who are overweight or have a cardiovascular problem," Andrews said. "My weight should be 170 pounds."

Andrews, who is five feet and nine inches, weighs 200 pounds, and hopes to trim down to 170 by working out regularly at the center.

Mike Mosbarger and his wife, Linda Mosbarger, own the Slapout fitness business.

The Fit Express II is located on Rightwood Road (Elmore County 23) near the Alabama 143 intersection in one side of a large metal prefab building that also houses Lake Pharmacy.

"We open early to give people an opportunity to come in and exercise before going to work," Mike Mosbarger said.



Dorothy Vaughn holds on to her husband, Guy, as he does aerobics.

Guy Vaughn, 79, who is recovering from the effects of a stroke, said he also enjoys exercising at the center.

"I think it's great," Vaughn said. "This is my third week. I've lost six or seven pounds. And for a man my age, it (extra weight) don't fly off."

> *"I've lost weight by exercising here. It works."*
> — Guy Vaughn

> *"I feel better after working out at Fit Express II."*
> — Phil Guy

Exhibit B



Exhibit B

Exhibit C

# *Curves for Women* ®

## *thirty minute*
## *fitness and weight loss centers*

### *Franchise Agreement*

*Curves International, Inc.*
*400 Schroeder*
*Waco, Texas  76710*

—

*254-399-9285*
*800-848-1096*
*facsimile  254-399-9731*

# TABLE OF CONTENTS

1.   GRANT OF FRANCHISE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.   TERM OF AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3.   FEES AND PAYMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4.   FRANCHISOR'S OBLIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5.   FRANCHISEE'S OBLIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6.   TRADEMARKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7.   INDEPENDENT CONTRACTOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8.   INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

9.   PROPRIETARY INFORMATION AND NONCOMPETITION . . . . . . . . . . . . . . . 12

10.  ASSIGNMENT AND TRANSFER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

11.  DEFAULT AND TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

12.  FRANCHISEE'S OBLIGATIONS UPON TERMINATION, EXPIRATION OR
     NON-RENEWAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

13.  DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

14.  ADMINISTRATIVE PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

     SIGNATURE PAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

     "EXHIBIT A" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

     "EXHIBIT B" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT made this 5th day of _April_ , 1999 by and between **CURVES INTERNATIONAL, INC.**, a Texas corporation having its principal place of business at 400 Schroeder, Waco, Texas 76710, hereinafter referred to as the "Franchisor", and **Linda S. Mosbarger.**, of **750 Shields Road, Deatsville, AL 36022**, hereinafter referred to as "Franchisee".

### RECITALS:

WHEREAS, Franchisor has invested considerable time, effort and money to develop a system and method of operating a women's thirty minute fitness and weight loss center, and has developed public goodwill and certain trade names, service marks and logos including but not limited to the mark *Curves for Women®* ("the Trademark") for its services throughout the United States of America;

WHEREAS, Franchisee recognizes the benefits to be derived from being identified with the Curves International, Inc. system and licensed by Franchisor to use its name and the Trademark;

WHEREAS, Franchisee has studied and fully understands the system of operations, trade names, service marks and logos of Franchisor, the importance of maintaining Franchisor's high standards and the terms and conditions herein, has reviewed Franchisor's Disclosure Statement and a completed copy of this Agreement, and has had the opportunity to visit and examine more than one *Curves for Women®* centers to familiarize itself with Franchisor's program;

WHEREAS, Franchisee desires to establish and operate a women's thirty minute fitness and weight loss center, to become a franchisee of Curves International, Inc., and to obtain the benefits of being a franchisee thereof pursuant to the provisions of this Agreement;

NOW, THEREFORE, for and in consideration of the mutual covenants, terms and conditions contained herein and other good and valuable consideration, the parties hereto agree as follows:

## 1.    GRANT OF FRANCHISE

A.    Franchisor hereby grants to Franchisee, and Franchisee accepts, an exclusive franchise to open and operate for the following stated term and on the conditions hereinafter set forth, a *Curves for Women®* center and to use the trademarks, trade names, logo and emblems associated with and developed by Franchisor. The franchise is granted for the area set out in "Exhibit A" herein.

B.    Franchisee shall not move or relocate its place of business without the prior written consent of Franchisor, which consent shall not be unreasonably withheld. Such request for relocation shall be made in writing, stating the new location and received by Franchisor at least sixty (60) days prior to the date of intended relocation.

C.    Franchisee shall permit Franchisor to inspect Franchisee's uses of the Trademark at all reasonable times for the purpose of ascertaining compliance with this Agreement. Franchisee shall obtain the approval of Franchisor prior to using the Trademark.

D.    Franchisee shall not do or cause any act to be done to impair Franchisor's exclusive rights, title and interests in and to the Trademark. Franchisee shall not represent that it has any ownership interest in the Trademark. Franchisee shall not adopt or use any words or marks that are similar to, or are likely to be confused with, the Trademark.

E.    Franchisee's business shall be conducted by Franchisee at one location only, located within the limits or boundaries of the exclusive franchise area as described in "Exhibit A", herein. For the purpose of this Agreement, Franchisee's business shall be deemed to include any and all activities in the nature of exercise and weight loss.

F.    In order to adequately respond to changing market conditions, subject to the restrictions described in this Agreement, Franchisor reserves the right to and may use other channels of distribution or license the use of alternative proprietary marks or methods in connection with the operation of businesses which may be similar to or different from the Franchise at any location on any terms and conditions Franchisor deems advisable without granting Franchisee any right thereto.

## 2.    TERM OF AGREEMENT

The term of this Agreement shall be for a period of ten (10) years from the date of this Agreement. Franchisee may, at its option, renew this Agreement for additional periods of five (5) years, provided that:

A.    Franchisee and its owners have complied with this Agreement during its term and are in full compliance upon requesting renewal and continue complying with this Agreement until expiration thereof;

B.    Franchisee shall give to Franchisor written notice of its election to renew not less than six (6) months nor more than twelve (12) months prior to the end of the term of this Agreement;

C.    Franchisee agrees to add or replace equipment, fixtures and signs and modify the *Curves For Women®* franchise and location to bring it into compliance with specifications and standards then-applicable for new *Curves For Women®* franchises;

D.      Franchisee and its owners execute a general release of any and all claims against the Franchisor, its officers, directors, agents, and employees in the form prescribed by Franchisor; and

E.      Franchisee and its owners execute a new Franchise Agreement in the form then being used by Franchisor, which may differ as to fees and services.

If at anytime Franchisee fails to meet any of the above conditions, Franchisor may refuse to grant a renewal of this Agreement to Franchisee and its owners.

## 3.   FEES AND PAYMENTS

A.      **Initial Franchise Fee.** In consideration of the franchise granted in this Agreement by Franchisor to Franchisee, Franchisee shall pay to Franchisor the sum of Nineteen Thousand Nine Hundred Dollars ($19,900.00). The Initial Franchise Fee becomes fully earned at the time the franchise is granted. Franchisee shall pay to Franchisor the sum of Three Thousand Dollars ($3,000.00) upon execution of this Agreement. Franchisee shall further pay to Franchisor the sum of Six Thousand Nine Hundred Dollars ($6,900.00) prior to the training described in Section 4.B. in this Agreement. Franchisee shall also pay to Franchisor the sum of Ten Thousand Dollars ($10,000.00) prior to the delivery of the equipment, described in Exhibit B hereof. In addition Franchisee shall pay to Franchisor the sum of Seven Hundred Fifty Dollars ($750.00) as a Delivery Fee upon delivery of the equipment, described in Exhibit B hereof. Franchisee understands that it may be required, under applicable state law, to secure permission from the appropriate government authority to operate a thirty minute fitness and weight loss center. It shall be Franchisee's responsibility to familiarize itself with all applicable laws and regulations, and Franchisor has made no representations as to the nature of such laws or Franchisee's ability to qualify under such laws. If, in Franchisor's sole opinion, Franchisee makes a reasonable effort in good faith to qualify under state law and fails to so qualify, the above-mentioned Initial Franchise Fee shall be refunded to Franchisee, except that Franchisor shall retain the sum of One Thousand Dollars ($1,000.00) to compensate it for expenses incurred in connection with this Agreement. Franchisee shall be responsible for any local or state sales tax or any other tax applicable to the purchase of the franchise and/or the fitness equipment included in the Initial Franchise Fee.

B.      **Monthly Royalty Fee.** Franchisee shall also pay to Franchisor a Monthly Service Fee of Three Hundred Ninety-Five Dollars ($395.00) payable on or before the first day of each month throughout the first twelve (12) months of the term of this Agreement. The Monthly Service Fee shall commence upon the opening of Franchisee's business to the general public, and shall be pro-rated for the first month based on the actual number of days that Franchisee shall be open to the public. Monthly Service Fees after the first month shall be paid by pre-authorized check draft.

After the first twelve (12) months of the term of this Agreement and throughout the remaining term of this Agreement, and any extension thereto, and at the discretion of the Franchisor, the Monthly Royalty Fee shall be determined by multiplying $395.00 by a fraction, the numerator of which is the Consumer Price Index, Urban Wage Earners and Clerical Workers, all items for the metropolitan area geographically nearest to the franchise location, published by the Bureau of Labor

Statistics, U.S. Department of Labor, or its successors, or if none, by any other instrumentality of the United States or the state in which the franchise is located for the twelfth month of each succeeding year during the term of this Agreement, and the denominator of which is the Consumer Price Index for the first full calendar month of the first year of this Agreement. Notwithstanding anything to the contrary in this Agreement, in no event shall the Monthly Service Fee be less than $395.00. The Monthly Service Fee is not refundable, with the exception of any fees that may have been overpaid to Franchisor in error by Franchisee.

C.    **Advertising Fee.** Franchisor reserves the right, upon thirty (30) days written notice to Franchisee, to require Franchisee to pay to the Franchisor, monthly, during the term of this Agreement and any extension thereof, a continuing advertising fee equal to three percent (3%) of Franchisee's prior one month period's gross sales and services. "Gross Sales and Services" shall mean the total sale price for all goods and services sold from the franchise operation, whether for cash or credit, without reserve or deduction for non-collectables, including but not limited to any activities associated with the use of the names or marks including lease, license, rental warranties, barter and trade-in at the greater value, as well as, without limitation, the sales price on discount sales to employees and excluding (a) the amount of sales tax levied upon the sales of goods and services sold, (b) the amount of merchandise accepted for return from customers, and (c) customer refunds within thirty (30) days of purchase. Advertising Fee payments must be received by the Franchisor on or before the fifth day of the following month. Payments must be mailed first-class mail, postage prepaid and properly addressed to a location designated by Franchisor. Franchisor reserves the right to raise the percent of gross sales and services applicable to the Advertising Fee from three percent (3%) to a maximum of six percent (6%) at any time upon thirty (30) days written notice.

Franchisor will assist in developing all advertising materials and Franchisee must have written approval from the Franchisor of all materials developed or altered by the Franchisee prior to the use of same. All Advertising Fund contributions and interest, dividends and other amounts earned thereon shall be used exclusively for network advertising, advertising in the Franchisee's market area, and for the purposes of marketing and public relations. Franchisor shall be obligated to spend at least fifty percent (50%) of the Advertising Fund contributions on national, regional or local media or other marketing techniques or programs designated to communicate the services of the franchises to the public in the sole discretion of the Franchisor. The remaining fifty percent (50%) of the Advertising Fund contributions, in addition to the above described purposes, may be expended by the Franchisor in its creation and production costs in reimbursement to the Franchisor for reasonable accounting, administrative and legal expenses associated with the Advertising Fund and for other purposes deemed appropriate by the Franchisor to enhance and promote the general recognition of the system and its marks. Franchisor shall not be liable for any act or omission with respect to the Advertising Fund which is consistent with this Agreement or done in good faith.

D.    **Late Payments and Remedies.** Any Monthly Service Fee that is more than five (5) days late shall incur a late fee of Thirty-Five Dollars ($35.00). Franchisee acknowledges and agrees that non-payment of any Monthly Service Fee or any other fees owed to Franchisor under this

Agreement shall be a material breach of this Agreement and entitle Franchisor to claim for general damages for breach of contract. No claim by Franchisee that Franchisor is in default under any provision hereof shall be a defense to a claim by Franchisor for Monthly Service Fees, or other amounts owing hereunder. Franchisee agrees that it will not, on the grounds of the alleged non-performance by Franchisor of any of its obligations hereunder, withhold payment of any amounts due to Franchisor.

## 4.    FRANCHISOR'S OBLIGATIONS

A.    **Location of Franchise.** Franchisor shall advise Franchisee in selecting a suitable location for Franchisee's business if no address is specified herein at the time of execution and may assist in the negotiation of a lease for said space. However, Franchisee shall be solely responsible for site selection and securing a lease for the premises. Prior to opening, Franchisee's location must be approved if the monthly rent of Franchisee's location exceeds One Thousand Dollars ($1,000.00). In the event Franchisor does not approve Franchisee's location and Franchisee, after reasonably searching within the territory granted herein, is unable to find a suitable location for Franchisee's business with a monthly rent equal to or less than One Thousand Dollars ($1,000.00) and, as a result of not having a suitable location, Franchisee is unable to open Franchisee's business within ninety (90) days from acceptance of this Agreement by Franchisor, Franchisor, in its discretion or upon written request by Franchisee, shall return all moneys paid in accordance with this Agreement to Franchisee, and this Agreement shall be terminated. Franchisee shall have the facility completed and furnished in accordance with Franchisor's specifications within one hundred eighty (180) days of acceptance of this Agreement by Franchisor unless otherwise approved in writing by Franchisor. Franchisor's assistance shall not be considered a guarantee or warranty in any manner whatsoever that the location will be successful.

B.    **Training.** Franchisor shall provide a mandatory five-day training class for Franchisee at a location and time designated by Franchisor. Franchisor shall train Franchisee in exercise physiology, nutritional counseling, marketing, sales, business systems and instructions on use of fitness equipment. There is no additional fee charged for the initial training program for the Franchisee. The Initial Franchise Fee covers the costs of this training. All expenses of Franchisee and its personnel incident to attendance at the training class, including travel, lodging, meals, transportation and other incidental expenses, shall be borne by the Franchisee. This training program must be satisfactorily completed by Franchisee before Franchisee can open its business. Franchisor reserves the right to terminate this Agreement should Franchisee fail, in the opinion of the Franchisor, to satisfactorily complete the initial training program. If Franchisee requests training in addition to that provided for above, Franchisor shall provide such instruction to Franchisee or its employees at such time and place and for such duration as may be mutually convenient; provided, however, that the costs of such additional training, including transportation, subsistence and a reasonable charge for the services of Franchisor's representative, shall be borne by Franchisee and, if requested by Franchisor, shall be paid in advance.

C.   **Equipment and Manuals.** Franchisor shall furnish Franchisee, for the exclusive use of the Franchisee and its employees, the equipment and manuals listed in Exhibit B herein. Franchisor shall provide these manuals and any other additional manuals at Franchisor's discretion upon written request by Franchisee that Franchisor deems sufficient to commence operations. Franchisee shall provide payment for any printing and/or handling charges resulting from additional manuals not supplied in "Exhibit B" herein. All manuals shall remain the property of Franchisor, and Franchisee shall treat them as confidential and shall not disclose the contents of such manuals to persons other than its employees.

D.   **Initial and On-Going Support.** Franchisor shall provide, at its own expense, a representative at Franchisee's business during the first four (4) days of its operation for assistance, training and advice. Franchisor will provide periodic training seminars for Franchisee at such times and in such locations as selected by Franchisor. Franchisee's attendance at those seminars may be required at the sole discretion of Franchisor. All expenses of Franchisee and its personnel incident to attendance at the training seminars shall be borne by Franchisee. Provided Franchisee complies with all obligations in this Agreement, Franchisor shall periodically analyze Franchisee's sales, promotional efforts and financial status and furnish Franchisee with suggestions as to any improvements which Franchisor believes to be necessary and Franchisor shall provide Franchisee with such on-going advice and assistance as Franchisor deems necessary and appropriate.

E.   **Confidentiality.**   Franchisor agrees that financial information submitted by Franchisee is confidential and shall not be disclosed to any third party without protecting Franchisee's identity unless Franchisee consents in advance of the disclosure, except as may be required in response to lawful judicial process or in response to any governmental investigation.

5.   **FRANCHISEE'S OBLIGATIONS**

A.   **Training of Personnel.** Franchisee shall train and instruct each person employed in the operation of Franchisee's business, other than those instructed by Franchisor, in the methods and techniques developed by Franchisor. Such training and instruction shall be based upon and given in accordance with Franchisor's training manuals, and shall be provided prior to participation by such employee in Franchisee's business.

B.   **Opening.** Franchisee shall open its business and start paying its Monthly Royalty Fee within ninety (90) days from acceptance of this Agreement by Franchisor, unless prior written consent of Franchisor grants Franchisee an extension for its opening date.

C.   **Manner of Operation.** Franchisees shall keep and maintain a safe, neat, clean and orderly facility at a location in keeping with the standards established in Franchisor's training manuals. The minimum hours of operation shall be from 9:00 a.m. to 12:00 p.m. and 4:00 p.m. to 7:00 p.m., Monday through Friday, excluding holidays. Franchisees fiscal year shall begin on January 1 and end on December 31 of each year. To maintain uniformity within Franchisor's system

and to maintain the standard practices that are necessary to promote the goodwill of Franchisor's system, Franchisee shall use in the operation of its business only the standard form of reports, stationery and printed material uniformly prescribed by Franchisor for use by members of its system. Franchisee may at its discretion purchase all such materials from Franchisor. The charge for such material if ordered from Franchisor, together with all costs for postage and handling, shall be paid in advance by Franchisee. Franchisee shall purchase check drafts for its members through a source approved by Franchisor. Franchisor reserves the right to prohibit Franchisee from using any form of reports, stationery or printed matters purchased from other suppliers that deviate in any way, either in content or in the standards of quality that have been established by Franchisor in the past or may be established by Franchisor in the future. Franchisee shall maintain the highest standards of quality and workmanship in its operation of the Franchise in accordance with the standards established by Franchisor in order to provide the highest quality service to customers of Franchisee and to preserve and enhance the value of the Trademark licensed hereunder. Unless Franchisor consents in writing, Franchisee is required to personally operate and/or exercise personal supervision over the operation of the Franchise. If Franchisee is a corporation, partnership or other legal entity, Franchisee must designate a shareholder, partner or member as the "operating principal", who must be acceptable to Franchisor, and furnish all organizational and other documents regarding Franchisee's creation and structure, together with any and all amendments and modifications thereto, to Franchisor upon request. This Agreement is a personal service contract and is entered into by Franchisor with Franchisee in reliance upon and in consideration of the personal qualifications made with respect to this Agreement, who, it is agreed, will be trained by Franchisor in accordance with Section 4.B. above, and will actively participate in the operation of Franchisee's business. Additional persons may be added from time to time upon Franchisor's written approval and the successful completion of Franchisor's current training program. Franchisee agrees that it will at all times have its business managed by a person who has been trained and approved by Franchisor in accordance with Section 4.B. above.

D.    **Compliance with Laws, Rules and Regulations.** Franchisee shall, at all times, comply with all requirements set forth in this Agreement and in the manuals, and with all laws, rules and regulations of duly-constituted governmental bodies relating to Franchisee's business, and any violation of such requirements, laws, rules and/or regulations may be deemed by Franchisor to be a material breach of this Agreement. To the extent not prohibited by such laws, rules and regulations, Franchisee shall strictly follow and comply with the procedures, methods and standards set forth in Franchisor's training manuals and subsequent revisions of those manuals, and directives that are from time to time issued by Franchisor pertaining to the instruction of employees and to the operation of Franchisee's business.

E.    **Insurance.** Franchisee shall purchase and maintain in effect at all times during the term of this Agreement a policy or policies of insurance, naming Franchisor as an additional insured on the face of each policy, at Franchisee's sole cost and expense, as follows:

1.    Public liability in no less than the following amounts, which amounts shall be changed from time to time on written notice by Franchisor: Bodily injury-One Million

Dollars ($1,000,000) each person, One Million Dollars ($1,000,000) each accident; and, property damage-One Million Dollars ($1,000,000) each accident;

    2.    Workers' compensation insurance as required by state law; and,

    3.    Automobile liability insurance as provided by state law.

All such policies of insurance shall contain a statement that they cannot be canceled without thirty (30) days' prior written notice to Franchisee and to Franchisor. Franchisee shall provide documentary evidence to Franchisor that such insurance is in full force and effect promptly on request by Franchisor. Franchisee shall promptly notify Franchisor of any and all claims against Franchisee and/or Franchisor.

    F.    **Reports.** Franchisee shall furnish to Franchisor monthly reports regarding the operation of Franchisee's business for the preceding month, such reports to be received by Franchisor on or before the fifth day of each month. The reports shall be prepared on forms prescribed by Franchisor for that purpose. Franchisee shall keep true and correct business records and books of account and shall establish and maintain such records in accordance with methods and procedures recommended by Franchisor.

    G.    **Advertising and Promotion.** Franchisee shall place in the yellow pages of the telephone directory serving its market area advertisement(s) as prescribed by Franchisor in the Confidential Operations Manual received at the initial training program. Additional yellow page advertisements may be placed by Franchisee, but only in the most recent form prescribed by Franchisor. Franchisee agrees to participate in all non-price related marketing and public relations programs instituted by any future Advertising Funds. Franchisee shall not engage in any deceptive, misleading or unethical advertising which, in the sole discretion of Franchisor, might be injurious or detrimental to Franchisor, Franchisor's trademarks, the system or the public. Franchisee shall use the trademarks of Franchisor only in the forms prescribed by Franchisor. All advertising or promotional materials, signs or other items which Franchisor designates to bear the Franchisor's trademarks shall be in the form, color, location and manner prescribed by Franchisor.

    H.    **Trademarks and Trade Names.** In connection with the operation of Franchisee's business, including advertising, Franchisee shall use no name or service mark other than the name *Curves for Women*® or any derivative of such name. Franchisee shall identify itself as a holder of a license from the Curves International, Inc., unless applicable law requires other or additional identification. Franchisee shall use the name and service mark in such format and with such suffix or prefix as Franchisor may from time to time designate. Franchisee shall not register the Trademark with any state authority. Except when necessary to comply with required purchases in accordance with this Agreement, Franchisee shall not place the Trademark nor give any third party the Trademark for the purpose of placing the Trademark on any products, supplies, or any other item in any form for any purpose unless Franchisee acquires prior written approval by Franchisor.

I.     **Financial Inspection.** To assist Franchisor in providing Franchisee with on-going advice and assistance, and to determine whether Franchisee is complying with the terms of this Agreement and with the specifications, standards and procedures established for operation of the Franchise, Franchisor, or its authorized representative, shall have the right, during regular business hours, or at such other times as may be mutually agreed upon, to inspect all records and books of accounts maintained by Franchisee with respect to Franchisee's business. Franchisor shall have the right to examine customer/membership records, both active and inactive, and any other related records. Upon request by Franchisor, Franchisee shall promptly furnish to Franchisor copies of social security reports, state and federal unemployment reports, federal income tax returns, state income, franchise or other tax returns, and such other federal, state, county or city reports as may be requested.

J.     **Reimbursement of Legal Fees.** If it becomes necessary for Franchisor to engage the services of an attorney in order to defend any claim made or action brought by any third party as a result of Franchisee's actions or inactions under this Agreement, Franchisor is entitled to indemnification from Franchisee and is entitled to recover reasonable attorney's fees, court costs and expenses from Franchisee. Otherwise, in the unlikely event that a dispute occurs or an action in law or equity arises between Franchisor and Franchisee concerning the operation, enforcement, construction or interpretation of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees, court costs and expenses incurred by the other party in the action.

K.     **Prohibition Against Encumbrance.** Without Franchisor's prior written consent, Franchisee shall not grant any security interest in this Agreement, in the Franchise, or in any membership agreements or membership check drafts used in the operation of the Franchise, nor shall any ownership interest in any corporate Franchisee be pledged or encumbered. If Franchisor consents to the grant of a security interest, the secured party must agree that in the event of Franchisee's default under the security interest, Franchisor or its designee shall be notified of the default and shall have the right but not the obligation to be substituted as a obligor to the secured party and/or to cure the default. In no event shall this requirement be construed to make Franchisor liable to Franchisee or to the secured party.

L.     **Equipment, Products and Supplies.** In order to provide products and services of the highest quality and in the most expeditious manner, and in order to protect the trade secrets of Franchisor, Franchisee will use and purchase the equipment provided, prescribed and required by Franchisor in operation of Franchisor's system. Franchisee shall offer and sell only the goods and services which conform to Franchisor's standards and specifications. Franchisee shall offer all goods and services that Franchisor designates as required for all franchisees. Franchisor restricts services provided by Franchisee to thirty minute and weight-loss services and to offering for sale weight-loss related products, as specified in the manuals, and in the changes thereto as may be, from time to time, provided to the Franchisee. Except when necessary to comply with required purchases in accordance with this Agreement, Franchisee shall not place the Trademark nor give any third party the Trademark for the purpose of placing the Trademark on any products, supplies, or any other item in any form for any purpose unless Franchisee acquires prior written approval by Franchisor.

Franchisor reserves the right to add additional authorized services that Franchisee is required to offer.

M.    **Franchisee's Signs.** Franchisee shall erect inside and outside of its business such signs as are specifically approved by Franchisor and which conform to Franchisor's specifications. No other sign, regardless of content, sign or construction may be erected or used without Franchisor's prior written approval.

## 6.    TRADEMARKS

A.    **Franchisor's Ownership of the Trademarks.** Franchisee agrees that the trademark *Curves for Women®* (Trademark) is the exclusive property of Franchisor and Franchisee asserts no claim and will hereafter assert no claim to the ownership thereof or to any goodwill attendant thereto. Franchisee further covenants that it will not contest Franchisor's ownership of the Trademark or its validity nor will it do or permit any act or thing to be done in derogation of any of the rights of Franchisor in connection with the Trademark either during the term of this Agreement or thereafter. Nothing in this Agreement shall be construed to give Franchisee any right, title or interest in or to the Trademark except for a revocable privilege and license to display and use the Trademark during the term of and pursuant to the conditions contained in this Agreement. Franchisee expressly understands and agrees that it has not acquired and will not acquire any ownership interests, equitable rights, goodwill or other interests in any Trademark by virtue of this Agreement, its relationship with Franchisor, or Franchisee's use of the Trademark and will not represent that it has. Franchisee also understands and agrees that following the expiration or termination of this Agreement for any reason, it shall not attribute any monetary amount to any goodwill associated with its use of the Trademark or in connection with its operation of the Franchise.

B.    **Modification of Marks.** If Franchisor, in its sole discretion, decides to modify or discontinue use of the Trademark and/or to adopt or use one or more additional or substituted trademarks, Franchisee shall promptly conform its use of the Trademark as directed, in writing, by Franchisor. The sole obligation of Franchisor in any such event shall be to reimburse Franchisee for its documented costs of compliance (such as changing signs, letterhead, etc.), and Franchisee waives any other claim arising from or relating to any such change, modification or substitution of trademarks.

C.    **Franchisee's Use of the Trademark.** Franchisee acknowledges that Franchisor's prior written consent is required for the use of the Trademark, or any other mark Franchisor owns or will own, except as granted herein. Franchisee shall not use the Trademark, or any form of the Trademark, as part of its name if Franchisee is or becomes a corporation or other legal entity. Franchisee shall use the Trademark and/or any trademark or service mark or trade name adopted by Franchisor, or other written instructions from Franchisor, including the form and manner and appropriate legends as may be prescribed from time to time. Franchisee agrees not to use any other trademark, service mark or trade name in combination with the Trademark without Franchisor's

prior written consent. Franchisee shall permit reasonable inspections of the Franchise to monitor with specimens of all uses of the Trademark upon request.

D.    **Defense of the Marks.** If Franchisee learns of any claim, suit or demand against Franchisee or the Trademark on account of any alleged infringement, unfair competition, or similar matter relating to the Trademark, or any unauthorized use of the Trademark, Franchisee shall promptly notify Franchisor, in writing. Franchisor may, but is not obligated to, take such action, if any, as Franchisor, in its sole discretion, deems necessary or appropriate in connection therewith. Franchisor shall have the sole right to defend, compromise or settle any such claim at Franchisor's sole cost and expense, using attorneys of its own choosing. Franchisee agrees to cooperate fully with Franchisor in connection with the defense of any such claim and hereby irrevocably appoints Franchisor to defend or settle all of such claims, demands or suits. Franchisee may participate at its own expense in such defense or settlement, but Franchisor's decisions shall be final and binding upon Franchisee. Franchisee shall not settle or compromise any such claim without the prior written consent of Franchisor. Franchisor agrees to indemnify and hold Franchisee harmless against any claim or demand arising from Franchisee's authorized use of the Trademark provided Franchisee has notified Franchisor of the claim or demand as required by this Section.

7.    **INDEPENDENT CONTRACTOR**

A.    It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between Franchisee and Franchisor, that Franchisee shall be an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name.

B.    During the term of this Agreement, and any extension hereof, Franchisee shall hold itself out to the public as an independent contractor operating the Franchise pursuant to a franchise agreement with Franchisor. Franchisee agrees to conspicuously post notices to that effect in such locations and by such means determined reasonably necessary by Franchisor to inform the public, customers and suppliers. Franchisor reserves the right to specify the content of such notices as well as where and when the notices shall be posted.

C.    Franchisee shall be responsible for, and shall promptly pay when due, all expenses of Franchisee's business, including all taxes and levies of any kind in connection with Franchisee's business and the income arising from such business. Franchisor shall not be liable for any such expenses, taxes, levies, or disbursements otherwise paid or incurred in connection with the establishment and operation of Franchisee's business.

D.    Franchisor shall not regulate the hiring or discharge of Franchisee's employees, officers or agents, the parties from whom Franchisee may accept business, the working conditions of Franchisee's employees, officers or agents or Franchisee's contracts with customers, suppliers or others, except to the extent necessary to protect Franchisor's system, trade name, trademarks and the goodwill associated therewith.

---

**8.    INDEMNIFICATION**

Franchisee agrees to indemnify and hold harmless Franchisor, its officers, agents and employees from any and all liability, loss or damage Franchisor may suffer as a result of claims, demands, costs or judgments against Franchisor arising out of the operation of Franchisee's business or any acts of Franchisee, its officers, agents or employees, whether the liability, loss or damage is caused by or arises out of the negligence of Franchisor, its officers, agents, employees, or otherwise.  The indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

---

**9.    PROPRIETARY INFORMATION AND NONCOMPETITION**

A.    **Manuals and Confidential Information.**  In order to protect the reputation and goodwill of Franchisor, to maintain uniform standards of service and operation under Franchisor's Trademark and system, to promote the goodwill of Franchisor's system, and for the mutual benefit of Franchisor and Franchisee, Franchisor shall provide Franchisee with manuals and Franchisor's system in accordance with this Agreement.  Franchisee acknowledges that all manuals are confidential and Franchisee does not acquire any right, title or interest in the manuals. The manual, and the information contained in them, shall at all times remain the property of Franchisor. Franchisee also acknowledges that Franchisor has developed, and may continue to develop or revise in the future, the system pertaining to the Franchise, and further acknowledges that this system, together with information pertaining to customers of the system, are trade secrets of Franchisor which have been developed through the research of and at the expense of Franchisor.  During the term of this Agreement or any time thereafter, Franchisee shall not (except as otherwise contemplated by this Agreement) communicate, divulge or use for itself or for the benefit of any other person, persons, partnership, association, corporation or entity any information, knowledge or know-how concerning Franchisor's manuals and system. Franchisee acknowledges that Franchisor's manuals and system are confidential and will not at any time contest the confidentiality of the information in them or Franchisor's sole ownership of them.  Franchisee shall only divulge information concerning Franchisor's manuals and system to those employees of Franchisee who must have access to it in order to participate in the operation of the Franchise.  Franchisee shall also cause its employees and, if Franchisee is a corporation, partnership or other legal entity, its shareholders, officers, members, directors and partners, to sign an agreement to safeguard all confidential information concerning Franchisor's manuals and system.  Franchisor may make additions to, deletions from or revisions of the manuals as Franchisor deems necessary, and such

additions, deletions and modifications shall become part of the manuals and shall be binding upon Franchisee, immediately after Franchisee's actual or deemed receipt of such additions, deletions or modifications; provided, however, that such additions to, deletions from or revisions to the manuals shall not alter Franchisee's status and rights under this Agreement. Franchisee shall conduct the operation of the Franchise in accordance with Franchisor's manuals and system. Upon the expiration or other termination of this Agreement for any reason, Franchisee shall return any of Franchisor's manuals and all supplements thereto to Franchisor.

B.    **Covenant Not to Compete.** Franchisee shall not own an interest in, conduct or operate, directly or indirectly, or be employed by or associated in any way with any aerobics, women's fitness and/or weight loss business other than that of Franchisor during the term of this Agreement. Franchisee shall not at any time, directly or indirectly, furnish any information as to Franchisor's methods of operation, advertising, publicity, promotion ideas or any other information relative to Franchisee's business, or to any other business licensed, owned or managed by Franchisor or any subsidiary of Franchisor to anyone except Franchisor. Franchisee acknowledges that the names *Curves for Women®, Quickfit™, The Heavin Formula* and *Fit & Slender*, the business reputation associated with such names, the methods and techniques employed by Franchisor, the training and instruction to be provided under and pursuant to this Agreement, the knowledge of the services and methods of Franchisor, and the opportunities, associations and experience established and acquired by Franchisee under and pursuant to this Agreement and as a member of the license system, are of considerable value. In consideration thereof, Franchisee therefore covenants and agrees that, except for any interest which Franchisee has in a competitive business on the effective date of this Agreement, by its signature hereinbelow, specifically consents, Franchisee shall not, directly or indirectly, as a proprietor, partner, investor, shareholder, member, director, officer, employer, employee, principal, agent, adviser, franchisor, franchisee, consultant or in any other individual or representative capacity or otherwise for a period of three (3) years immediately following the later of the expiration, termination or non-renewal of this Agreement for any reason or the date on which Franchisee actually ceases operation:

> 1.    engage in or participate in or derive any benefit from any similar business to that licensed and established under and pursuant to this Agreement within forty (40) miles of the area listed on "Schedule A" herein, without Franchisor's prior written consent. If Franchisor grants permission for Franchisee to engage in the operation of a similar business as set forth above, Franchisee agrees that Franchisee will pay Franchisor a Royalty Fee for a period of twenty-four (24) months in accordance with Section 3.C. herein in addition to any other sums due and owing to Franchisor; or

> 2.    employ or seek to employ any person who is employed by Franchisor or any other Franchisee, or otherwise induce or seek to induce such person to leave his or her employment; or

> 3.    interfere or attempt to interfere with any of the business relationships and/or advantages of Franchisor or any other Franchisee; or

4.    use any confidential information from Franchisor's manuals or system in any manner in any similar business to that licensed and established under and pursuant to this Agreement; or

5.    use the Trademark, or any form of the Trademark, any other mark owned by Franchisor at the time of expiration, termination or non-renewal of this Agreement, or any confidential information from Franchisor's manuals or system in any manner to engage in or participate in or derive any benefit from any similar business to that licensed and established under and pursuant to this Agreement; or

6.    divert or attempt to divert any customer or business from Franchisor or any other Franchisee or solicit or endeavor to obtain the business of any person who shall have been a customer of Franchisee's Franchise.

C.    **Injunctive Relief.** Franchisee acknowledges and agrees that the damage caused to Franchisor by Franchisee's violation of any portion of this Section 9 shall constitute irreparable injury for which there is no adequate remedy at law and, accordingly, acknowledges and agrees that Franchisor may seek enforcement of this Section 9 by temporary restraining order, temporary and/or permanent injunction, and such other legal or equitable relief as may be appropriate.

10.    **ASSIGNMENT AND TRANSFER**

A.    As used in this Agreement the term "transfer" shall mean and include the voluntary, involuntary, conditional, direct or indirect assignment, sale, gift or other transfer by Franchisee or any of its owners of any interest in or grant of any security interest in: (a) this Agreement; (b) the Franchise; (c) Franchisee; or (d) some or all of the assets of the Franchise (other than inventory items in the ordinary course of business). As used above, an assignment, sale or other transfer shall include the following events: (1) the transfer of ownership of shares or a partnership interest; (2) merger or consolidation or issuance of additional securities representing an ownership interest; (3) any sale of voting shares of Franchisee or any security convertible to voting shares of Franchisee or any agreement granting the right to exercise or control the exercise of the voting rights of any holder of an ownership interest; or (4) transfer in a divorce, insolvency, corporate or partnership dissolution proceeding or, in the event of the death of Franchisee or an owner of Franchisee, by will, declaration of or transfer in trust, or under the laws of intestate succession or otherwise by operation of law.

B.    **Assignment by Franchisor.** Franchisor may assign this Agreement and all of its rights and privileges hereunder to any other person, firm or corporation; provided, however, that in respect to any assignment resulting in the subsequent performance by the assignee of the functions of Franchisor, the assignee shall, at the time of such assignment, be economically capable, in Franchisor's reasonable judgment, of performing the obligations of Franchisor hereunder and expressly assume and agree to perform such obligations.

C.    **Notice of Assignment by Franchisee.** Franchisee and its owners may not transfer

the Franchise or any interest therein unless Franchisee first notifies Franchisor of such intention by written notice by certified mail setting forth the proposed assignee's name, address, statement of financial qualification and business experience during the previous five (5) years. Within sixty (60) days of receipt, Franchisor must notify Franchisee as to whether or not Franchisor approves the proposed assignee. If Franchisor does not reply within sixty (60) days of the required notification by Franchisee, then Franchisor's approval is deemed granted. No transfer is deemed valid unless the proposed assignee agrees in writing to comply with all the requirements of the Franchise then in effect. Unless approval is granted in writing by Franchisor, no transfer is deemed valid without the proper notification of the transfer by Franchisee as set out herein.

     D.    **Franchisor's First Right of Refusal.** If Franchisee or any shareholder thereof has received and desires to accept a *bona fide* offer from a third party to purchase Franchisee's interest in the Franchise, Franchisee or shareholder shall first notify Franchisor of such offer, and Franchisor shall have the right and option, exercisable within twenty (20) days after notification, to purchase Franchisee's Franchise or shareholder's interest as offered by the third party. This right of first refusal shall not be applicable on the part of Franchisor if any partner or shareholder listed in the current Franchise Agreement desires to sell to an existing partner or shareholder. Should Franchisor not exercise this option and the terms of the unaccepted offer be altered, Franchisor must be notified of the altered terms and shall have twenty (20) additional days from the date of notification to purchase on the altered terms. Should Franchisor not exercise this option, Franchisee may transfer its interest in the manner set forth below.

     E.    **Assignment by Franchisee.** Franchisee acknowledges that Franchisor is entering into this Agreement in reliance upon and in consideration of Franchisee's business skill, financial capacity, aptitude and other qualifications. Accordingly, the rights and duties created by this Agreement are personal to Franchisee and neither Franchisee's interest in this Agreement nor any of its rights or privileges hereunder nor the Franchise or any interest therein may be assigned, transferred, shared or divided, voluntarily or involuntarily, directly or indirectly, by operation of law or otherwise, in any manner, without the prior written consent of Franchisor, which consent shall not be unreasonably withheld, provided that Franchisee complies with the provisions of this Section. Any actual or intended assignment, transfer or sale made or accomplished in violation of the terms of this Section shall be null and void and shall constitute a material breach of this Agreement which may give rise to termination of this Agreement. Franchisor's consent to a proposed assignment shall be conditioned upon the following requirements:

     1.    the payment of a transfer fee in the amount of Two Thousand Dollars ($2,000.00) to Franchisor by Franchisee or assignee; and

     2.    Franchisor's receipt of required notification by Franchisee as required herein and any forms required by Franchisor that Franchisor is then using in evaluating prospective purchasers of new franchises; and

     3.    Franchisor's approval of the proposed assignee and the meeting of minimum

financial criteria by the proposed assignee within the standards that Franchisor is then applying in evaluating prospective purchasers of new franchises; and

    4.    the payment in full to Franchisor of all outstanding debts of Franchisee; and

    5.    payment of all debts and obligations owed to third parties which were incurred by Franchisee in connection with the Franchise; and

    6.    the signing of a general release of all claims against Franchisor by Franchisee; and

    7.    the proposed assignee's execution of the then-current Franchise Agreement; and

    8.    the delivery of any information required by the rules and regulations of any franchise disclosure legislation to be delivered to the proposed assignee at least ten (10) days prior to any assignment; and

    9.    the successful completion of the initial training seminar then required of all new franchisees of Franchisor, unless such training is waived by Franchisor in writing by reason of the assignee's prior experience or training; and

    10.    the delivery by Franchisee or assignee to Franchisor, prior to execution, a copy of the contract conveying the Franchise to the assignee, and Franchisor shall, in its reasonable judgment, not have objected to such contract within fifteen (15) business days after receipt of such contract.

F.    **Transfer Due to Death or Incapacity.** The transfer of Franchisee's interest in this Agreement in the event of the death or legal incapacity or permanent disability of Franchisee or the operating principal, if a transfer or assignment is necessary as a result of such an event, shall not constitute an assignment requiring payment of a transfer fee, as set forth herein, so long as the person designated by Franchisee's heirs, legatees, personal representative, conservator or guardian, as applicable:

    1.    applies in writing to Franchisor within ninety (90) days after death or legal incapacity or permanent disability of Franchisee for Franchisor's approval to transfer the Franchise, or the interest of the deceased or disabled shareholder if Franchise is held by a corporation; and

    2.    meets Franchisor's standards for new franchisees; and

    3.    agrees to be bound by the terms and conditions of the Franchise Agreement then in effect between Franchisor and Franchisee; and

4.    executes a consent to be so bound; and

5.    satisfactorily completes Franchisor's then-current training requirements.

In the event of death or legal incapacity or permanent disability of Franchisee or the operating principal requiring a transfer or assignment of Franchisee's interests in this Agreement or in the Franchise, Franchisor may, at its sole discretion, assume the operation of the Franchise pending the transfer or assignment.

G.    **Transfer to Franchisee's Corporation.** If an individual Franchisee desires to assign this Agreement to a corporation formed or controlled by Franchisee, Franchisor will grant its consent, provided:

1.    Franchisee is, and covenants to remain, the owner of the majority of the voting stock of the corporation or, if Franchisee is more than one individual, each individual shall have the same proportionate ownership interest in the corporation as that individual had in the Franchise prior to the transfer; and

2.    all corporate documents reasonably required by Franchisor are provided to Franchisor prior to the transfer; and

3.    Franchisee or another qualified individual is designated "operating principal" in accordance with Section 5.C. hereof; and

4.    Franchisee and/or the principal shareholders of the assignee corporation personally guarantee the obligations to be performed under this Agreement by the Franchisee corporation.

## 11.    DEFAULT AND TERMINATION

A.    **By Franchisor, Without Notice.** Franchisee shall be deemed to be in default of this Agreement, and Franchisor may, at its sole option, terminate the Agreement and all rights hereunder, without affording Franchisee an opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, if:

1.    Franchisee becomes insolvent or makes a general assignment for the benefit of creditors; or proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee or a petition in bankruptcy is filed by Franchisee or such a petition if filed against and not opposed by Franchisee or Franchisee is adjudicated a bankrupt or insolvent or a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee or a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court

of competent jurisdiction; or

2.    a final judgment related to the Franchisee remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas bond is filed); or the Franchise is dissolved; or execution is levied against the Franchisee; or suit to foreclose any lien or mortgage against the Franchise or its equipment is instituted against Franchisee and not dismissed within thirty (30) days; or the real or personal property of the Franchise must be sold after levy thereupon by any sheriff, marshal or constable; or

3.    Franchisee has made any material misrepresentations or misstatements to Franchisor on the application for the Franchise, or with respect to the ownership of Franchise; or

4.    Franchisee ceases to operate the Franchise for three (3) consecutive business days (excluding vacations or holidays) when, in Franchisor's opinion, the ability of Franchisee to resume an effective operation has been substantially impaired, or Franchisee otherwise abandons the Franchise at any time, or Franchisee otherwise forfeits the right to do or transact business in the jurisdiction where the Franchise is located; or

5.    Franchisee is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that Franchisor believes is reasonably likely to have an adverse effect upon the Franchise, the Trademark, the goodwill associated therewith, or Franchisor's interest therein; or

6.    Franchisee discloses or divulges the contents of Franchisor's manuals or other confidential information provided to Franchisee by Franchisor, contrary to the terms of the Agreement; or

7.    Franchisee knowingly maintains false books or records, or knowingly submits any false or fraudulent reports, statements or documents to Franchisor; or

8.    Franchisee misuses or makes any unauthorized use of the Trademark or any other identifying characteristics of Franchisor's system, or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein; or

9.    Franchisee fails to maintain insurance at all times in accordance with this Agreement.

B.    **By Franchisor, With Notice.**  Except as set forth in Section 11.A. above, Franchisee will have fifteen (15) days after receipt of a written Notice of Default from Franchisor within which to remedy any default under this Agreement and provide evidence thereof to Franchisor; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to Franchisor's satisfaction within the fifteen (15) day period (or within such

longer period as Franchisor may, at its sole option, grant), and by promptly providing proof thereof to Franchisor. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee, effective immediately upon the expiration of the fifteen (15) day period or such longer period as applicable law may require. Franchisee shall be in default under this Agreement for failure to comply with any of the requirements imposed by the Agreement, as it may from time to time be reasonably supplemented by Franchisor's manuals, or fails to carry out the terms of this Agreement in good faith. Such defaults include, but are not limited to; if Franchisee:

     1.     fails, refuses, or neglects to pay promptly any monies owing to Franchisor or its subsidiaries or affiliates when due, or to submit any information required by Franchisor under this Agreement; or

     2.     fails to maintain or observe any of these standards, specifications or procedures prescribed by Franchisor in this Agreement, Franchisor's manuals, or otherwise in writing; or

     3.     fails, refuses, or neglects to obtain Franchisor's prior written consent as required by this Agreement; or Franchisee or any partner or shareholder in the Franchise purports to sell, transfer or relinquish any rights or obligations under this Agreement or any interest in the Franchise to any third party without Franchisor's prior written consent, contrary to the terms of this Agreement; or

     4.     or Franchisee's heirs, legatees, personal representative, conservator or guardian, as applicable, fails to dispose of Franchisee's interest in the Franchise following Franchisee's death or permanent disability or legal incapacity as outlined in this Agreement; or

     5.     engages in a similar business to that licensed and established under and pursuant to this Agreement without obtaining Franchisor's prior consent and paying Royalty Fees, or violates the covenant against competition, or markets any service or product under a name or mark which, in Franchisor's opinion, is confusingly similar to the Trademark; or

     6.     fails to comply with any of the covenants or conditions, or fails to obtain execution of the covenants required by this Agreement; or

     7.     refuses to permit Franchisor to inspect the Franchise, or the books and records of the Franchise upon demand; or

     8.     allows any dispute, disagreement or controversy between or among partners, managers, officers, directors or stockholders of Franchisee which, in the reasonable opinion of Franchisor, adversely affects the operation of Franchisee, the Franchise, or the interest of Franchisor to continue; or

9.    fails to commence operation of the Franchise within ninety (90) days from acceptance of this Agreement by Franchisor, unless prior written consent of Franchisor grants Franchisee an extension for its opening date; or

10.    receives an excessive amount of customer complaints against the Franchise and/or Franchisee and an investigation by Franchisor determines these complaints to be warranted; or

11.    a threat or danger to public health or safety results from the maintenance or operation of the Franchise; or

12.    Franchisee, upon receiving notice of termination for a default specified under this Agreement, fails to immediately initiate a remedy to cure such default; or

13.    Franchisee, after curing a default pursuant to this Agreement, commits the same default again, whether or not cured after notice; or

14.    Franchisee is repeatedly in default under this Agreement for failure to substantially comply with any of the requirements imposed by this Agreement, whether or not cured after notice; or

15.    Franchisee fails or refuses to conduct and govern its business or the operation of Franchise according to any applicable or governing law, rules or regulations of any governmental or other body, or any other appropriate organization, or any law, ordinance, rule or regulation of the Federal, State, Municipal or City government having jurisdiction.

C.    **By Franchisee.**  There are no conditions contained in this Agreement under which Franchisee may terminate this Agreement prior to the expiration of its term except by mutual agreement with Franchisor and execution of a mutual release or by sale of the Franchise to another franchisee in good standing or to a qualified third party.

D.    **Notice As Required by Law.**  Notwithstanding anything to the contrary contained in this Section, if applicable law or regulation limits Franchisor's rights to terminate or requires longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice periods or restrictions upon termination required by such laws and regulations. Franchisor shall not, however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, arbitration, hearing or dispute relating to this Agreement or the termination thereof.

## 12.    FRANCHISEE'S OBLIGATIONS UPON TERMINATION, EXPIRATION OR NON-RENEWAL

A.    **Franchisee's Obligations.**  Immediately upon termination, expiration or non-renewal

of this Agreement for any reason, all rights granted to Franchisee shall terminate and Franchisee shall thereafter:

      1.      cease to use Franchisor's system and methods of operation and comply with the post-term covenants contained in Section 9 herein; and

      2.      cease to use the Trademark or any confusingly similar name, device, mark, service mark, trademark, trade name, slogan or symbol used in connection with the Franchise, including any reproduction, counterfeit copy, variation, emulation or colorable imitation thereof which is likely to cause confusion or mistake or deceive the public; and take any steps necessary to change the name of any corporation or entity which Franchisee may have formed, or under which Franchisee trades or does business, so that the name will not likely be confused with Franchisor's Trademark; and

      3.      promptly assign to Franchisor any interest that Franchisee may have in the telephone number and telephone listing used by Franchisee in connection with the operation of its business. Franchisee shall promptly transfer all telephone calls by call-forwarding to Franchisor or to such other party or entity as Franchisor shall direct; to execute any such instruments and take such actions as Franchisor may deem necessary to affect such transfer and call-forwarding of telephone calls. Franchisee acknowledges that this Agreement shall be conclusive evidence of Franchisor's rights to such telephone numbers and directory listings and its authority to direct this transfer; and

      4.      promptly assign to Franchisor, upon Franchisor's demand, any interest and right that Franchisee may have in the building where the franchise granted herein is located and operates, unless Franchisee owns said building; and

      5.      promptly assign and deliver to Franchisor, at Franchisee's expense, any and all check drafts for any and all memberships, any and all membership lists, past and present, and any and all leads for potential members for the business. Franchisee shall not duplicate any membership lists or leads, past or present, used in any manner with the business, and, after deliverance of said materials to Franchisor, Franchisee shall destroy any and all copies of membership lists, leads, and check drafts used in any manner with the business; and

      6.      promptly pay all sums and debts owing to all third-party creditors of the Franchise as well as to Franchisor and its affiliates, whether such sums and debts owing to Franchisor and its affiliates are evidenced by promissory note, invoice, bill or other writing and notwithstanding the fact that such sums and debts owing to Franchisor and its affiliates may not at that time be fully due and payable, such debts being accelerated automatically without further notice to Franchisee. If termination is for any default of Franchisee, sums owing to Franchisor shall include all damages, costs and expenses (including reasonable attorney's fees) incurred by Franchisor as a result of the default, which obligation shall give

rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the vehicles, personal property, furnishings, equipment, signs, inventory, fixtures or other assets owned by Franchisee and used in the Franchise at the time of default; and

7.      return to Franchisor, at Franchisee's expense, all printed material furnished to Franchisee, including, without limitation, all Franchisor's manuals, advertising material, stationery and printed forms and all other matters relating to the operation of the Franchise and/or bearing the Trademark which may be in Franchisee's possession or control at the time of such expiration, termination or non-renewal; and

8.      sell to Franchisor, at Franchisor's sole discretion and upon Franchisor's demand, all Quickfit™ equipment identified in Exhibit B herein owned by Franchisee. If Franchisee has used the Quickfit™ equipment identified in Exhibit B herein as collateral for any type of debt, Franchisee shall promptly satisfy whatever amount necessary to release and clear the Quickfit™ equipment identified in Exhibit B herein. Franchisor shall have the right to purchase the Quickfit™ equipment identified in Exhibit B herein from Franchisee at a purchase price in accordance with the following payment description; if the Quickfit™ equipment identified in Exhibit B herein has been used (calculated based on Franchisee's original opening date): less than one (1) year - $7,500; between one (1) year and two (2) years - $5,000; between two (2) years and three (3) years - $3,000; between three (3) years and four (4) years - $2,500; between four (4) years and five (5) years - $2,000; and more than five (5) years - $1,500. Each piece of the Quickfit™ equipment identified in Exhibit B herein must be in operable condition or Franchisor may attribute a discount for each inoperable piece of equipment in accordance with the above payment description; and

9.      satisfactorily resolve all customer disputes, or reimburse Franchisor or any Franchisee who does so for the reasonable cost of such services; and

10.     refrain from doing anything that would imply or indicate that, or might be anticipated to imply or indicate that, Franchisee is an authorized *Curves for Women®* franchisee.

B.      **Execution of Documents.** Franchisor may, if Franchisee fails or refuses to do so, execute in Franchisee's name and on its behalf, any and all documents necessary to effect the obligations of Franchisee under Sections 12.A.2 and 3 and Franchisee hereby irrevocably appoints Franchisor as Franchisor's attorney-in-fact to do so.

C.      **Franchisor's Rights Not Prejudiced.** The expiration, termination or non-renewal of this Agreement shall be without prejudice to Franchisor's rights against Franchisee and such expiration, termination or non-renewal shall not relieve Franchisee of any of its obligations to Franchisor existing at the time of expiration, termination or non-renewal, nor will it terminate those obligations of Franchisee which by their nature survive the expiration, termination or non-renewal of this Agreement.

13.    **DISPUTE RESOLUTION**

A.    **Agreement to Use Procedure.** Franchisor and Franchisee have entered into this Agreement in good faith and in the belief that it is mutually advantageous to them. It is with the same spirit of cooperation that they pledge to attempt to amicably resolve any controversy or claim arising out of or relating to this Agreement or the breach thereof or the transaction embodied therein (a "Dispute"), without the necessity of litigation. If a Dispute arises, the parties agree to utilize the procedures described herein before commencing any legal action. If a party fails to utilize these procedures prior to commencement of any legal action, the other party shall be entitled to a sixty (60) day abatement of the legal action upon filing the appropriate procedural motion in the legal proceeding and bringing this provision to the attention of the court or other legal authority having jurisdiction over the matter.

B.    **Initiation of Procedure.** The initiating party shall give written notice to the other party, describing the nature of the Dispute, its claim for relief and identifying one or more individuals with authority to resolve the Dispute on such party's behalf. The other party shall have ten (10) business days within which to designate in writing one or more individuals with authority to resolve the Dispute on such party's behalf ("Authorized Individuals").

C.    **Direct Negotiations.** Authorized Individuals shall be entitled to investigation of the Dispute as they deem appropriate, but agree to meet promptly, and in no event later than thirty (30) days from the date of the initiating party's written notice, to discuss resolution of the Dispute. Authorized Individuals shall confer in person or by telephone at times, places and frequency as they may agree. However, if the Dispute has not been resolved within thirty (30) days from the date of their initial meeting, the parties shall cease direct negotiations and submit the Dispute to mediation in accordance with the following procedure.

D.    **Selection of Mediator.** Within fifteen (15) business days after the date the parties cease direct negotiations, the parties shall make a good faith effort to select a person to mediate the Dispute. If no mediator has been selected under this procedure, the American Arbitration Association, Two Galleria Tower, Suite 1440, Dallas, TX 75240-6620 at 214-696-5000 or the CPR Legal Program, 366 Madison Avenue, New York, NY 10017 at 212-949-6490 shall be asked to supply a list of five (5) potential qualified attorney-mediators within ten (10) business days. Within ten (10) business days after receipt of the list, the parties shall rank the proposed mediators in numerical order of preference, simultaneously exchange such list, and select the individual receiving the highest combined ranking as the mediator. If such individual is not available to serve, the parties shall proceed to contact the individual who was the next highest in ranking until a mediator is selected.

E.    **Time and Place for Mediation.** In consultation with the mediator selected, the parties shall promptly designate a mutually convenient time and place for the mediation, such time to be no later than thirty (30) days after selection of the mediator. If the parties cannot agree, this provision is subject to the jurisdiction specified in Section 14.N. hereof. In the mediation, each party

shall be represented by persons with authority and discretion to negotiate a resolution of the Dispute, and may be represented by counsel.

F.    **Exchange of Information; Summary of Views.** Both parties shall attempt in good faith to agree on procedures for the expeditious exchange of information which is desired for preparation for the mediation. Both parties will deliver a concise summary of its view on the Dispute to the mediator at least seven (7) days before the first scheduled session of the mediation.

G.    **Conduct of Mediation.** The mediator shall determine the format for the meetings, and the mediation session shall be private. The mediator will keep confidential all information learned in private caucus with any party unless specifically authorized by such party to make disclosure of the information to the other party. The parties agree that the mediation shall be governed by the provisions of Vernon's Texas Code Annotated, Civil Practice & Remedies Code Section 154 and/or such other rules as the mediator shall prescribe.

H.    **Termination of Procedure.** Both parties agree to participate in the mediation to its conclusion. The mediation shall be terminated by: (1) the execution of a settlement agreement by the parties, or (2) a declaration of the mediator that mediation is terminated, or (3) a written declaration by the parties to the effect that the mediation process is terminated at the conclusion of one full day's mediation session. The parties agree not to terminate negotiations and not to commence any legal action or seek other remedies prior to the expiration of seven (7) days following the mediation; provided, however, any party may commence litigation within such seven (7) day period if litigation could be barred by an applicable statute of limitations or in order to request an injunction to prevent irreparable harm.

I.    **Fees; Disqualification; Confidentiality.** The fees and expenses of the mediator shall be shared equally by the parties. The mediator shall be disqualified as a witness, expert or counsel for any party with respect to the Dispute and any related matters. Mediation is a compromise negotiation for purposes of Federal and Texas Rules of Evidence and constitutes privileged communication under Texas law. The entire mediation process is confidential, and such conduct, statements, promises, offers, views and opinions shall not be discoverable or admissible in any legal proceeding for any purpose; provided, however, that evidence which is otherwise discoverable or admissible is not excluded from discovery or admission as a result of its use in the mediation.

14.    **ADMINISTRATIVE PROVISIONS**

A.    **Entire Agreement; Amendments.** This agreement constitutes the entire Agreement between the parties and may not be altered, amended or added to unless such amendment or addition is in writing and signed by both an authorized officer of Franchisor and by Franchisee. This Agreement shall be deemed to cancel and supersede the terms of all prior written or oral agreements and understandings, if any, between Franchisor and Franchisee pertaining to such license.

B.    **Notices.** Any notices required or permitted to be given under this Agreement shall

be given by certified or registered United States Mail, return receipt requested, postage prepaid, United Postal Service, or Federal Express directed to Franchisor or Franchisee at their addresses shown herein or at such other address as they may subsequently designate in writing. Notice by mail shall be deemed given upon the depositing thereof in a United States Postal Service facility, a United Postal Service facility, or a Federal Express facility as shown on the receipt therefor.

C.    **Written Consent from Franchisor.** Whenever this Agreement requires Franchisor's consent, Franchisee agrees to make a timely written request for such consent. Franchisor will not unreasonably withhold its consent but its consent must be in writing to be valid.

D.    **Public Representation as Franchisee.** Franchisee shall represent that it is doing business as a Franchisee under the tradename and style of *Curves for Women®.* For this purpose, Franchisee shall publicly display at its business during all times this Agreement is in effect, Franchisor's certificate of good standing. Franchisee shall prominently display a notice or certificate in the public area of its business, as well as a statement on Franchisee's letterhead and on all forms, printed materials, and advertising materials to be distributed to the public, which clearly states that "EACH FACILITY IS INDEPENDENTLY OWNED AND OPERATED". Franchisee shall file for and maintain an "Assumed Name Certificate" in the city, county and/or state where its business is located. Franchisee shall furnish evidence of such filing to Franchisor.

E.    **Reasonableness.** Franchisor and Franchisee both agree to act reasonably in all dealings with one another pursuant to this Agreement.

F.    **Performance.** Any and all payments by Franchisee to Franchisor under this Agreement shall be made where Franchisor's principal place of business is then located.

G.    **Severability.** Each provision contained in this Agreement shall for all purposes be construed to be separate and independent. If any provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid and unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the other provisions of this Agreement; and the remainder of the Agreement, and the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, it being hereby agreed that such provisions are severable and that this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted. Each provision of this Agreement shall be valid and shall be enforceable to the fullest extent permitted by law.

H.    **Waiver and Delay.** The acceptance by Franchisor of any payment specified to be paid by Franchisee hereunder with knowledge of a breach of any covenant or agreement hereof shall not be, nor be construed to be, a waiver of any breach of any term, covenant or condition of this Agreement. The failure or delay to enforce any of the provisions of this Agreement shall not constitute a waiver of rights or a waiver of any subsequent enforcement of the provisions of this Agreement. The waiver or remedy of any default or breach hereunder shall not waive or affect the

default remedied or any prior or subsequent default. However, either party may, by written notice, unilaterally waive or reduce any obligation or restriction of the other party. The waiver or reduction may be revoked at any time for any reason on ten (10) days' written notice. All rights and remedies herein enumerated shall be cumulative and none shall exclude any other right or remedy allowed by law, and said rights and remedies may be exercised and enforced concurrently and whenever and as often as the occasion therefore arises.

I.    **Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original; and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

J.    **Construction and Interpretation.** If any provision of this Agreement is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid. The paragraph headings used herein are descriptive only and shall have no legal force or effect whatsoever. The term "affiliate" as used in this Agreement is applicable to any company directly or indirectly owned or controlled by Franchisor. The word "corporation(s)" as used in this Agreement shall include Limited Liability Companies and such other similar organizations as are duly formed and existing pursuant to state law. The word "partnership(s)" as used in this Agreement shall include Limited Liability Partnerships and such other similar organizations as are duly formed and existing pursuant to state law. All words in this Agreement shall be deemed to include all genders and the singular as well as the plural, as the context of this Agreement requires.

K.    **Savings Clause.** If any term hereof may be construed to obligate Franchisee to pay interest in excess of the highest legal amount, it is agreed that such term is a mistake in calculation or wording and, notwithstanding same, it is agreed that neither Franchisee nor any other person or entity obligated for the payment of any sums hereunder shall ever be obligated to pay interest in excess of the highest lawful amount. Franchisor intends to conform strictly to usury laws now and hereafter in effect and in no event shall Franchisor charge or collect, directly or indirectly, an amount for the use, forbearance or detention of money hereunder in excess of the highest lawful rate of interest, any excess of payments to be spread first over the term of the obligation and then, if any excess remains, to be applied next to reduction of the unpaid balance of the principal and then, after such unpaid balance is reduced to zero, any remaining excess shall be rebated to Franchisee. If the maturity of any indebtedness hereunder is accelerated before the due date, any unearned interest in excess of the maximum permitted by law shall be canceled automatically as of the date of such acceleration and if theretofore paid, shall be refunded or credited against the principal amount of the obligation.

L.    **Modification of Agreement.** Any modification of this Agreement or additional obligation assumed by either party in connection therewith shall be binding only if placed in writing and signed by all parties hereto.

M.    **Attorney Fees.** In the event that any legal action is filed in relation to this

Agreement, the successful party in the action shall be entitled to recover its costs therein, including reasonable attorneys' fees.

N.    **Governing Law and Jurisdiction.** Franchisee and each of its owners agree that the relationship, rights, and obligations of the parties of this Franchise Agreement shall be governed by the internal laws of the state of Texas, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Section 1051 et seq.). **FRANCHISEE AND EACH OF ITS OWNERS AGREE THAT ANY ACTION ARISING OUT OF OR RELATING TO THE RELATIONSHIP, RIGHTS, OR OBLIGATIONS OF THE PARTIES HEREIN SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF GENERAL JURISDICTION WHERE FRANCHISOR'S PRINCIPAL BUSINESS ADDRESS IS THEN LOCATED AND FRANCHISEE IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND WAIVES ANY OBJECTION IT MAY HAVE TO EITHER THE JURISDICTION OR VENUE OF SUCH COURT.**

**FRANCHISOR AND FRANCHISEE WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM, EACH SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY IT. FRANCHISOR AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY ANY OF THEM.**

O.    **Acknowledgments.** Franchisee acknowledges that Franchisor and its subsidiaries and affiliates have certain rights reserved to them to grant licenses and rights to others, which may or may not be similar to the license and rights conveyed hereunder; to market Franchisor-approved products; and to otherwise use Franchisor's Trademark and system as set forth in this Agreement. Franchisee acknowledges that, prior to the execution of this Agreement, Franchisee has had the opportunity to contact existing Franchisees of Franchisor. Franchisee acknowledges that Franchisee had the opportunity to independently investigate, analyze and construe both the business opportunity being offered hereunder and the terms and provisions of this Agreement itself, utilizing the services of such independent attorneys, accountants, or other advisers as Franchisee so elects. Franchisee acknowledges that no representation or statement has been made by Franchisor or any employee, agent or salesman thereof and relied upon by Franchisee regarding the future growth of Franchisor's franchise system, the anticipated income, earnings and growth of Franchisee, or the viability of the business opportunity conveyed hereunder. **FRANCHISEE ACKNOWLEDGES RECEIPT OF A COPY OF THIS AGREEMENT AND ACKNOWLEDGES THAT IT HAS READ ALL OF THE FOREGOING AGREEMENT AND THAT IT HEREBY ACCEPTS AND AGREES TO EACH AND ALL OF THE PROVISIONS, COVENANTS AND CONDITIONS THEREOF.**

P.    **Submission of Agreement.** Submission of this Agreement does not constitute an offer and this Agreement shall become effective only upon the execution hereof by both Franchisor and Franchisee.

Q.     **Effective Date.** This Agreement is effective as of the date first above written.

CURVES INTERNATIONAL, INC.

By: _____

Gary A. Findley, President and COO

ATTEST:

FRANCHISEE:

_Linda S. Mooberger_
(Signature)

WE THE UNDERSIGNED PRINCIPALS OF THE CORPORATE OR PARTNERSHIP FRANCHISEE, DO AS INDIVIDUALS JOINTLY AND SEVERALLY, WITH THE CORPORATION OR PARTNERSHIP AND AMONGST OURSELVES, ACCEPT AND AGREE TO ALL OF THE PROVISIONS, COVENANTS AND CONDITIONS OF THIS AGREEMENT AS GUARANTORS AND ACKNOWLEDGE RECEIPT THEREOF.


_____
(Signature)


_____
(Signature)


_____
(Signature)


_____
(Signature)

# EXHIBIT A

Curves International, Inc. grants an exclusive franchise to operate a *Curves for Women*® thirty minute fitness and weight loss center at the location set out below on the terms and conditions contained in this Agreement executed simultaneously herewith:

## The city limits of Deatsville, Alabama

The area shall not include any area outside of the area identified and described above. Regardless of any rights granted to Franchisee in the area identified herein, Franchisee shall not open a Curves For Women ®facility within two (2) miles of an existing Curves for Women ® facility.

The identified marks representing the boundaries as stated within this Agreement are identified as of the date of this Agreement. Except when both Franchisor and Franchisee agree in writing, the area, as stated herein as of the date of this Agreement, shall not be altered in any manner in the future as to size or location regardless of any future alterations to the identified marks representing the boundaries herein.

## EXHIBIT B

Curves International, Inc. provides Franchisees with the following equipment and manuals needed for beginning operations as part of the Initial Franchise Fee:

<u>Equipment</u>

*Quickfit* Thirty Minute Fitness Circuit, including:

      Biceps/Triceps
      Leg Extension/Leg Curl
      Shoulder/Laterals
      Chest/Back
      Hip Ab/Ad
      Squat
      Leg Press
      AB/Back
      Step Benches (4)
      Running Squares (4)

Heart Rate Chart
Stretching Chart
Music and Cue Tape

<u>Manuals</u>

Confidential Training Manual
Confidential Master Copies Manual

_____
(Name of Telephone Company)


_____
(Address)


_____


## TRANSFER OF SERVICE AGREEMENT

In the event my **CURVES FOR WOMEN®** franchise business is discontinued for any reason, I hereby release the use of the following telephone number(s):_____
_____ used in conjunction with said business to **CURVES INTERNATIONAL, INC.**, or its designee.

_Lida S. Mosbarger_                                    _____
(Present Customer's Signature)                         (Date)


SWORN AND SUBSCRIBED before me by the said _____
on the _____ day of _____, 199___.


_____
Notary Public, State of _____


I hereby assume all charges outstanding, either billed or unbilled, including White Pages directory charges, on the telephone number(s) listed above.


_____                                _____
(New Customer's Signature)                             (Date)


SWORN AND SUBSCRIBED before me by the said _____
on the _____ day of _____, 199___.


_____
Notary Public, State of _____

# RECEIPT

This Offering Circular summarizes certain provisions of the Franchise Agreement and other information in plain language. Read this Offering Circular and all agreements carefully.

If We offer You a franchise, We must provide this Offering Circular to You by the earliest of:

  (1)    The first personal meeting to discuss our franchise; or

  (2)    Ten business days before the signing of a binding agreement; or

  (3)    Ten business days before a payment to Us.

You must also receive a Franchise Agreement containing all material terms at least five business days before you sign a Franchise Agreement.

If We do not deliver this Offering Circular on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and any applicable state agency.

I have received a Uniform Franchise Offering Circular dated September 30, 1998. This Offering Circular included the following Exhibits and Attachments:

|  |  |
|---|---|
| Exhibit A: | Financial Statements |
| Exhibit B: | Franchise Agreement |
| Exhibit C: | Promissory Note and Security Agreement |
| Exhibit D: | Transfer of Service Agreement |
|  |  |
| Attachment A: | List of State Administrators |
| Attachment B: | List of Current Franchise Locations |
| Attachment C: | List of Agents for Service of Process |
| Attachment D: | List of Franchisees Who Have Left the System |

03/01/99
Date

*Linda S. Mosbarger*
Prospective Franchisee

*Linda S. Mosbarger*
Printed Name

STATE OF ALABAMA)
COUNTY OF ELMORE)

Personally came and appeared before me, the undersigned Notary, the within named individuals who are residents of ELMORE County, State of ALABAMA, and makes their statement and Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of their knowledge.

**WE THE FOLLOWING INDIVIDUALS ACKNOWLEDGE THAT LINDA LEWIS MOSBARGER WAS THE OWNER OF MIKE'S GYM IN HOLTVILLE, ALABAMA BEFORE SHE BECAME THE OWNER OF CURVES IN HOLTVILLE. BOTH BUSINESSES OPERATED SIMULTANEOUSLY SIDE-BY-SIDE UNTIL CURVES WENT OUT OF BUSINESS IN 2006. I MAKE THIS STATEMENT BASED UPON MY PERSONAL KNOWLEDGE HAVING NEVER BEEN CONVICTED OF A FELONY, BEING OF SOUND MIND AND HAVING NO FINANCIAL STATE IN THE OUTCOME OF THIS LITIGATED ISSUE.**

| | NAME | DATE OF BIRTH | ADDRESS | PHONE # | SIGNATURE |
|---|---|---|---|---|---|
| 1 | Sylvia D. Thomas | 5-9-52 | 4240 Coosa River Dr Deatsville, Al 36022 | 334-569-2388 | Sylvia W. Thomas |
| 2 | Harold Mann | 4-13-36 | 1521 Fern Rd Wet, Al | 334-569-3673 | Harold Mann |
| 3 | Reenie Joe Thomas | 3-30-1950 | 4340 Coosa River Rd Deats, AL | 334 5692798 | Reenie Joe Thomas |
| 4 | Eleanor Glendora Harris | 11-8-39 | 1992 Possum Trot Rd Deatsville al 36022 | 569-3691 | Eleanor Glendora Harris |
| 5 | Billy J Harris | 11-30-38 | 1992 possum Trot Rd Deatsville AL 36022 | 569-3081 | Billy J Harris |
| 6 | Sandra Tucker | 12-2-51 | 1138 Lightwood Rd Deds AL 36022 | 569-1026 | Sandra Tucker |
| 7 | Willie D Tucker | 6-7-49 | 1138 Lightwood Rd Deatsville | 569-1026 | Willie D Tucker |
| 8 | Heather Lea | 10-27-83 | 30 Orris dr. deats AL | 558-7349 | Heather Lea |
| 9 | Susan Tenly | 4/1/85 | 30 Carts dr Deats AL | 558-7349 | Susan Tenly |
| 10 | Audrey Taylor | 3-12-46 | 808 Tallassee St Wet | 567-7590 | Audrey Taylor |
| 11 | Shelton Renz | 4/7/1951 | 86 Honeysuckle Rd Deats | 569-1320 | |
| 12 | Mimi Findley | 9-22-37 | 5100 Ceasarville Rd | 569223 | Mimi Findley |
| 13 | Anne H-Welch | 2-1-60 | 2596 Carpenter Rd Deatsville AL 36022 | 285-5164 | Anne H Welch |
| 14 | | | | | |
| 15 | Carole Spivey | 11-21-76 | 87 Guy Rd Deatsville AL 36022 | 569-3090 | Carole Spivey |

Done this the 9th day of January, 2008.

## Notary Certification

I, Kellie A. Carmon the undersigned authority, a Notary Public in and for said State at Large, hereby certify that the above named individuals whose names are signed in the foregoing, and who are known to me, acknowledged before me on this day, that being informed of the contents and being of sound mind verified the truth and veracity of the forgoing and voluntarily executed this document after being duly sworn.

Given under my hand and seal this the 9th day of January, 2008. My commission expires.

Kellie A. Carmon

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 19, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF ALABAMA)
COUNTY OF ELMORE)

Personally came and appeared before me, the undersigned Notary, the within named individuals who are residents of **ELMORE** County, State of **ALABAMA**, and makes their statement and Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of their knowledge.

**WE THE FOLLOWING INDIVIDUALS ACKNOWLEDGE THAT LINDA LEWIS MOSBARGER WAS THE OWNER OF MIKE'S GYM IN HOLTVILLE, ALABAMA BEFORE SHE BECAME THE OWNER OF CURVES IN HOLTVILLE. BOTH BUSINESSES OPERATED SIMULTANEOUSLY SIDE-BY-SIDE UNTIL CURVES WENT OUT OF BUSINESS IN 2006. I MAKE THIS STATEMENT BASED UPON MY PERSONAL KNOWLEDGE HAVING NEVER BEEN CONVICTED OF A FELONY, BEING OF SOUND MIND AND HAVING NO FINANCIAL STATE IN THE OUTCOME OF THIS LITIGATED ISSUE.**

| NAME | DATE OF BIRTH | ADDRESS | PHONE # | SIGNATURE |
|---|---|---|---|---|
| 16 Vickie J. Bryne | 4/16/55 | Deatsville AL 36022 1458 Lightwood Rd | 334-578-2911 | Vickie J. Bryne |
| 17 | 2/10/74 | 2335 Cedarville Rd Wetumpka 36092 | 334 567 8032 | |
| 18 | 12/30/P | P.O. Box 220159 Deatsville AL 36022 | 334 850-3617 | |
| 19 Kelly Giles | 5/26/72 | 269 Crosscpk Dr Elmore AL | 334-208-7834 | Kelly Giles |
| 20 Gary Byrne | 1/19/60 | 2071 Lightwood Rd Deatsville | 334 569 2681 | Gary Byrne |
| 21 Ronell Spencer | 2/24/66 | 4725 Lightwood Rd Deatsville AL 36022 | 334-569-3893 | Ronell Spencer |
| 22 Quette O'Neill | 10/30/66 | 350 Archie Ln Deatsville 36022 | 334-569-1686 | Quette O'Neill |
| 23 Elisha Rogers | 07-22-77 | 323 Speigner Cr Deatsville 36022 | 334 569-0788 | Elisha Rogers |
| 24 Timothy Tenley | 01-18-59 | 30 Cains Dr Deatsville 36022 | 334-395312 | |
| 25 Melinda Moore | 12-13-59 | 8350 Lightwood Rd Marbury AL 36051 | 334 569-1722 | Melinda Moore |
| 26 Rita Horne | 11-07-61 | 211 Beachwood Rd Elmore Dr Wetumpka, AL 36092 | 569-0831 | Rita Horne |
| 27 J Blake Bass | 07-23-82 | 6991 Lightwood Rd Deatsville AL 36022 | 334-3645 | J Blake Bass |
| 28 Dixie Hilyer | 07-01-76 | 2930 Coosa River Rd Deatsville AL 36022 | 657-8841 | Dixie Hilyer |
| 29 | 05/24/69 | 60 Still Pines Circle Wetumpka, AL 36093 | 567-0835 | |
| 30 | 9/16/68 | 7815 Holtville Rd Wetumpka AL 36092 | 567-0629 | |

Done this the 9th day of January, 2008.

## Notary Certification

I, Kelle A. Garman the undersigned authority, a Notary Public in and for said State at Large, hereby certify that the above named individuals whose names are signed in the foregoing, and who are known to me, acknowledged before me on this day, that being informed of the contents and being of sound mind verified the truth and veracity of the forgoing and voluntarily executed this document after being duly sworn.

Given under my hand and seal this the 9th day of January, 2008. My commission expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 19, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

Kelle A. Garman

STATE OF ALABAMA)
COUNTY OF ELMORE)

Personally came and appeared before me, the undersigned Notary, the within named individuals who are residents of ELMORE County, State of ALABAMA, and makes their statement and Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of their knowledge.

**WE THE FOLLOWING INDIVIDUALS ACKNOWLEDGE THAT LINDA LEWIS MOSBARGER WAS THE OWNER OF MIKE'S GYM IN HOLTVILLE, ALABAMA BEFORE SHE BECAME THE OWNER OF CURVES IN HOLTVILLE. BOTH BUSINESSES OPERATED SIMULTANEOUSLY SIDE-BY-SIDE UNTIL CURVES WENT OUT OF BUSINESS IN 2006. I MAKE THIS STATEMENT BASED UPON MY PERSONAL KNOWLEDGE HAVING NEVER BEEN CONVICTED OF A FELONY, BEING OF SOUND MIND AND HAVING NO FINANCIAL STATE IN THE OUTCOME OF THIS LITIGATED ISSUE.**

| NAME | DATE OF BIRTH | ADDRESS | PHONE # | SIGNATURE |
|------|---------------|---------|---------|-----------|
| 31 Marilyn Fisher | 1/11/53 | 338 Co Rd 70 Deatsor | 334 365 4778 | Marilyn Fisher |
| 32 Kenneth Fisher | 10/19/50 | 338 Co Rd 70 Deats. AL | 334-365 4778 | Kenneth R Fish |
| 33 Michael J Lacey | 11/25/42 | 76 Lacey Lane Deatsville, AL | 334 569 2357 | M J Lacey |
| 34 Ramona Turner | 12-14-63 | 316 Skating Rink Rd Wetumpka AL | 334 · 569 1636 | R Turner |
| 35 Shirley Bonner | 7/19/40 | 217 Bonners Rd Wetumpka AL | 334-569 3623 | Shirley Bonner |
| 36 Nan Gray | 2-6-39 | 521 Nancy Lane Wpka AL | 334-567-7740 | Nan Gray |
| 37 Kalyn Forshey | 4-16-85 | 9411 Lightwood Road Deatsville, AL | 334-207-2055 | Kalyn Fy |
| 38 MANDI PRICE | 01-26-85 | 1714 BALTZER RD Deatsville, AL | 334-354-8907 | Mandi A Price |
| 39 Karen Prescott | 4-29-58 | 565 Womble Lane Deatsville, AL 36022 | 334 569-2448 | Karen Prescott |
| 40 Kay Barnwell | 1-20-1961 | 274 Ashbury Lane, Deatsville Al | 334-569-1149 | Kay Barnwell |
| 41 Candia Forshey | 3-18-86 | 185 shields Rd. Deatsville AL | 334-207-4448 | Candia Forshey |
| 42 John Forshey | 5-22-87 | 185 shields Rd Deatsville AL | 334-207-4448 | John Forshey |
| 43 John Ahu | 8-15-20 | 9411 Lightwood Rd Deatsville AL 36022 | 558 1756 | |
| 44 Buddy Jackson | 2-17-47 | 501 Gardendale Dr Former Elmore resident Montgomery AL 3611 | 270-9480 | Buddy Jackson |
| 45 Ronald Thompson | 7-14-45 | 155 Hoods Drive Deatsville, AL 36022 | 569-3407 | Ronald Thompson |

Done this the **9th** day of **January**, 2008.
★ Former Elmore resident

**Notary Certification**

I, **Kelle A. Carman** the undersigned authority, a Notary Public in and for said State at Large, hereby certify that the above named individuals whose names are signed in the foregoing, and who are known to me, acknowledged before me on this day, that being informed of the contents and being of sound mind verified the truth and veracity of the forgoing and voluntarily executed this document after being duly sworn.

Given under my hand and seal this the **9th** day of **January**, 2008. My commission expires:

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 19, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

Kelle A. Carman

STATE OF ALABAMA)
COUNTY OF ELMORE)

Personally came and appeared before me, the undersigned Notary, the within named individuals who are residents of **ELMORE** County, State of **ALABAMA**, and makes their statement and Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of their knowledge.

## WE, THE FOLLOWING INDIVIDUALS ACKNOWLEDGE THAT LINDA LEWIS MOSBARGER WAS THE OWNER OF MIKE'S GYM IN HOLTVILLE, ALABAMA BEFORE SHE BECAME THE OWNER OF CURVES IN HOLTVILLE. BOTH BUSINESSES OPERATED SIMULTANEOUSLY SIDE-BY-SIDE UNTIL CURVES WENT OUT OF BUSINESS IN 2006. I MAKE THIS STATEMENT BASED UPON MY PERSONAL KNOWLEDGE HAVING NEVER BEEN CONVICTED OF A FELONY, BEING OF SOUND MIND AND HAVING NO FINANCIAL STATE IN THE OUTCOME OF THIS LITIGATED ISSUE.

| | NAME | DATE OF BIRTH | ADDRESS | PHONE # | SIGNATURE |
|---|---|---|---|---|---|
| 46 | Martha Mann | 7/31/39 | 1521 Fern Rd. Wetumpka | 569-3623 | Martha Mann |
| 47 | Billy Withrow | 8/30/49 | 141 Gardena Rd Millbrook | 220-6608 | Billy Withrow |
| 48 | Stephen Rogers | 3-10-48 | 476 Tankersley Rd Wetumpka, Ala | 569-1567 | Steph Rogers |
| 49 | Robin Rogers | 12-19-46 | 476 Tankersly Rd Wetumpka, Ala | 569-1567 | Robin Rogers |
| 50 | Dashiell Miller | 11/16/79 | 1210 Kenner Creek Circle Deatsville AL | 365-347 | Dashiell Miller |
| 51 | Suzanne W Mercer | 01/20/62 | 65 Whatley Drive Deatsville | 258-5450 | Suzanne W Mercer |
| 52 | Lori Hodgins | 8/17/59 | 339 Old Ferry Rd Deatsville, AL | 569-2228 | Lori Hodgins |
| 53 | William Braswell Jr | 4/1/58 | 120 Huckleberry Dr. Deatsville | 569 1814 | William Braswell |
| 54 | Michael Horne | 10/27/60 | 211 Beachwood Rd Wetumpka | 569-0831 | Michael Horne |
| 55 | Jared Horne | 06/27/90 | 211 Beachwood Rd Wetumpka | 569-0831 | Jared Horne |
| 56 | Vicki Geddie | 5/30/1960 | 379 Nancy Lane Wetn | 567-3308 | Vicki Geddie |
| 57 | Rita Gray | 7/15/54 | 639 pine Leaf St. Wet. Al. | 300-3226 | Rita Gray |
| 58 | Mary Thompson | 4/5/47 | 155 #5205 Dr Deatsville AL 36022 | 569-3407 | Mary Thompson |
| 59 | Ann Jackson | 2-18-50 | 501 Gardendale Dr - Former Elmore residence Montgomery, AL 36111 | 270-9480 | Ann Jackson |
| 60 | Faye Burkhalter | 3-21-54 | Lewis Road Deatsville AL 36022 | 5693407 | Faye Burkhalter |

Done this the ____9th____ day of ____January____, 2008

### Notary Certification

I, ____Kelle A. Carman____ the undersigned authority, a Notary Public in and for said State at Large, hereby certify that the above named individuals whose names are signed in the foregoing, and who are known to me, acknowledged before me on this day, that being informed of the contents and being of sound mind verified the truth and veracity of the forgoing and voluntarily executed this document after being duly sworn.

Given under my hand and seal this the ____9th____ day of ____January____, 2008.    My commission expires

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 19, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF ALABAMA)
COUNTY OF ELMORE)

Personally came and appeared before me, the undersigned Notary, the within named individuals who are residents of **ELMORE** County, State of **ALABAMA**, and makes their statement and Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of their knowledge.

## WE THE FOLLOWING INDIVIDUALS ACKNOWLEDGE THAT LINDA LEWIS MOSBARGER WAS THE OWNER OF MIKE'S GYM IN HOLTVILLE, ALABAMA BEFORE SHE BECAME THE OWNER OF CURVES IN HOLTVILLE. BOTH BUSINESSES OPERATED SIMULTANEOUSLY SIDE-BY-SIDE UNTIL CURVES WENT OUT OF BUSINESS IN 2006. I MAKE THIS STATEMENT BASED UPON MY PERSONAL KNOWLEDGE HAVING NEVER BEEN CONVICTED OF A FELONY, BEING OF SOUND MIND AND HAVING NO FINANCIAL STATE IN THE OUTCOME OF THIS LITIGATED ISSUE.

| NAME | DATE OF BIRTH | ADDRESS | PHONE # | SIGNATURE |
|------|--------------|---------|---------|-----------|
| 61 Joe McClellan | 8-5-45 | 172 Honeysuckle Rd Deatsville, AL 36022 | 334 569-3025 | Joe McClellan |
| 62 Faye Matthews | 08/20/58 | 314 Shady | 569-0061 | Faye Matthews |
| 63 Lisa McMichael | 11/17/58 | Brook PR Deatsville 55 Lake Region Dr Ext. | 569-2836 | Lisa McMichael |
| 64 Carrie Howard | 5/5/60 | 113 Lake Region Cove Wetumpka Al. 36092 | 569-3518 | Carrie Howard |
| 65 Nancy Oats | 12/9/66 | 109 Willow Oak Dr Deatsville AL 36022 | 569-1040 | Nancy Oats |
| 66 Joy Post | 7/1/61 | 2584 Co Rd 85 Deatsville AL 36022 | 365-0619 | Joy Post |
| 67 Clarence E. Chandler | | 635 Old Farm Road Deatsville, Al. 36022 | 569-3103 | Clarence Chandler |
| 68 Brenda Andrews | | 270 Blackberry Lane Deatsville, AL 36022 | 569-3923 | Brenda Andrews |
| 69 Belinda Carmichael | | 133 Oak St Wetumpka, AL 36092 | 567-0777 | Belinda Carmichael |
| 70 Billy W. Dennis | 10-18-81 | 1485 Flatwood Rd. Wetumpka AL 36092 | 514-9448 | Billy W. Dennis |
| 71 Josh Thornton JT | 12-29-80 | 1714 Baltzer Rd Wetumpka, AL 36092 | 354-8907 | Josh Thornton |
| 72 Chrissy H. Dennis | 12-28-79 | 1485 Flatwood Road Wetumpka, AL 36092 | 514-9448 | Chrissy H. Dennis |
| 73 Renito Dennis | 12-29-58 | 1769 Baltzer Road | 391-0508 | Renito Dennis |
| 74 Bob Barnwell | 2-18-63 | 274 Asbury Lane Deatsville | 569-1149 | Bob Barnwell |
| 75 Sheila Clark | 5-19-52 | 1126 Fern Rd Wetumpka | 569-6129 | Sheila B. Clark |

Done this the 16th day of January, 2008

### Notary Certification

I, Kelle A. Garmon the undersigned authority, a Notary Public in and for said State at Large, hereby certify that the above named individuals whose names are signed in the foregoing, and who are known to me, acknowledged before me on this day, that being informed of the contents and being of sound mind verified the truth and veracity of the forgoing and voluntarily executed this document after being duly sworn.

Given under my hand and seal this the 16th day of January, 2008. My commission expires _____

Kelle A. Garmon

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 19, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF ALABAMA)
COUNTY OF ELMORE)

Personally came and appeared before me, the undersigned Notary, the within named individuals who are residents of **ELMORE** County, State of **ALABAMA**, and makes their statement and Affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of their knowledge.

**WE THE FOLLOWING INDIVIDUALS ACKNOWLEDGE THAT LINDA LEWIS MOSBARGER WAS THE OWNER OF MIKE'S GYM IN HOLTVILLE, ALABAMA BEFORE SHE BECAME THE OWNER OF CURVES IN HOLTVILLE. BOTH BUSINESSES OPERATED SIMUTANEOUSLY SIDE-BY-SIDE UNTIL CURVES WENT OUT OF BUSINESS IN 2006. I MAKE THIS STATEMENT BASED UPON MY PERSONAL KNOWLEDGE HAVING NEVER BEEN CONVICTED OF A FELONY, BEING OF SOUND MIND AND HAVING NO FINANCIAL STATE IN THE OUTCOME OF THIS LITIGATED ISSUE.**

| NAME | DATE OF BIRTH | ADDRESS | PHONE # | SIGNATURE |
|------|---------------|---------|---------|-----------|
| 76. Natasha Martin | 8/17/82 | 400 Janie Rd Deatsville | 334-569-1123 | Natasha Mart |
| 77. Donna Woodham | 5/16/60 | 4505 Ceasarville Rd Wetumpka Al | 569-2584 | Donna Woodham |
| 78. Tonya Holman | 2-4-84 | 837 Lewis Rd Deatsville 36022 | 424-3032 | Tonya Holman |
| 79. Annelle Wallace | 12.8.39 | 4455 Ceasarville Rd Wetumpka Al 36092 | 569-3852 | Annelle Wallace |
| 80. Shaunda Hudgens | 6.6.83 | 103 Perkins Street Wetumpka 36092 | 569-3644 | Shaunda Hudgens |
| 81. Jessica Grace | 7-11-54 | 4585 Ceasarville Rd. Wetumpka 36092 | | Jessica Grace |
| 82. ~~scribbled out~~ | | | | |
| 83. Stephanie Barnes | 6/15/71 | 4457 Ceasarville Rd Wetumpka 36092 | | Stephanie Barnes |
| 84. James K. Barnes | 7/21/1971 | 4457 Ceasarville Rd Wet Al | 569-2061 | James Barnes |
| *85. Florine Watson | 3/01/58 | 206 Adams Lane Coosada AL 36020 | 285-0348 | Florine Watson |
| *86. Terry Watson | 6/02/54 | 206 Adams Lane Coosada AL 36020 | 285-0248 | Terry Watson |
| 87. * Former Elmore residents | | | | |
| 88. | | | | |
| 89. | | | | |
| 90. | | | | |

Done this the 16th day of January, 2008.

## Notary Certification

I, Kelle A. Garmon the undersigned authority, a Notary Public in and for said State at Large, hereby certify that the above named individuals whose names are signed in the foregoing, and who are known to me, acknowledged before me on this day, that being informed of the contents and being of sound mind verified the truth and veracity of the forgoing and voluntarily executed this document after being duly sworn.

Given under my hand and seal this the 16th day of January, 2008. My commission expires _____.

Kelle A. Garmon

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 19, 2010
BONDED THRU NOTARY PUBLIC UNDERWRITERS

To Whom It May Concern:


RE:  Jordan's Gym
       770 Shields Road
       Deatsville, AL 36022


I was not a member when Curves opened in the Holtville/Slapout area. However, I had friends and acquaintances who were there and they knew that the men's equipment was there and used it.  I remember conversations at the time regarding the men's equipment.

I also remember (from conversations) the men's gym was at the back of the building on Lightwood Road adjacent to Lake Pharmacy, and they had their own entrance.



*Barbara J. Fuller*
Barbara J. Fuller
440 Myrick Drive
Deatsville AL  36022
334-569-1846

Date:  *January 10, 2008*


*Audrey B. Britt    My commission expires: 04/24/10*



Thanksgiving Week 2006
Landscaping by Ken Johnson
on his New facility

## Memorandum of Understanding

On this the 3rd day of December, 2006, an agreement and
memorandum of understanding was reached between the following
two individuals, Truitt K. Johnson and Linda S. Lewis, related to their
respective businesses, in development, Natural Beauty Garden
Center Development, 8617 U. S. Highway 231, Wetumpka, Alabama
36092, and Jordan's Gym, formerly Mike's Gym, 770 Shields Road,
Deatsville, Alabama   36022.  The parties, Truitt K. Johnson and
Linda S. Lewis, each desire to develop future businesses.  In this
light, Linda S. Lewis, grants, sales and devises her interest in
Jordan's Gym to Truitt K. Johnson, for good and valuable
consideration.  Additionally, Truitt K. Johnson, grants, sales and
devises to Linda S. Lewis an 1% ownership in the Natural Beauty
Garden Center to be developed in the near future.  The principle
purpose for this agreement is to finance the parties' joint development
company Natural Beauty Garden Center.

_____
TRUITT K. JOHNSON

_____
LINDA S. LEWIS

## LEASE AGREEMENT

This lease agreement was entered into on October 25, 2007, between **Possum Trot Properties, LLC,** a corporation organized under the laws of the State of Alabama, having its principal place of business at 750 Shields Road, Deatsville, 36022, Elmore County, Alabama   36022, referred to as "lessor," and **Jordan Community Center, LLC,** a corporation organized under the laws of the State of Alabama, having its principal place of business at 770 Shields Road, Deatsville, Elmore County, Alabama, referred to as "lessee."

### SECTION ONE

### DESCRIPTION OF PREMISES

Lessor leases to lessee the premises located at 770 Shields Road, Deatsville, Elmore, Alabama.

### SECTION TWO

### TERM

The term of this lease agreement is 3 years, beginning on October 25, 2007, and terminating on October 25, 2010, at 12 noon, unless renewed by agreement on or before September 30, 2010.

### SECTION THREE

### RENT

A. The total rent under this lease agreement is $36,000 per term; at the rate of $1,000 per month for each consecutive month after execution.

B. Lessee shall pay lessor the above-specified amount in installments of $1,000 each month, beginning on the first day of the next month following execution of this lease agreement, with succeeding payments due on the 1st day of each subsequent month during the term of the lease agreement.

### SECTION FOUR

### USE OF PREMISES

The demised premises are to be used for the purposes of a community center. Lessee shall restrict its use to such purposes, and shall not use or permit the use of the demised premises for any other purpose without the prior, express, and written consent of lessor, or lessor's authorized agent.

## SECTION FIVE

## RESTRICTIONS ON USE

A. Lessee shall not use the demised premises in any manner that will increase risks covered by insurance on the demised premises and result in an increase in the rate of insurance or a cancellation of any insurance policy, even if such use may be in furtherance of lessee's business purposes.

B. Lessee shall not keep, use, or sell anything prohibited by any policy of fire insurance covering the demised premises, and shall comply with all requirements of the insurers applicable to the demised premises necessary to keep in force the fire and liability insurance.

## SECTION SIX

## WASTE, NUISANCE, OR UNLAWFUL ACTIVITY

Lessee shall not allow any waste or nuisance on the demised premises, or use or allow the demised premises to be used for any unlawful purpose.

## SECTION SEVEN

## DELAY IN DELIVERING POSSESSION

This lease agreement shall not be rendered void or voidable by the inability of lessor to deliver possession to lessee on the date set forth in Section Two. Lessor shall not be liable to lessee for any loss or damage suffered by reason of such a delay; provided, however, that lessor does deliver possession no later than April 15, 2007. In the event of a delay in delivering possession, the rent for the period of such delay will be deducted from the total rent due under this lease agreement. No extension of this lease agreement shall result from a delay in delivering possession.

## SECTION EIGHT

## UTILITIES

Lessor shall arrange and pay for all utilities furnished to the demised premises for the term of this lease agreement, including, but not limited to, electricity, gas, water, sewer, and telephone service.

## SECTION NINE

## REPAIRS AND MAINTENANCE

Lessee shall maintain the demised premises and keep them in good repair at its expense, except that side and rear exterior walls and the roof will be maintained in good condition by lessor. Lessee shall maintain and repair windows, doors, floors, adjacent sidewalks, the building front, and interior walls.

## SECTION TEN

### DELIVERY, ACCEPTANCE, AND SURRENDER OF PREMISES

A. Lessor represents that the demised premises are in fit condition for use by lessee. Acceptance of the demised premises by lessee shall be construed as recognition that the demised premises are in a good state of repair and in sanitary condition.

B. Lessee shall surrender the demised premises at the end of the lease term, or any renewal of such term, in the same condition as when lessee took possession, allowing for reasonable use and wear, and damage by acts of God, including fires and storms. Before delivery, lessee shall remove all business signs placed on the demised premises by lessee and restore the portion of the demised premises on which they were placed in the same condition as when received.

## SECTION ELEVEN

### PARTIAL DESTRUCTION OF PREMISES

A. Partial destruction of the demised premises shall not render this lease agreement void or voidable, nor terminate it except as specifically provided in this lease agreement. If the demised premises are partially destroyed during the term of this lease agreement, lessor shall repair them when such repairs can be made in conformity with governmental laws and regulations, within 180 days of the partial destruction. Written notice of the intention of lessor to repair shall be given to lessee within 60 days after any partial destruction. Rent will be reduced proportionately to the extent to which the repair operations interfere with the business conducted on the demised premises by lessee. If the repairs cannot be made within the time specified above, lessor shall have the option to make them within a reasonable time and continue this lease agreement in effect with proportional rent rebate to lessee as provided for in this lease agreement. If the repairs cannot be made in 180 days, and if lessor does not elect to make them within a reasonable time, either party shall have the option to terminate this lease agreement.

B. Disputes between lessor and lessee relating to provisions of this section shall be arbitrated or mediated. The parties shall each select an arbitrator or mediator, and the two arbitrators/mediators selected shall together select a third arbitrator/mediator. The three arbitrators/mediators shall determine the dispute, and their decisions shall be binding on the parties. The parties shall equally divide the costs of such arbitration/mediation.

## SECTION TWELVE

### ENTRY ON PREMISES BY LESSOR

A. Lessor reserves the right to enter on the demised premises at reasonable times to inspect them, perform required maintenance and repairs, or to make additions, alterations, or modifications to any part of the building in which the demised premises are located, and lessee shall permit lessor to do so.

B. Lessor may erect scaffolding, fences, and similar structures, post relevant notices, and place moveable equipment in connection with making alterations, additions, or repairs, all without incurring liability to lessee for disturbance of quiet enjoyment of the demised premises, or loss of occupation of the demised premises.

## SECTION THIRTEEN

### SIGNS, AWNINGS, AND MARQUEES INSTALLED BY LESSEE

A. Lessee shall not construct or place signs, awnings, marquees, or other structures projecting from the exterior of the demised premises without the prior, express, and written consent of lessor.

B. Lessee shall remove signs, displays, advertisements, or decorations it has placed on the premises that, in the opinion of lessor, are offensive or otherwise objectionable. If lessee fails to remove such signs, displays, advertisements, or decorations within 30 days after receiving written notice from lessor to remove them, lessor reserves the right to enter the demised premises and remove them at the expense of lessee.

## SECTION FOURTEEN

### BUSINESS SALE SIGNS

Lessee shall not conduct "Going out of Business," "Lost Our Lease," "Bankruptcy," or other sales of that nature on the demised premises without the written consent of lessor.

## SECTION FIFTEEN

### NONLIABILITY OF LESSOR FOR DAMAGES

Lessor shall not be liable for liability or damage claims for injury to persons or property from any cause relating to the occupancy of the demised premises by lessee, including those arising out of damages or losses occurring on sidewalks and other areas adjacent to the demised premises during the term of this lease agreement or any extension

of such term. Lessee shall indemnify lessor from any and all liability, loss, or other damage claims or obligations resulting from any injuries or losses of this nature.

## SECTION SIXTEEN

### LIABILITY INSURANCE

A. Lessee shall procure and maintain in force at its expense during the term of this lease agreement and any extension of such term, public liability insurance with insurers and through brokers approved by lessor. Such coverage shall be adequate to protect against liability for damage claims through public use of or arising out of accidents occurring in or around the demised premises. The insurance policies shall provide coverage for contingent liability of lessor on any claims or losses. The insurance policies shall be delivered to lessor for safekeeping. Lessee shall obtain a written obligation from the insurers to notify lessor in writing at least 30 days prior to cancellation or refusal to renew any policy.

B. If the insurance policies required by this section are not kept in force during the entire term of this lease agreement or any extension of such term, lessor may procure the necessary insurance and pay the premium for it, and the premium shall be repaid to lessor as an additional rent installment for the month following the date on which the premiums were paid by lessor.

## SECTION SEVENTEEN

### ASSIGNMENT, SUBLEASE, OR LICENSE

A. Lessee shall not assign or sublease the demised premises, or any right or privilege connected with the demised premises, or allow any other person except agents and employees of lessee to occupy the demised premises or any part of the demised premises without first obtaining the written consent of lessor. A consent by lessor shall not be a consent to a subsequent assignment, sublease, or occupation by other persons.

B. An unauthorized assignment, sublease, or license to occupy by lessee shall be void and shall terminate this lease agreement at the option of lessor.

C. The interest of lessee in this lease agreement is not assignable by operation of law without the written consent of lessor.

## SECTION EIGHTEEN

### BREACH

The appointment of a receiver to take possession of the assets of lessee, a general assignment for the benefit of the creditors of lessee, any action taken or allowed to be taken by lessee under any bankruptcy act, or the failure of lessee to comply with each

term and condition of this lease agreement shall constitute a breach of this lease agreement. Lessee shall have 30 days after receipt of written notice from lessor of any breach to correct the conditions specified in the notice. If the corrections cannot be made within the 30-day period, lessee shall have a reasonable time to correct the default if action is commenced by lessee within 30 days after receipt of the notice.

## SECTION NINETEEN

## REMEDIES OF LESSOR FOR BREACH BY LESSEE

Lessor shall have the following remedies in addition to its other rights and remedies in the event lessee breaches this lease agreement and fails to make corrections as set forth in Section Eighteen:

A. Lessor may reenter the demised premises immediately and remove the property and personnel of lessee, store the property in a public warehouse or at a place selected by lessor, at the expense of lessee.

B. After reentry, lessor may terminate this lease agreement on giving 30 days' written notice of termination to lessee. Without such notice, reentry will not terminate this lease agreement. On termination, lessor may recover from lessee all damages proximately resulting from the breach, including, but not limited to, the cost of recovering the demised premises and the balance of the rent payments remaining due and unpaid under this lease agreement.

C. After reentering, lessor may relet the demised premises or any part of the demised premises for any term without terminating this lease agreement, at such rent and on such terms as it may choose. Lessor may make alterations and repairs to the demised premises. The duties and liabilities of the parties if the demised premises are relet shall be as follows:

(1). In addition to lessee's liability to lessor for breach of this lease agreement, lessee shall be liable for all expenses of the reletting, for the alterations and repairs made, and for the difference between the rent received by lessor under the new lease agreement and the rent installments that were due for the same period under this lease agreement.

(2). Lessor, at its option, shall have the right to apply the rent received from reletting the premises (a) to reduce lessee's indebtedness to lessor under this lease agreement, not including indebtedness for rent, (b) to expenses of the reletting and alterations and repairs made, (c) to rent due under this lease agreement, or (d) to payment of future rent under this lease agreement as it becomes due.

If the new lessee does not pay a rent installment promptly to lessor, and the rent installment has been credited in advance of payment to the indebtedness of lessee other than rent, or if rentals from the new lessee have been otherwise applied by lessor as provided for in this section, and during any rent installment period, are less than the rent

payable for the corresponding installment period under this lease agreement, lessee shall pay lessor the deficiency, separately for each rent installment deficiency period, and before the end of that period. Lessor may, at any time after such reletting, terminate this lease agreement for the breach on which lessor based the reentry and relet the demised premises.

After reentry, lessor may procure the appointment of a receiver to take possession and collect rents and profits of the business of lessee. If necessary to collect the rents and profits, the receiver may carry on the business of lessee and take possession of the personal property used in the business of lessee, including inventory, trade fixtures, and furnishings and use them in the business without compensating lessee. Proceedings for appointment of a receiver by lessor, or the appointment of a receiver and the conduct of the business of lessee by the receiver, shall not terminate this lease agreement unless lessor has given written notice of termination to lessee as provided in this lease agreement.

## SECTION TWENTY

## ATTORNEY FEES

If lessor files an action to enforce any agreement contained in this lease agreement, or for breach of any covenant or condition, lessee shall pay lessor reasonable attorney fees for the services of lessor's attorney in the action, all fees to be fixed by the court.

## SECTION TWENTY-ONE

## CONDEMNATION

Eminent domain proceedings resulting in the condemnation of a part of the demised premises, but leaving the remaining premises usable by lessee for the purposes of its business, will not terminate this lease agreement unless lessor, at its option, terminates this lease agreement by giving written notice of termination to lessee. The effect of any condemnation, where the option to terminate is not exercised, will be to terminate this lease agreement as to the portion of the demised premises condemned, and the lease of the remainder of the demised premises shall remain intact. The rental for the remainder of the lease term shall be reduced by the amount that the usefulness of the demised premises has been reduced for the business purposes of lessee. Lessee assigns and transfers to lessor any claim it may have to compensation for damages as a result of any condemnation.

## SECTION TWENTY-TWO

## OPTION TO RENEW

Lessor grants to lessee an option to renew this lease agreement for a period of 3 years after expiration of the term of this lease, but such option must be acted upon by the lessee

Deatsville, Alabama  36022

To lessee:  Truitt K. Johnson
1792 Antioch Road
Wetumpka, Alabama  36092

B. The address to which any notice, demand, or other writing may be given or made or sent to any party as above provided may be changed by written notice given by such party as above provided.

## SECTION TWENTY-EIGHT

## BINDING EFFECT

This lease agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the parties.

## SECTION TWENTY-NINE

## TIME OF THE ESSENCE

It is specifically declared and agreed that time is of the essence of this lease agreement.

## SECTION THIRTY

## PARAGRAPH HEADINGS

The titles to the paragraphs of this lease agreement are solely for the convenience of the parties and shall not be used to explain, modify, simplify, or aid in the interpretation of the provisions of this lease agreement.

In witness, each party to this lease agreement has caused it to be executed at the premises in Deatsville, Alabama on the date indicated below.

Done this the 25th day of October, 2007

Lessor: Linda S. Lewis
750 Shields Rd
Deatsville, AL 36022
334-300-1378

Lessee:
1792 Antioch Rd.
Wetumpka, AL 36092
567-0793

Exhibit H



Marilyn Fisher
( who resembles Linda Mosbarger Lewis )
12 / 2007

# RULE VII
# RULES GOVERNING ADMISSION TO THE ALABAMA STATE BAR

### In the Supreme Court of Alabama
### May 1, 1993

### ORDER

WHEREAS, The Board of Commissioners of the Alabama State Bar has recommended to this Court that Rule VII, Rules Governing Admission to the Alabama State Bar, be amended; and

WHEREAS, the Court has considered the recommended amendment and considers that amendment appropriate;

IT IS, THEREFORE, ORDERED that Rule VII, Rules Governing Admission to the Alabama State Bar, be amended to read in accordance with the appendix to this order and that the "Application Form for Admission Pro Hac Vice" appearing as part of the appendix be adopted and approved for use with this rule;

IT IS FURTHER ORDERED that this amendment shall become effective January 1, 1994, and it is FURTHER ORDERED that any foreign attorney (as defined in Rule VII as hereby amended) appearing pro hac vice as counsel in a cause pending before a court or administrative agency of this state as of January 1,1994, shall comply with this Rule VII as hereby amended and shall do so no later than January 31, 1994.

Hornsby, C.J., and Maddox, Almon, Shores, Houston, Kennedy, and Ingram, JJ., concur.

## ADMISSION OF FOREIGN ATTORNEYS PRO HAC VICE

### A. Appearance of Foreign Attorneys Pro Hac Vice Permitted; Exceptions

An attorney or counselor-at-law who is not licensed in good standing to practice law in Alabama, but who is currently a member in good standing of the bar of another state, the District of Columbia, or other United States jurisdiction (hereinafter called a foreign attorney) and who is of good moral character and who is familiar with the ethics, principles, practices, customs, and usages of the legal profession in the State of Alabama, may appear as counsel pro hac vice in a particular case before any court or administrative agency in the State of Alabama upon compliance with this rule (for purposes of this rule, an administrative agency is any board, bureau, commission, department, hearing officer, or other administrative office or unit of the state). However, except as provided in Section I below, no foreign attorney is eligible to appear as counsel pursuant to this rule if that attorney (a) is a resident of the State of Alabama, or (b) is regularly employed in the State of Alabama, or (c) is regularly engaged in substantial business, professional, or other activities in the State of Alabama.

### B. Foreign Attorney Appearing Pro Hac Vice Subject to Local Jurisdiction

A foreign attorney appearing as counsel pro hac vice before any court or administrative agency of the State of Alabama shall be subject to the jurisdiction of the courts of this state in any matter arising out of the attorney's conduct in such proceedings. The attorney shall be familiar with and shall comply with the standards of professional conduct required of members of the Alabama State Bar and shall be subject to the disciplinary jurisdiction of the courts of this state, of the disciplinary tribunals of the Alabama State Bar, and of the Board of Commissioners of the Alabama State Bar with respect to any acts occurring during the course of the attorney's appearance. The judge, hearing officer, or agency may examine the foreign attorney to satisfy the court, hearing officer, or agency that the foreign attorney is aware of and will observe the ethical standards required of attorneys in this state. If the judge, hearing officer, or agency is not satisfied that the foreign attorney is reputable and will observe the ethical standards required of attorneys in this state, the court, hearing officer, or agency may in its discretion revoke the authority of the attorney to appear.

### C. Association of local counsel

No foreign attorney may appear pro hac vice before any court or administrative agency of this state unless the attorney has associated in that cause an attorney who is a member in good standing of the Alabama State Bar (hereinafter called local counsel). The name of local counsel shall appear on all notices, orders, pleadings, and other documents filed in the cause. Local counsel shall personally appear and participate in all pretrial conferences, hearings, trials, and other proceedings conducted in open court, unless specifically excused from such appearance by the court or administrative agency. Local counsel associating with a foreign attorney in a particular cause shall thereby accept joint and several responsibility with the foreign attorney to the client, to opposing parties and counsel, and to the court or administrative agency in all matters arising from that particular cause.

### D. Verified Application

In order to appear as counsel before a court or administrative agency in this state, a foreign attorney shall file with the court or agency where the cause is pending a verified application for admission to practice (a form for such an application follows this rule), together with proof of service by mail, in accordance with the Alabama Rules of Civil Procedure, of a copy of the application and notice of hearing upon the Alabama State Bar at its Montgomery, Alabama, office. In the event application is made before any defendant in an action has appeared, a copy of the application and notice must also be served upon such defendant. The copy of the application and notice of hearing served upon the Alabama State Bar shall be accompanied by a nonrefundable $100 filing fee. The notice of hearing shall be given at least 21 days before the time designated for the hearing, unless the court or agency has prescribed a shorter period. In criminal cases involving indigent defendants, the court or agency may waive the filing fee and notice requirements for good cause shown.

Upon receipt of any application for admission, the Alabama State Bar shall file with the court or agency and serve upon all counsel of record, or upon any parties not represented by counsel, and upon the applicant, before the scheduled hearing date, a statement indicating whether the applicant or other attorney members of the firm with which he or she is associated have previously made any application for admission, the date of such application, and whether it was granted. No application shall be granted before this statement of the Alabama State Bar has been filed with the court or agency. Once this statement is received, the court or administrative agency shall issue an order granting or denying the application. A copy of each order granting or denying an application shall be mailed by the local counsel to the Alabama State Bar at its Montgomery, Alabama, office.

### E. Form of Application

The application required by this Rule shall be on a form approved by the Alabama State Bar and the Supreme Court (a form so approved for such application follows this rule) and shall state: (1) the applicant's residence; (2) the court or courts to which the applicant has been admitted to practice and the date or dates of admission; (3) that the applicant is a member in good standing of such court or courts (with such exceptions as may be there); (4) that the applicant is not currently suspended or disbarred from practice in any court (stating exceptions); (5) the title of the court and cause in which the applicant or any member of the firm of attorneys with which the applicant is associated has filed an application for admission as counsel under this rule in this state in the preceding three years, the date of each application, and whether it was granted; (6) the name, address, and telephone number of local counsel who is attorney of record; and (7) the name of each party and the name and address of counsel of record who appeared for that party. The applicant shall also provide such other information and statements as may be called for by the form approved by the Alabama State Bar and the Supreme Court.

Before any application is granted, local counsel must appear as attorney of record in the particular cause or must consent in writing to the association.

The granting or denial of an application for admission as counsel pursuant to this rule is discretionary with the court or administrative agency before which the application is made. Absent special circumstances, repeated appearances by any person or firm of attorneys pursuant to this rule shall be cause for denial of an application. In any case where the foreign attorney has entered an appearance pro hac vice in five cases within the preceding 12 months, the court or administrative agency shall examine the foreign attorney to establish good cause for according such privilege, including facts or circumstances affecting the personal or financial welfare of the client and not the attorney. Such facts may include, but are not limited to the following: (1) a showing that the cause involves a complex field of law in which the foreign attorney is a specialist, (2) a long-standing attorney-client relationship, (3) lack of local counsel with expertise in the field involved, (4) the existence of legal questions involving the law of a jurisdiction in which the foreign attorney regularly practices, or (5) the need for extensive discovery proceedings in foreign jurisdiction.

In the event the action or cause is transferred from one court or administrative agency of this state to another or in the event the action is appealed, a foreign attorney authorized to appear in the cause while it was pending before the first court or administrative agency shall be deemed admitted to the court or agency to which the cause has been transferred or appealed; provided, however, that the court or agency having jurisdiction over the transferred or appealed cause may, for good cause, revoke the authority of the foreign attorney to appear. ( See Section F, "Appearance Before an Appellate Court")

**F. Appearance Before an Appellate Court**

(1) Upon filing an appearance in a matter in an appellate court of this state (i.e., the Supreme Court, the Court of Civil Appeals, or the Court of Criminal Appeals), a foreign attorney previously admitted to appear in the matter before a trial court or administrative agency shall furnish to the clerk of the appellate court proof of the previous admission, along with a certification by the foreign attorney that the admission has not been rescinded.

(2) If the appearance before the appellate court is to be the foreign attorney's first appearance in the matter, then admission shall be by motion to the appellate court, and the motion shall be supported by a certificate of good standing from the bar of another United States jurisdiction.

(3) Any foreign attorney moving for admission to appear before an appellate court of this state shall be required to associate local counsel, whose name, address, and telephone number shall be included in the foreign attorney's motion for admission. Although local counsel is not required to be an active participant in the matter, the foreign attorney is required, in the motion for admission pro hac vice, or in the initial filing in the appellate court (in the event the foreign attorney has been previously admitted in the matter by a trial court or an administrative agency), to designate which attorney shall be lead counsel for purposes of service in the matter prescribed in the Alabama Rules of Appellate Procedure. On proper motion, and for good cause shown, the appellate court may waive the required association of local counsel.

(4) A foreign attorney admitted to practice in a matter before the Court of Criminal Appeals or the Court of Civil Appeals is deemed admitted in any subsequent proceedings in that same matter before the Supreme Court.

(5) At any time, for good cause shown, and on the application of any party, the previous order admitting the foreign attorney to practice in a matter may be reviewed and/or rescinded without hearing, by the appellate court before which the matter is then pending.

**G. Quarterly Report**

The executive director of the Alabama State Bar shall prepare a quarterly report listing all applications filed during that quarter and during the preceding 12 months and listing the names of the applicants and indicating as to each application whether the application was granted or denied. The report shall be transmitted to the clerk of each circuit and district court, each circuit and district judge, the clerk of the Supreme Court, and such other persons the Board of Commissioners directs.

**H. Suspension or Disbarment Terminates Permission To Appear Pro Hac Vice**

(1) Permission for a foreign attorney to appear pro hac vice under the provisions of this rule shall terminate upon that attorney's suspension or disbarment in any

jurisdiction in which the foreign attorney has been admitted. The foreign attorney shall have the duty to promptly report to the court or administrative agency of this state before which the attorney is appearing any disciplinary action that has been taken against the attorney in any other jurisdiction.

(2) In the event local counsel in a particular case is suspended or disbarred from the practice of law in the State of Alabama, the foreign attorney shall, before proceeding further in the pending cause, associate new local counsel who is in good standing to practice law in the State of Alabama and shall file a verified notice thereof with the court or administrative agency of this state before which the foreign attorney is appearing.

**I. Exceptions**

(1) Nothing in this rule shall be construed to prohibit any foreign attorney from appearing before any court or administrative agency of this state on his or her individual behalf in any civil or criminal matter.

(2) Foreign attorneys representing the United States Government shall be permitted to appear and to represent it in any matter in which it is interested, without the association of local counsel.

**J. Enforcement**

(1) No court clerk or filing officer of any administrative agency of this state shall accept for filing any pleadings or other documents from a foreign attorney who has not complied with the requirements of this rule. Any pleadings or other documents filed in violation hereof shall be stricken from the record upon the motion of any party or by the court or administrative agency sua sponte.

(2) The courts and administrative agencies of this state shall have the duty and authority to enforce the provisions of this rule by denying violators the right to appear. If a foreign attorney engages in professional misconduct during the course of an appearance, the judge or the hearing officer of the administrative agency before which the foreign attorney is appearing may revoke permission to appear pro hac vice and may cite the attorney for contempt. In addition, the judge or hearing officer shall refer the matter to the Disciplinary Commission of the Alabama State Bar for appropriate action.

(3) Violation of this rule is deemed to be the unlawful practice of law. The Alabama State Bar or its designated commissioners shall have the right to take appropriate action to enforce these rules under provisions of *Ala. Code* 1975, § 4-3-43.

(4) The provisions of this rule shall be cumulative to all other statutes and rules related to or dealing with the unauthorized practice of law within the State of Alabama.

---

| | § | |
|---|---|---|
| Plaintiff | § | |
| | § | |
| | § | Case No. |
| | § | |
| vs. | § | |
| | § | |
| | § | |
| | § | (Court or Administrative Agency) |
| Defendant | § | |
| | § | |
| | § | |
| | § | |

**VERIFIED APPLICATION FOR ADMISSION
TO PRACTICE UNDER RULE VII OF THE
RULES GOVERNING ADMISSION TO THE ALABAMA STATE BAR**

Comes now_____, applicant herein, and respectfully represents the following:

1. Applicant resides at _____

Street Address

# IN THE SUPREME COURT OF ALABAMA
November 8, 2007

# *ORDER*

IT IS ORDERED that the first paragraph of Rule VII.D., Rules Governing Admission to the Alabama State Bar, be amended to read as follows:

"D. Verified Application. In order to appear as counsel before a court or administrative agency in this state, a foreign attorney shall file with the court or agency where the cause is pending a verified application for admission to practice (a form for such an application follows this rule), together with proof of service by mail, in accordance with the Alabama Rules of Civil Procedure, of a copy of the application and of the notice of hearing upon the Alabama State Bar at its Montgomery, Alabama, office. In the event application is made before any defendant in an action has appeared, a copy of the application and notice must also be served upon such defendant. The copy of the application and the notice of hearing served upon the Alabama State Bar shall be accompanied by a nonrefundable $300 filing fee. The notice of hearing shall be given at least 21 days before the time designated for the hearing, unless the court or agency has prescribed a shorter period."

IT IS FURTHER ORDERED that the amendment of Rule VII.D. be effective immediately.
IT IS FURTHER ORDERED that the following note from the reporter of decisions be added to follow Rule VII:

"Note from the reporter of decisions: The order amending Rule VII.D., Rules Governing Admission to the Alabama State Bar, effective November 8, 2007, is published in that volume of Alabama Reporter that contains Alabama cases from ___ So. 2d."

Cobb, C.J., and See, Lyons, Woodall, Stuart, Smith, Bolin, Parker, and Murdock, JJ., concur.



# Quality Paralegal Education
## Faulkner University —— A CHRISTIAN UNIVERSITY ——

### *Our Mission*
The Faulkner University Legal Studies Department seeks to provide a program that supports its students during their academic and professional careers. Upon graduation, students will be well equipped to begin or continue an exciting career as a paralegal.

### *What are typical paralegal responsibilities?*
Paralegals work in many areas of law including litigation, real estate, corporate, probate and estate planning, intellectual property, family law, labor law, and bankruptcy. Paralegals perform tasks such as investigating facts, drafting legal documents, legal research, interviewing clients and witnesses, maintaining contact with clients, and the maintenance of legal files.

### *What can I not do as a paralegal?*
A paralegal/legal assistant cannot give legal advice, represent a client in court, establish a fee, or accept a case on behalf of an attorney.

### *How do I choose a Legal Studies Program?*
One way to ensure you receive a quality education is to choose a program with instruction specific to the skills required for the state. Secondly, it is important to choose a program with academic standards, such as those required by the American Bar Association. **Faulkner University's Legal Studies Program is approved by the American Bar Association.** The Faulkner University Legal Studies program offers an ABA Approved curriculum exclusively at its Montgomery campus, with a strong reputation of academic excellence.

### *How can I get started?*
Legal Study courses are offered at convenient times that cater to the needs of students of all ages. Our faculty is comprised of experienced practioners with outstanding academic credentials. Contact Marci Johns, J.D. Director of Legal Studies today!

**Phone: 800.879.9816
Ext. 7140
mjohns@faulkner.edu**

**5345 Atlanta Highway
Montgomery, AL 36109
www.faulkner.edu**

Exhibit K



Mike's Gym Clients
with  Linda Lewis (Masbarger)
inside her business (Mike's Gym)
November, 2004





February, 2007
Taylor Bass

November, 2004
Taylor Bass in Front of
" Mike's Gym " Sign
In " Mike's Gym "