UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| Curves International, Inc.,<br><br>                    Plaintiff,<br>vs.<br><br>Linda S. Mosbarger,<br><br>                    Defendant | Case Action No. 2007-CV-807-MHT<br><br>**AFFIDAVIT OF MICHAEL R. GRAY** |

STATE OF MINNESOTA    )
                     ) ss.
COUNTY OF HENNEPIN   )

Michael R. Gray, after first being duly sworn upon oath, states and alleges as follows:

1. I am a Principal in the law firm of Gray, Plant, Mooty, Mooty, and Bennett, P.A., which law firm has been retained to represent the Plaintiff in this action. I make this Affidavit based on my first-hand knowledge of the facts set forth herein.

2. Attached as Exhibit A are true and correct copies of pages from the deposition transcript of Linda Lewis.

FURTHER YOUR AFFIANT SAITH NOT.

Dated:  February 7, 2008

                                                                s/Michael R. Gray
                                                                Michael R. Gray

Subscribed to and sworn before
me this 7th day of February, 2008

s/Lori Kleinschmidt
Notary Public

My Commission Expires January 31, 2010

## CERTIFICATE OF SERVICE

I hereby certify that I have filed a copy of the following:

- Affidavit of Michael R. Gray

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

> Connie Morrow
> Charles E. Grainger, Jr.
> cmorrow@graingerlegal.com
> cgrainger@mindspring.com

Dated:  February 7, 2008                **GRAY, PLANT, MOOTY,**
                                                            **MOOTY & BENNETT, P.A.**

                                                            By  s/Michael R. Gray
                                                               Michael R. Gray (MN 175602)
                                                               Jason J. Stover (MN 30573X)
                                                               500 IDS Center
                                                                80 South Eighth Street
                                                               Minneapolis, Minnesota 55402-3796
                                                               Telephone:  (612) 632-3000
                                                                Facsimile:  (612) 632-4444
                                                                mike.gray@gpmlaw.com
                                                                jason.stover@gpmlaw.com

GP:2326625 v1

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF ALABAMA
 3                   NORTHERN DIVISION
 4
 5   CURVES, INTERNATIONAL, INC.,)
 6         Plaintiff,             )
 7                                )
 8   VS.                          )CIVIL ACTION NO:
 9   LINDA S. MOSBARGER,          )2007-CV-807-MHT
10                                )DEPOSITION OF:
11         Defendant.             )LINDA S. MOSBARGER
12
13            S T I P U L A T I O N S
14         IT IS STIPULATED AND AGREED, by and
15   between the parties through their respective
16   counsel, that the deposition of:
17              LINDA S. MOSBARGER,
18   may be taken before Alana Mize, Commissioner and
19   Notary Public, State at Large, at the Law
20   Offices of Granger Legal Services, 4220
21   Carmichael Court North, Montgomery, Alabama
22   36106, on the 2nd day of November, 2007,
23   commencing at approximately 9:20 a.m.
```

Page 6

1  A      During my divorce.
2  Q      Okay. How long ago was that?
3  A      March '06.
4  Q      So you're kind of familiar with the
5  rules of how a deposition works or at least how
6  it worked in that case?
7  A      Yes.
8  Q      You're under oath to tell the truth
9  and I get to ask you questions. And I want to
10 make sure you understand my question before you
11 answer it. So if you have any questions about
12 it, please let me know. If you answer the
13 question, I will assume that you understood it.
14 Okay?
15 A      Yes.
16 Q      If you need to take a break, let me
17 know. You can't take a break with a question
18 pending, but between questions you can ask for a
19 break and we'll do that. I'll show you some
20 documents. We'll talk about those. We can't
21 talk over each other. And the court reporter is
22 taking down everything that we both say and if
23 you start answering my question before I'm done

Page 7

1  with my question, it gets broken up on the
2  record and difficult to read. So I'll ask you
3  to wait until I'm done with my question before
4  you answer and I'll try to do the same to you.
5  Okay?
6  A      Yes.
7  Q      And that's the last thing, you have
8  to -- everything has to be verbal. Shaking the
9  heads or uh-huhs or huh-uhs don't translate well
10 and if -- I may remind you from time to time
11 that you have to answer verbally. Okay?
12 A      Okay.
13 Q      All right. Would you give your name
14 and your address for the record, please?
15 A      My name is Linda S. Lewis. 750
16 Shields Road, Deatsville, Alabama 36022.
17 Q      How long have you lived there?
18 A      25 years.
19 Q      Have you ever been convicted of a
20 felony?
21 A      No.
22 Q      Are you on any medication today that
23 would prevent you from providing full, complete,

Page 8

1  and honest answers?
2  A      No.
3  Q      Give me your educational background
4  starting with high school.
5  A      High school diploma.
6  Q      What year?
7  A      1974.
8  Q      From what high school?
9  A      Holtville High School.
10 Q      Where is that?
11 A      Where I live.
12 Q      In Deatsville?
13 A      It's a Wetumpka address.
14 Q      Okay. Any posthigh school
15 education?
16 A      No.
17 Q      Well, you hesitated. I'm not
18 talking about college maybe a voc tech school,
19 community college, other course work that you
20 took?
21 A      No.
22 Q      And you didn't have any experience
23 operating your own business prior to Curves;

Page 9

1  correct?
2  A      I'm sorry. I didn't understand you.
3  Q      Okay. Did you have any experience
4  operating -- owning and operating your own
5  business prior to becoming a Curves franchisee?
6  A      Did I have any experience, yes.
7  Q      Okay. And what business did you own
8  and operate prior to Curves?
9  A      My exhusband and I owned Mike's Gym.
10 Q      From what time period?
11 A      April 1997.
12 Q      Until?
13 A      Until our divorce, March 2006.
14 Q      And where was Mike's Gym located?
15 A      97 Lightwood Road.
16 Q      And what did Mike's Gym do? What
17 it's his business?
18 A      Mike's Gym had hydraulics, it was an
19 exercise business.
20 Q      Did it have free weights as well?
21 A      Yes, there was free weights.
22 Q      Was it coed?
23 A      Mike's Gym?

Page 10

1 Q     Yes.
2 A     No.
3 Q     Men only?
4 A     Men only.
5 Q     What type of instruction or
6 programming did it offer to it's members?
7 A     Just circuit training.
8 Q     The address, 97 Lightwood, isn't
9 that the location, the same address that you
10 used for one of the Curves?
11 A     Yes.
12 Q     That was a poor question. Isn't
13 that the same address that you operated your
14 Curves franchise for a period of time?
15 A     Yes.
16 Q     What time period would that have
17 been?
18 A     From May '99 until July '06, 2006,
19 except for there were two locations, 97
20 Lightwood Road, 10098 Holtville Road.
21 Q     Explain to me the two different
22 locations. What happened?
23 A     The location where I was at the time

Page 11

1 was not a good location.
2 Q     Well, I don't know what that means.
3 A     It means that -- we were getting --
4 Q     Which location are you referring to?
5 A     97 Lightwood Road. We were off the
6 beaten path.
7 Q     Well, if you could in a narrative
8 form explain to me the different chronologies of
9 where you were with your Curves franchise in
10 connection with Mike's Gym.
11 A     We were adjacent.
12 Q     So you weren't in the same space?
13 A     Actually he was behind the building.
14 Q     So the answer is you weren't in the
15 same space?
16 A     Yes.
17 Q     There was a physical wall between --
18 A     Yes.
19 Q     But they both had the same address?
20 A     Yes.
21 Q     And so I'm -- the record is clear,
22 you operated your Curves franchise at 97
23 Lightwood from May of '99 until July of 2006?

Page 12

1 A     No.
2 Q     Okay. What is correct?
3 A     I operated the Curves franchise from
4 May of '99 to 2002.
5 Q     And then what?
6 A     At 97 Lightwood Road. I relocated
7 with Curves's permission 10009 Holtville Road,
8 500 feet away from the old location.
9 Q     That was in 2002?
10 A     All the way up until July of '06.
11 Q     And was Mike's Gym still in
12 operation at 97 Lightwood in July of '06?
13 A     No.
14 Q     What happened?
15 A     It moved with us.
16 Q     To the same physical space?
17 A     It moved to 10009 Holtville Road in
18 a separate room with a wall up with a different
19 address.
20 Q     What was the address of Mike's Gym?
21 A     I don't remember. You're sitting on
22 the line of Wetumpka and Deatsville, Alabama
23 there. One side was Wetumpka, the other was

Page 13

1 Deatsville, but it split right down the middle
2 of the building.
3 Q     But it was physically adjacent to
4 and separated by a wall?
5 A     Exactly.
6 Q     And then did Mike's close in July of
7 '06?
8 A     Mike's Gym actually closed during
9 March of '06. The name Mike's Gym closed after
10 our divorce and it became Jordan's Gym, slang
11 name for the Jordan Community Center.
12 Q     So you were divorced in March of '06
13 and why did Mike's -- what did the divorce have
14 to do with closing Mike's Gym or closing that
15 name as you put it?
16 A     My exhusband had a stroke.
17 Q     Okay.
18 A     The divorce drug out for two years.
19 I was awarded Mike's Gym in my divorce. I had
20 to pay him part of Curves, and I got to keep the
21 business of Mike's Gym.
22 Q     Okay. I've got several questions
23 about that. Did your exhusband have a stroke

Page 14

1  during the divorce proceedings?
2  A      He filed for divorce November of
3  '04, March of 05 he had a stroke.
4  Q      And the divorce became final in
5  March of '06?
6  A      (Witness nods head.)
7  Q      As part of that you got -- the
8  Mike's Gym business was awarded to you?
9  A      Yes.
10 Q      You said something about paying him
11 for Curves. What was that about?
12 A      The judge ordered me to pay him some
13 money out of Curves because we were married.
14 Q      So in order to keep the Curves
15 business, you had to pay him something; is that
16 correct?
17 A      Yes.
18 Q      Well, how much did you pay him?
19 A      I don't remember. I just remember
20 just having to refinance my house $44,000 and
21 part of that was to pay for his nursing home,
22 part of that was to pay him out of Curves, part
23 of that was court cost, part of that -- it was

Page 15

1  all broken down.
2  Q      So you don't remember how much you
3  actually paid him?
4  A      I don't remember.
5  Q      Your divorce papers would specify
6  that though, wouldn't they?
7  A      Yes.
8  Q      Who was your attorney for your
9  divorce?
10 A      Jeff Courtney.
11 Q      In --
12 A      Wetumpka.
13 Q      What happened to Mike's Gym after
14 March of '06?
15 A      At that time I was ready to get out
16 of the exercise business after all of the
17 hardship I had went through, so -- but there was
18 a gym. So I decided that I would sell it and
19 just work towards my -- well, the -- my landlord
20 went up on the rent during that time. He went
21 up on me three times in the small time that I
22 was there. And so when he went up on the rent
23 and I was going through all of the hardships

Page 16

1  that I was going through, I couldn't stay.
2         But then I got to thinking about if
3  he can make money with his property, maybe I
4  should get into the development stage of
5  developing business and being entrepreneur
6  myself.
7  Q      When you say he, you are referring
8  to your landlord?
9  A      Yes.
10 Q      Okay. So what happened?
11 A      So after the divorce, I got to
12 thinking about developing maybe some other
13 businesses other than exercise but there was a
14 gym. It was still there. So I knew a great
15 entrepreneur that we sat down and talked and we
16 decided this is what we were going to do. And I
17 sold him my part of the business of Mike's Gym
18 at that time. It was called -- we changed to
19 name to Jordan's Community Center. He owns it
20 now.
21 Q      Who is this?
22 A      Truwit Ken Johnson.
23 Q      So did the business relocate, Mike's

Page 17

1  Gym, from the Holtville Road address to
2  someplace else?
3  A      I built a commercial building on my
4  property. And part of the agreement between me
5  and Mr. Johnson was that he would allow me to
6  have interest in his garden center. We talked
7  about this in December of '06, and then the
8  trade off would be that he would own Jordan's
9  Gym. Jordan's Community Center.
10 Q      Do you have your business dealings
11 with Mr. Johnson in writing?
12 A      Yes.
13        MR. GRAY: I asked for those,
14 Ms. Morrow, do you have those?
15        MS. MORROW: I faxed those to you
16 last night and they told me you had electronic.
17 I faxed them about 6:00 o'clock last night.
18        MR. GRAY: I didn't get it. I don't
19 know what number you faxed it to.
20        MS. MORROW: I faxed it to the one
21 that I faxed the original discovery to.
22        MR. GRAY: Oh, that's --
23        MS. MORROW: And Jason assured me

Page 26

1  testimony?
2        THE WITNESS: I may have said
3  everyday but not everyday.
4  Q     (By Mr. Gray) So what days do you
5  work out there?
6  A     Sometimes every other day.
7  Q     So you don't have a specific
8  schedule?
9  A     No.
10 Q     You live right next door to Jordan's
11 Gym; correct?
12 A     I do.
13 Q     How many feet from Jordan's Gym is
14 your house?
15 A     I don't know the feet.
16 Q     It's adjacent to it; correct?
17 A     Yes.
18 Q     It's a walkable distance?
19 A     Yes.
20 Q     You can see your house from Jordan's
21 Gym?
22 A     Yes.
23 Q     And you can see Jordan's Gym from

Page 27

1  your house; correct?
2  A     Yes.
3  Q     And you own the land; correct?
4  A     Yes.
5  Q     And when was the building built?
6  A     It was completed the fall of '06.
7  Q     Do you have a specific date?
8  A     October, November.
9  Q     And who paid for it?
10 A     A second mortgage, Trust Mark
11 National Bank.
12 Q     What was the cost of the building?
13 A     I'm not certain.
14 Q     A ball park?
15 A     Maybe -- maybe -- I'm not certain
16 but maybe 45, 50.
17 Q     You built it and you paid for it and
18 you don't know how much it cost?
19 A     I let the mortgage company handle
20 it.
21 Q     And you're the sole owner of the
22 property?
23 A     Yes.

Page 28

1  Q     Who owns the fixtures and equipment
2  inside?
3  A     Mr. Johnson.
4  Q     Do you have a bill of sale to
5  Mr. Johnson for that?
6  A     This agreement and the LLC is what I
7  have.
8  Q     Prior to the time that Mr. Johnson
9  -- prior to the time that you executed Exhibit 1
10 with Mr. Johnson, you owned the fixtures and
11 equipment inside the building?
12 A     My exhusband and I owned them.
13 Q     Well, didn't you get the business as
14 part of the divorce from your husband?
15 A     It was awarded to me.
16 Q     Okay. So after March of '06 it
17 belonged to you; correct?
18 A     Yes.
19 Q     So when you entered into the
20 agreement in December of '06 with Mr. Johnson,
21 did you sign a bill of sale transferring
22 ownership interest of the fixtures and equipment
23 inside to him?

Page 29

1  A     All I have got is the memorandum of
2  understanding.
3  Q     What's the building been used for
4  since it's been -- since it was completed in the
5  fall of '06?
6  A     Well, you know, that may be a
7  question you might want to ask him. From what I
8  can see, it's used for birthday parties, charity
9  events, rehab, family reunions. It's a
10 community center, so it could be used for
11 anything.
12 Q     You omitted from there gym and work
13 out equipment.
14 A     I'm sorry.
15 Q     You omitted the work out facility,
16 it's used for that also, isn't it?
17 A     I would call it more rehab, but if
18 you want to say it that's fine.
19 Q     Well, you're in it every day or
20 every other day.
21 A     Did you say rent?
22 Q     No, you are physically in the space
23 you said every day or every other day. Have you

Page 58

1  draft authorizations for?
2  A    No.
3  Q    Your banking records wouldn't
4  reflect how many debits you took that month?
5  A    No.
6  Q    You don't have bank records from
7  July of '06?
8  A    My computer crashed.
9  Q    I'm not asking for you computer.
10 I'm asking about bank records.
11 A    I don't understand what you are
12 trying to ask.
13      MS. MORROW: I object. It is my
14 understanding all of this is through the Curves'
15 computer system and Curves has all of this
16 information as she does not.
17      MR. GRAY: Your assumption that
18 Curves has all of this information is just an
19 assumption.
20      MS. MORROW: So that's not true?
21      MR. GRAY: I don't know.
22      MS. MORROW: That's what I have been
23 told.

Page 59

1       THE WITNESS: Yes, everything
2  computerized through Curves.
3  Q    (By Mr. Gray) Did you get any bank
4  communications on a monthly basis?
5  A    No.
6  Q    You didn't get a bank statement?
7  Your business didn't get a bank statement on a
8  monthly basis?
9       MS. MORROW: If you recall or --
10      THE WITNESS: I -- I honestly don't
11 know what you're trying to ask but no. That's
12 all I can say.
13      MS. MORROW: Did you do this all
14 through Curves would be an okay answer.
15      THE WITNESS: I did it all through
16 Curves.
17 Q    (By Mr. Gray) Who was your bank for
18 your business in July of '06?
19 A    I don't remember. I was totally out
20 of the exercise business by then.
21 Q    I didn't ask that, I just asked who
22 your bank was.
23 A    I don't remember.

Page 60

1  Q    Do you still have a bank account
2  now?
3  A    No.
4  Q    You don't have a checking account?
5  A    Personal.
6  Q    All right. Who do you bank with
7  now?
8       MS. MORROW: Do you work for
9  Sterling or --
10      THE WITNESS: Who do I bank with
11 now?
12      MS. MORROW: If you recall.
13      THE WITNESS: I don't know.
14 Q    (By Mr. Gray) You don't know who
15 your bank is right now?
16 A    I'm not into the Curves business
17 anymore.
18 Q    I didn't ask that.
19 A    Are you asking me where my personal
20 business is? Is that what you're asking?
21 Q    I asked where you bank now.
22      MS. MORROW: If you have one, if you
23 don't -- if you are not making money, you may

Page 61

1  not have a bank account. I don't know what the
2  facts are.
3       MR. GRAY: Counsel, that's coaching.
4  If you have an objection to the form of the
5  question make it. Don't suggest an answer to
6  her by saying if you don't have an account, then
7  you don't have an account.
8       MS. MORROW: She'd already answered
9  that.
10      MR. GRAY: No, she's being evasive.
11      MS. MORROW: Asked and answered is
12 my objection. If she doesn't have it, that's
13 not evasive.
14      THE WITNESS: I do not have a
15 business banking account?
16 Q    (By Mr. Gray) I didn't -- that's not
17 what I asked. Where do you bank? What's the
18 name of the bank that you use now?
19      MS. MORROW: I object to the form.
20 You asked her does she bank, I object to the
21 where it is.
22 Q    (By Mr. Gray) Do you have a checking
23 account?

### Page 70

1  agreement?
2  A      I was told by a Curves'
3  representative, Mike Carver and Candy Carver, a
4  husband and wife that worked for Curves that
5  it -- don't worry about getting an attorney to
6  look at it, it -- everybody signs the same
7  thing, just sign it.
8  Q      Okay. And the question was, did you
9  read it before you signed it?
10 A      No.
11 Q      Do you know if at that time your
12 husband looked at it before you signed it?
13 A      No.
14 Q      Did you ask him for any help or
15 advice?
16 A      No.
17 Q      Did you work in Mike's Gym?
18 A      Yes.
19 Q      So you are familiar with at least
20 his gym and how it operated?
21 A      Yes.
22 Q      Did you tell Curves --
23 A      That knew.

### Page 71

1  Q      -- that you had experience?
2  A      Yes, they knew.
3  Q      How did they know it?
4  A      They came to see me.
5  Q      Where?
6  A      At the 97 location, the 97 Lightwood
7  Curves location.
8  Q      At Mike's Gym?
9  A      Uh-huh.
10 Q      You have to verbalize your answer?
11 A      Yes. Sorry.
12 Q      Did you think it was significant
13 that you had some experience in the fitness
14 industry prior to signing the Curves franchise
15 agreement?
16 A      I don't remember what I was thinking
17 back then. I was excited.
18 Q      How did you hear about Curves?
19 A      I worked out at one in Wetumpka and
20 the manager there told me that I should own one.
21 Q      And who is that?
22 A      Monica Packwood.
23 Q      Was she the owner or just the

### Page 72

1  manager?
2  A      I don't think she was either one at
3  that time. She may have just been an employee.
4  Q      Okay. Were you employed by Mike's
5  Gym?
6  A      Yes.
7  Q      In what capacity?
8  A      Just owner.
9  Q      I'm showing you what has been marked
10 as Exhibit Number 4.
11        (Plaintiff's Exhibit 4 was
12        marked for identification.)
13 Q      Do you recall having seen that? Can
14 you identify that as your application for
15 financial --
16 A      International -- do I recall it?
17 It's been a long time, but it looks like my
18 writing
19 Q      And your signature?
20 A      Uh-huh, yes.
21 Q      You don't mention anything about
22 Mike's Gym on that application, do you?
23 A      Oh, I know what this is now. No,

### Page 73

1  there was no need.
2  Q      You didn't disclose that Mike's Gym
3  existed or that you worked there or that you
4  were employed there; correct?
5  A      There was no need to, right.
6  Q      Okay. And at the time that you
7  applied for or filled this out, you were an
8  executive assistant at Sterling Bank; correct?
9  A      I worked for Sterling in the same
10 time Mike had his gym.
11 Q      Well, again on the lower portion of
12 the first page you only write that you're an
13 executive assistant for Sterling Bank. There's
14 nothing about Mike's Gym, is there?
15 A      No.
16 Q      So you were an executive assistant
17 at Sterling Bank at the time?
18 A      Yes.
19 Q      And is that the location that's
20 right next door here?
21 A      Yes.
22 Q      Okay. I only have one copy. Can I
23 see that? After you signed the franchise

Page 74

1  agreement, you went to training for Curves for a
2  week; correct?
3  A       It was less than a week, yes, less
4  than a week.
5  Q       And where did you go to do that?
6  A       I believe it was Waco.
7  Q       You were involved with litigation
8  with Curves prior to this lawsuit; correct?
9  A       Yes.
10 Q       In 2001?
11 A       I don't remember if it was one or --
12 Q       Okay. And that lawsuit involved a
13 dispute about you opening a second location
14 without permission; correct?
15 A       That's what it was about, yes.
16 Q       And that case was resolved; correct,
17 before trial?
18 A       It was thrown out of court.
19 Q       And do you remember the terms of the
20 resolution, who did what?
21 A       Curves didn't file something or
22 another on time and the judge threw it out.
23 Q       Okay. Did you close -- well, did

Page 75

1  you disassociate from studio B as part of that?
2  A       I never was associated with it.
3  Q       You've seen the pictures of you
4  saying grand opening and Studio A was --
5  A       It was for my daughter.
6  Q       Well, okay.
7          MS. MORROW: I haven't seen those.
8          MR. GRAY: I know.
9  Q       After that litigation was resolved
10 in whatever way it was resolved, you continued
11 operating your Curves location in Deatsville;
12 correct?
13 A       Yes.
14         MR. GRAY: I'm not going to mark it
15 but just for your edification.
16         MS. MORROW: Is that it on the
17 picture that you were talking about that you
18 have that?
19         MR. GRAY: I don't know whether they
20 are attached to this or not, no.
21         MS. MORROW: If you could get it to
22 me, you've seen it so someone has one, you can
23 get me a copy.

Page 76

1          MR. GRAY: Well, yeah. Okay.
2          MS. MORROW: Is this my copy?
3          MR. GRAY: Yeah.
4          MS. MORROW: Thank you.
5  Q       (By Mr. Gray) Your daughter that was
6  involved in it was Ms. Spivey; is that correct?
7  A       Yes.
8  Q       I'm showing you what has been marked
9  as Exhibit Number 5. Can you identify that as a
10 letter that you wrote to Curves in October of
11 '06?
12         (Plaintiff's Exhibit 5 was
13         marked for identification.)
14 A       This is the letter that I wrote to
15 Curves to shut down my business.
16 Q       Okay. And the --
17 A       Wait just a minute. October 3rd is
18 not the correct date, not when I actually shut
19 down. Let me read this for a minute.
20 Q       Sure.
21         MS. MORROW: It's got a --
22         THE WITNESS: Okay. July '06.
23 Good. I see it now.

Page 77

1  Q       (By Mr. Gray) You wrote the letter
2  on October 3rd; correct?
3  A       Yes, after I -- hold on just a
4  minute.
5          MS. MORROW: Do you have a copy of
6  that September 15th letter?
7          MR. GRAY: I think I do.
8          MS. MORROW: I would like a copy of
9  that too.
10         MR. GRAY: It is just a collection
11 letter, she is behind on fees it says --
12         MS. MORROW: If you can give me a
13 copy so to make it --
14         MR. GRAY: Can you make a list of
15 what you want? Otherwise I am going to forget.
16         MS. MORROW: Yeah.
17 Q       (By Mr. Gray) Have you had a chance
18 to read that?
19 A       Yes.
20 Q       Do you recall writing it?
21 A       Yes.
22 Q       Do you remember what the September
23 15th letter is that you are referring to?

Page 78

1  A     No, but Curves should have a copy of
2  it.
3  Q     Yeah. And I will tell you it's a
4  letter saying you are behind in fees.
5  A     Oh, okay.
6  Q     And this is, I think, you responded
7  to that. In the first paragraph, you refer to
8  the fact that there is high rent and there is no
9  other building available to move into the
10 community. This is as of October '06. You were
11 building the building on your property at that
12 time; correct?
13 A     That's right.
14 Q     Okay. And you don't know whether
15 the building was actually done as of the time
16 that you wrote this letter or not, do you?
17 A     I do not.
18 Q     Do you know whether you got a
19 certificate of occupancy from your local
20 municipality when your building was done?
21 A     We don't have to do that. We don't
22 have any codes in an unincorporated area.
23 Q     Do you have your paperwork with your

Page 79

1  contractor who built it?
2  A     My nephew did it.
3  Q     Is he a contractor?
4  A     Yes.
5  Q     Okay. Do you have any paperwork
6  with him?
7  A     I'm not sure where it is.
8  Q     Would that paperwork indicate when
9  it was done?
10 A     It could.
11 Q     You have electricity bills, phone
12 bills, utility bills for the building; correct?
13 A     Not at that time.
14 Q     Well, do you have them now?
15 A     January 1, '07.
16 Q     That's when the first ones came in?
17 A     That's when the business actually --
18 the community center actually went into business
19 with Ken Johnson.
20 Q     I understand that. But when's the
21 first time that you paid a utility bill for the
22 building?
23 A     I don't remember.

Page 80

1  Q     In the first paragraph, the first
2  sentence -- well, it also says you lost your
3  husband to stroke last year. Did he pass away?
4  A     No.
5  Q     And by this time, October of '06,
6  your divorce had been final; correct?
7  A     Yes.
8  Q     You say that in the second paragraph
9  Janie Little agreed that she had visited the
10 area, etcetera, "and there was no where else for
11 me to relocation." You could have relocated to
12 the building that you were building; correct?
13 A     No, not at that time.
14 Q     Why not?
15 A     Because I wasn't sure exactly about
16 what I wanted to do.
17 Q     Well, theoretically you could have
18 relocated to that building?
19 A     No.
20 Q     Why not?
21 A     Just wasn't what I wanted to do at
22 that time.
23 Q     Oh, okay. That's different than

Page 81

1  having the ability to if you desire to do that;
2  correct?
3        MS. MORROW: I object. This is
4  asked and answered. She's told --
5  Q     (By Mr. Gray) The building was
6  available and you could have used it for a Curve
7  location had you wanted to?
8  A     By October 3rd was it available? I
9  don't know. I don't remember what --
10 Q     This time period, the end of --
11 A     It was in the fall when it was
12 finished.
13       MS. MORROW: It could have been
14 December, November, you don't know.
15       THE WITNESS: It could have -- yeah.
16 Q     (By Mr. Gray) The building is within
17 the territory that's specified in the franchise
18 agreement; correct?
19 A     The city limits?
20 Q     Yes.
21 A     No.
22 Q     It's not the Deatsville?
23 A     No.

Page 82

1  Q      What city limits is it in?
2  A      We don't have city limits.
3  Q      You live in Deatsville, the address
4  is Deatsville; correct?
5  A      I don't live in Deatsville, I live
6  in Holtville.
7  Q      Okay. You just -- when I asked you
8  your address at the beginning of deposition you
9  said Deatsville?
10 A      Our address is Deatsville but we
11 live in Holtville.
12        MS. MORROW: Just for your -- some
13 people in Holtville have a Wetumpka address,
14 some people have a Deatsville address. The
15 unincorporated area is on the map is Holtville.
16 The high school, the elementary, the middle
17 school, that's Holtville. It's not in
18 Deatsville and it's not this Wetumpka.
19        And I should have objected earlier
20 with -- for clarification purposes when she said
21 she graduated, you know, from Holtville and you
22 said that's in Deatsville, it's -- it's not.
23 Q      (By Mr. Gray) The last sentence in

Page 83

1  the second paragraph says, "I have several bank
2  draft for members that have put stop payment on
3  their drafts." Do you see that, the very end of
4  the second paragraph?
5  A      Second paragraph?
6  Q      I guess it is the third paragraph if
7  you count the one sentence right here
8  (indicating).
9        THE WITNESS: Do you see it,
10 Connie?
11 Q      (By Mr. Gray) Look here
12 (indicating).
13 A      "I have several bank drafts from
14 members who have put stop payments on their
15 drafts." I've got -- I kept those.
16 Q      Okay. And my question is that
17 indicates that is in fact how you did get paid
18 by bank draft; correct? That's how members paid
19 their monthly fees?
20 A      Right.
21 Q      And do you know why members were
22 putting stop payments on their drafts?
23 A      They don't like Curves.

Page 84

1  Q      And was that what they were telling
2  you?
3  A      They didn't like the contract. They
4  didn't like people gets into their checking
5  accounts. They don't like Curves system, that's
6  exactly what they said.
7  Q      Okay. You say, "Bottom line, I am
8  out of business with Curves because I have no
9  building and no more market." You didn't
10 mention the fact that you were building a
11 building on your property in this letter, did
12 you?
13 A      No, because I had no intentions of
14 owning a gym.
15 Q      Okay. And then you say, "You do
16 have any permission to shut down the Deatsville,
17 Alabama franchise. However it has been shut
18 down since July of '06. I have since referred
19 my members to the Wetumpka, Prattville, and
20 Clanton Curves, which are at my Curves
21 doorsteps." I thought you said you didn't refer
22 people to other curves.
23 A      They were there were other Curves.

Page 85

1  They knew they could go. And when they asked me
2  would they go, I said yes. But I called Curves
3  and asked them to pick up the files.
4  Q      They have no obligation to do that,
5  do they?
6  A      Curves?
7  Q      Yeah.
8  A      They are asking for them. They have
9  been asking for them.
10 Q      Did you send them to them?
11 A      No.
12 Q      Did you offer to send them to the
13 other three locations?
14 A      No because of personal -- I figured
15 that should go through the Curves office.
16 Q      Then the last paragraph you say, the
17 equipment needs to be picked up because you are
18 paying storage fees. Where was it being stored
19 in October of '06?
20 A      In my barn.
21 Q      So you weren't paying storage fees?
22 A      I'm paying rent. I'm paying
23 mortgage payments every month.

Page 146

1  A    No.
2  Q    Your lawyers did?
3  A    Yes.
4  Q    And at your request?
5  A    Yes.
6  Q    Okay. And you don't own any
7  ownership interest in Jordan Community Center,
8  LLC?
9  A    I do not.
10 Q    Yet you asked your lawyer to draft
11 the paper and you filed them and paid the filing
12 fee?
13 A    It was easier to do it that way,
14 yes.
15      MS. MORROW: Do you need a break for
16 lunch?
17      THE WITNESS: No, I'm okay unless
18 you do.
19      MS. MORROW: No, I'm fine.
20 Q    (By Mr. Gray) Do you recognize
21 Exhibit Number 10 as the responses to the
22 discovery requests in this case?
23      (Plaintiff's Exhibit 10 was

Page 147

1       marked for identification.)
2  A    Yes, I do.
3  Q    Do you recognize your signature I
4  guess on the third to the last page? They are
5  not numbered.
6  A    Yes.
7  Q    Okay.
8       MS. MORROW: Just for the record for
9  clarification, on number one is a typo and
10 there's a also another typo on the certificate
11 of service. It says September it should say
12 October. And Reynolds should say Johnson.
13      MR. GRAY: Where are you referring
14 to?
15      MS. MORROW: The number one general
16 objections there's a typo that says it should be
17 Mr. Johnson. And that's just a typo or an over
18 site and then the certificate of service should
19 say October, the 26th day of October. The date
20 is right, the day part the right, but the --
21 there was one other one. Yeah, San Antonio on
22 page -- and this has to do with, you know, this
23 was expedited discovery and we had to get it out

Page 148

1  quickly because you all were in Minnesota. And
2  got to the end of the day like on about 4:45 on
3  the day that we had to get it to you all and
4  it's just a lack of proofing. But any way on
5  number 14 should be Waco, Texas instead of San
6  Antonio, Texas.
7       MR. GRAY: Where, the first
8  paragraph?
9       MS. MORROW: Uh-huh. And as far as
10 I know, those are the only typos.
11      MR. GRAY: Okay. Number one in the
12 general objections, who -- which Mr. Johnson are
13 you referring to there?
14      MS. MORROW: Ken, Truwit Ken
15 Johnson. But it appears to me some of the
16 things being requested were, that was my
17 objection.
18 Q    (By Mr. Gray) In number one what
19 does your daughter know about the allegations in
20 the complaint?
21 A    She knows what's going on.
22 Q    How?
23 A    She knows I have been sued again by

Page 149

1  Curve's, and that's all she knows.
2  Q    And what does Mr. Johnson know?
3  A    He knows I have been sued by Curve's
4  again.
5  Q    Did he know about the first case?
6  A    I talked to him about it.
7  Q    When? Back when it was happening?
8  A    No. It could have been two and a
9  half years ago when I talked to him about it, I
10 don't quite remember.
11 Q    From April of '99 to the present,
12 the only employee that you ever had was your
13 daughter?
14 A    That's correct.
15 Q    When you stopped operating Curve's
16 in July of 2006, why didn't you cancel the phone
17 number at that time?
18 A    Because there was another gym that
19 had the same phone number, actually had it
20 before Curve's. It was the other gym's phone
21 number first.
22 Q    Mike's?
23 A    Yes. But then Jordan's.

Page 150

1   Q       I thought you closed Mike's in March
2   of 2006?
3   A       No, that was our divorce. It was
4   his -- his gym was handed to me in the divorce
5   or awarded to me.
6   Q       So in July of 2006 you closed
7   Curve's but Mike's Gym continued to operate?
8   A       Right.
9   Q       And you owned it?
10  A       It was awarded to me.
11  Q       So you owned it?
12  A       I guess I did.
13  Q       Okay. And when did that close?
14  A       I -- I don't know because I mean
15  after everything that Curve's has put me through
16  and the divorce, I lost interest.
17  Q       That doesn't answer the question.
18  A       I don't know.
19  Q       You don't know the date the business
20  closed?
21  A       I do not know.
22          MS. MORROW: Are you asking the date
23  that Mike's Gym closed?

Page 151

1           MR. GRAY: Yes.
2           MS. MORROW: You know the date that
3   Mike's closed.
4           THE WITNESS: Oh, Mike's Gym, you
5   said Jordan's.
6   Q       (By Mr. Gray) Okay.
7   A       You said Jordan's Gym.
8   Q       If I did -- what's the date that
9   Mike's Gym closed?
10  A       Mike's Gym closed right after the
11  divorce was final. There was no Mike's Gym
12  anymore.
13  Q       And the divorce was March of 2006?
14  A       It became Jordan's Gym. There was
15  no Mike's Gym. It was named Jordan's Gym.
16  Q       Okay. So in March of 2006, Mike's
17  Gym became Jordan's Gym?
18  A       Right.
19  Q       At the same location as your Curve's
20  location only adjacent to it?
21  A       Right.
22  Q       And how long did Jordan's Gym
23  operate at that location?

Page 152

1   A       I don't -- you know, like I said, I
2   was so out of the exercise business, I do not
3   know.
4           MS. MORROW: Formally did you ever
5   close it down?
6           THE WITNESS: I don't -- no, I did
7   not.
8           MS. MORROW: Not until you sold it?
9           THE WITNESS: Not until I sold it.
10          MS. MORROW: But you don't know if
11  people were using it, you weren't there?
12          THE WITNESS: No.
13  Q       (By Mr. Gray) Who operated it?
14  A       Nobody.
15  Q       Who opened the door in the morning?
16  A       I have no idea. They went in
17  themselves, I was out of there.
18  Q       You were awarded the business, you
19  changed the name to Jordan's Gym, and basically
20  abandoned it?
21  A       I didn't abandon it. I knew it was
22  there, but I wasn't interested in it.
23  Q       Did you collect any money from the

Page 153

1   people that were using it?
2   A       No.
3   Q       You just left the front door open?
4   A       You have got to remember that people
5   didn't want it either.
6   Q       I'm just asking questions. I don't
7   have to remember anything.
8   A       No.
9   Q       I wasn't there.
10          MS. MORROW: And if you don't
11  remember because of everything going on in your
12  life at that time --
13          MR. GRAY: That's -- Counsel, make
14  an objection to a question.
15          MS. MORROW: Okay. I object that
16  she's -- to the form of the question.
17  Q       (By Mr. Gray) All right. This all
18  started with the phone number, and you said that
19  that phone number was also being used by
20  Jordan's Gym when you closed down Curve's in
21  July of '06. Now you are telling me in March of
22  '06 it went from Mike's Gym to Jordan's Gym but
23  you didn't know anything about what -- you

Page 154

1  didn't care. How did people get in? You left
2  the front door open for months and people came
3  and went as they pleased, didn't pay any fees,
4  you just didn't care, is that your testimony?
5  A     I was out of the exercise business
6  in my mind. I didn't care.
7  Q     Okay. Then why change the name from
8  Mike's Gym to Jordan's Gym?
9  A     Because you don't understand our
10 divorce, what happened.
11 Q     Tell me. What did you change the
12 name from Mike's Gym to Jordan's Gym?
13       MS. MORROW: Yeah, clarify that
14 whole thing, that's what he's asking.
15       THE WITNESS: Let me tell you what
16 happened. My husband filed for divorce.
17       MS. MORROW: Who was your husband?
18       THE WITNESS: Mike Mosbarger
19 November the 4th. I mean November of '04. In
20 March, he had a terrible stroke. He laid in the
21 bathroom in an apartment by himself for three
22 days. No one found him until his boss went and
23 knocked on the door and found him. He blew his

Page 155

1  brain out with a stroke. He had high
2  cholesterol. He had high blood pressure. He
3  was a vegetable. It drug -- it drug the divorce
4  out.
5        MS. MORROW: Because of that, the
6  Mike's Gym you felt needed to be changed?
7        MR. GRAY: Wait, Counsel.
8        MS. MORROW: But that's true. I
9  mean, I'm just -- I'm not wanting her --
10       MR. GRAY: I would appreciate it if
11 you would just not do that.
12       MS. MORROW: Okay.
13       MR. GRAY: Let her answer the
14 question. If needs clarification she can do it,
15 I can ask. I don't want you to testify.
16       MS. MORROW: My concern was she was
17 going to give us a narrative of every day by day
18 detail and you really were just interested in
19 why the name had to be changed is my
20 understanding. So she's answering it.
21       MR. GRAY: She's answering it in the
22 way she wants to without, I would appreciate,
23 coaching from you.

Page 156

1  Q     So?
2  A     So it drug out for two years. And
3  in that same the year that he had his stroke, I
4  lost my mother, I lost my little brother, and I
5  lost a good friend to leukemia.
6  Q     Okay.
7  A     That January my daughter's husband
8  was on meth, and she has three little babies.
9  Where was my mind to exercise?
10 Q     Okay. So how does that play into
11 changing the name?
12 A     I did not want Mike's name on
13 anything that I owned because of what he put me
14 through.
15 Q     Okay. So when the divorce became
16 final in March of '06 and you were awarded that
17 business, you changed the name to Jordan's Gym?
18 A     Well, the community actually changed
19 it.
20 Q     How did the community change it?
21 A     They just -- it was Jordan's
22 Community Center, we were planning on Jordan
23 Community Center developing and that kind of

Page 157

1  thing and it just became Jordan's Gym and that
2  was it.
3  Q     Well --
4  A     But you have still got to remember
5  no one was interested.
6  Q     In March of '06 it was still located
7  back on Holtville Road; correct?
8  A     Yes.
9  Q     Okay. And in March of '06 you
10 changed it from Mike's Gym to Jordan's Gym. How
11 long did that business operate at that location?
12 A     I don't know exactly when the name
13 was changed.
14 Q     Okay. The question is --
15 A     It was changed by a sign. Mike's
16 Gym came down, Jordan's gym went up. I don't
17 remember when it was changed during that year.
18 Q     And but you did that?
19 A     I was very uninterested at that
20 time.
21 Q     But you made the change; correct?
22 A     I put the sign up there.
23 Q     Okay. And you don't recall how long